UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:06-HC-2195-BR

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Petitioner, | ) | |
| | ) | GOVERNMENT'S PROPOSED |
| v. | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| GRAYDON EARL COMSTOCK, | ) | |
| Respondent, | ) | |

INTRODUCTION

The United States seeks to civilly commit Respondent Graydon
Earl Comstock ("Comstock" or "Respondent") as a "sexually dangerous
person" under Section 302(4) of the Adam Walsh Child Protection and
Safety Act of 2006 ("Adam Walsh Act"), Pub. L. No. 109-248, Title
111, § 302(4), 120 Stat. 587, 620-22 (2006), codified at 18 U.S.C.
§§ 4247-4248.

In order to commit Respondent, the government must prove by
clear and convincing evidence that he is "sexually dangerous."
Under the Adam Walsh Act, a person is sexually dangerous if he "has
engaged or attempted to engage in sexually violent conduct or child
molestation and . . . is sexually dangerous to others." 18 U.S.C.
§ 4247(a)(5). In order to determine that someone is sexually
dangerous to others, a court must find that he "suffers from a serious
mental illness, abnormality, or disorder as a result of which he would
have serious difficulty in refraining from sexually violent conduct

or child molestation if released." Id. § 4247(a)(6).

The parties submitted a Revised Proposed Joint Pre-Trial Order, [DE 118]. The Government identified twenty-eight (28) exhibits for admission, and three witnesses it would call during its case-in-chief: (1) Dr. Amy Phenix, (2) Dr. Lela Demby,[1] (3) the Respondent, and (4) Lynelle Cox. Respondent identified sixteen (16) exhibits for admission, and four (4) witnesses he would call during his case-in-chief: (1) Dr. Terrence Campbell, (2) Dr. George Corvin, (3) the Respondent, and (4) Mary Comstock.[2]

The Government proposes the following findings or fact and conclusions of law.

<u>FINDINGS OF FACT</u>

A.    PROCEDURAL HISTORY

1.    Respondent was certified pursuant to 18 U.S.C. § 4248 on November 2, 2006, [DE 1]. On February 15, 2007, he filed a motion to dismiss the certification on the grounds that § 4248 is unconstitutional, [DE 12].[3] His request to continue any evidentiary

---

[1] The testimony of Dr. Lela Demby was submitted by deposition <u>de bene esse</u> because she was unavailable at the time of trial as defined by Rule 32, Fed. R. Civ. P. She was made available to the Court for the Court to ask follow-up questions relating to her testimony in this case.

[2] Petitioner filed a motion in limine to exclude the testimony of Mary Comstock on the grounds that it is irrelevant.

[3] Respondent contended that Congress exceeded its power in enacting § 4248, and that § 4248 violates due process and equal protection guaranteed by the Fifth Amendment, the double jeopardy

hearing, [DE-13], was granted, [DE-14].

On March 20, 2007, Respondent filed another motion to dismiss the petition, this time on the grounds that the clear and convincing standard is constitutionally invalid, [DE-19]. On May 22, 2007, he requested again that the hearing on his petition be continued, [DE-29], which was granted, [DE-30].

2.    On September 7, 2007, Judge Britt granted Respondent's motions to dismiss on the grounds that 18 U.S.C. § 4248 is unconstitutional as in excess of Congress' powers and violative of due process, [DE-32]. The Court stayed Respondent's release pending the government's appeal, [DE-32, 40]. On January 8, 2009, the Court of Appeals affirmed Judge Britt's ruling that 18 U.S.C. § 4248 is unconstitutional on the grounds that § 4248 exceed Congress' powers. See United States v. Comstock, 551 F.3d 274 (4th Cir. 2009). The government appealed, and on May 17, 2010, the United States Supreme Court reversed and remanded. See United States v. Comstock, 130 S.Ct. 1949 (2010)(holding Congress did not exceed its powers in enacting § 4248 and remanding for a determination of whether § 4248 violates due process). On December 6, 2010, the Court of Appeals determined § 4248 did not violate due process. See United States

clause, the ex post facto clause, the Eighth Amendment prohibition against cruel and unusual punishment, and the right to a jury trial guaranteed by the Sixth Amendment.

<u>v. Comstock</u>, 627 F.3d. 513 (4th Cir. 2010).

     3.    On January 27, 2011, for the first time, Respondent filed a motion for hearing on the petition, [DE-65]. The government did not oppose this motion, [DE-69].

     4.    On September 16, 2011, the evidentiary hearing on the government's petition was set for November 28, 2011, [D.E. 106].

**B.    Personal and Family Data[4]**

     1.    Graydon Comstock was born on June 7, 1942, in Fayetteville, Arkansas. He is currently sixty-nine years old.

     2.    Respondent has reported that he grew up in a loving family and experienced a normal childhood, [¶39]. There is no indication that any substance or physical abuse existed in the home, [<u>id.</u>].

     3.    Prior to his incarceration in 2000, Comstock was employed in the educational field for more than thirty years as an educator, guidance counselor, coach, and administrator, [¶51]. He worked internationally for the majority of his career including in the Philippines, Dubai, Peru, the Netherlands, Iran and India.

