UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

5:06-HC-2195-BR-JG

| | |
|---|---|
| UNITED STATES OF AMERICA | RESPONDENT'S PROPOSED |
| v. | FINDINGS OF FACT AND |
| GRAYDON COMSTOCK | CONCLUSIONS OF LAW |

Comes now the respondent, Graydon Comstock, by and through undersigned counsel, and respectfully requests that the Court enter the following findings of fact and conclusions of law in this matter, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.   INTRODUCTION

Petitioner, the United States of America ("the government") instituted this civil action on November 2, 2006, seeking to commit Graydon Comstock ("Mr. Comstock" or "Respondent") as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 ("the Act").  18 U.S.C. § 4248. [Docket Entry ("DE") 1.]  The government filed a certificate stating that mental health personnel for the Federal Bureau of Prisons ("BOP") examined Respondent and issued a preliminary determination that he is sexually dangerous within the meaning of the Act.  A certificate filed under the Act stays Respondent's release from federal custody pending a hearing to determine whether Respondent qualifies for commitment as a sexually dangerous person.  The government's petition was filed less than a week prior to Respondent's scheduled date of release from BOP custody on November 8, 2006. [*See id.*]

1

An evidentiary hearing and bench trial is scheduled in this case before the Honorable District Judge Bernard A. Friedman during the November 28 – December 11, 2011 term.  On September 28, 2011, the Court directed the parties to file proposed findings of fact and conclusions of law no later than the beginning of the hearing.  After considering the testimony at the evidentiary hearing, the evidentiary record, and the parties' submissions, this Court concludes that the Government has failed to establish by clear and convincing evidence that Respondent is sexually dangerous to others as required by the Act and the Constitution.

II.     FACTS

1.  Mr. Comstock was born in 1942 and was sixty-nine (69) years of age at the time of his evidentiary hearing.

2.  At the time of his hearing, Mr. Comstock had been incarcerated for more than five (5) years after his release date.

3.  Mr. Comstock's release date from the BOP was November 8, 2006. [DE 1.]

A.      **Personal History**

4. Mr. Comstock was born in Arkansas into an intact family and has three siblings. (Petr. Ex. 7 at 8.) He was born and raised in Arkansas and Oklahoma and reports no history of physical or sexual abuse as a child. (*Id.* at 8-9.)

5. He graduated from high school in 1960 in Tulsa and enrolled in the University of Arkansas, graduating with a Bachelors of Science Degree in Physical Education 1967. (*Id.* at 9-10.) He subsequently received a Masters Degree in Recreational Administration from the University of Arkansas in 1968. (*Id.* at 10.) Mr. Comstock has additional college credits at

several institutions, as well as certifications in guidance counseling and educational administration. (*Id*.)

6. Mr. Comstock was employed in the educational field for over thirty years as an educator, guidance counselor, coach, and administrator. (*Id*.) The majority of his career was spent internationally, including schools in Peru, the Netherlands, Iran, India, Dubai, and the Philippines. (*Id*.) Additionally, he worked at domestic schools in various states including Colorado, Alaska, Kansas and Arkansas. (*Id*.) Prior to his educational career, Mr. Comstock enlisted in the United States Army National Guard in 1960 and served as a field medic; he earned an honorable discharge. (*Id*.)

7. Mr. Comstock has never married or fathered any children. Mr. Comstock has one foster son, whom he met when he was residing in Manila, Phillipines. He met his foster son when his son was a child prostitute. Although the relationship initially had a physical component, the physical component eroded after a month, and Mr. Comstock lived with his foster son as a father. (Comstock Depo. Tr. at 104-08.)

8. Mr. Comstock has never been diagnosed with alcohol or drug abuse. (*Id*. at 9.)

9. Mr. Comstock was employed at FCI Butner in the food services but resigned in January of 2007 due to health problems. (Resp.'t Ex. 7.)

**B.**     **Criminal and Sexual Offense History**

10. Mr. Comstock has no arrests or convictions for any nonsexual crimes. (*Id.* at 7-8.)

11. In 2000, Mr. Comstock pled guilty to two counts of aggravated indecent liberties with a child in the state of Kansas and was sentenced to fifty-five months with a post-release supervision term of thirty-six months. (Petr. Ex. 16.)