     4.    Respondent has never married nor fathered any children,

---

[4]Much of the information contained in Sections B-E is taken from the Presentence Investigative Report (PSR) prepared by U.S. Probation, [Ex. 7], which was adopted by the Court at Comstock's sentencing on federal criminal charges for Receipt of Material Depicting a Minor Engaging in Sexually Explicit Conduct. The citations are to the paragraphs within the PSR. Each of the experts relied on this information in the preparation of their reports and in forming their opinions.

4

[¶40].  He has one sister and one brother, [¶38].  He has reported that he has a foster son, Michael, who resides in the Philippines, [¶40].

5.  Comstock met Michael when he (Comstock) was residing in the Philippines in 1991.  Comstock was approximately 50 years old and Michael was just 12 years old when they met.  Respondent told U.S. Probation that there was not a sexual relationship between he and Michael, and that he "loves him as a son," [¶40].  Comstock has since admitted that he did have a sexual relationship with Michael, and was introduced to Michael through a child prostitute pimp in the Philippines.  According to Comstock, Michael, at the time, was a child sex worker.

C.  **Comstock's Criminal History**

1.  On June 6, 2000, Comstock, 58, was convicted of two counts of Aggravated Indecent Liberties with a Child in Kearny County, Kansas, Case Nos. 00CR07 and 00CR12 [¶¶31,32; Government Exs. 16, 17].  He was sentenced to 55 months imprisonment.

2.  The offense conduct for these convictions involved the molestation of four separate male children, ages 6, 7, 9 and 10, [Government Exs. 16, 17].[5]  Two of the boys were in the first grade,

_____

[5] The PSR does not report the number of victims associated with these two cases.  The charging documents and investigative materials show that there were two victims in Case No. 00CR07 ("AM," age 10 and "HM," age 9) and two other victims in Case No. 00CR12 ("JSD,"

one in the third grade, and one in the fourth grade at the school where Comstock was a school counselor, [id.].

3.    As part of the investigation into the allegations that he molested boys from the school where he worked, law enforcement searched Comstock's apartment, [¶13].  They found numerous computer generated pictures of pre-pubescent boys in various sexual poses and/or states of undress located in various places in his residence, a packet of materials from North American Man Boy Love Association ("NAMBLA"), a Gay Men's Press book entitled Loving Sander, brochures relating to puberty, and permission slips for children to visit his residence to use his computer, [¶13].

4.    Comstock was subsequently convicted in federal court of Receipt of Material Depicting a Minor Engaging in Sexually Explicit Conduct, [Government Exs. 5, 6].  He was sentenced to 37 months imprisonment to run consecutively to the sentence imposed in the aforementioned cases, and three years supervised release, [Government Ex. 6].

## D.   Comstock's Physical Condition

1.    In 1975, when he was 34, Comstock was diagnosed with hepatitis while living in Iran, [¶42].  In 1980, when he was 39, Comstock suffered a stroke and required extensive physical therapy, [¶43].  It was determined the stroke likely resulted from his high

_____

age 7 and "PDD," age 6), Government Exs. 16, 17.

blood pressure, [id.].  In 1987, he underwent hernia surgery, [id.].

2.    Since incarcerated, Comstock has suffered a heart attack and undergone coronary bypass surgery.  He has also been diagnosed with diabetes and prostate cancer.  He completed a course of radiation therapy in October 2007, and his prostate cancer has been in remission since July 2008.

**E.    Comstock's Mental and Emotional Health**

1.    Comstock has reported that prior to his incarceration he sought counseling on two occasions, [¶45].  First, after graduating from college due to an awareness that he had problems relating to his sexual orientation, [id.].  Then later he sought counseling during the period of time following his stroke and a career change, [id.].

2.    Comstock indicates he has never used illicit substances and is not a consumer of alcoholic beverages, [¶47].

**F.    Comstock's Sex Offender Treatment**

1.    While incarcerated in Kansas, Comstock participated in the Sex Offender Treatment Program.  His Discharge Summary, [Government Ex. 14], indicates he entered treatment on November 1, 2001, but terminated treatment on February 4, 2002.  Subsequently, he entered the Sexual Offender Treatment Program on July 18, 2002, and eventually met the criteria for successful completion of the 18-month program.

2. According to the Discharge Summary, Comstock was open about his attraction to children when he began treatment. However, he took minimal responsibility for his offending. As his treatment progressed, he increased his level of responsibility.

3. While in treatment, Comstock described his attraction template as 10-14 years of age, non-familial. He reported that he had sexual contact with 100 boys in his lifetime and that all of those boys fit into his attraction template.

4. Comstock also reported that he has sexually offended young boys throughout his life. As part of his treatment, he created a spreadsheet relating to his offenses against young children, and identified, among other things, his age at the time of the offense(s), the sexual behavior involved, where the offense(s) occurred, his fantasies and masturbation habits about the victim, his grooming behavior, and how he manipulated the environment to be close to the child, [Ex. 22]. He also wrote an autobiography, which includes, among other things, descriptions of his sexual offending throughout the world, [Ex. 23].