3

12.  In 2000, Mr. Comstock also was charged in a two-count indictment in the United States District Court for the District of Kansas, with the receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), and with criminal forfeiture, in violation of 18 U.S.C. § 2252(a)(3). (Petr. Ex. 6.) He pleaded guilty to both counts and received a sentence of thirty-seven months in custody to be served consecutively to his state sentences, followed by thirty-six months of supervised release. (*Id.* at 2.) Mr. Comstock has not been released from incarceration since 2000.

13.  At some prior point, Mr. Comstock was questioned by the FBI regarding an investigation into one of Mr. Comstock's friends. No charges were filed as a result. (Comstock Depo. Tr. at 89.)

### C.   <u>Medical Health</u>

14.  At age thirty-nine (39), Mr. Comstock suffered a hemorrhagic stroke determined to be the result of uncontrolled hypertension. (Resp.'t Ex. 2 at 2-3.) He continues to remain on medical treatment for high blood pressure. He was also treated as an inpatient for hepatitis in 1975, underwent hernia surgery in 1987, and suffers from bilateral hearing loss and hypercholesterolemia. (*Id.* at 3.)

15.  Mr. Comstock is undergoing treatment for gastroesophageal reflux disease, diverticulous, chronic functional diarrhea, coronary artery disease, cerebral atherosclerosis, type II diabetes, depressive disorder not otherwise specified, and a history of prostate cancer previously treated with radiation therapy. (*Id.*)

16.  Mr. Comstock underwent a three-vessel coronary artery bypass graft in 2006 which was scheduled emergently after he was found to have suffered from a "large posterior myocardial

4

infarction on April 26, 2006." (*Id.*) His records also reflect that he was previously prescribed sublingual nitroglycerin for angina. (*Id.*)

17. Mr. Comstock is currently being treated with a number of medications, including Abilify (an atypical antipsychotic), Atenolol, Gemfibrozil, Lisinopril, Loperamide, Metformin, Niacin, Prilosec, Simvastatin, Terazosin, Trazadone, and Effexor. (*Id.*)

### D. Bureau of Prisons Disciplinary History

18. In over a decade in incarceration, Mr. Comstock has incurred only two formal sanctions–one for hitting an inmate and another for being insolent to a staff member. (Petr. Ex. 18.)

19. Images of underage boys were found in a search of Mr. Comstock's cell in June of 2008. No charges were ever filed. (Petr. Ex. 10.)

20. Mr. Comstock was alleged to have propositioned a developmentally delayed inmate for sex in 2008. Mr. Comstock denied the allegations. No charges were ever filed. (Petr. Ex. 9.)

### E. Sex Offender Treatment

21. As part of his Kansas state sentence, Mr. Comstock entered the Kansas Sexual Abuse Treatment Program ("SATP") in November of 2001. He withdrew from the program after three months even though he held a 98% attendance record and had completed most of the written work.[1] (Petr. Ex. 14 at 1.)

22. Mr. Comstock re-enrolled in July of 2002 and completed the eighteen-month-long SATP in 2003 long before the passage of the Adam Walsh Act. (*Id.*) As part of the SATP, he

---

[1] Mr. Comstock notes his objection to the government's use of any of the disclosures he made during treatment on the basis of the psychotherapist-patient privilege and the Privacy Act. *See* Resp.'t Mot. in Limine [DE 131].

completed an entry and exit battery of psychological tests, in-class and homework assignments, an empathy letter, autobiography, sexual history, and a Personal Maintenance Program Contract (PMPC). Additionally, Mr. Comstock participated in the physiological components of the SATP including a polygraph and penile plethysmograph and psycho-educational modules including life skills, feelings, empathy, values and decisions, sexuality, and relapse prevention. He completed all written assignments in the Safer Society Press series of guided workbooks for sex offenders. He maintained a 99% attendance average in the program. (*Id.*)

23. His treators in Kansas found that the results of his penile plethysmograph indicated that Mr. Comstock <u>has developed</u> the ability to control arousal to deviant stimuli. (*Id.* at 4.) Similarly, they found that the results of his polygraph showed that Mr. Comstock <u>was disclosive</u> concerning the extent and duration of his deviant sexual interest. (*Id.*) Although they ultimately delivered a poor diagnosis, they wrote that:

> Mr. Comstock completed a PMPC that was thorough and insightful. He formulated interventions for each element of his deviant sexual pattern. He developed positive appropriate activities that will occupy his time and energy. . . . Mr. Comstock appears to have developed a fair amount of insight into his own behavior. . . . Mr. Comstock appears able to identify and describe the elements of his offending behavior. . . . Although he has learned how he offends, it is unlikely that he will stop offending.