5. While in treatment, Comstock reported that by age 10 he knew he was different. He reported that he had traveled all over the world as an educator, and he described how in each country, sex with young boys was common practice for him. In some countries, he would locate child sex workers and pay them for sex. He reported

8

that the sexual acts routinely consisted of undressing each other slowly, caressing and massaging each other, masturbating each other, and ended with Comstock performing oral sex on them. He reported he did not like anal sex.

6.     Comstock also admitted he collected magazines from all over the world that depicted children engaged in sexual scenarios.

7.     Comstock reported that he had offended against many boys in the United States. He reported that he watched his male students as they showered. Additionally, as a teacher in the United States and abroad, he developed a rating system of 1-5 based on their attractiveness and vulnerability. He would then develop a seating chart in which those with higher scores would be seated closest to him.

8.     Comstock reported that he also groomed boys that he coached or counseled at school. He would develop good relationships with the parents, who would let their children stay overnight with him. He reported that he would watch the boys as they slept and fantasize about having sexual contact with them. He reported that these fantasies led him to offend, and he would fondle the boys' genitalia as they slept.

9.     Comstock reported that he also volunteered as a camp counselor during the summer. He would pick out the boys most attractive to him, groom them, and fondle them while they slept in

his cabin.

10.   Comstock stated that his motivation for offending depended on the offending behavior.  For example, when he offended against the child sex workers, his motivation was sexual with his goal being to give the child an orgasm by masturbating and fondling him. However, when he offended against his students, team members, and camp members, his motivation had more to do with emotion rather than sex with his goal being to develop a relationship with the victims. Comstock stated that intimacy was his primary goal and sex was part of that intimacy.  While he fantasized about being sexual with the victims, he also fantasized about spending life with them.

11.   Comstock had difficulty formulating healthy replacement behaviors that will meet his romantic and sexual needs.   The Discharge Summary concluded that, "Although he has learned how he offends, it is unlikely he will stop offending."   Thus, his prognosis was poor.

**G.   Comstock's Post-Certification Conduct**

1.   On March 20, 2007, Comstock reported to a BOP psychologist that if he is committed, he does not intend to participate in treatment, [Ex. 11].  He stated, "being a pedophile is who I am," and "even if there were a magic pill to take that would cure pedophilia, I wouldn't take it," [id.].  He also inquired of the BOP psychologist why pedophilia is considered aberrant rather than

10

simply being seen as a similar "orientation" to homosexuality or lifestyle choice, [id.].

2.   On June 4, 2008, the following items were found in Comstock's possession, [Ex. 10]:

a.   Approximately 93 images of underage males cut out from magazines and newspapers.  About 1/3 of the youth were partially dressed, and one photo depicted a "full-frontal" photograph of a nude, pre-adolescent male;

b.   A catalog entitled "Culture Kids" with numerous photographs of children, children's toys, etc;

c.   Several newspaper articles on topics such as nudist colonies and childraising of boys.

3.   In October 2008, it was reported that Comstock may have propositioned another developmentally delayed inmate for sex, [Government Ex. 9].

**H.   Evaluation of Dr. Andres Hernandez**

1.   Dr. Andres Hernandez is the Director of the Commitment and Treatment Program at Butner (formerly the Sex Offender Treatment Program).  He conducted an evaluation of Respondent in October 2006, which included clinical interviews on October 20, 2006, and October 23, 2006.

2.   Respondent produced a handwritten victim list to Dr. Hernandez on October 23, 2006, that accounted for 78 child victims,

11

[Government Ex. 12].

3.    During the clinical interview, Comstock indicated that he had received outpatient supportive counseling in 1980, during which he disclosed his pedophilic urges; however, he did not receive treatment for this disorder, [Government Ex. 13].  He also admitted that since 1963 he had been an avid consumer of child pornography, and regularly purchased, collected and masturbated to child pornography images.

4.    Dr. Hernandez diagnosed Respondent with Paraphilia, Sexually Attracted to Males, Exclusive Type and Adjustment Disorder with Anxiety.  He opined that Comstock's overall risk category was High Risk to Very High Risk.

I.    **Evaluation of Dr. Amy Phenix**

1.    Dr. Amy Phenix is a forensic psychologist, who has evaluated hundreds of sex offenders for civil commitment in multiple states.[6]  Her initial report is dated April 1, 2011, [Government Ex. 2].  She submitted a supplemental report dated November 6, 2011, [Government Ex. 28], which includes information she obtained during a clinical interview of Comstock on October 18, 2011.[7]

---

[6] Her Curriculum Vitae is Government Exhibit 1.

[7] Respondent would not consent to a clinical interview by Dr. Phenix, and Petitioner was required to seek an order compelling him to do so after he submitted to an interview by his chosen examiner, Dr. Terrence Campbell.