(*Id.* at 3.)

24. Mr. Comstock also met frequently with doctors at FCI Butner including Dr. Tom Owens, Dr. Andres Hernandez, and Dr. Caroline Frazer. (*See, e.g.*, Resp.'t Ex. 8.) On multiple occasions, Mr. Comstock met with Butner physicians to explore the possibility of castration. (*See, e.g.*, *id.*)

**F.      Current Status**

25.  On November 2, 2006, the United States filed the instant action seeking to commit Mr. Comstock as a sexually dangerous person under the Adam Walsh Act, 18 U.S.C. § 4248. [DE 1.]  Pursuant to the statute, the filing of this action stayed his release pending the outcome of the proceedings.  Mr. Comstock completed his criminal sentence on November 8, 2006 and was scheduled to be released that day if the government had not filed the certification pursuant to § 4248.  On November 7, 2007, this Court granted Respondent's motion to dismiss on the grounds that the Act violated the Commerce Clause. The United States Supreme Court reversed, and on December 6, 2010, the Fourth Circuit issued its opinion reversing and remanding this case back to this Court. During the appellate courts' review of the constitutionality of the Act, Respondent's § 4248 proceeding was stayed *ab initio*.

26.  If released, Mr. Comstock will be on supervised release for a term of three years. (Petr. Ex. 5.)  The amended conditions of his supervised release include, among others, no unsupervised contact with anyone under the age of eighteen, registering as a sex offender, no access to the internet except for employment purposes if sanctioned by a probation officer, prohibition against possession of any sexually explicit pictures, paraphernalia, magazines, video tapes, or similar materials, and reporting to a probation officer as required. (*Id.*)

## III.    EXPERT'S QUALIFICATIONS

27.  The government retained Dr. Amy Phenix as an expert in the case.  Dr. Phenix reviewed Mr. Comstock's records and interviewed Mr. Comstock.

28.  The government will also call Dr. M. Lela Demby as an expert in the case.  Dr. Demby reviewed Mr. Comstock's records but did not conduct a current interview of Mr. Comstock. She did conduct an initial interview with Mr. Comstock in 2007.

29.  Respondent selected Dr. Terence Campbell as a court examiner.  Dr. Campbell reviewed Mr. Comstock's records and interviewed Mr. Comstock.

30. Respondent retained Dr. George Corvin. Dr. Corvin reviewed only Mr. Comstock's medical records and did not interview Mr. Comstock.

31.  The parties did not challenge the qualifications of any of the above experts.  The Court having reviewed the curriculum vitae of the experts, finds that each individual is qualified by education and experience to offer expert testimony in this matter.

## IV.    LEGAL PRINCIPLES

### A.        Section 4248 Violates Equal Protection

32.  As a preliminary matter, this Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments because there is no rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public.  *Incorporated by reference, United States v. Timms*, 5:08-HC-01256-BO (Eastern District of North Carolina, filed July 1, 2011).[2]

### B.        Delay in the Proceedings Violated Respondent's Due Process Rights

33.  This Court also finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.  *Id.*

### C.        18 U.S.C. § 4248 as applied to Respondent Constitutes Criminal Punishment

---

[2] Mr. Comstock is aware that this Court has ruled in the government's favor with respect to the first three legal principles. However, because the Fourth Circuit and Supreme Court have not ruled on these matters, Mr. Comstock includes them here for preservation.

34. This Court finds that the conditions of Respondent's confinement constitute criminal punishment that violates the Double Jeopardy Clause, the Ex Post Facto Clause, the Eighth Amendment prohibition against cruel and unusual punishment, and the jury trial right contained in the Sixth Amendment.

### D. Standard of Proof and Elements Required to be Established

35. The government has the burden of proving each element by clear and convincing evidence. 18 U.S.C. § 4248(d). "[T]he individual's interest in the outcome of a civil commitment proceeding is of such weight and gravity" that this standard is required not only by the Act, but by the Due Process clause of the Constitution." *Addington v. Texas*, 441 U.S. 418, 427 (1979). The clear and convincing evidence standard is an "intermediate standard," lying somewhere "between preponderance of the evidence and proof beyond a reasonable doubt." *Id.* at 425. "'Clear and convincing' has been defined as evidence of such weight that it produces in the mind of the trier of fact a firm belief or conviction, without hesitancy, as to the truth of the allegations sought to be established." *Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 450 (4th Cir. 2001) (internal quotations and citations omitted). It has alternatively been described "as meaning 'highly probable.'" *Direx Israel Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 810 n.7 (4th Cir. 1992) (quoting 9 J. Wigmore, Evidence § 2498 (3d ed. 1940)).