2.    Dr. Phenix concludes that Comstock meets the criteria for civil commitment as a sexually dangerous person.  In forming her opinion, Dr. Phenix reviewed the discovery (approximately 2,400 pages) and conducted a clinical interview of Comstock, which lasted approximately 2.5 hours.  The discovery included information related to Comstock's criminal history, medical history, and social history.  It also included institutional reports, investigative records related to Comstock's sexual conduct, psychological evaluations by other psychologists, and information he disclosed in sex offender treatment.

3.    Dr. Phenix determined that Comstock had previously engaged in or attempted to engage in sexually violent conduct or child molestation.  In support of this conclusion, Dr. Phenix referenced Comstock's convictions for Aggravated Indecent Liberties with a Child in 2000.

4.    Dr. Phenix diagnosed Comstock with the following mental disorders: Pedophilia, Sexually Attracted to Males, Exclusive Type; and, Depressive Disorder Not Otherwise Specified (NOS).

5.    In her report, Dr. Phenix noted that paraphilias are defined as the DSM-IV-TR8 as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving: 1)

---

[8] <u>Diagnostic and Statistical Manual of Mental Disorders</u>, Fourth Edition, Text Revision.

non-human objects; 2) the suffering or humiliation of oneself or one's partners, and 3) children or other non-consenting persons that occur over a period of at least 6 months." She defined pedophilia as: A) recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger), over a period of at least six months; B) the person has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or interpersonal difficulty; and, C) the person is at least age 16 years and at least five years older than the child or children in Criterion A. The DSM-IV-TR specifies that an individual in late adolescence involved in a sexual relationship with a 12 or 13 year old is not to be included in this category. Also, it is necessary to specify if the person is sexually attracted to males, females or both, and to specify if the person has limited the behavior to incest. Finally, it is necessary to specify if the person is exclusively attracted to children or if the person is also attracted to adults (i.e., nonexclusive type).

6. In support of her diagnosis of Pedophilia, Sexually Attracted to Males, Exclusive Type, she noted that Comstock has reported same sex attraction since age 11 and deviant sexual arousal to primarily male prepubescent children from age 12 throughout his life. Additionally, he educated himself in a field where he would

14

have access to children for sexual activity, and traveled internationally seeking child victims for sexual activity, particularly in countries where child prostitution is more prevalent or attitudes about sex with children are more lax.

7. Dr. Phenix also noted that while in sex offender treatment in Kansas, Comstock admitted to molesting 101 children throughout the world, including the United States, and that close to half of those victims were strangers. She also noted his charges and convictions for Aggravated Indecent Liberties with a Child in 2000.

8. Dr. Phenix also noted Comstock has admitted to sexual fantasies and urges toward pre-pubescent children, and that his fantasies of sex with children have led to urges to molest and he has acted on those urges. Additionally, Comstock has been involved in collecting and viewing child pornography from at least 1975 to 2000. Moreover, when child pornography is unavailable in custody, Comstock creates his own male child images from magazines to use for deviant sexual arousal. At the time of his arrest, Comstock was found to have materials from NAMBLA, an organization that promotes sexual activity between men and male children and he has consistently voiced that society should have tolerance for adults having sex with children. Dr. Phenix concluded that Comstock is a self-admitted pedophile with no sexual arousal to adult males or females (exclusive type).

15

9.    In order to assess Comstock's risk of sexual reoffense, Dr.
Phenix scored two actuarial instruments, both of which have been
subject to multiple validation studies that have established their
usefulness in predicting sexual reoffense.

10.    Dr. Phenix used the STATIC-99 Revised (STATIC-99R), and
the STATIC-2002 Revised (STATIC-2002R), to assess Comstock's
likelihood of reoffense.

11.    Actuarials do not give a percentage of the chance Comstock
would reoffend, but rather are used to understand Comstock's relative
risk to other sex offenders.    Each of these tools looks at the
likelihood that an offender will be charged with a new sex offense.
Consequently, they underestimate the probability that an offender
will commit a new sex offense as it is well known that most sexual
offenses go unreported and undetected.

12.    The STATIC-99R uses aspects of demographic and criminal
history information to assess three broad dimensions that contribute
to risk – (1) an offender's history of sexually criminal behavior,
(2) the offender's history of generally criminal behavior, and (3)
his youth.

13.    On the STATIC-99R, Comstock scored a 2, which put him in
the Low-Moderate Risk Category to reoffend relative to other sex
offenders.    The median score on the STATIC-99R for sex offenders from
relatively unselected samples is 2.    Comstock's score of 2 placed

16

him into the 39.7 to 54.4 percentile meaning that 39.7 to 54.4 percent of sex offenders in the sample scored at or below his score.

14. Dr. Phenix concluded that the appropriate norm to make a determination of absolute risk of sexually reoffense is the high-risk need norm. As a result, Comstock is similar to a sample of offenders who were arrested for a sexual offense at a rate of 12.2% in 5 years and 19.7% in 10 years.

15. The risk factors included in the STATIC-2002 are grouped into five domains: (1) age, (2) persistence of sexual offending, (3) deviant sexual interests, (4) relationship to victims, and (5) general criminality.