36. To commit Respondent, the government must prove by clear and convincing evidence that Respondent is a "sexually dangerous person," which the Act defines as "a person who has engaged or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). An individual is "sexually dangerous to others" under the Act if he "suffers from a serious mental illness, abnormality, or disorder as a

9

Case 5:06-hc-02195-BR-JG   Document 138   Filed 11/27/11   Page 9 of 23

result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

37. This phrase has not been defined by the statute. The legislative history indicates that it is a direct legislative enactment of the principle of volitional impairment enunciated in *Kansas v. Hendricks*, 521 U.S. 346 (1997) and *Kansas v. Crane*, 534 U.S. 407 (2002). *See* H.R. Rep. No. 109-218(I) Section-by-Section Analysis and Discussion § 511. In *Crane*, the Supreme Court stated that the "serious difficulty" requirement is intended to distinguish the "dangerous sexual offender whose mental illness, mental abnormality or mental disorder subjects him to civil commitment, from the dangerous, but typical, recidivist convicted in an ordinary criminal case who, having been convicted and punished for one crime, proceeds through his own free choice to commit another." *Crane*, 534 U.S. at 413.

38. A finding of dangerousness is also constitutionally required. *Kansas v. Crane*, 534 U.S. at 407-09, 410 (stating "we have consistently upheld involuntary commitment statutes . . . [when] (1) the confinement takes place pursuant to proper procedures and evidentiary standards; (2) there is a finding of 'dangerousness either to one's self or others,' and (3) proof of dangerousness is "coupled . . . with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality'" (*citing Kansas v. Hendricks*, 521 U.S. 346, 357-58; quotations omitted)). *See also Foucha v. Louisana*, 504 U.S. 71, 82-83 (1992).

39. The Court finds that in this regard, the statute and due process considerations require that, in addition to a volitional impairment, the government must prove by clear and convincing evidence that Respondent poses a risk of reoffense that is significant enough to justify a finding that Respondent is sexually dangerous and therefore can be preventively detained.

40. In this case the government has proven neither. The evidence in this case does not demonstrate that Respondent currently suffers from a volitional impairment. The evidence also demonstrates that the recidivism rates proposed by the government's experts are likely overestimates.  Further, even if this Court were to credit the government's experts regarding Respondent's likelihood of recidivism, the statistical evidence presented does not rise to the level of clear and convincing evidence of dangerousness sufficient to justify commitment.

## V.    FINDINGS

### A.    Prior Bad Acts

41. Mr. Comstock does not contest that he has engaged in child molestation in the past. This Court finds that the government has established this element by clear and convincing evidence.

### B.    Suffers from a Serious Mental Illness, Abnormality or Disorder

42. Dr. Demby, Dr. Phenix, and Dr. Campbell have diagnosed Mr. Comstock with pedophilia, sexually attracted to males, exclusive type. Dr. Campbell and Dr. Phenix have diagnosed Mr. Comstock with depression, not otherwise specified. (Resp.'t Ex. 4 at 8; Petr. Ex. 2 at 17.) Dr. Demby diagnosed Mr. Comstock with major depressive disorder, recurrent, in full remission. (Petr. Ex. 4 at 18.) Since there is no disagreement among the experts that Mr. Comstock suffers from pedophilia, and the Respondent does not contest that diagnosis, the Court finds that the government has established this element by clear and convincing evidence that Mr. Comstock suffers from a serious disorder, namely pedophilia.

### C.    Serious Difficulty Refraining from Child Molestation

43.  In order to commit Mr. Comstock, the government must prove that the disorder results

in "serious difficulty refraining from sexually violent conduct or child molestation if released."

18 U.S.C. § 4247(a)(6).  As discussed previously, this term implies a volitional impairment.

44.  The DSM-IV-TR is clear that the fact that someone has been diagnosed with a mental

illness or disorder does not answer the question of whether that person's volition is impaired.  The

manual states:

> It is precisely because impairments, abilities and disabilities vary widely within
> each diagnostic category that assignment of a particular diagnosis does not imply a
> specific level of impairment or disability.  The fact that an individual's
> presentation meets the criteria for DSM diagnoses does not carry any necessary
> implications regarding the individual's degree of control over the behaviors that
> may be associated with the disorder.  Even when diminished control over one's
> behavior is a feature of the disorder, having the diagnosis in itself does not
> demonstrate that a particular individual is or was unable to control his or her
> behavior at a particular time.