16. On the STATIC-2002R, Comstock scored 5, which placed him in the Moderate Risk Category. The median score on the STATIC-2002R for sex offenders from relatively unselected samples is 4. Comstock's score of 5 placed him in the 77.0 to 86.8 percentile of sex offenders meaning that 77.0 to 86.8 percent of sex offenders scored at or below his score. Conversely, only 13.2 to 23 percent scored higher. Offenders with the same score as Comstock from the high-risk need norms have been found to sexually reoffend at a rate of 19.4% in 5 years and 28.4% in 10 years.

17. Dr. Phenix scored Comstock on the Hare Psychopathy Checklist, revised, 2nd edition (PCL-R) to ascertain the presence and degree of psychopathy. His score of 12 placed him in the low range

17

for psychopathy.

18. Dr. Phenix used the Structured Risk Assessment-Forensic Version to assess psychological factors that function as long-term vulnerabilities for sexual offending that fall into the three domains of Sexual Interest, Relational Style, and Self-Management. Comstock's score of 3.99 placed him in the Very High range.

19. Dr. Phenix considered the three factors that are considered protective, that is they decrease the risk of further sexual offending. These factors include: (1) having been in the community without sexually reoffending for 10 years, (2) having less than 15 years left in the offender's time at risk due to illness or physical conditions that significantly decrease the motivation and/or ability to sexually reoffend and (3) very advanced age. With respect to these factors, she concluded Comstock has not been in the community without repeatedly sexually offending. While it is possible he has less than 15 years left in his life it is difficult to ascertain since his medical disorders are stabilized and he is responding to treatment. Additionally, Comstock's age is fully accounted for in the Static-99R and the Static-2002R in that on both the instruments he received a significant reduction in risk. However, in her opinion, the reduction on the actuarials for age is inappropriate given that Comstock was continuing to sexually offend at age 58, only two years before he received a substantial reduction

18

in risk on the actuarial.  This was also after he had suffered a stroke, a myocardial infarction and had a number of other medical conditions.  Thus, neither his age nor his medical conditions mitigated his risk.  Moreover, it is well known that some individuals with pedophilia remain at risk of reoffense throughout their life.  According to Dr. Phenix, Comstock is likely one of those.

20.  Dr. Phenix summarized her opinion as follows:

Mr. Comstock is smart, clever and manipulative having secured victims of sexual molest all over the world, especially in countries where children are more available for sex or where vulnerable children are not well supervised.  He has methodically moved from country to country in part to avoid detection and sanction when he was detected.  Released to the community he will be free again to travel and seek children for sexual activity.

Mr. Comstock has reinforced his deviant sexual arousal with children since age 12.  He was so entrenched in a lifestyle of seeking boys for emotional and sexual needs that he was a student of the NAMBLA literature that promotes sex between adult men and boys.  He seeks out vulnerable children like his foster son who have no parental supervision.  He has admitted to 101 child victims all over the world.  He has used and shared child pornography since at least 1975 when he was found to be involved in a child pornography ring in the Netherlands.  In custody and after treatment he has sought child images and stimuli for deviant arousal.  Finally, he has no sexual arousal to appropriate partners and remains at his age preoccupied with children.

Despite the lower range of risk on the actuarial instruments I opine that Mr. Comstock is at high risk for sexual reoffense.

## J.    Evaluation of Dr. Lela Demby

1.    Dr. Lela Demby is a clinical psychologist, and is currently

19

employed as a sex offender forensic psychologist. She is a commissioned officer with U.S. Public Health Service, and is assigned to FCI Butner. She has conducted more than 1,000 sex offender forensic psychological examinations under the Adam Walsh Act. She has done full forensic evaluations of approximately 25 of the Adam Walsh detainees.[9]

2.     Dr. Demby's initial § 4248 Forensic Evaluation Report of is dated February 19, 2007, [Government Ex. 21]. Her updated report is dated February 17, 2011, [Government Ex. 4].

3.     Dr. Demby concludes that Comstock meets the criteria for civil commitment as a sexually dangerous person. In forming her opinion, Dr. Demby reviewed the same materials made available to Dr. Phenix and Dr. Campbell, and conducted a clinical interview of Comstock. Her report addresses Comstock's developmental history, educational history, marital and relationship history, military history, occupational history, medical history, substance abuse history, psychiatric history, criminal history, evidence of deviant sexual interests, and discipline history during incarceration.

4.     Dr. Demby diagnosed Comstock with the following mental disorders: Pedophilia, Sexually Attracted to Males, Exclusive Type; and, Major Depressive Disorder, Recurrent, in Full Remission.

5.     During her clinical interview of Comstock in 2007,

---

[9] Her Curriculum Vitae is Exhibit 3.

Comstock informed Dr. Demby that he was "coerced" to give an inaccurate number of victims while in sex offender treatment in Kansas and during his interview with Dr. Hernandez. He claims he only admitted to "hundreds" of victims in the Kansas sex offender treatment program because he would have been sanctioned if he did not admit to new victims. He told Dr. Demby he only had seven victims, not 101, and only three of these victims were child sexual victims. The other four were individuals who had been emotionally hurt by his actions, including his own family members who supported him.