DSM-IV-TR at page xxxiii**.**

45.  This Court finds that the government has not shown by clear and convincing evidence

that Respondent currently presents a serious mental illness, abnormality or disorder that impairs

his volitional control such that he would have serious difficulty refraining from sexually violent

conduct or child molestation if released.

## VI.    DANGEROUSNESS/RISK ASSESSMENT

### A.    <u>Introduction</u>

46.  Dr. Demby, Dr. Phenix, and Dr. Campbell conducted a risk analysis based on

empirical tools and actuarial instruments to evaluate, quantify, and support their dangerousness

determination.

47. No psychological tests or actuarial instruments have been developed that predict with certainty an individual's risk of future sexual offending. The risk instruments are based on group data and provide risk estimates of defined sample groups to which an individual is compared. "The recidivism rates contained in the actuarial tables are the product of the amalgamated risk characteristics of the group and, therefore cannot be ascribed to a particular individual since the risk factors for the individual may vary substantially from that of the group." Theodore Donaldson & Brian Abbott, *Prediction in the Individual Case: An Explanation and Application of its Use with the Static-99R in Sexually Violent Predator Risk Assessments,* 29(1) American Journal of Forensic Psychology 7 (2011). The actuarial instruments provide only group prediction rates on risk of re-offending. The instruments do not provide individual rates of reoffending. *Id.*

48. In evaluating Mr. Comstock, Dr, Campbell, Dr. Phenix, and Dr. Demby utilized a clinical analysis combined with actuarial instruments and psychological tests to determine if Mr. Comstock presents a serious risk of reoffending.

49. Four expert opinions were offered by the parties on the issue of whether Mr. Comstock meets the criteria for commitment pursuant to 18 U.S.C. § 4248. Dr. Phenix and Dr. Demby, the government's experts, both opined that Mr. Comstock is a sexually dangerous person as defined by the Act. Dr. Campbell and Dr. Corvin opined that Mr. Comstock is not a sexually dangerous person and is not at risk of reoffending if released.

50. For the reasons set forth below, the Court finds that the government has not established by clear and convincing evidence that Respondent suffers from a serious mental illness, abnormality or disorder that impairs his volitional control and would result in him having serious difficulty refraining from sexually violent conduct or child molestation.

**B.**     **Expert Opinions**

   **1. Dr. Amy Phenix**

   51. Dr. Amy Phenix authored two evaluation reports dated April 1, 2011 and November

6, 2011. (Petr. Ex. 2, 28.) She opined, based on her examination of Mr. Comstock and review of

his records, that Mr. Comstock meets the criteria as a sexually dangerous person as described in

18 U.S.C. § 4248. (*Id.*) Her opinion appears to be based on both a clinical analysis of Mr.

Comstock and an assessment of actuarial instruments. (*Id.*)

   52. In her initial report, Dr. Phenix opined, based on a record review only, that Mr.

Comstock suffers from two serious mental disorders (pedophilia and depressive disorder, not

otherwise specified) that will cause him serious difficulty in refraining from child molestation if

released to the community. (Petr. Ex. 2 at 16-17.)

   53. In reaching her April 2011 conclusion, Dr. Phenix utilized several actuarial

instruments and psychological tests. She used the Static-99 Revised, the Static-2002 Revised,[3]

---

   [3] In 1999, Dr. Karl Hanson, a statistical researcher with the Canadian Office of Public
Safety, developed the Static-99, an actuarial instrument consisting of ten factors. The ten factors
are: whether the offender is younger than 25 years old, whether the offender ever lived with a
lover for at least two years, index non-sexual violence, prior non-sexual violence, number of
prior sentencing dates, any unrelated victims, any stranger victims, and any male victims. The
Static-99 scores the offender on a scale from 0 to 12. Each score is associated with a risk level
(i.e. high, medium, low). Each score was also associated with a percentage of recidivism over 5
years, 10 years, and 15 years. Dr. Hanson derived the original recidivism percentages associated
with each score on the Static-99 by retrospectively scoring the instrument on a group of 1,086
offenders released from incarceration in Canada and the United Kingdom between 1958 and
1993 with known 5, 10, and 15 year recidivism rates after release. The average age of these 1,086
individuals was 33.5 years old. The Static-99 has been revised and replaced by the 99-R and
revised again in 2002.
   In the fall of 2008, the developers of the Static-99 issued new recidivism percentages
associated with the different scores on the instrument. The prior recidivism percentages
associated with the original Static-99 were derived from sex offenders released from 1958 to
1993, these newer recidivism percentages are based on contemporary samples of sex offenders

and the Structured Risk Assessment–Forensic Version ("SRA:FV"). (*Id.* at 1.) Dr. Phenix gave

Mr. Comstock a score of 2 on the Static-99R, placing him in the low-moderate category, and a

score of 5 on the Static-2002R, placing him in the moderate risk category. (*Id.* at 23.)