6. Comstock informed Dr. Demby that the adult-child sexual contact was not harmful, but harm was caused by anti-pedophilic responses when the contact was made public. According to Comstock, adult-child sex could be loving and nurturing. Comstock also informed Dr. Demby that the law enforcement response to adult-child sex caused more trauma than the actual contact. He told her, "I am aware now that any contact between adult and child has the potential to cause harm because of the trauma surrounding it with the police and testifying in court." Comstock also declared, "I didn't choose to be a pedophile, it was God's choice, but things being the same, I accept it and I've done a good job of it. Being a father to Michael will be the thing that gets me into heaven."

7. In support of her diagnosis of Pedophilia, Dr. Demby noted

that Comstock has demonstrated a pattern of repeated sexual arousal and abuse of male children since his adolescence. He was convicted of two counts of Aggravated Indecent Liberties with a Minor and Receipt of Material Depicting a Minor Engaging in Sexually Explicit Conduct. Comstock also reported he had a preference for boys who were prepubescent, and that he had molested over 100 children. Comstock has traveled to many different countries in pursuit of child sex workers and opportunities to molest, and sought out pro-pedophilic organizations with which to associate and gain support and information.

8.    In her initial report (2007), Dr. Demby used the STATIC-99 and Rapid Risk Assessment for Sex Offense Recidivism ("RRASOR") to assess Comstock's risk. A score of 5 on the STATIC-99 placed him the Moderate-High range to reoffend, which is associated with a 40% rate of sexual recidivism within a 15 year period. On the RRASOR he scored a three which is associated with a 36.9% risk of re-offending within a 10 year period.

9.    In her updated report, Dr. Demby used the STATIC-99R to assess Comstock's risk to reoffend. Like Dr. Phenix, she determined Comstock's score was a 2. Dr. Demby used the norms from the preselected for treatment. Those from this sample that scored a two, were found to reoffend at a rate of 7.2% in five years and 11.5% in ten years.

10. Dr. Demby used the SVR-20 to address dynamic factors, factors that have the capacity to change over time, in assessing Comstock's risk of reoffense. The risk factors incorporated in the SVR-20 are associated with risk for future sexual violence among individuals who have already committed an offense. Of the twenty factors considered, Dr. Demby determined that eight exacerbated Comstock's risk and his risk would be considered HIGH on the SVR-20.

11. Dr. Demby also considered Comstock's age and medical condition, factors which typically reduce an offender's risk of reoffense. Dr. Demby noted that Comstock is over 60, which is beyond the age at which sexual and violent behavior is empirically expected to significantly decline. She concludes that his age had been properly accounted for by the STATIC-99R. Moreover given that he was 58 years old at the time of his convictions for molesting multiple pre-pubescent children, and his medical condition at the time, Dr. Demby opined that his age and current medical conditions have not reduced his risk for sexual recidivism. Rather, in her opinion, the continuation of his sexual offending in spite of these conditions suggests the persistence, strength, and intensity of his sexual deviancy.

12. In addressing his sex offender treatment, which is typically a positive indicator and reason to consider a reduction in one's risk of reoffense, Dr. Demby noted Comstock's distorted view

23

of his sexual offending despite treatment, and indicates his risk is higher than what is indicated by his actuarial score.

13. In summarizing her risk assessment and prognosis, Dr. Demby stated:

> Comstock is a life-long pedophile with a history of abusing prepubescent children. He has an exclusive attraction to children, and has never engaged in or expressed a desire for a sexual relationship with an adult. He has demonstrated extreme and prolonged efforts to surround himself with vulnerable children. His educational and occupational choices served to foster his access to children, and to place him in a position of authority over them. His specializations in counseling and physical education facilitated his approach to children in states of emotional vulnerability, neediness, and defenselessness. Even his early life choices to volunteer as a camp counselor afforded him the opportunities to molest children who were asleep and unaware of his behavior. His self-reported patterns of deceiving and manipulating parents into allowing their children to sleep at his home is indicative of the façade of trustworthiness that he cultivated throughout his career in primary education settings. His participation in pro-pedophilic organizations dated back to 1977. Although he prefers young boys, he has taken advantage of the opportunity to abuse at least one young girl. His paraphilic sexual attraction to children has led to significant occupational impairment, three criminal convictions and two periods of incarceration. Cumulatively, his overall history, criminal record, offense characteristics, lifestyle pattern, and treatment resistance indicate a high risk of future reoffenses. His prognosis is considered poor.

14. Dr. Demby concluded that it is highly likely that his pattern of sexual deviance and sexual abuse of prepubescent boys will continue. She opined that his diagnosis of pedophilia is chronic, pervasive, and deeply ingrained noting he has spent his life and copious resources indulging his desire to have sexual contact with

24

young male victims. Moreover, his pattern of offending against children has continued despite near detection and significant repercussions to his occupational career. She noted Comstock has shown questionable remorse for those behaviors and limited desire to change his patterns, he continues to blame society for the harm his actions have caused his victims, and his risk of reoffense is high.