54. Dr. Phenix noted that these actuarial instruments have moderate predictive accuracy.

(*See, e.g.*, *id.* at 18.)

55. In her later report, she added another assessment tool: the Hare Psychopathy Checklist

("PCL-R"). She gave Mr. Comstock a score of 12 on the PCL-R, placing him in the low range for

psychopathy. (Petr. Ex. 28 at 14.)

56. When quantifying recidivism rates for individuals who achieved the same score as Mr.

Comstock on the Static-99R and the Static-2002R, Dr. Phenix compared him to a group of

offenders with the highest recidivism rates, the "high-risk/high-needs" group. As noted in Dr.

Phenix's report, the Static-99R and Static-2002-R have multiple reference groups for comparison

(routine correctional, non-routine correctional, pre-selected for treatment, preselected for

risk/need) and evaluators are instructed to select and use the reference group(s) that best fit

selection criteria of the individual being evaluated. (Petr. Ex. 2 at 20, 22.) Dr. Phenix did not

compare Mr. Comstock's Static-99R or Static-2002R scores to any other sample groups when

listing recidivism rates. Dr. Phenix noted that individuals with the same scores on the Static-99R

and Static-2002R as Mr. Comstock in the high-risk/high needs group, recidivated at a rate of 12.2

---

who were released from incarceration in the 90s and after. The new recidivism percentages
associate with the different scores on the Static-99 are substantially lower than the old recidivism
percentages. A. Harris et al., *Are New Norms Needed for the Static-99*, presented at the 27th
Annual Research and Treatment Conference of the Association for the Treatment of Sexual
Abusers, Atlanta, Georgia, October 23, 2008.

% in five years and 19.7% in ten years on the Static-99R , and 19.7% in five years and 28.4% in ten years on the Static-2002R. (*Id.* at 23.)

57.  On October 18, 2011, Dr. Phenix conducted a clinical interview of Mr. Comstock. (Petr. Ex. 28 at 1.) Following the interview Dr. Phenix authored an additional report dated November 6, 2011 in which she opined that Mr. Comstock meets criteria as a sexually dangerous person under the Act. (*Id.*)

**2.    Dr. M. Lela Demby**

58.  Dr. Demby, a psychologist employed by the BOP, opined based on her review of the records and a 2007 interview that he suffers from a serious mental illness, abnormality, or disorder, and as a result would have serious difficulty in refraining from sexually violent conduct or child molestation. (Petr. Ex. 4.) Dr. Demby diagnosed Mr. Comstock with pedophilia, sexually attracted to males, exclusive type, and major depressive disorder, recurrent, in full remission. (*Id.* at 18.)

59.  In assessing Mr. Comstock's risk of recidivism Dr. Demby lists three actuarial instruments, the Static-99, the Static-99R, and the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR), that she relied upon in her evaluation. (*Id.* at 20-22.)  At her deposition, Dr. Demby noted that she no longer relies on the Static-99 because it has been replaced by the Static-99R nor does she continue to rely on the RRASOR. (Depo. Tr. at 67.) Dr. Demby gave Mr. Comstock a score of 2 on the Static-99R, which placed Mr. Comstock in a group that reoffended at a rate of 7.2% in five years and 11.5% in ten years. (*Id.* at 22.)

60. Lastly Dr. Demby utilized the Sexual Violence Risk-20 (SVR-20) in assessing dynamic factors related to Mr. Comstock's risk for future sexual violence.[4] After concluding that eight of the twenty factors would exacerbate Mr. Comstock's risk, she opined that his risk of future sexual violence is high. (*Id.* at 8.)