**K.  Evaluation of Dr. Terrence Campbell**

1.   Dr. Terrence Campbell is a psychologist specializing in forensic psychology. He is licensed in Michigan and has testified in sexually violent person or sexually violent predator cases in a variety of different states, including Florida, Wisconsin, California, Washington, Illinois, and New Hampshire.[10] His forensic evaluation of Respondent is dated July 8, 2011, [Respondent Ex. 4]. An addendum to his report is dated July 31, 2011, [Respondent Ex. 5].

2.   The same documents made available to Drs. Phenix and Demby were available to Dr. Campbell. Dr. Campbell conducted a clinical interview of Comstock on June 29, 2011, for approximately two hours and forty-five minutes, and a follow-up interview on July 22, 2011.

3.   Dr. Campbell, like Drs. Phenix, Demby, and Hernandez diagnosed Comstock with Pedophilia, Sexually Attracted to Males,

---

[10] His Curriculum Vitae is Respondent Ex. 3.

Exclusive Type. Like Dr. Phenix, he also diagnosed Depressive Disorder Not Otherwise Specified. However, Dr. Campbell opines that Comstock does not meet the criteria for civil commitment under the Adam Walsh Act as a sexually dangerous person concluding, "Mr. Comstock cannot be characterized as exhibiting 'serious difficulty in refraining from sexually violent conduct,'"

4. In support of his diagnosis of Pedophilia, Dr. Campbell notes only the June 4, 2008 incident report, which reports that Comstock was found in possession of several items depicting young children. In Dr. Campbell's opinion, while Comstock previously viewed his pedophilia as "egosyntonic" (meaning he is not distressed by it), Comstock now views his pedophilia as "ego-alien" (meaning Comstock is significantly distressed by his own urges). Dr. Campbell does not indicate when this change occurred for Mr. Comstock.

5. Dr. Campbell opines that there is no reliable evidence indicating that Comstock currently exhibits impairment in his "emotional or volitional capacity."

6. He further opines that because Comstock's score is only a two on the STATIC-99R, there is a 77% to 91% chance the conclusion that Comstock will reoffend will be wrong. On the other hand, there is a 90% to 97% chance that the conclusion that he will not reoffend will be right. With regard to his scores on the STATIC-2002R, Dr.

Campbell believes there is a 72% to 89% chance the determination that Comstock will reoffend will be wrong. On the other hand, there is an 84% to 96% chance the determination that he will not reoffend will be right. Based on these statistical conclusions, Dr. Campbell agreed to testify on Comstock's behalf.

7.      In his report, Dr. Campbell noted the difference between "approach" pedophiles and "avoidant" pedophiles. "Approach" pedophiles rationalize that sexual contact between adults and children should not be considered criminal, and characteristically engage in premeditated planning seeking opportunities to offend against children. "Avoidant" pedophiles know that adult-child sexual contact is grossly inappropriate; they want to stop their offending, but fall victim to their overwhelming sexual urges related to children. Consequently, "avoidant" pedophiles typically involve a breakdown in their behavioral controls. Premeditated planning is not characteristic of "avoidant" pedophiles. Dr. Campbell believes Comstock is an "avoidant" pedophile because of statements made during his clinical interview with Comstock.

8.      Dr. Campbell also would characterize Comstock's pedophilia as "in control" because Comstock, according to Dr. Campbell, can control his urges.

9.      Dr. Campbell believes that any well-informed psychologist would agree that an impulsive individual who characteristically acts

first and thinks later is an individual who has serious difficulty controlling his behavior and impulsivity is the operational definition of serious difficulty. Thus, according to Dr. Campbell, planned, premeditated grooming cannot fall within the definition of sexually dangerous under the Adam Walsh Act. Moreover, because Comstock's offending was "never really impulsive," he cannot meet the criteria for commitment under the Adam Walsh Act.

**L.    Testimony of Dr. George Corvin**

1.    Dr. George Corvin has been in private practice as a general and forensic psychiatrist since 1996.[11] His report is dated August 2, 2011, [Respondent Ex. 2].

2.    Dr. Corvin was asked to review Comstock's medical and psychiatric status as described in his extensive medical records to determine whether Comstock's overall mental health and medical health condition would be expected to have any notable effect on his sexual functioning, particularly with regard to his libido.

3.    Dr. Corvin did not personally examine Comstock, but only reviewed his medical and mental health records, which Dr. Corvin opined provided a compelling picture of an individual who suffers from several chronic medical conditions, each of which can independently impair sexual functioning. According to Dr. Corvin, sexual dysfunction is a side effect of many of the treatment

---

[11] His Curriculum Vitae is Respondent Ex. 1.

modalities Comstock is receiving.