61. Dr. Demby concluded in her report that Mr. Comstock's "age and medical conditions have not served to reduce his sexually deviant behavior, and are not considered to have reduced his risk for sexual recidivism." (*Id.* at 26.) She also concluded that his completion of sex-offender treatment was not a positive factor because Mr. Comstock "continues to see society's protective measures against the sexual abuse of children as the traumatic factor in the equation, and he continues to blame social and law enforcement agencies as the true 'abusers' of children." (*Id.*)

**3.     Dr. Terence Campbell**

62. Dr. Campbell evaluated the Respondent and opined based on his examination of Mr. Comstock and review of his records that Mr. Comstock has demonstrated volitional control over his disorder (pedophilia). He concluded that "[t]here is no reliable evidence indicating that Mr. Comstock currently exhibits impairment in his 'emotional or volitional capacity.'" (Resp.'t Ex. 4 at 50.) Dr. Campbell classifies Mr. Comstock as an avoidant pedophile, one who rationalizes that sexual conduct between adults and children should not be considered criminal. (*Id.* at 51-52.) He explains that assessing risk for avoidant pedophiles necessitates ascertaining whether they continue to rationalize adult-child sexual contacts. (*Id.* at 52.) From his interview with Mr. Comstock, Dr. Campbell concludes that Mr. Comstock now associates harm with adult-child

---

[4] The SVR-20, developed by Boer, Hart, Kropp and Webster in 1997, assesses sex offender recidivism risk by addressing twenty risk factors. Terence W. Campbell, *Assessing Sex Offenders* 200. The test aids in rendering a clinical judgment.

sexual contacts. Dr. Campbell emphasizes the effect that incarceration has had on Mr. Comstock and explains that Mr. Comstock has internalized the reality that another offense would result in spending the remainder of his life in prison. (*Id.* at 52-53.) Dr. Campbell also cites to Mr. Comstock's willingness to undergo chemical or surgical castration as evidence of his commitment not to reoffend in the future. (*Id.* at 53.)

63. Dr. Campbell concurred with the diagnosis of pedophilia. (*Id.* at 6.) He likewise concurs that there is evidence that Mr. Comstock struggles with a mood disorder involving dysphoria or depression. (*Id.* at 8.) However, Dr. Campbell explains that depression is not related to sexual recidivism. (*Id.*)

64. Illustrating the difficulty of proving volitional control, Dr. Campbell explained that "experts cannot tell whether an individual is unable or simply unwilling to control sexual behavior." (*Id.* at 11 (internal citation omitted).) Ergo, Dr. Campbell uses the construct of impulsiveness to shed light on the issue of volitional control: "Impulsiveness is a construct relevant to explaining both normal and individual differences in personality and more extreme personality pathology among clinical populations. Impulsiveness can be defined as a predisposition toward rapid, unplanned reactions to internal or external stimuli without regard to the negative consequences of these reactions to the impulsive individuals or to others." (*Id.* (internal citation omitted).) Using the Barratt Impulsiveness Scale,[5] Dr. Campbell gave Mr. Comstock a score of 54, well below the cutoff of 74–which designates high impulsiveness. (*Id.*)

---

[5] The Barratt Impulsiveness Scale is "arguably the most commonly administered self-report measure specifically designed for the assessment of impulsiveness in both research and clinical settings." (Resp.'t Ex. 4 at 11 (citing M.S. Sanford et al., Fift*y Years of the Barratt Impulsiveness Scale: An Update and Review*, Personality and Individual Differences, 47, 385 (2009).

65. Dr. Campbell relied on age-related data to show that recidivism rates decrease with age for sex offenders. (*Id.* at 36-37.) He also explained how there is an absence of a scientifically significant relationship between recidivism and sexual deviance. (*Id.* at 40.) Dr. Campbell conducted a relapse prevention interview (Resp.'t Ex. 5) to assess Mr. Comstock's familiarity with the goals and procedures of relapse prevention.

### 4.    Dr. George Corvin

66. Dr. Corvin is a board-certified forensic psychiatrist and general psychiatrist who examined Mr. Comstock's overall mental health and medical conditions to determine if Mr. Comstock's health would have any notable effect on his sexual functioning, particularly with regards to his libido. (Resp.'t Ex. 2 at 1.)

67. Dr. Corvin reports that thirty-nine percent (39%) of men aged 75-85 still reported being sexually active, although research indicates that men in poor health were considerably less likely to remain sexually active. (*Id.* at 2.)

68. Concluding that Mr. Comstock was presently not sexually dangerous, Dr. Corvin explained that sexual dysfunction is a side effect of many of Mr. Comstock's health problems, and he concluded that to the extent that Mr. Comstock's age, medical problems, and current medication regimen reduce his libidinal urges, the likelihood that Mr. Comstock would have serious difficulty in refraining from sexually violent conduct or child molestation would also be decreased. (*Id.* at 3-4.)