4.    Dr. Corvin concludes that while none of the factors he considered in his evaluation preclude the possibility that Comstock could theoretically continue to experience strong sexual interests that would increase his risk of engaging in sexually dangerous conduct, review of the available information suggests a high likelihood that he has experienced a sustained reduction in libido (as Comstock has recently reported) as a result of his substantial medical and mental health problems.    Consequently, Dr. Corvin believes that to the extent Comstock's age, medical problems, and current medication regimen reduce his libidinal urges, the likelihood that he would have "serious difficulty in refraining from sexually violent conduct or child molestation if released" would be lessened as well.

## CONCLUSIONS OF LAW

**A.    Comstock has engaged in or attempted to engage in sexually violent conduct or child molestation.**

1.    The government has established by clear and convincing evidence that Comstock has engaged in or attempted to engage in sexually violent conduct or child molestation.

**B.    Comstock is "sexually dangerous" to others.**

1.    First, the government has established by clear and convincing evidence that Comstock suffers from a serious mental

illness, abnormality or disorder.

2.    Second, the government has established by clear and convincing evidence that as a result of his serious mental illness, abnormality or disorder, Comstock would have "serious difficulty in refraining from sexually violent conduct or child molestation if released."

3.    The government must show that Comstock's difficulty will be "serious."  The government, however, need not establish that the person it seeks to commit will, or is likely to, reoffend.  See United States v. Hunt, 643 F.Supp.2d 161, 179-81 (D. Mass. 2009).  Instead, the analysis focuses on Comstock's volitional control understood in relation to his mental illness.  See United States v. Carta, 2011 WL 2680734, slip op., at *22 (D. Mass. July 7, 2011).  This determination requires more than relying on recidivism rates of past offenders, but requires analysis of a range of different factors, including Comstock's history before incarceration, his time in prison, and the opinions of experts.  Id.

4.    The determination of this prong of the analysis is informed by the constitutional constraints on the civil commitment scheme. Carta, at *23.  In Kansas v. Crane, 534 U.S. 411 (2002), the Supreme Court held that in order to civilly commit someone for sexual dangerousness "there must be proof of serious difficult in controlling behavior." Id. at 413.  This standard allowed courts

30

wide discretion in relying on a number of different factors relevant to sexual dangerousness. Carta, *23. The standard did not have "any kind of narrow or technical meaning;" nor was it demonstrable with "mathematical precision." Crane, at 413.

5.    The final analysis must not be just whether Comstock exhibits traits shared by recidivists. Carta, at *23. Rather, Comstock's volitional control must be "viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself. . . [in such a way that] distinguish[es] [him] from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.

6.    The evidence in this case supports the conclusion that Comstock would have "serious difficulty in refraining from sexually violent conduct or child molestation if released."

7.    Supervised release, particularly just three years, is also not sufficient to overcome all the other evidence that demonstrates Comstock will have serious difficulty refraining. Nor does Comstock's age and medical conditions suggest that he will not have serious difficulty refraining. He was in his late 50's when caught molesting first, third and fourth grade boys, and found in possession of child pornography.

8.    The Court disagrees with Dr. Campbell's opinion that the Adam Walsh Act is inapplicable to individuals whose sex offenses

31

involve planned, premeditated grooming.  Even if the Court assumed Comstock's offending was never impulsive, the Court holds that the Adam Walsh Act applies to the type, duration and pattern of Comstock's sex offenses, which demonstrate more that Comstock does not want to control his behavior, but rather he has little ability, if any, to control his behavior.  Regardless, Dr. Campbell's opinion that Comstock will not have seriously difficult refraining from child molestation if released cannot be reconciled with all the other evidence in this case.

11.  Greater weight must be given to the opinions of Drs. Phenix, Demby, and Hernandez.  Their analysis of Comstock's sexual dangerousness is more thorough, better reasoned, better supported by the record, and therefore more convincing.

12.  Comstock's mental disorders, abnormalities, and illnesses have made him, and continue to make him a sexually dangerous person.  His lack of self-control is evident by the pattern and duration of his offending, not to mention his unauthorized possession of pictures of children while in custody awaiting an evidentiary hearing on whether he is a sexually dangerous person.  Indeed, Comstock appears to have little to no ability to manage his mental illness.

13.  Comstock should be committed to the custody of the Attorney General until he is no longer a sexually dangerous person under the Adam Walsh Act.

Respectfully submitted, this 25th day of November, 2011

THOMAS G. WALKER
United States Attorney


BY: /s/ Joshua B. Royster
JOSHUA B. ROYSTER
Attorney for Petitioner
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC  27601-1461
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: joshua.royster@usdoj.gov
N. C. Bar# 28785

<u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing has been served

upon the Office of the Federal Public Defender, counsel for

Respondent, by electronically filing the foregoing with the Clerk

of Court this date, November 25, 2011, using the CM/ECF system which

will send notification of such filing to the above.


BY: /s/ Joshua B. Royster
JOSHUA B. ROYSTER
Attorney for Petitioner
Assistant United States Attorney
Civil Division
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, NC  27601-1461
Telephone: (919) 856-4530
Facsimile: (919)856-4821
Email: joshua.royster@usdoj.gov
N. C. Bar# 28785

33