## VII.    CONCLUSIONS OF LAW

69. The Court finds that § 4248 deprives Respondent of equal protection of the law under the Fourteenth and Fifth Amendments to the United States Constitution because there is no

rational basis for § 4248's differentiation between individuals in BOP custody and individuals in the general public.

70. The Court finds that Respondent was deprived of his due process rights under the Fifth Amendment of the United States Constitution because the government failed to bring Respondent before the Court for a civil commitment hearing within a reasonable time after they filed the petition seeking commitment pursuant to § 4248.

71. The Court finds that the conditions of Respondent's confinement constitute criminal punishment that violates the Double Jeopardy Clause, the Ex Post Facto Clause, the Eighth Amendment prohibition against cruel and unusual punishment, and the jury trial right contained in the Sixth Amendment.

72. The Court finds that Respondent has committed acts of child molestation in the past.

73. The Court finds that Respondent meets the diagnostic criteria for pedophilia.

74. The Court finds that pedophilia is a chronic disease but does not carry with it any necessary implications regarding level of volitional control. The Court finds that the government has not proven by clear and convincing evidence that Respondent suffers from a volitional impairment such that he would have "serious difficulty refraining from sexually violent conduct of child molestation if released."

75. The United States Supreme Court precedent makes clear that the "serious difficulty" language does not require total or complete lack of control, but does require that it must be difficult, if not impossible, for the person to control his dangerous behavior. *See Kansas v. Crane*, 534 U.S. 407, 411 (2002) (citing *Kansas v. Hendricks*, 521 U.S. 346, 358 (1997)). The conflicting

evidence concerning the probability of Mr. Comstock's reoffending cannot support a finding that he would have "serious difficulty" in refraining from child molestation.

76. The Court has been presented with four opinions about Respondent's risk of reoffense in the event he is released. The Court has considered the information and finds this information relevant to its determination of Respondent's sexual dangerousness. Having considered the reports, forensic evaluations, and testimony of the four experts in this case, the Court finds that the government has not proven dangerousness by clear and convincing evidence sufficient to justify commitment.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment in this matter that Graydon Comstock is not a "sexually dangerous person" and order his release from the custody of the federal Bureau of Prisons so that he may commence his term of supervised release.

Respectfully submitted this 27th day of November, 2011.

THOMAS P. MCNAMARA
Federal Public Defender

/s/ Debra Carroll Graves
DEBRA CARROLL GRAVES
Assistant Federal Public Defender
E-mail: Debra_Graves@fd.org
N.C. State Bar No. 13513

/s/ Katherine E. Shea
KATHERINE E. SHEA
Assistant Federal Public Defender
E-Mail: Kat_Shea@fd.org
Member of the New York State Bar

ATTORNEYS FOR RESPONDENT
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450

21

Raleigh, North Carolina 27601
Telephone: 919-856-4236; Fax: 919-856-4477
LR 57.1 Counsel, Appointed

22

*CERTIFICATE OF SERVICE*

I HEREBY CERTIFY that a copy of the foregoing was served upon:

**Joshua B. Royster**                          **Michael Bredenberg**
**G. Norman Acker, III**                       Bureau of Prisons, Legal Dept.
**R.A. Renfer, Jr.**                           P.O. Box 1600, Old Highway 75
**Ed Gray**                                    Butner, NC 27509
U. S. Attorney's Office                        Email: mbredenberg@bop.gov
Rm. 800, 310 New Bern Ave.
Raleigh, NC 27601
Email: joshua.royster@usdoj.gov
Email: norman.acker@usdoj.gov
Email: rudy.renfer@usdoj.gov
Email: edward.gray@usdoj.gov

by electronically filing the foregoing with the Clerk of Court on November 27, 2011 using the CM/ECF system which will send notification of such filing to the above:

This the 27th day of November, 2011

/s/ Debra Carroll Graves
DEBRA CARROLL GRAVES
Assistant Federal Public Defender
E-mail: Debra_Graves@fd.org
N.C. State Bar No. 13513

/s/ Katherine E. Shea
KATHERINE E. SHEA
Assistant Federal Public Defender
E-Mail: Kat_Shea@fd.org
Member of the New York State Bar

Attorneys for Respondent
Office of the Federal Public Defender
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
Telephone: 919-856-4236
Fax: 919-856-4477
LR 57.1 Counsel, Appointed