Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

_____

UNITED STATES OF AMERICA,

                Petitioner,

       v.                        No. 5:06-HC-02195-BR

GRAYDON EARL COMSTOCK, JR.,

                Respondent.

_____

Bench Trial

HON. BERNARD A. FRIEDMAN, Judge

November 28, 2011

9:00 a.m. – 5:05 p.m.

Raleigh, North Carolina

REPORTED BY: Joseph C. Spontarelli, CCR

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 1 of 263

```
 1     APPEARANCES:
 2
 3         UNITED STATES DEPARTMENT OF JUSTICE
           UNITED STATES ATTORNEY'S OFFICE
 4         By:  Joshua B. Royster, Esquire
           and  Edward D. Gray, Esquire
 5         Assistant U.S. Attorneys
           310 New Bern Avenue
 6         Suite 800
           Raleigh, North Carolina 27601
 7         (919)856-4859
           edward.gray@usdoj.gov
 8         On behalf of the United States of America
 9
10
           OFFICE OF THE FEDERAL PUBLIC DEFENDER
11         By:  Debra Graves, Esquire
           and  Kat Shea, Esquire
12         Assistant Federal Public Defenders
           150 Fayetteville Street
13         Suite 450
           Raleigh, North Carolina 27601
14         (919)856-4236
           kat_shea@fd.org
15         On behalf of the Respondent
16
17
18
19
20
21
22
23
24
25
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 2 of 263

1                   INDEX TO WITNESSES

2    Witness:            Direct   Cross   Redirect   Recross

3

4    Amy Phenix, Ph.D.      15      27       27        121

5                                            151

6

7

     Graydon Earl           158     237      261
8    Comstock, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Reported By: Joseph C. Spontarelli, CCR**           **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 3 of 263

```
 1                P R O C E E D I N G S
 2                     9:00 a.m.
 3
 4          THE COURT:  Call the case.
 5          THE CLERK::  Case No. 5:06-HC-02195-BR,
 6    United States versus Graydon Earl Comstock, Jr.
 7          THE COURT:  May we have appearances?
 8          MR. ROYSTER:  Good morning, Your Honor.
 9    Joshua Royster, Assistant United States Attorney
10    for the government.
11          MR. GRAY:  Good morning, Your Honor.
12    Edward Gray, Assistant United States Attorney for
13    the government.
14          MS. GRAVES:  Good morning, Your Honor.
15    Debra Graves, Assistant Federal Public Defender on
16    behalf of Graydon Earl Comstock, Jr.
17          MS. SHEA:  Good morning, Your Honor.
18    Kat Shea also on behalf of Mr. Comstock.
19          THE COURT:  Let the record reflect this
20    is the date and time scheduled for the hearing on
21    this matter.
22          The Respondent is present.  The record
23    should also reflect that the Court has before it
24    the government's trial exhibits, respondent's
25    trial exhibits as well as the other documents that
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 4 of 263

Page 5

```
 1    have been filed.
 2             Also, it's my understanding that the
 3    Magistrate Judge has made rulings on the Motions
 4    in Limine.  The Court has had an opportunity to
 5    review those and the Court agrees with the
 6    Magistrate Judge's rulings on those and will adopt
 7    them for purposes of this trial.
 8             Are there any other preliminary matters
 9    that we should talk about before we start the
10    trial starting with the petitioner?
11             MR. ROYSTER:  No, Your Honor.
12             THE COURT:  Respondent?
13             MS. GRAVES:  Your Honor, we will renew
14    our Motion in Limine regarding the admission of
15    Mr. Comstock's sex offender treatment records.
16             I've read the order which was provided
17    to me this morning.  We believe that there is a
18    distinction between the disclosure of the records
19    to Dr. Campbell who was a court appointed
20    respondent selected examiner such that it should
21    not be viewed as a waiver of the privilege on
22    behalf of Mr. Comstock.
23             I would note the distinction between a
24    court examiner and a respondent examiner.  We do
25    have a respondent examiner in this case.  We chose
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 5 of 263

1    an examiner and retained one of our own.  He's not

2    really an examiner, but he's an expert -- a

3    non-examining expert -- Dr. George Corvin.  We

4    chose him, we paid him and we did not disclose

5    Mr. Comstock's sex offender treatment records to

6    our expert.  We maintained the privilege.

7           What was provided to Dr. Campbell who

8    was a court examiner were the discovery materials,

9    the disclosures that had been provided to us by

10    the government.  Our understanding of a court

11    examiner is that he is not a person that we are in

12    control of.  We simply provided the information to

13    him that had been provided to the previous court

14    examiner who had been retained by the government

15    and in doing so putting him on the same playing

16    field as the previously selected examiners that

17    had offered opinions regarding Mr. Comstock.  It

18    was certainly not Mr. Comstock's intention to

19    waive any privilege by doing so.

20           THE COURT:  I understand your argument.

21    We had gone over your motions before we got here

22    today and I believe that the Magistrate has

23    reached the correct conclusions for the proper

24    reasons and therefore I will deny the motion.

25    However, it is on the record and clearly objected

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 6 of 263

1    to so it will be noted.

2                    MS. GRAVES:  Thank you, Your Honor.

3                    THE COURT:  Anything else?

4                    (No audible response.)

5                    THE COURT:  I'm pretty familiar with

6    the case.  If you care to petitioner you may make

7    a short opening statement.

8                    MR. ROYSTER:  Thank you, Judge.

9                    Judge, as you know this is a case under

10   the Adam Walsh Act in which the United States

11   seeks to civilly commit Graydon Comstock as a

12   sexually dangerous person.

13                   To prevail we must show by clear and

14   convincing evidence that Mr. Comstock has engaged

15   in or attempted to engage in sexually violent

16   conduct or child molestation and he is sexually

17   dangerous to others; that is that he suffers from

18   a serious mental illness, abnormality or disorder

19   as a result of which he would have serious

20   difficulty refraining from sexually violent

21   conduct or child molestation if released.

22                   Judge, Graydon Comstock is 69 years

23   old.  On June 6th of the year 2000 when he was 58

24   years old he pleaded guilty to two counts of

25   aggravated indecent liberties with a child in

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 7 of 263

1    Kansas.  These charges related to him molesting a
2    first grader and a fourth grader at the school
3    where he worked.  Additional charges relating to
4    his molestation of another first grader and a
5    third grader were dismissed as part of his plea.
6    He was sentenced to 55 months imprisonment.
7              During the investigation of the
8    allegations of the child molestation law
9    enforcement executed a search warrant at his home.
10   During the search they found child pornography on
11   his computer, pictures of child porn printed out
12   and laying around in various places throughout his
13   apartment, materials from NAMBLA -- North American
14   Man-Boy Love Association -- a pro pedophilic
15   organization -- a book called Loving Sander which
16   you will hear testimony about, permission slips
17   for other children to visit his home so that they
18   could play games.
19             Judge, as a result of the possession of
20   the child pornography he was charged and convicted
21   federally.  He was sentenced to 37 months in
22   federal prison to run consecutive to his state
23   term.
24             Mr. Comstock was scheduled for release
25   from federal prison on November 8, 2006 but as a

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 8 of 263

1    result of the Adam Walsh Act and the resulting

2    appellate proceedings bearing his name

3    Mr. Comstock has remained in federal custody

4    pending this evidentiary hearing on whether he

5    should be committed as a sexually dangerous

6    person.

7              Judge, you're going to hear testimony

8    in this case from multiple expert witnesses and

9    likely Mr. Comstock himself.  There will be

10   testimony about his admission to molesting

11   approximately 100 children during 30 years of his

12   professional career.  In fact, Judge, the majority

13   of his career was spent outside the United States

14   in places like India, Peru, Philippines, Iran and

15   Dubai where he molested children and had sex with

16   child sex workers that he met through pimps.

17             Judge, after having sex with one of

18   these children in the Philippines Mr. Comstock

19   took him in as a foster son.  His name is Michael

20   and you will hear testimony about his relationship

21   with him.

22             You will also hear testimony about the

23   grooming tactics, the planning and the other

24   things that Mr. Comstock did to get close to the

25   children so that he would have opportunities to

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 9 of 263

```
 1    molest them.
 2              Dr. Amy Phenix is the government's
 3    non-BOP expert.  She has testified in hundreds of
 4    civil commitment cases of sexually dangerous
 5    persons in numerous jurisdictions all over the
 6    country including some of the Adam Walsh trials in
 7    this district and in Massachusetts.  She finds
 8    that Mr. Comstock suffers from pedophilia and he
 9    is a sexually dangerous person.
10              Dr. Lela Demby is the BOP psychologist
11    assigned to this case.  As you know she testified
12    by de bene esse deposition.  She has evaluated
13    more than 1000 federal inmates under the Adam
14    Walsh Act and she, too, finds that Mr. Comstock
15    suffers from pedophilia and he is a sexually
16    dangerous person.
17              Judge, you will hear testimony from Dr.
18    Terence Campbell.  He is the respondent's chosen
19    examiner.  He agrees with Dr. Phenix and Dr. Demby
20    that Mr. Comstock suffers from pedophilia.
21    However, he believes Mr. Comstock is not sexually
22    dangerous and you will hear testimony that he
23    appears to believe at least in part that
24    Mr. Comstock is not impulsive and because he is
25    not impulsive but rather his actions are planned
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 10 of 263

```
 1   and premeditated he cannot meet the criteria of
 2   the Adam Walsh Act.
 3            Dr. George Corvin is a forensic
 4   psychiatrist who will testify that while he hasn't
 5   personally examined Mr. Comstock he has reviewed
 6   his file and he knows and believes that
 7   Mr. Comstock suffers from several medical
 8   conditions and as a result of those conditions his
 9   libido is decreased.  Judge, he does not opine on
10   the issue of sexual dangerousness.  His testimony
11   will be limited to that if his libido has
12   decreased then it's likely that his sexual
13   dangerousness may have been decreased.
14            Dr. Phenix and Dr. Demby will explain
15   why the factors of his age and his medical
16   conditions do not mean that he is not sexually
17   dangerous.
18            Judge, the evidence will show that even
19   after being certified as a sexually dangerous
20   person and awaiting his commitment hearing
21   Mr. Comstock was still feeding his sexual urgers.
22   In June 2008 the BOP officials found numerous
23   images of underage males cut out from magazines
24   and newspapers in his cell.  Approximately
25   one-third are youth and partially dressed, and one
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 11 of 263

1  depicts a full front of a nude pre-adolescent
2  male.
3           Mr. Comstock has indicated he will not
4  participate in treatment because being a pedophile
5  is who I am; and even if there were a magic pill
6  to take that could cure pedophilia he said I
7  wouldn't take it.
8           We agree, Judge, that being a pedophile
9  is who Mr. Comstock is.  We also agree that he has
10 a serious mental disorder, abnormality or illness
11 and as a result of it he will have serious
12 difficulty refraining from committing sexually
13 violent conduct or child molestation if released.
14          Judge, at the end of this trial we will
15 ask that you commit him under 4248 as a sexually
16 dangerous person so that he can get the treatment
17 he needs and we believe he should have before he
18 is released back into the community.  Thank you,
19 Judge.
20          THE COURT:  Thank you.  Counsel.
21          MS. GRAVES:  Thank you, Your Honor.
22          Your Honor, it is our view that the
23 government's evidence will focus largely on
24 Mr. Comstock's past.  We want the Court to focus
25 on Mr. Comstock's present condition and whether he

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 12 of 263

 1    has any current difficulty abiding by the law.

 2              Their experts rely heavily on the many

 3    offenses that Mr. Comstock has admitted to from

 4    his past; and quite frankly, Your Honor, they want

 5    to use that evidence to satisfy all three prongs

 6    of the Adam Walsh Act.

 7              The first prong, of course, is that

 8    Mr. Comstock has committed acts of child

 9    molestation and Mr. Comstock will not deny that.

10    He will acknowledge that that prong is satisfied.

11              The second prong is that Mr. Comstock

12    has a serious mental illness or disorder and

13    Mr. Comstock will acknowledge that he has

14    pedophilia.  He has acknowledged it numerous times

15    and will continue to acknowledge that.

16              The third prong, however, is the one

17    where most of the contest will take place in this

18    case.

19              We ask that the Court focus on

20    Mr. Comstock's current mental status, his current

21    ability to control himself and his current plans

22    for release from the Bureau of Prisons.

23              The evidence will show that

24    Mr. Comstock has already completed a sex offender

25    treatment program.  He completed one in Kansas.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 13 of 263

1            That Mr. Comstock has expressed a

2    number of times his intention not to reoffend

3    against children.  That Mr. Comstock has increased

4    age which, of course, correlates with a reduced

5    likelihood of recidivism.  That Mr. Comstock, in

6    fact, has never been a recidivist because this is

7    the very first time Mr. Comstock has been

8    incarcerated or even prosecuted for sexual crimes.

9            The evidence will also show that

10   Mr. Comstock has been in declining health for the

11   past six years.  That he has experienced some very

12   serious medical problems which have had impact on

13   his sexual functioning and on his sexual urges and

14   drives.

15           Finally, we will present evidence that

16   Mr. Comstock has a very good, solid relapse

17   prevention plan.  That Mr. Comstock's sister Mary

18   will come before the Court and testify to her

19   willingness to take in her brother to provide a

20   supportive, loving, caring and very law abiding

21   environment for him to live in throughout the rest

22   of his life.

23           We believe that when the Court

24   considers all of these factors the Court will find

25   that the government has failed to prove by clear

**Reported By: Joseph C. Spontarelli, CCR            www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 14 of 263

1     and convincing evidence that Graydon Earl Comstock

2     if released would have serious difficulty

3     refraining from committing child molestation.

4     Thank you.

5              THE COURT:  Thank you very much.  First

6     witness, please.

7              MR. ROYSTER:  Thank you, Judge.  The

8     United States calls Dr. Amy Phenix.

9

10              AMY PHENIX, Ph.D.,

11     was sworn or affirmed and testified as follows:

12

13              THE COURT:  Give us your full name and

14     spell your full name.

15              THE WITNESS:  Amy Phenix, A-m-y

16     P-h-e-n-i-x.

17              THE COURT:  Thank you.

18              Counsel, you may proceed.

19

20              DIRECT EXAMINATION

21

22     BY MR. ROYSTER:

23         Q     Dr. Phenix, before I get started at

24     your feet there are two notebooks.  At some point

25     during your examination we may be referring to

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 15 of 263

1    those notebooks and I want you to know where they

2    are.  Okay?

3        A     Yes.

4        Q     Dr. Phenix, what is your occupation?

5        A     I'm a clinical psychologist in private

6    practice.

7        Q     How long have you been a clinical

8    psychologist?

9        A     Since I got my degree in 1990 and my

10   license in 1992.

11       Q     Where are you licensed to practice?

12       A     The States of California, Washington

13   and Florida.

14       Q     Do you have any particular area of

15   expertise?

16       A     Forensic psychology/sex offender risk

17   assessment.

18       Q     How long have you been involved in this

19   particular area of psychology?

20       A     I've worked in forensic psychology

21   since 1989, and I've worked in evaluating sex

22   offenders and sex offender risk assessments since

23   1996.

24       Q     Could you please tell the Court your

25   educational background beginning with your

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 16 of 263

1    undergraduate degree?

2        A        I have a Bachelor's Degree in education

3    from the University of Cincinnati.  I have a

4    Master's Degree in psychology from the University

5    of South Alabama.  I have a Doctorate Degree in

6    clinical psychology from the California School of

7    Professional Psychology in Fresno, California.

8        Q        Are you a member of any professional

9    organizations?

10       A        Yes.

11       Q        What?

12       A        I'm a member of the American

13   Psychological Association, the California

14   Psychological Association, the Association for

15   Treatment of Sexual Abusers -- our largest

16   professional group in this area -- California

17   Collision for Sex Offending and the Forensic

18   Mental Health Association of California.

19       Q        If you could take a look, Dr. Phenix,

20   at the government's trial exhibits.  If I could

21   refer you to Exhibit 1.

22       A        Yes.

23       Q        Do you recognize it?

24       A        Yes.  It's my Curriculum Vitae.

25       Q        Is it a current copy of your Curriculum

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 17 of 263

1    Vitae?

2         A     Yes, it is.

3         Q     Dr. Phenix, have you given any

4    presentations to professional groups on issues

5    relating to sexual deviancy?

6         A     Yes, I have.

7         Q     Could you tell the Court a little bit

8    about those?

9         A     Since about 1997 I have given many

10   presentations and trainings to professional

11   groups.  For example, all types of mental health

12   workers, law enforcement, probation and parole

13   officers, sexual assault investigators on issues

14   having to do with evaluating sex offenders,

15   understanding sex offender risk and also to groups

16   of evaluators that conduct sexually violent

17   predator evaluations and sexually dangerous person

18   evaluations throughout various states in the U.S.

19        Q     You mentioned sexually dangerous and

20   sexually violent persons.  Do you mean with

21   respect to civil commitment of those individuals?

22        A     That's correct.

23        Q     Have you authored or co-authored any

24   peer reviewed articles on sexual deviancy?

25        A     Yes, I have.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 18 of 263

1        Q        Are those listed in your resume?

2        A        Yes, they are.

3        Q        Have you authored or co-authored any

4    articles about sex offender evaluations and risk

5    assessments?

6        A        Yes, I have.

7        Q        Are those in your resume as well?

8        A        They are.

9        Q        Dr. Phenix have you, yourself,

10   conducted sex offender evaluations?

11       A        Yes.

12       Q        Approximately how many have you done?

13       A        In total I would say from the time I

14   worked in the prison system through the current

15   time I've conducted at least 500/600 sex offender

16   evaluations overall.

17       Q        Have you diagnosed and treated sex

18   offenders?

19       A        Yes, I have.  Since 1989.

20       Q        You mentioned since 1989.  What were

21   you doing when you were treating sex offenders in

22   1989?

23       A        I was doing my clinical internship at

24   the California Men's Colony; a medium security

25   prison on the central coast of California where I

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 19 of 263

1    remained as a staff psychologist for six years.

2              There I was responsible for evaluating

3    individuals with mental disorders that were

4    transferred to this essentially large psychiatric

5    hospital for the Department of Corrections.  Many

6    of those individuals transferred to the facility

7    were sex offenders who I evaluated and provided a

8    diagnosis and provided treatment to them because

9    the prison served as a large protective custody

10   institution.

11        Q    What did you do after your work with

12   the California Men's Colony?

13        A    Actually I took a year off and

14   transferred -- still working with California Men's

15   Colony -- to the parole department in Fresno,

16   California.  There I was responsible for a

17   caseload of offenders who had mental illness, who

18   had committed violent crimes and who had committed

19   sex offenses and I provided treatment to sex

20   offender treatment groups while I worked at the

21   parole department.

22        Q    When you were done with your work with

23   the parole department you went back and continued

24   your work with the California Men's Colony?

25        A    Yes.

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 20 of 263

1    Q    Do you know approximately how many sex

2    offenders you evaluated or treated as part of your

3    work with the Men's Colony?

4    A    I would say 100 to 200, somewhere in

5    there.

6    Q    Why did you leave?

7    A    I left because they were going to

8    transfer me to an undesirable place to live so I

9    decided still as a civil servant to move to a

10    local forensic hospital where I would not have to

11    move my residence.

12    Q    Where was that?

13    A    That was Atascadero State Hospital on

14    the central coast of California.

15    Q    What did you do there?

16    A    There I was responsible for a ward of

17    about 50 what we call mentally disordered

18    offenders in California.  These are offenders who

19    had committed -- their most recent crime was

20    considered a violent crime.  They had a mental

21    illness.  They continued to have symptoms that

22    made them dangerous in prison.  They were

23    evaluated according to a California statute and

24    committed to the state hospital as a mentally

25    disordered offender for further treatment until

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 21 of 263

1    they were no longer dangerous and could be

2    released to the community.

3         Q      Was that a sexually violent predator or

4    sexually dangerous predator type law that you're

5    talking about for civil commitment?

6         A      No, it was not.  It was non-sexual

7    violence, but there were also sexual offenders who

8    had committed violent offenses and were housed or

9    committed as mentally disordered offenders.

10        Q      How long were you at Atascadero State

11   Hospital?

12        A      Not quite a year.

13        Q      What did you do after that?

14        A      After that I was transferred to the

15   Department of Mental Health headquarters in

16   Sacramento, California where I served as the

17   clinical consultant to the new Sex Offender

18   Commitment Program which was responsible for

19   evaluating sexually violent predators.

20        Q      What year was that that you went to the

21   Department of Mental Health?

22        A      It was November of 1995.

23        Q      Did you conduct sex offender

24   evaluations there?

25        A      Yes, I did.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 22 of 263

1        Q        Tell the Court about that experience.

2        A        This was a brand-new sexually violent

3    predator law in California.  My job was to develop

4    the protocol of how to evaluate sexually violent

5    predators, to hire and train the panel of

6    evaluators in California -- the psychologists and

7    psychiatrists -- that conducted those evaluations.

8    I trained them in the research in the area and the

9    clinical aspect of these evaluations, and then

10   also to conduct those evaluations myself and

11   provide court testimony in the county of

12   commitment for those individuals.

13       Q        Do you know approximately how many

14   evaluations you did while you were there for civil

15   commitment?

16       A        I continued to conduct those

17   evaluations for civil commitment and I've

18   conducted approximately 250.

19       Q        How long were you with the Department

20   of Mental Health?

21       A        I was a state employee until 1999 so

22   for about four years.  I was the clinical

23   consultant for the program.  Actually I was the

24   clinical consultant for 15 years.  In 1999 I was

25   no longer a state employee but I had the same

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 23 of 263

1    responsibilities for the program by contract.

2        Q    Did you go into private practice next?

3        A    Yes.

4            In 1999 I went into private practice,

5    but I maintained the same job for the Department

6    of Mental Health until 2008.

7        Q    Dr. Phenix, did your work change in any

8    way when you went into private practice?  You

9    mentioned that it was similar.  Did it change at

10   all?

11       A    It did change.

12       Q    How so?

13       A    Prior to that time I was in a training

14   role, but in terms of the evaluations I conducted

15   it was for the State of California.

16            After that time in private practice I

17   was able to accept cases working for the

18   respondent which I had not been able to do

19   previously, and also I began to work in many other

20   jurisdictions outside of California.

21       Q    What percentage of your practice now

22   involves issues relating to sex offenders and the

23   risk assessment of sex offenders?

24       A    All of it.

25       Q    How many states, if you know, have

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 24 of 263

```
 1    civil commitment laws for sexually dangerous

 2    persons?

 3         A     20.

 4         Q     Have you testified in all 20?

 5         A     No.

 6         Q     How many have you testified in?

 7         A     Eight or nine.

 8         Q     Dr. Phenix, do you know how many

 9    initial evaluations for civil commitment of

10    sexually dangerous persons you've done during your

11    entire practice?

12         A     About 350.

13         Q     You mentioned that you had done

14    evaluations for the respondent.  Have you ever

15    testified in court for the respondent?

16         A     Yes.

17         Q     Again civil commitment.

18         A     That's right.

19         Q     Dr. Phenix, are you familiar with the

20    Adam Walsh Act?

21         A     Yes.

22         Q     Have you evaluated sex offenders under

23    the Adam Walsh Act to determine if they meet

24    criteria for commitment?

25         A     Yes.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 25 of 263

1      Q      How many total evaluations have you

2   done?

3      A      I believe about 24.

4      Q      Have you found that each person has met

5   the criteria?

6      A      No.

7      Q      Were all of those evaluations done as

8   part of your work here in the Eastern District of

9   North Carolina?

10     A      No.  I also worked in the District of

11  Massachusetts.

12     Q      Dr. Phenix, do you know of those 24

13  that you've done how many that you have found met

14  the criteria?

15     A      Yes.  21.

16     Q      In the cases that you found that the

17  person did not meet the criteria were there cases

18  where the BOP psychologists had found they did and

19  you disagreed?

20     A      Yes.  All three of them.

21            MR. ROYSTER:  Your Honor, at this time

22  we tender Dr. Phenix as an expert in forensic

23  psychology specializing in the evaluation,

24  diagnosis and treatment of sex offenders.

25            THE COURT:  Any voir dire?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 26 of 263

1              MS. GRAVES:  Just one question.

2

3                    CROSS-EXAMINATION

4    BY MS. GRAVES:

5         Q     Dr. Phenix, are you board certified?

6         A     No.  We don't have a board

7    certification.  I have a license in psychology to

8    practice.

9         Q     There is no board certification for

10   forensic psychologists?

11        A     Not like medical doctors.

12             MS. GRAVES:  Thank you.

13             THE COURT:  Any objection to her

14   testifying as an expert?

15             MS. GRAVES:  No, sir.

16             THE COURT:  She may proceed as an

17   expert.

18             MR. ROYSTER:  Thank you, Judge.

19

20                  REDIRECT EXAMINATION

21

22   BY MR. ROYSTER:

23        Q     Dr. Phenix, were you asked to evaluate

24   Graydon Comstock?

25        A     Yes, I was.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 27 of 263

1      Q      What specifically were you asked to do?

2      A      I was asked to review all the records

3   and discovery that was provided in the case and

4   initially to offer an opinion based on record

5   review as to a mental disorder, mental illness and

6   also risk for future sexually violent behavior or

7   child molestation.

8      Q      Do you know approximately when you were

9   asked to do this?

10     A      I was asked to do it in about March of

11  2011, I believe.

12     Q      What kind of information was provided

13  to you to review?

14     A      I was provided with information

15  regarding his 2000 criminal adjudication; both his

16  state criminal offense charging documents,

17  conviction documents, presentence investigation

18  report, police reports dealing with his state and

19  federal convictions.

20            I was also provided information from

21  the Department of Corrections when he was

22  incarcerated in Kansas as well as his federal

23  incarceration.

24            I was provided any type of psychiatric

25  or treatment records for his sex offender

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 28 of 263

```
 1    treatment.
 2              I was also provided other evaluations
 3    that had been completed for Mr. Comstock
 4    pertaining to civil commitment.
 5         Q     Dr. Phenix, those records that you just
 6    identified are those the types of records upon
 7    which mental health professionals commonly rely on
 8    when evaluating persons to determine whether
 9    they're sexually dangerous?
10         A     Yes.
11         Q     Did you in fact rely on those documents
12    to make that determination?
13         A     Yes.
14         Q     Did you get an opportunity to interview
15    Mr. Comstock?
16         A     Yes, I did.
17         Q     How long did the interview last?
18         A     The interview lasted, I'd say, about
19    three to four hours.
20         Q     What did you do during the interview?
21         A     During the interview -- which is
22    relatively structured -- I asked him about his
23    psychosocial history and that would include his
24    upbringing, his developmental history, his family
25    history, school/education history, his employment
```

Reported By: Joseph C. Spontarelli, CCR                    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 29 of 263

1    history, any psychiatric history or evaluations

2    that had been completed for him.  I also conduct a

3    thorough psychosexual history given the nature of

4    this type of evaluation.  I inquired about any

5    prior criminal history.  Those were the types of

6    psychosocial topics that I discussed with him.

7        Q        If you could turn to Exhibit 2 in the

8    notebook.

9        A        Yes.

10       Q        Do you recognize Exhibit 2?

11       A        Yes.  That would be my report dated

12   April 1, 2011 for Mr. Comstock.

13       Q        Was this report written and submitted

14   prior to your opportunity to interview

15   Mr. Comstock?

16       A        Yes, it was.

17       Q        Did you submit a revised report

18   subsequent to your interview with Mr. Comstock?

19       A        Yes, I did.

20       Q        If you could take a look at Exhibit 28.

21   Do you recognize it?

22       A        Yes.  That would be my updated

23   evaluation dated November 6, 2011.

24            MR. ROYSTER:  Your Honor, at this time

25   we move into evidence Exhibit 1 which is her CV

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 30 of 263

1    and Exhibit 2 and 28 her reports.

2              THE COURT:  Any objection?

3              MS. GRAVES:  No objection.

4              THE COURT:  Received.

5              MR. ROYSTER:  Thank you, Judge.

6    BY MR. ROYSTER:

7         Q    Dr. Phenix, let's talk about your

8    opinion with respect to Mr. Comstock.  What is

9    your opinion as to whether he is a sexually

10   dangerous person under the Adam Walsh Act?

11        A    I believe he is a sexually dangerous

12   person under the Adam Walsh Act.

13        Q    Can you summarize for the Court the

14   basis for your opinion?

15        A    Yes, I can.

16             I believe that he has engaged in or

17   attempted to engage in sexually violent conduct or

18   child molestation.  I believe that he is dangerous

19   to others and the reason for that is, I believe,

20   that he has a serious mental illness, abnormality

21   or disorder.  I also believe that as a result of

22   that mental illness, abnormality or disorder that

23   he would have serious difficulty refraining from

24   sexually violent conduct or child molestation --

25   particularly in this case from child molestation.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 31 of 263

```
 1      Q      Let's talk about each one of those in
 2   order, Dr. Phenix.
 3             What is the basis of your conclusion
 4   that he has committed or attempted to commit a
 5   sexually violent act or child molestation?
 6      A      That would be his most recent or his
 7   only adjudication for criminal sexual behavior in
 8   2000 where he pled guilty to two counts of
 9   aggravated indecent liberties with children for
10   molesting four prepubescent boys; two brothers age
11   six and seven and another set of brothers age nine
12   and ten years of age.
13      Q      Dr. Phenix, with respect to the second
14   element how did you determine that he suffers from
15   a serious mental illness, abnormality or disorder?
16      A      I examined his history, I examined the
17   interview information that he provided to a number
18   of other doctors or evaluators and I also
19   conducted a clinical interview where I was able to
20   conduct a mental status examination and also
21   examined his psychosexual history and admissions
22   and from that I was able to determine that he did
23   have a mental abnormality or disorder.
24      Q      Did you refer to any manual or any
25   other treatise to come to this conclusion?
```

Reported By: Joseph C. Spontarelli, CCR      www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 32 of 263

1       A       Yes.

2               I referred to the Diagnostic and

3       Statistical Manual of Mental Disorders, 4th

4       Edition which I will call the DSM which is a

5       classification manual of all recognized mental

6       disorders published by the American Psychiatric

7       Association.

8       Q       Is the DSM generally accepted in the

9       field of psychology for diagnosing mental

10      disorders?

11      A       Yes, it is.  It's used by all mental

12      health workers.

13      Q       Dr. Phenix, what were your diagnostic

14      conclusions with respect to Mr. Comstock?

15      A       I provided a diagnosis for Mr. Comstock

16      of pedophilia, sexually attracted to males,

17      exclusive type and also depressive disorder not

18      otherwise specified.

19      Q       Which of these two disorders affect his

20      sexual dangerousness?

21      A       Pedophilia, sexually attracted to

22      males, exclusive type.

23      Q       Dr. Phenix, what is pedophilia?

24      A       Pedophilia is abnormal sexual arousal

25      to prepubescent children.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 33 of 263

1      Q      What's the diagnostic criteria for

2  finding that a person suffers from pedophilia?

3      A      A person who suffers from pedophilia

4  according to the DSM would be someone who

5  experiences intense recurrent sexually arousing

6  fantasies, sexual urges or behaviors toward

7  prepubescent children and that would be someone

8  generally age 13 years or younger and having that

9  experience over at least a period of six months.

10     Q      When you say six months, does that mean

11 he consistently has that urge or fantasy or

12 behavior or is it just spread out over a period of

13 six months?

14     A      It would be the experience of

15 fantasies, behaviors or urges over that period of

16 time of six months.  Generally it's much longer.

17 That would be a minimum criteria.

18     Q      Has Mr. Comstock in your opinion

19 experienced more than one of those three that you

20 mentioned, the fantasies, urges or behaviors or

21 all three?

22     A      He's experienced all three of those

23 over his lifetime.

24     Q      Dr. Phenix, in discussing your

25 diagnosis of pedophilia would it assist you in

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 34 of 263

1    your testimony in reviewing a timeline that you

2    prepared?

3         A      Yes, it would.

4              MR. ROYSTER:  Your Honor, at this time

5    I would like to have the witness use a timeline to

6    illustrate her testimony.  This will not be an

7    exhibit.

8              THE COURT:  It will not be an exhibit?

9              MR. ROYSTER:  It will not be admitted

10   as an exhibit.  It's just for illustrative

11   purposes.

12             THE COURT:  Any objection?

13             MS. GRAVES:  No.

14             THE COURT:  Very well.

15             MR. ROYSTER:  May I approach, Judge?

16             THE COURT:  Please.

17   BY MR. ROYSTER:

18        Q      Dr. Phenix, I've handed you a document.

19   Do you recognize it?

20        A      Yes, I do.

21        Q      What is it?

22        A      This is a chronology of Mr. Comstock's

23   employment.  It also contains information not only

24   about where he worked but who he was working with

25   and incidents of sexual molestation during those

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 35 of 263

1     periods of employment.

2          Q     Did this information assist you in

3     diagnosing pedophilia?

4          A     Yes, it did.

5          Q     Let's talk about it first then.

6                How did this information assist you in

7     diagnosing Mr. Comstock with pedophilia?

8          A     This information was one of essentially

9     four areas that I examined to make a determination

10    of pedophilia in this case.

11               The first area I looked at was career

12    choices.  Essentially for Mr. Comstock as I look

13    at his history he has designed his life around

14    seeking boys for sexual activity.  That in my

15    opinion was the first priority for him.

16               The second priority was the jobs he

17    chose which allowed him to be in the proximity of

18    children.

19               One can see from this timeline as you

20    follow it in 1967 and 1968 he was educated in his

21    field of physical education and recreational

22    administration.  He left there with a Master's

23    Degree in recreational administration.  He left

24    the University of Arkansas and obtained his first

25    job at the Fayetteville Youth Center as assistant

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 36 of 263

1  director also working at the same time at Ohio

2  State University.

3              It is notable that his first job

4  involved working with elementary school children.

5              He has reported a lifetime of being

6  sexually aroused to prepubescent children.  You

7  will note in every one except one of his jobs he

8  was working with elementary and middle school

9  children -- in this case children ages six to 18.

10  This is when he reports his first two victims

11  through employment.

12              It's typical or not unusual I will say

13  for individuals with pedophilia to seek out

14  situations where they can have the proximity of

15  children; particularly where they can be in some

16  position of authority over children.  This is what

17  Mr. Comstock has done throughout his professional

18  life.

19              The only job where he worked with

20  adults would be 1968 at Ohio State University

21  where he was supervising students who would have

22  been generally 18 and over in their own endeavors

23  in being educated in recreation.

24              In 1969 he sought his first job

25  internationally.  It is notable that he was

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 37 of 263

1       employed in a number of different jobs -- sought

2       out these jobs -- in countries where there would

3       be the presence of unsupervised children, where

4       there are countries where there are laxed laws

5       regarding sex between adults and children.

6               Furthermore, in this case he worked in

7       jobs where he would be housed with the children.

8       For example, in 1969 at the American International

9       School in India he was a dorm parent and coach so

10      he lived within the proximity of children who did

11      not have parents there so that he could have

12      greater access to those children.

13              Furthermore, he is in the field of

14      physical education where kids would be exercising,

15      they would be showering and he reported at this

16      point that he was sexually aroused to children

17      since age ten -- middle school aged children.

18      That he was fixated on that younger age and so he

19      had the ability working in physical education to

20      observe children in showers where he reported

21      being aroused, where he reported picking out

22      children of his victim type that were attractive

23      to him.  He reported picking out vulnerable

24      children.

25              He would then place those children in

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 38 of 263

 1    the front of the class where he would have greater

 2    interaction with him them and be able to establish

 3    a grooming type relationship for the purpose of

 4    sexual activity.  This sets the stage to move from

 5    job-to-job where he could have a lot of access to

 6    children.

 7         Q       Dr. Phenix, let me just ask you a

 8    couple questions about this timeline that you've

 9    put together.

10               The dates that you have, are those

11    exact dates or are they approximate dates?

12         A       Those would be approximate dates.

13         Q       The location -- what do you mean by

14    that?

15         A       The location is what country he went

16    to, and furthermore in that location who was he

17    working with.

18         Q       You've got the events part.  Where did

19    you get the information that you included in this

20    chart under the events?

21         A       I got the information from other

22    psychological evaluations for civil commitment,

23    from additional records in the discovery, from my

24    interview with Mr. Comstock and from writings that

25    he did while he was housed at Butner Federal

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 39 of 263

 1    Correctional Institute.

 2        Q        Did you review his deposition?

 3        A        I did.

 4        Q        Is some of the information within this

 5    chart that you're referring to from his testimony

 6    in his deposition?

 7        A        Yes, it is.

 8        Q        For each event or several of them at

 9    least there is a number outside the word victims.

10    What are you indicating there with respect to that

11    information?

12        A        That would be how many victims he has

13    admitted to in the various locations.

14        Q        If you could, Dr. Phenix, walk us

15    through, if you could, and summarize for us the

16    information that's on this chart and how it

17    relates to your diagnosis of pedophilia.

18        A        I think that it's notable that in every

19    single job that Mr. Comstock had internationally

20    as well as in the United States that he molested

21    children who were in school or in proximity to him

22    in each one of those jobs as well as in each

23    period of time that he was doing ongoing graduate

24    work in various locations except for 1986 and 1987

25    when he was in Colorado as a counselor and he was

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 40 of 263

1    working in Dubai.

2              Other than that you will note that he

3    has a number of victims -- in many cases multiple

4    victims -- at each particular location.

5              Furthermore, something that is very

6    consistent in his work history and in his timeline

7    is that he was working with elementary school

8    children in every single work setting after his

9    first job in 1968 at Ohio State University.

10             Other incidents that would indicate

11   that he has pedophilia -- turning to page two of

12   this chronology -- would be the 1973 job in the

13   Teheran American School in Iran.  In this school

14   he worked with children from fifth grade to eighth

15   grade.  He acted as a coach.  He admitted to five

16   victims during this time.  As a matter of fact, he

17   was terminated from his job.  While he was not

18   adjudicated for molesting boys he was caught

19   molesting boys.

20             He had arranged to take a group of 55

21   boys from the Teheran American School to India on

22   a vacation.  He was one of the chaperones to these

23   boys and he admitted in his report at Butner to

24   fondling three of those boys while they were

25   asleep and one of them disclosed the molest and it

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 41 of 263

1    caused him to lose his job although he was not

2    adjudicated for that.

3                He left that job and he obtained a job

4    at the American School of the Haig in the

5    Netherlands -- a country that's known for their

6    liberal sexual attitudes.  He was 33 years of age.

7        Q     What does that mean -- liberal sexual

8    attitudes?

9        A     In a country where they tolerate, for

10   example, and promote prostitution.  It's

11   associated with a freer acceptance of sexuality.

12   At that time Mr. Comstock had reported that there

13   was a tolerance for sexual activity between adults

14   and children, and that child pornography was

15   freely available in the Netherlands at that time

16   so it would be more accepting about that type of

17   sexual behavior.

18                Evidence of that would be that

19   Mr. Comstock became associated with what he called

20   a pedophile group.  It was a group of men who had

21   sexual arousal to children and they formed a group

22   where they would meet once a month and discuss

23   issues surrounding sexual activity between adults

24   and children.  That it was something that was

25   tolerated by authorities in the Netherlands at

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 42 of 263

1    that time.

2              One can see that he had several more

3    victims -- a total of seven admitted victims while

4    he was working in the Netherlands.  He was again

5    teaching grade school and middle school aged

6    children.

7              We see his involvement in this

8    pedophile group repeated again.  In the '70s he

9    said that he had joined NAMBLA -- as you

10   previously mentioned it's an organization -- North

11   American Man-Boy Love Association -- that promotes

12   sexual activity between adults and children and

13   makes efforts to try to change and liberalize laws

14   to make that permissible.

15             In fact, when Mr. Comstock was arrested

16   in 2000 he had pamphlets from NAMBLA --

17             MS. GRAVES:  Your Honor, we would

18   object at this time.  This has reached a point

19   where it's going into information the source of

20   which we don't know.

21             THE COURT:  I'll sustain the objection

22   and ask the government to lay a foundation.

23   BY MR. ROYSTER:

24        Q    Dr. Phenix, you were talking about the

25   NAMBLA information.  What documents or what did

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 43 of 263

1    you review that indicated that information was

2    found at his house?

3        A      When he was arrested in 2000 subsequent

4    to a search warrant those were some of the

5    materials that were found by law enforcement that

6    he had in his apartment.

7        Q      You mentioned his participation in this

8    organization in the Netherlands.  Where did you

9    find that information?

10       A      He self-reported that information.

11       Q      To who?

12       A      To me, to Dr. Demby.

13       Q      Did he also talk about it in his

14   deposition?

15       A      Yes, he did.

16              THE COURT:  You may proceed.

17              MR. ROYSTER:  Thank you, Judge.

18   BY MR. ROYSTER:

19       Q      Dr. Phenix, moving on past the

20   Netherlands can you please continue on with your

21   timeline and how this supports your diagnosis of

22   pedophilia?

23       A      Mr. Comstock left the Netherlands

24   because while he was there and on the trip to

25   India suffered a serious stroke as a young man.

Reported By: Joseph C. Spontarelli, CCR              www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 44 of 263

 1    He returned to the United States for therapy for
 2    having had that stroke.  This is notable because a
 3    serious medical condition can change the course of
 4    pedophilia.  It can reduce a person's libido, it
 5    can cause mobility problems in terms of seeking
 6    children for sexual activity and it can cause
 7    sexual dysfunction.
 8              However, one can see through this
 9    chronology that that did not happen for
10    Mr. Comstock.  In fact, he went on to go to
11    graduate school in his recovery from his stroke
12    and he went to the University of Hawaii.  For the
13    time that he was there which looks to be about a
14    year or two he reported yet again another victim
15    of child molestation but this time it was repeated
16    molestation once or twice a week with a
17    14-year-old boy over a period of time.
18              It's evident here that his stroke did
19    not cause a reduction in libido or sexual
20    dysfunction that would interfere with him
21    continuing to molest children and continuing to
22    express those symptoms of pedophilia.
23         Q    How old was he at this time?
24         A    About 39.
25         Q    Where did he go after his work in

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 45 of 263

1    Hawaii?

2        A        He went on to continue to work

3    internationally.  He went to Lima, Peru where he

4    was a physical education teacher coaching sixth

5    through eighth grade.  He continued to molest at

6    least one child that he admitted to.

7                 His father died and he returned to

8    Arkansas in 1995.

9                 He went to graduate school again and he

10   continued in graduate school to molest children,

11   so we do not see any decrease in his sexual

12   arousal to prepubescent children at this time.

13       Q        You said he returned to Arkansas in

14   1995.  Is that what you meant -- looking when he

15   left Lima, Peru?

16       A        That would be 1984.  When he left Lima,

17   Peru his father had died and he engaged in

18   graduate work in Arkansas and got a job as an

19   elementary school counselor in Arkansas.  That job

20   terminated as a result of an investigation by the

21   FBI into his being involved in child pornography.

22                 A friend of his -- an acquaintance of

23   his in the Netherlands that he knew when he lived

24   there had been arrested and investigated by the

25   FBI for child pornography -- making it or trading

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 46 of 263

1    it -- and they found Mr. Comstock's
2    identification, name, address and had contacted
3    him regarding being involved in that child
4    pornography.  He was sent to be evaluated by a
5    psychologist and that did not result in any
6    charges for him.
7            Nonetheless, Mr. Comstock has admitted
8    throughout his adult life to using child
9    pornography for stimulation for his deviant sexual
10   arousal to children.
11   Q     Where did he go after he lost his job
12   in Arkansas?
13   A     He lost his job as a result of that
14   investigation and he went to Colorado where he
15   worked as a counselor and then on to Dubai where
16   he worked as a guidance counselor for children
17   Kindergarten through eighth grade.
18   Q     He's got this one victim in 1985 that
19   you've listed and then in '86 and '87 he hasn't
20   reported any victims.  Does that break the
21   six-month period?  He's got two years it looks
22   like where he doesn't have a reported victim.
23   A     No.  In fact, looking at the length of
24   time for expressing pedophilia you would include
25   the very first indications of that.  That would be

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 47 of 263

1    for him age 15 when he molested a nine year old.

2    He had deviant arousal before then, but that would

3    be the first expressions of that through the last

4    time that he committed sexual molest to children

5    or experienced those sexual fantasies.  That would

6    be at the very least 2008 when he was collecting

7    child images.

8         Q    Your chart indicates he returns from

9    Dubai to Colorado.

10        A    That's correct.

11             In Colorado he again worked as a

12   guidance counselor for elementary and middle

13   school.  He reported having a victim in 1989 and

14   then he moved on to a job in the Philippines where

15   he worked at the International School of Manila.

16   The Philippines is a country that he had become

17   familiar with.

18             At this point he was 49 years of age,

19   but he had previously reported going to the

20   Philippines to engage in sexual activity with

21   child sex workers which are present in the

22   Philippines and children that you can access

23   through essentially pimps who like child

24   prostitutes that are tolerated to a certain

25   extent.  He knew this because he had gone there

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 48 of 263

```
 1   for three years in a row on vocation at age 35 --
 2   not in a row -- age 37 and age 39.  He had gone to
 3   the Philippines for the purpose of engaging in
 4   sexual activity with children on vacation and he
 5   amassed what he reported to be 15 victims while he
 6   was on vacation in the Philippines; and then at
 7   age 49 went back there to work for several years
 8   and amassed another 13 victims of child molest
 9   while he was working there as a guidance
10   counselor.
11        Q     Where did you find the information
12   about his vacations?
13        A     He reported that to Dr. Hernandez at
14   Butner.  Dr. Hernandez was conducting an
15   evaluation and asked him to write down all of his
16   victims and he made a list of 78 victims out of
17   the 101 that he could recall.
18        Q     Let me ask you to flip over in your
19   notebook to Exhibit 12.
20              My first question for you is if you
21   recognize Exhibit 12?
22        A     Yes, I do.
23        Q     What is it?
24        A     This is a Federal Bureau of Prisons'
25   psychology data system or what we would call
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 49 of 263

1  progress note.  It's written by Dr. Hernandez.

2  This is the progress note that indicates he asked

3  him to produce a handwritten victim list where he

4  acknowledged those 78 victims.

5       Q     Flip over to the second page.  What is

6  the second page of Exhibit 12?

7       A     That would be the summary of where he

8  worked or was on vacation or the location where he

9  had all of the 78 victims; the sexual activity

10  that he engaged in with the victims and what

11  relationship the victims were to him.

12       Q     What's your understanding of who wrote

13  this?

14       A     Mr. Comstock wrote this for Dr.

15  Hernandez.

16       Q     Do you know what the information at the

17  top of each column represents?

18       A     Yes.

19       Q     How do you know it?

20       A     He talked about it in his deposition.

21       Q     Just so we're all clear, his deposition

22  testimony is that something you generally rely on

23  in forming your opinion as to sexual dangerousness

24  of a person?

25       A     Yes.

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 50 of 263

1      Q      What is your understanding based on his
2  testimony about what those columns mean up at the
3  top?
4      A      At the top there would be the location
5  and then the place and then how many victims, how
6  many victims involved with anal penetration or
7  intercourse.
8                  I'm not clear on the next column.
9                  The column after that would be the
10  relationship and that would be a student, an
11  athlete, a counsel lead; in other words, he was
12  their counselor.  Then a column that says O and
13  that would be other such as a child sex worker.
14                  I'm sorry, after anal the column would
15  be female.
16      Q      You mentioned vacations.  Does he
17  indicate that on this chart?
18      A      Yes.  If you go about halfway down the
19  place for location which is the second column
20  after age you can see all of the locations I've
21  discussed and then you can see
22  VAC-Philippines-Thailand-Portugal-Canary Islands
23  and India.  These would be his vacations.
24      Q      Dr. Phenix, going back to the
25  Philippines was he ultimately terminated from his

Reported By: Joseph C. Spontarelli, CCR              www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 51 of 263

1    job there in the Philippines?

2        A        Yes.

3                He was terminated from his job in 1998

4    so he was there several years.  He was terminated

5    for having what was termed an unnatural

6    relationship with a boy that he had adopted.  By

7    1998 this boy was 17 years old.  Mr. Comstock met

8    him.  He was an underprivileged child in foster

9    care.  According to Mr. Comstock he was going to

10   be sent to some type of boys' facility and

11   Mr. Comstock took him into his home.  He had been

12   already having sexual activity with this boy.  He

13   was 11.

14       Q        What were the circumstances under which

15   they met initially?

16       A        He reported that he was a child sex

17   worker.  He was having sex with strangers on the

18   street.  He was 11 years old.  He met him through

19   his pimp.

20               He took him into his home and engaged

21   in sex with this boy at age 11.  It's unclear in

22   the records of a month to a year of sexual

23   activity.

24               It's notable that the boy would then go

25   through puberty.  The sexual activity ended.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 52 of 263

1     Mr. Comstock's would not be sexually aroused to a

2     boy going through puberty and gaining secondary

3     sexual characteristics so the sexual activity

4     stopped.  Mr. Comstock essentially raised this boy

5     until he left the Philippines.

6          Q     Did you talk to him about this

7     relationship in your interview?

8          A     Yes.

9          Q     Did he tell you how long the sex went

10    on with Michael?

11         A     He said the sex went on prior to moving

12    in with him during a period of time, but for a

13    month after the boy moved in with him.

14         Q     You indicated that when he went into

15    puberty the sexual relationships stopped.  Is that

16    your opinion, are you speculating or is that what

17    he told you?

18         A     No, he reported that.  He's reported an

19    aversion to body hair and so that would be a

20    secondary sexual characteristic of a boy going

21    through puberty and Mr. Comstock would no longer

22    be aroused to him.

23         Q     Where did he go after he was terminated

24    from his job in the Philippines?

25         A     He then came back to the United States

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 53 of 263

1    and began working at the Lakin School District in

2    Kansas and ultimately two years later was arrested

3    for the instant offense.

4         Q       If you could, Dr. Phenix, tell the

5    Court about the offenses and how that factors into

6    your diagnosis that he meets the criteria for

7    pedophilia.

8         A       These offenses involve four boys.  The

9    first set of offenses were perpetrated against six

10    and seven year old brothers.

11            One of the ways that Mr. Comstock would

12    access children is to -- when he was arrested he

13    had permission slips for children to come to his

14    apartment and to use his computer.  He had these

15    boys in his apartment several times to come over

16    and play computer games.  During that time he

17    repeatedly fondled the six-year-old boy between

18    November of 1999 and February of 2000 and he

19    fondled the seven-year-old boy's genitals

20    underneath his shorts two to three times.

21            He also befriended nine and

22    ten-year-old boys.  He was again working at the

23    local recreation center.  He was a coach coaching

24    and he had the boys sign up to play sports.  He

25    had befriended the boys' mother.  While one of the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 54 of 263

1    boys was at a basketball game he had the

2    nine-year-old boy -- the younger boy -- at his

3    house caring for the child with the mother's

4    permission and he put his hands in the front

5    pocket of the boy and fondled his genitals.  He

6    had his arms around him and rubbed his body and

7    told the boy that he loved him.  He asked the boy

8    not to tell and said he would get in trouble.

9              He then picked up the ten-year-old boy

10   from the basketball game and in the car he fondled

11   the boy's genitals.

12       Q    What else happened during the course of

13   the investigation of those instances of child

14   molestation that was relevant to your diagnosis of

15   pedophilia?

16       A    With the execution of the search

17   warrant what was found was typical materials that

18   one would see for individuals aroused to

19   prepubescent children.  These are what we would

20   call adult/child sexual materials that are used

21   for erotic stimulation to children.  Most obvious

22   of that would be child pornography.

23              In this search there were 34 pictures

24   of nude boys that were clearly prepubescent boys.

25   There were pictures of these boys not only nude

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 55 of 263

1    but engaging in sexual activity with penetration,
2    sexual activity with each other.  This would be
3    used for the purpose of masturbation to these
4    pictures.  They would be sexual erotica.
5              He was found with, as I mentioned
6    before, a packet of NAMBLA materials.  He was
7    found with a book called Loving Sander.  This is a
8    story of an adult male engaging in sexual activity
9    with a boy.  It's read for the purpose of erotic
10   stimulation.
11             He was also found with a book on
12   boarding schools for boys ages eight to 12.  That
13   was likely used for the purpose of finding those
14   jobs -- many of which he had sought out in
15   international locations where he could live with
16   boys.
17             He had a questionnaire -- are you in
18   puberty.  These are the kinds of things you give
19   to boys to start a conversation about sexual
20   activity as a grooming technique if you will.
21             He had typed permission slips that
22   would allow parents to sign for their children to
23   come to his home to use the computer to access
24   children.
25             These are all materials consistent with

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 56 of 263

1    someone that has pedophilia.

2    Q    You mentioned before that there were

3    four areas that you looked at in your diagnosis

4    and one of those was the career choices.  What are

5    the other three?

6    A    Essentially I looked at all areas of

7    his life; his career, his vacations and recreation

8    and that's what I discussed in terms of where did

9    he decide to go on vacations.  He did take some

10    vacations internationally with a friend, but he

11    took five known trips for the purpose of engaging

12    in sexual activity with boys -- Philippines,

13    Thailand, Portugal, Canary Islands, India --

14    victims in all of those area.

15    The third area that confirmed

16    pedophilia or supported that diagnosis was his

17    collecting and using child pornography throughout

18    his adult life and those types of erotic material

19    I've already discussed.

20    Finally it would be his own admissions

21    to having pedophilia.  The number of victims --

22    which is quite extraordinary -- about a hundred

23    victims that he's admitted to -- his own admission

24    that he is aversive to any type of body hair

25    indicated only sexual arousal to prepubescent

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 57 of 263

1    children.

2              His description of the type of boy that

3    he's aroused to.  A thin boy between age 10 and

4    14 -- a blonde boy.  He has a victim type that's

5    attractive to him.

6              His own report at age ten he became

7    fixated on boys and that that never changed

8    throughout his life.  Also his admission to one of

9    the criteria or symptoms of pedophilia --

10   masturbation to prepubescent boys he's admitted to

11   throughout his life.  He has essentially a classic

12   diagnosis of pedophilia.

13       Q     Dr. Phenix, are you aware of any

14   instances while Mr. Comstock has been in federal

15   custody where he has been found with pictures of

16   children?

17       A     Yes.

18       Q     Can you tell the Court about that?

19       A     We know that his pedophilia has been

20   persistent, long standing and enduring throughout

21   his life.  That's not always the case with

22   pedophilia.  It can wax and wane.  That's not the

23   case for Mr. Comstock.

24              In fact, as recently as June of 2008

25   Mr. Comstock was 66 years old.  At this time he

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 58 of 263

 1    had a shake-down of his room, a search of his cell

 2    and they found 93 images of boys.  He had cut them

 3    out from catalogs.  They were his victim type and

 4    victim age range.

 5              About a third of them were only

 6    partially dressed.  One of them was nude -- a full

 7    frontal picture of a nude boy.

 8              He had a catalog called Culture Kids.

 9    These catalogs are allowed in the institution.

10    Child pornography obviously is not but these

11    catalogs are.

12              THE COURT:  What was the name of it?

13              THE WITNESS:  Culture Kids.  They had

14    lots of pictures of kids and toys and that type of

15    thing.

16              He also had newspaper cutouts of

17    articles and the articles had to do with nudist

18    colonies and also Raising Boy.

19              When child pornography is not available

20    individuals who masturbate to child stimuli and

21    images will cut them out of catalogs and make

22    their own book, if you will, or collection of

23    erotic stimuli to the age group to which they're

24    attracted and that's exactly what Mr. Comstock did

25    only a few years ago.

Reported By: Joseph C. Spontarelli, CCR     www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 59 of 263

1    BY MR. ROYSTER:

2         Q     He wasn't convicted for having child

3    porn as a result of that, was he?

4         A     No.  That would not qualified as child

5    pornography.

6         Q     Does that affect your analysis with

7    respect to his diagnosis of pedophilia or sexual

8    dangernousness in any way that he wasn't convicted

9    of having child porn in 2008?

10        A     No, not at all.  He wasn't convicted of

11   almost all of his victims of child molest.  This

12   is a clinical decision on my part.

13        Q     Dr. Phenix, does pedophilia affect a

14   person's emotional or volitional control?

15        A     Yes.

16        Q     Can you tell the Court how it does?

17        A     It affects each individual differently.

18   There are individuals who have pedophilia who can

19   exercise very good controls over their behavior so

20   throughout their life or at various times in their

21   life they experience deviant, abnormal sexual

22   arousement to children and yet they manage it by

23   finding ways to avoid, for example, a high-risk

24   situation by participating in sex offender

25   treatment that provides the individual with

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 60 of 263

1    techniques and skills to avoid reoffense and

2    sometimes simply making the decision that they

3    choose not to do that.  That they will not act out

4    even though they experience sexual fantasies and

5    urges that are abnormal.

6            On the other hand there are some

7    individuals with pedophilia all along that

8    continuum from having good control to having very

9    poor control over their behavior or what I would

10   consider serious difficulty with volition.

11       Q    Does pedophilia make a person more

12   likely to commit a sex offense?

13       A    I believe that it does.

14       Q    Why?

15       A    It fuels these fantasies and urges.  If

16   you don't have pedophilia you don't experience

17   those kind of fantasies and urges and it's easier

18   to avoid that leading to some type of reoffense.

19       Q    Dr. Phenix, so much time has passed

20   since his conviction in 2000.  How can you say

21   that now currently as he sits here today that

22   Mr. Comstock suffers from pedophilia?

23       A    I think that there's a number of

24   factors that lead me to strongly believe he still

25   suffers from pedophilia.  For one he says he does.

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 61 of 263

1    Number two, pedophilia is -- you can think of it

2    like a sexual orientation.  It's life-long,

3    enduring and pervasive.

4              As an individual realizes in their

5    sexual development that they have some sexual

6    attraction perhaps to the opposite sex or the same

7    sex and then they act out on that throughout their

8    life -- they don't decide I decided to change my

9    sexuality -- you recognize you have a certain

10   sexual orientation and you can act on that or not

11   act on that and that's what pedophilia is.  It's a

12   sexual orientation.  You can't just stop it but

13   you can manage it throughout your lifetime.  There

14   is no question in my mind that Mr. Comstock

15   continues to have pedophilia.

16        Q     You said you can't stop it, but you can

17   manage it.  Is that supported by the research in

18   your field?

19        A     Yes, it is.  That's why the focus of

20   sex offender treatment is not curing it; it's

21   managing it.  Giving the person the skills and

22   abilities to avoid reoffending.

23        Q     Can pedophilia go into remission?

24        A     No, you can't conclude that pedophilia

25   has gone into remission.  For example, a person

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 62 of 263

1  with pedophilia molests children and then goes to
2  prison for ten years and you don't see him
3  molesting children.  Of course there aren't any
4  children in the proximity.  There's a ten-year
5  period of time where you don't see him molesting
6  children and then he's released from prison and he
7  starts molesting children again.  That's because
8  the individual -- pedophilia is life-long -- the
9  individual can reinforce that and we don't know
10 that.
11          What's happening in prison is that he's
12 sexually aroused to children so he's fantasizing
13 about the children on the television but you don't
14 know that he's having those sexual fantasies so he
15 masturbates to those sexual fantasies of children
16 or something from the magazines.
17          We don't know that.  It's all in his
18 mind's eye what's happening and so it's not a
19 surprise that ten years later when the person gets
20 out of prison they have continued over those years
21 to reinforce this deviant sexual arousal and so
22 it's no surprise they start molesting again.  We
23 can't judge a person to be in remission because
24 you simply can't see what's going on.
25      Q     Is impulsivity a symptom of pedophilia?

Reported By: Joseph C. Spontarelli, CCR            www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 63 of 263

1    A    It can be.  Individuals with pedophilia

2  can be very impulsive about acting out on the

3  fantasies and urges so they don't think through

4  the consequences of their behavior, they don't

5  care if they're in a risky situation; they seek

6  out a child anyway in an impulsive way and that's

7  one way that a person with pedophilia can act out

8  their deviance.

9    Q    You've also diagnosed him with

10  depressive disorder not otherwise specified.

11  What's the basis for that diagnosis?

12    A    The basis for that would be his

13  expression of symptoms consistent with depression

14  over his incarceration.  I did not see those

15  symptoms when he was out in the community, but

16  since he's been incarcerated he's had low energy,

17  poor appetite, distractibility, feeling helpless

18  and hopeless and feeling sad and feeling down.  He

19  has received antidepressant medication fairly

20  consistently throughout his incarceration in the

21  BOP.

22    Q    Does it affect his risk to reoffend?

23    A    No, it won't be associated with an

24  increased or decreased risk of sexual reoffense.

25    Q    Dr. Phenix, let's talk a few moments

**Reported By: Joseph C. Spontarelli, CCR**   **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 64 of 263

1    about your opinion that he would have serious

2    difficulty refraining from sexually violent

3    conduct or child molestation if released.

4              First of all, what do you understand

5    this to mean?

6       A      Serious difficulty with volition would

7    be poor control over his behavior.

8       Q      How did you go about determining that

9    he would have serious difficulty refraining?

10      A      In a number of ways.  Looking both at

11   his admissions and also examining his behaviors in

12   the past and currently.

13      Q      Is there anything that you referred to

14   in understanding what serious difficulty

15   refraining meant under the law?

16      A      Yes.

17             There is a definition of serious

18   difficulty refraining from sexually violent

19   conduct or child molestation contained in the Code

20   of Federal Regulation.

21      Q      Did you refer to that in coming to your

22   conclusion that he would have serious difficulty

23   refraining?

24      A      Yes, I did.

25      Q      We've talked a little bit about

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 65 of 263

```
 1    volitional control.  Does he have serious
 2    difficulty with volitional control?
 3         A     Yes.
 4         Q     Why do you say that?
 5         A     For a number reasons.  First of all
 6    I would say because of the extraordinary number of
 7    victims that he has had over time and the
 8    frequency in which he has molested children.
 9               The Federal Code of Regulation
10    indicates that repeated sexual contact with
11    children would indicate serious difficulty with
12    volition and he has experienced that over 30
13    years.
14         Q     When you interviewed him did you ask
15    him how many victims he had?
16         A     Yes.
17         Q     Why?
18         A     I wanted to see if he had a consistent
19    report of victims, and also it's pertinent to my
20    opinion of pedophilia and the risk to reoffend.
21         Q     What did he tell you about the number
22    of victims he had?
23         A     He had seven victims, and I believe
24    three of them were of molest.
25         Q     Do you believe him?
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 66 of 263

1        A      No.

2        Q      Why?

3        A      Because in the records he had already

4    admitted to 78 victims.  In treatment he admitted

5    to 101 victims.

6               He also provided very detailed

7    documentation of the 78 victims including the

8    location, what his feelings were at the time that

9    he engaged in sexual activity with the boys, what

10   he did with the boys sexually.  It was very

11   detailed.

12       Q      What do you do with that information

13   when he tells you something that's so different

14   than what you've read?  How did that factor into

15   your evaluation?

16       A      I understand at times he lies and that

17   is not atypical in a forensic setting.

18       Q      Dr. Phenix, does a person have to be

19   impulsive in order to find that they have a

20   volitional impairment?

21       A      No, they don't have to be.

22       Q      When I asked you that about

23   impulsiveness what do you understand that to mean?

24       A      That would be a person who acts without

25   thinking.  Doesn't think through the consequences

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 67 of 263

1    of his behavior.

2        Q     Why do you not think that that's a

3    necessary component of volitional impairment?

4        A     That's one component.  Volitional

5    impairment to me is more complex than that.  I

6    also see volitional impairment on a continuum.

7    That continuum would be a person who is highly

8    impulsive, doesn't ever think about the

9    consequences of their behavior all the way to the

10   type of sex offender who is very methodical; who

11   plans, who organizes, who grooms his victims.  A

12   person can have serious difficulty with their

13   volition anywhere on that continuum.

14              I believe that almost all -- if not

15   all -- offenders make a choice to sex offend.

16   They make a decision.  That doesn't mean that they

17   have good volitional control.  It's terrible

18   volitional control to make a decision to act out

19   on your deviant sexual arousal.  It can have many

20   different expressions -- serious difficulty with

21   volition.

22       Q     So it's the fact that the person

23   actually commits the act that is the volitional

24   impairment, not necessarily why they commit it.

25       A     Right.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 68 of 263

1    Q    How does his lack of impulsivity affect

2  his risk to reoffend?

3    A    When Mr. Comstock offends against

4  children he does so with extensive planning and

5  sophistication.

6        He educated himself in a career so he

7  could molest children.  He worked in places to

8  gain access to children.  He moved to places where

9  he knew he would have greater access to his

10  victims.  He reported choosing the most attractive

11  and vulnerable victims so he tried to see what the

12  family structure was like.  If it would be easier

13  to work his way into the family to gain access to

14  those children so that he could have the children

15  spend the night with him he would get to know the

16  parents for the purposes of being able to have

17  proximity to their children.

18        His planning and organization and

19  sophistication were extensive, and they are an

20  expression of his serious difficulty with volition

21  that he would go to such extent to commit this

22  illegal criminal behavior.

23    Q    Dr. Phenix, based on your experience,

24  training and education do you have an opinion as

25  to whether that planning and premeditation makes

**Reported By: Joseph C. Spontarelli, CCR    www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 69 of 263

1    him more or less dangerous than someone who is

2    just acting on impulse?

3        A      It's hard to say if it's more or less.

4    For example, a person acting on impulse may try to

5    snatch a child every other day.  You just have to

6    look at each individual.  What I can say is that

7    the way he has planned and executed these molests

8    demonstrates serious difficulty with his volition.

9        Q      Are you aware or familiar with the

10   Barratt Impulsivity Scale?

11       A      I have seen it before.  I have never

12   used it.

13       Q      You didn't use it in this case?

14       A      No.

15       Q      Why not?

16       A      That scale has no validity for

17   understanding serious difficulty with volition

18   pursuant to the civil commitment statutes.  It has

19   no validity for predicting future sexual

20   reoffense.  You use psychological testing to

21   answer a referral question.  There's no referral

22   question here in terms of assessing his

23   impulsivity.  I'm to assess the whole continuum of

24   serious difficulty with his volition.

25                  Also generally in terms of impulsive

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 70 of 263

Page 71

1　behavior you can look at that to see how a person

2　acts.  Do they act in a planned way or do they

3　have a pattern of acting without considering the

4　consequences of their behavior.

5　　　Q　　Are you aware of any research regarding

6　impulsivity indicating a serious difficulty

7　refraining from sexual reoffense?

8　　　A　　No.

9　　　Q　　As part of your evaluation and

10　specifically with regard to the issue of serious

11　difficulty did you assess his risk to reoffend?

12　　　A　　Yes, I did.

13　　　Q　　How did you go about doing that?

14　　　A　　Well, I began by scoring well known and

15　accepted actuarial instruments that assess the

16　risk of future sexual reoffense commonly used in

17　this field.

18　　　　　I also scored an instrument that

19　examined what we call dynamic or changeable risk

20　factors -- the SRA-FV.

21　　　　　I then went on to examine any other

22　clinical or case specific factors that would

23　impact Mr. Comstock's risk to sexually reoffend.

24　　　Q　　What are some examples of the clinical

25　or case-specific factors that you considered?

**Reported By: Joseph C. Spontarelli, CCR**　　www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG　Document 146　Filed 12/15/11　Page 71 of 263

 1      A      That would have to do, for example,
 2   with medical conditions that might decrease the
 3   individual's risk of future sexual reoffense like
 4   mobility problems, chronic diseases, terminal
 5   diseases.  It would be statements about poor
 6   volitional controls or statements that indicate
 7   the person feels like they may go on to reoffend
 8   and that type of thing.
 9      Q      Let's talk about the actuarials.  First
10   of all why did you assess his risk to reoffend?
11      A      I assessed his risk to reoffend to
12   answer the question as a result of a serious
13   mental illness, abnormality or disorder would he
14   have serious difficulty refraining from sexually
15   violent conduct or child molestation.  In other
16   words, can he stop himself and what is the risk
17   that he can't stop himself and that he would
18   actually go on to do it.
19      Q      Let's talk about actuarial instruments
20   for a minute.  First, what is an actuarial
21   instrument?
22      A      An actuarial instrument in this case is
23   a list of known risk factors for future sexual
24   reoffense that have been established in the
25   research that when present predict future sexual

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 72 of 263

1  reoffense.

2          Each of those risk factors contained in

3  an actuarial instrument are statistically weighted

4  for their contribution to sexual reoffense.  Some

5  risk factors are stronger predictors than others

6  and we can determine statistical weights, we can

7  add up to get a total risk score that corresponds

8  to a relative level of risk like low, medium or

9  high and also what we would call an absolute risk

10  or a probability of sexual reoffense for the study

11  sample over a period of time of over five years or

12  ten years.

13      Q     Are actuarials widely used by

14  professionals in your field for predicting risk of

15  sexual reoffense?

16      A     Absolutely.  They're almost always used

17  in sex offender risk assessments in my field, and

18  actuarials are used in many fields to assess risk.

19          For example, in getting car insurance

20  the car insurance company will score actuarials to

21  determine the risk that you pose to cost them

22  money.  It's used in many different fields.

23      Q     Dr. Phenix tell the Court, if you will,

24  how they are useful in these types of assessments.

25      A     Actuarial instruments are developed

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 73 of 263

1    generally on very large samples of sex offenders

2    and generally they can provide us with an overall

3    level of risk for this large group of sex

4    offenders on which they were developed.

5            If the individual that you're

6    evaluating is similar to that group of sex

7    offenders then that can give you an idea of a

8    ballpark level of risk for the person you're

9    evaluating.

10       Q     Can an actuarial instrument just by

11   itself tell us whether Mr. Comstock is going to

12   reoffend?

13       A     No.

14       Q     Why do you say that?

15       A     An actuarial instrument doesn't tell

16   you whether a person will or will not reoffend.

17   It can't do that.  It can provide a general

18   probability for the study sample.  For example, in

19   this case I don't think Mr. Comstock is well

20   represented in the study sample.

21            For every individual you have to look

22   at case-specific factors rather than relying only

23   on an actuarial instrument.  It's just one piece

24   of the risk assessment.

25       Q     Do you think that's what you were being

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 74 of 263

 1    asked to do in this case; to opine on whether he
 2    will or will not reoffend?
 3        A      No, I was not.
 4        Q      What is your understanding as to what
 5    you were asked to do with respect to his
 6    reoffense?
 7        A      What's the probability of him
 8    reoffending.  For example, a measure of relative
 9    risk -- is it low, medium, high.
10        Q      What actuarials did you use in
11    assessing his risk?
12        A      I used two actuarial instruments.  I
13    used the Static-99 Revised and the Static-2002
14    Revised.
15        Q      Why did you use those particular
16    instruments?
17        A      These instruments were developed and
18    tested on the largest group of sex offenders.  The
19    Static-99R is the most widely used actuarial
20    instrument internationally and it is the most
21    validated or tested instrument in the field.
22        Q      What does that mean?  How do you go
23    about testing or validating an actuarial?
24        A      One would not use an actuarial
25    instrument unless it was cross-validated.  What

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 75 of 263

Page 76

1    that means is that the instrument is developed on

2    one group of sex offenders.  Usually it predicts

3    pretty well for that group of sex offenders

4    because it was developed on them.

5            When you test that instrument on other

6    samples or groups of sex offenders sometimes the

7    predictive accuracy of the instrument will go down

8    and so you want to determine if the instrument

9    will be useful with all different types of sex

10   offenders, all different groups of sex offenders

11   so I have greater confidence that it will be

12   useful in evaluations that I'm conducting.

13           We then cross-validate the instrument

14   on as many different samples or groups of sex

15   offenders as you can to gain that greater

16   confidence that it can generalize the offender

17   you're evaluating.

18       Q    Were you involved in the development of

19   the Static-99R?

20       A    No.

21       Q    Do you know how it was developed?

22       A    Yes.

23       Q    Can you tell the Court how that

24   particular instrument was developed?

25       A    There were 24 different samples of sex

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 76 of 263

1    offenders –– actually ultimately 23 different
2    samples of sex offenders –– totaling about 8300
3    sex offenders who were released from various
4    prisons and forensic hospitals in the late '80s,
5    the 1990s and early 2000s.
6              The instrument was scored on those
7    individuals released to the community and then
8    data was collected as to which offenders
9    reoffended and which ones did not to calculate
10   then the ability of the instrument to identify
11   what offenders would go on to reoffend and what
12   offenders would not.
13       Q    Were you involved in the development of
14   the Static-2002R?
15       A    No.
16       Q    Do you know how it was developed?
17       A    It was developed in exactly the same
18   way but with a smaller sample of offenders.
19       Q    Have these actuarial instruments that
20   you used in this case Dr. Phenix –– the Static-99R
21   and the Static-2002R –– have they been subject to
22   peer review?
23       A    Yes, they have.
24       Q    Do the actuarials give you a percentage
25   of whether he will reoffend?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 77 of 263

1       A       No.  They give a probability of sexual

2    reoffense for each cutoff score on the instrument

3    for the study sample so it would be for those

4    8300 -- Static-99R for those 8300 sex offenders.

5    For each score on the instrument what actual

6    number or probability of reoffense for each cutoff

7    score, but that doesn't tell us the true

8    probability for Mr. Comstock.

9       Q       Why not?

10      A       Because Mr. Comstock was not in the

11   study sample so I would make a judgment as to

12   whether Mr. Comstock was similar to the offenders

13   in the study sample or dissimilar in terms of how

14   much I would rely on these actuarial instruments

15   in any given case.

16      Q       Dr. Phenix, if you would take a look at

17   Exhibit 2 of your report -- pages 18 and 19.  Do

18   you see that?

19      A       Yes, I do.

20      Q       At the bottom of page 18 and the top of

21   19 is this where you report your scoring of Mr.

22   Comstock for the Static-99R?

23      A       Yes.

24      Q       Could you just tell the Court or

25   summarize for the Court the different risk factors

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 78 of 263

1    that are considered with respect to this

2    instrument?

3        A       Yes.

4                 There are ten receptors on the

5    Static-99R.  These are robust predictors that have

6    long been established in the field when present to

7    increase the risk of future sexual reoffense.

8                 The first one has to do with the age of

9    the offender.  We know that for large groups of

10   sex offenders that older sex offenders have

11   reduced risk to younger sex offenders.

12                There are four age categories

13   associated with a score on this item.  Age 18 to

14   34 is a risk point of one.  Age 35 to 39.9 is a

15   risk score of zero.  Age 40 to 59.9 is a minus

16   risk score of minus one.  60 and over is a minus

17   three risk point.

18                The second item has to do with

19   statistically whether an offender has ever lived

20   in a two-year intimate relationship.  That would

21   not be whether they have been married per se but

22   having lived in a two-year intimate relationship

23   consistently.  In this case Mr. Comstock never had

24   so he receives a higher risk point of one.

25                The next two items -- index non-sexual

Reported By: Joseph C. Spontarelli, CCR                    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 79 of 263

1  violence and prior non-sexual violence -- we know
2  that there are two constructs or factors that
3  predict future sexual reoffense.  One has to do
4  with sexual deviancy and the other has to do with
5  criminality and non-sexual violence.  We're
6  measuring both on this instrument.
7           This asks you was there a conviction
8  for non-sexual violence at the time of the most
9  recent sex offense -- that would be in 2000 -- in
10 the case of Mr. Comstock there was not so he gets
11 a zero -- and in his criminal history has there
12 ever been prior to the most recent sex offense a
13 conviction for non-sexual violence.  Mr. Comstock
14 has no other criminal history and he would have a
15 zero on that item.
16          Item five is a measure of sexual
17 deviance.  Does he have prior sex offenses.  We
18 know that Mr. Comstock does, but the only thing
19 that you can code on this item is actual charges
20 and convictions for prior sex offense.  He has had
21 no prior charges and convictions despite all of
22 those molestations in his past and therefore he
23 gets no risk point on this item and he gets a
24 zero.
25          Item number six is called prior

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 80 of 263

1    sentencing dates.  That's an English term for
2    prior convictions.  This is a criminality item and
3    you count up any convictions prior to the most
4    recent sex offense and if you have four or more
5    you get a risk point of one, and three or less you
6    get no risk point; you get a zero.  Mr. Comstock
7    has no prior criminal history so he gets a zero on
8    this item.
9             Item seven asks are there any
10   convictions for non-contact sex offenses --
11   generally exhibitionism, voyeurism and child
12   pornography; although it could be others.
13   Mr. Comstock has a one on this because he has a
14   conviction for child pornography -- his federal
15   case.
16             There are three victim items.  The
17   first of those is the relationship to the victim.
18   Offenders who have incest offenses have the lowest
19   risk.  There's a risk point on this instrument for
20   unrelated victims and for stranger victims.  Those
21   are increased risk of incest and each one would be
22   one risk point for Mr. Comstock because he has
23   both.  In terms of stranger victims he many times
24   had sex with what he described as child sex
25   workers in various countries who were strangers.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 81 of 263

1     All of his victims except for his brother and his

2     cousin were unrelated.

3               He also has a one for male victim.

4     Individuals who have male victims are at greater

5     risk than those with only female victims so he

6     gets one risk point there.  Because Mr. Comstock

7     has a minus three as a result of his age -- 60 and

8     over -- he has only a score of two on the

9     Static-99.

10    Q     Before we get into what all that means

11    let's flip over a couple pages to page 21.  Are

12    you there?

13    A     Yes.

14    Q     That chart there, is that your scoring

15    summary for the Static-2002R?

16    A     Yes, it is.

17    Q     Why did you use a second instrument?

18    A     I use multiple actuarial instruments

19    for the purpose of converging evidence.  There is

20    no one best actuarial instrument.  If there was an

21    actuarial instrument that had the highest

22    predictive accuracy I would use that but there's

23    not.

24              The three most widely accepted

25    actuarial instruments that we have all have equal

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 82 of 263

1   predictive accuracy and so there is no one best

2   instrument.

3              They do, however, have different items

4   so I have a greater review of the known risk

5   factors for future sexual reoffense using more

6   than one instrument.  Furthermore, I have

7   converging evidence of risk.

8              For example, all three of the

9   instruments could say the person is high risk and

10  then I would have greater confidence they were

11  truly high risk.

12             If they're widely discrepant -- one

13  says low risk and another one says high risk --

14  then I have questions about the utility of those

15  instruments in making the risk prediction.

16      Q      How do you know how to score them?

17      A      Each one of these actuarial instruments

18  has coding rules that guide a clinician in how to

19  score each item.

20      Q      Were you involved in the development of

21  the coding rules?

22      A      Yes.  I'm one of the authors of the

23  coding rules of the Static-99R, and I'm the lead

24  author of the coding rules for Static-2002R.

25      Q      Do you get any royalties for testifying

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 83 of 263

1    about these instruments since you developed the

2    coding rules if you use them in your cases?

3        A    I'm not paid for any of my role in

4    developing the coding rules for either instrument.

5        Q    Do you train people on how to use these

6    instruments?

7        A    Yes, sometimes.

8        Q    Let's go back to the Static-2002R and

9    tell the Court why you scored it the way you did.

10       A    The Static-2002R is conceptually

11   different than the Static-99R.  The Static-99R is

12   simply a list of factors that are statistically

13   related to future sexual reoffense.

14            The Static-2002 was developed to make

15   conceptual sense.  You can actually look at the

16   way the individual has scored to see where the

17   risk is coming from and that can be helpful, for

18   example, in a treatment setting so you know what

19   area to treat -- either criminality -- maybe

20   that's where the risk is coming from -- or sexual

21   deviance.

22            There are five categories of risk

23   areas.  The first one is age and that's very

24   similar to Static-99.

25            The second category is persistence of

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 84 of 263

1   sex offending and there are three components to

2   that.  Prior sentencing occasions for sex offenses

3   just like Static-99; has the person committed a

4   sex offense as a juvenile and as a adult -- that

5   would increase risk.  Finally, how frequently do

6   they offend.

7              In this case for age Mr. Comstock got a

8   zero because that would be 60 and over -- low risk

9   related to that -- and because he was never

10  detected or at least adjudicated all of those

11  years he was offending -- he gets a zero on

12  persistence of offending.  That would go up if

13  somebody had been caught repeatedly.

14             There's a category called deviant

15  sexual interest and that contains items having to

16  do with whether there's a non-contact sex offense

17  which we saw in Static-99 for male victim.  That's

18  more deviant than a female victim so there's a one

19  there.  Do they have two victims under the age of

20  12 with one of them unrelated.  This picks up on

21  pedophilia -- sexual attraction toward children --

22  and Mr. Comstock had a one for each one of those

23  items so we see a total score of three for deviant

24  sexual interest.

25             We also have a category on relationship

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 85 of 263

1   to victim just like Static-99.  Mr. Comstock gets

2   a point for unrelated and stranger victim.

3           Finally there is a cluster called

4   general criminality and Mr. Comstock doesn't get a

5   point for any of these items.  He has not engaged

6   in general criminal activity in the past.  All of

7   his criminal activity has been related to sexual

8   deviance.  He has no prior involvement with the

9   criminal justice system, no prior sentencing

10   occasions for criminal behavior, he did not

11   violate community supervision, he did not have any

12   prior non-sexual violence offenses as we've

13   discussed in the past so he received a total score

14   of five on this instrument.

15          MR. ROYSTER:  Judge, do you anticipate

16   a morning break?

17          THE COURT:  I do.  I was going to do it

18   around 11:00 but now is fine.

19

20         (Recess.)

21

22   BY MR. ROYSTER:

23     Q    We left off talking about your scoring

24   of the Static-99R and the Static-2002R.  Turn to

25   page 23 of your report.

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 86 of 263

1          Dr. Phenix, taking a look at page 23 of

2     your report -- do you see that?

3          A     Yes.

4          Q     What is that chart at the top of the

5     page?

6          A     That is a summary of the findings in

7     regards to risk for both Static-99R and

8     Static-2002R.

9          Q     What does that information tell us?

10         A     It tells us measures of relative and

11    absolute risk.  For example, it tells us the risk

12    category that he fell into for each of these

13    instruments.  For Static-99R he received a total

14    score of two in the low/moderate range.  In

15    Static-2002R he received a total score of five in

16    the moderate range.

17         Q     What are the different ranges for those

18    instruments?

19         A     The ranges for Static-99R is low,

20    low/moderate, moderate, moderate/high and high.

21    That would be the same for the Static-2002R.

22         Q     What does the percentile column

23    indicate?

24         A     The percentile allows us to compare the

25    results on the actuarial instrument for

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 87 of 263

1    Mr. Comstock to a large sample of what we consider

2    typical sex offenders.  In reading a percentile

3    for Mr. Comstock's score of two on Static-99R he

4    received a percentile of 39.7 to 54.4.  According

5    to this percentile he scored about in the middle

6    in terms of risk offenders between very low and

7    very high.  39.7 to 55.4 percent of offenders

8    scored at or below his score.

9    Q    Is it the same thing for the

10    Static-2002R that 63.4 to 77 percent scored at or

11    below?

12    A    That's right.  He scored a bit higher

13    on Static-2002R than he did on Static-99R.

14    Q    What are those two columns over there,

15    the five-year percent risk and the ten-year

16    percent risk?

17    A    For the study sample in five years on

18    Static-99R individuals with a score of two

19    12.2 percent of them went on to be arrested or

20    convicted of a sex offense.  In ten years for

21    Static-99R for the study sample 19.7 of the

22    offenders with a score of two went on to be

23    arrested or convicted of a new sex offense.

24    Q    The same for the 2002-R?

25    A    That's correct.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 88 of 263

```
 1        Q        Do you regard these figures under the

 2   five percent risk and the ten percent risk -- do

 3   you regard those figures to be an accurate

 4   estimate of Mr. Comstock's risk to reoffend?

 5        A        No.

 6        Q        Why?

 7        A        I didn't find the actuarials useful in

 8   informing me about Mr. Comstock's risk.  In rare

 9   cases actually I think that the actuarials can be

10   misleading in terms of overall risk.

11               These values are as accurate as

12   Mr. Comstock being well represented in the study

13   sample, and I don't think that he is well

14   represented.  I think there's very few offenders

15   in the study sample that have the history and

16   chronicity of his offending that have the number

17   of victims that he's had in his lifetime that have

18   committed that many offenses and never been

19   subject to detection and adjudication until age

20   58.

21               By age 60 if you look at age data very,

22   very few offenders go on to reoffend after age 60.

23   Mr. Comstock was 58 -- he was almost 60 when he

24   was detected with his first sex offense.  He

25   simply is not well represented in the study
```

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 89 of 263

1    samples so I don't think that the actuarials in
2    this case are helpful to us in terms of assessing
3    his overall risk.
4          Q     Dr. Phenix, did you calculate the
5    positive predictive value and negative predictive
6    value for these scores?
7          A     No.
8          Q     Do you know what that is?
9          A     Yes.
10         Q     What is it?
11         A     That would be essentially the
12   percentage of times that you say someone is going
13   to reoffend and they do, or you say that they're
14   going to reoffend and they do not.
15         Q     Surely that's an important analysis for
16   this case.  Do you agree with that?
17         A     It's not an important analysis for this
18   decision that I've made.
19         Q     Why?
20         A     Because I'm not making a decision about
21   whether Mr. Comstock will or will not go on to
22   reoffend.  While you can calculate that from
23   various samples where you have the data of who
24   went on to reoffend, I'm simply offering an
25   opinion that there is a certain probability that

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 90 of 263

1      he will go on to reoffend.

2          Q      Do the authors or the developers of

3      these actuarials recommend using those values to

4      opine on sexual dangerousness?

5          A      No.

6          Q      We've talked about the actuarials and

7      you mentioned that there were dynamic factors that

8      you also considered.  How did you consider the

9      dynamic factors -- first what are dynamic factors?

10         A      We have essentially two types of known

11     research drive risk factors for future sexual

12     reoffense.

13             The first type is static risk factors,

14     unchangeable historical risk factors, that

15     generally can't change except they can go up.  If

16     you have a male victim you will always in your

17     life have a male victim.  You can't remove that

18     from the risk assessment.  If you have prior sex

19     offenses you will always have that.  Those are

20     static risk factors.

21             We also have research drive dynamic or

22     changeable risk factors that when they are

23     decreased will decrease overall risk and these are

24     generally the targets of treatment for sex

25     offenders.

Reported By: Joseph C. Spontarelli, CCR            www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 91 of 263

1          We have for years assessed dynamic or
2     changeable risk factors and now we have a more
3     structured scheme in which to do that.
4          Q     What is that scheme?
5          A     That's called the SRA-FV -- Structured
6     Risk Assessment-Forensic Version.
7          Q     Who developed that?
8          A     Dr. David Thornton and Dr. Ray Knight.
9          Q     Were you involved in the development of
10    it at all?
11         A     No.
12         Q     What does it tell us?
13         A     It tells us the extent of the presence
14    of dynamic or changeable risk factors that will
15    add what we'll call incremental validity to the
16    Static-99R and the Static-2002R.
17               In other words, is there any factors we
18    can consider that will add new information and
19    improve our ability to predict who will go on to
20    reoffend and that's what dynamic factors do; they
21    add new information to the static factors and give
22    us a better predictive accuracy overall in risk
23    assessment.
24         Q     If you will take a look at page 24 and
25    the top of page 25 of your report, Dr. Phenix,

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 92 of 263

1    there's a chart there.  What is that chart?

2         A     That's the coding form for the

3    Structured Risk Assessment—Forensic Version.  It's

4    called the Light because it doesn't include a few

5    of the factors on the instrument that would be

6    scored from psychological testing.

7         Q     Is this essentially how you consider

8    the dynamic factors?

9         A     Yes.

10        Q     Walk us through, if you will, this

11   chart and how the scoring works.

12        A     There are three constructs here that

13   predict future sexual reoffense in a dynamic or

14   changeable way.  We're examining what's called

15   long-term vulnerabilities.  How has each one of

16   these factors affected this person throughout

17   their life up to the current time.

18             The first cluster is having to do with

19   sexual interests.  The first one being a sexual

20   preference for children.  These static risk

21   factors do not fully account for sexual

22   preferences for children or pedophilia.  There's

23   risk outside of the static risk factors that is

24   captured by that disorder.  This is measured by

25   having three or more child victims.  For a male

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 93 of 263

 1    that would be under the age of 14.  Of course we
 2    know that he has close to a hundred if not a
 3    hundred child victims.
 4              You can score a zero; meaning the
 5    factor is absent completely.  A one meaning there
 6    is some indications of that factor, or a two
 7    meaning that that factor meets the operational
 8    definition in the coding rules.  He has a two on
 9    sexual preference for children.
10              Sexualized violence is defined as
11    sexual arousal to the forced aspects of sexual
12    activity commonly called sexual status zone.  The
13    pain, the humiliation, the mere force itself
14    during sexual activity would be arousing.  That is
15    not the case for Mr. Comstock.  That is not
16    present.  He has a score of zero.
17              Sexual preoccupation has long been
18    established as a dynamic or a changeable risk
19    factor.  It's present much more often in
20    individuals who commit sex offenses and it's
21    generally defined as being preoccupied with
22    deviant sexual themes and arousal.  Using
23    pornography, placing yourself in situations where
24    you are in the presence of children to seek
25    children for sex, going to strip bars, making

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 94 of 263

1    phone calls to telephone sex lines.  In this case

2    designing your life around being able to access

3    children.  I've already testified, I think to a

4    great extent, to the level of sexual preoccupation

5    that Mr. Comstock has had throughout his life up

6    until the current time in 2008 when he was found

7    to have deviant child stimuli.

8         Q      How do you get the scoring to work?

9         A      For sexual preoccupation he has a two

10   on narrow and broad sexual preoccupation each

11   defined operationally with a total score of four.

12              You've got to do a little math here so

13   it's divided by two and you get a total factor

14   score of two for sexual preoccupation.

15              You add up the factor scores and divide

16   it by three because there's three items to get a

17   domain score of 1.33.  You're going to add the

18   domain scores to get a total score and that tells

19   you -- that total score will tell you the extent

20   of dynamic risk factors present.

21              THE COURT:  For narrow and broad you

22   have two.  That's the highest, zero to two?

23              THE WITNESS:  Correct.  That's the

24   highest for both of those.

25              For example, in broad sexual

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 95 of 263

```
 1    preoccupation the frequency of seeking out child
 2    victims would be a primary factor here.  It's not
 3    only the child pornography and the obsession with
 4    finding children but the pattern and duration of
 5    offending as well.  It's measured on sexual
 6    preoccupation.  Some individuals with pedophilia
 7    have one or two individuals their entire life.
 8              THE COURT:  And that score would be?
 9              THE WITNESS:  That score would be one
10    or zero.
11    BY MR. ROYSTER:
12        Q    Dr. Phenix, the next domain is
13    relational style RSD.  What does that mean?
14        A    We know that factors having to do with
15    interpersonal relationships and the ability to
16    develop intimate relationships and sustain them in
17    a healthy way indicates reduced risk for sexual
18    recidivism.
19              We saw one factor that related to this
20    on Static-99 -- ever lived in an intimate
21    relationship for two years -- that's just a yes or
22    no.  This actually isn't a repeat of that.  This
23    looks at the quality of the relationship that the
24    person developed and it's a protective factor if
25    it's present.
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 96 of 263

 1        Q        What do you mean by protective factor?

 2        A        It lowers risk for sexual reoffense if

 3     a person has the ability to establish and maintain

 4     a relationship and it's a healthy relationship.

 5        Q        A couple of times today you've said we

 6     know something to be the case.  Who is we and how

 7     do you know it?

 8        A        We would be the research in this field.

 9     Individuals like myself rely on the research in

10     the field that establishes the risk factors that

11     we rely on.

12              We know that we have better predictive

13     accuracy if we rely on research derived risk

14     factors than relying on something like our

15     experience or something that's not in the

16     research -- not related to sexual reoffense in the

17     research.

18        Q        Go ahead and tell us how you scored

19     this relational style domain.

20        A        If Mr. Comstock had lived in an

21     established relationship that was not fraught with

22     difficulties, problems, infidelity, domestic

23     violence for two years he would have a zero, but

24     he has never had an adult relationship.  He's not

25     ever had sex with an adult person.  He's not

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 97 of 263

1   sexually aroused to adults by his own self-report
2   and so he received a two here.  He cannot get his
3   emotional needs met by an appropriate adult
4   relationship and that increases his risk.
5       Q       You mean an intimate relationship or
6   can it just be a familial relationship?
7       A       It needs to be an intimate
8   relationship.  Individuals who don't have the
9   skills to develop those relationships, who can't
10  maintain those relationships because of problems
11  that are created such as substance abuse,
12  infidelity, domestic violence they are at higher
13  risk generally because they don't have their
14  emotional needs met.
15           When Mr. Comstock looks to have his
16  adult intimate and emotional needs met he goes to
17  children to have that happen and that puts him at
18  higher risk.
19           Emotional congruence with children --
20  Mr. Comstock scored a two on this.  It's also
21  called emotional identification with children.
22  Individuals with pedophilia may turn to children
23  just because they're sexually aroused to them just
24  to have sex and yet they are married; they have
25  adult relationships that are fulfilling to them;

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 98 of 263

```
 1   although there are individuals with pedophilia
 2   that have this emotional congruence or
 3   identification with children and children meet
 4   their emotional needs and so what they do is they
 5   develop children in their mind's eye as if they're
 6   an adult like they're in an adult love
 7   relationship.  They write love letters to children
 8   as if you would write it to your partner or to
 9   your spouse.  You fall in love.  They fall in love
10   with children and they believe that a sustained
11   relationship would be just like an adult sustained
12   relationship.
13           The record that Mr. Comstock
14   self-reports over a lengthy time indicates that he
15   has a strong emotional identification with
16   children.  He believes he can be a loving, caring
17   partner to children.
18           About one of his victims he wrote to
19   Dr. Hernandez when asked about what his thoughts
20   were when he was molesting this child and he said
21   I love him as much as anyone could love.  He needs
22   me and I need him.  He described his feelings as
23   loving and caring and compassionate.
24           This indicates -- also Mr. Comstock's
25   statement -- that he looks to children for meeting
```

**Reported By: Joseph C. Spontarelli, CCR**   **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 99 of 263

1    his emotional need and that is a two on this item

2    and it increases his risk of sexual reoffense.

3             The next item is what's called

4    grievance thinking.  It's a style or way of

5    thinking feeling like you're persecuted by others.

6    A person who can't accept the views of other

7    people.  You feel put upon all the time.  You feel

8    sorry for yourself.  People don't understand you.

9    They don't get you.  It's a style of thinking that

10    is associated with an increased risk of sexual

11    reoffense primarily because you can't take

12    responsibility for what you've done.

13             Over the years in treatment and

14    actually in interviews with clinicians

15    Mr. Comstock has believed that he is persecuted

16    because of his sexual arousal to children.  He

17    believes it should be justified, he believes it is

18    legitimate, he believes you can have a loving,

19    caring relationship between an adult man and a

20    prepubescent boy.

21             MS. GRAVES:  Objection to what he

22    believes.

23             THE COURT:  I think you started to lay

24    a foundation.

25    BY MR. ROYSTER:

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 100 of 263

 1      Q      What's your basis for saying that, that
 2  he believes that?
 3      A      He reported those beliefs to Dr. Demby,
 4  he reported those beliefs when he was in treatment
 5  in the Department of Corrections in Kansas and
 6  it's been consistent about his report.  He even
 7  reported that he thought it was prejudicial of the
 8  DSM to have pedophilia be a mental disorder
 9  because it wasn't; and the people that actually
10  harmed children were the police who interviewed
11  them like law enforcement, social workers who
12  interview children after they have been sexually
13  abused because he didn't believe the abuse
14  actually harmed them.
15            MS. GRAVES:  Same objection, Your
16  Honor.
17            THE COURT:  Overruled.  She's
18  indicating what she has gained from reports.
19            THE WITNESS:  He has had long-standing
20  feelings or long-standing evidence of grievance
21  thinking that he had been persecuted because of
22  his sexual arousal to children and he should not
23  have been.
24            He's also had writings since he's been
25  in custody since 2006 indicating he believes he's

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 101 of 263

1    a political prisoner and the like.  He tends to

2    look outside of himself rather than internally

3    about the problems that he's experiencing.

4    BY MR. ROYSTER:

5        Q      Just so the record is clear, Dr.

6    Phenix, these writings and this information this

7    is material that was sent to you to review in

8    preparation of your report and to conduct your

9    evaluation, is that right?

10       A      Yes.

11       Q      Can you give the Court an idea how many

12   pages of documents you reviewed as part of that?

13       A      Certainly over 2600.

14       Q      The relational interest domain total

15   score is 1.66, is that right?

16       A      Yes.

17       Q      How did you get there?

18       A      The final component would be poorly

19   managed anger.  If a person has grievance thinking

20   they may actually strike out against another

21   person if they feel put upon too much.

22              Mr. Comstock has never expressed poorly

23   managed anger in terms of aggression or violence

24   toward others so I gave him a two.  You would add

25   the components of grievance thinking which would

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 102 of 263

1    be two total divided by two which is a one under a

2    factor score and if you add up all the factor

3    scores under relational style that would be a

4    total of five divided by three because there's

5    three factors equaling 1.66.

6         Q       Why do you divide the grievance

7    thinking and the sexual preoccupation domains by

8    two and not the others?

9         A       Because those are subcomponents.

10   There's two subcomponents, narrow and broad sexual

11   preoccupation so you divide the four by two and

12   there's two grievance thinking components --

13   internal grievance thinking and poorly managed

14   anger.

15        Q       So it's not necessarily because one

16   deserves more weight than the other; it's just

17   because there are two components and you weight

18   the average.

19        A       Yes.

20        Q       What about the last domain?

21        A       The last domain is called dysfunctional

22   coping.  This is defined as a person's ability to

23   identify their problems, to generate reasonable

24   solutions to those problems and to execute those.

25   The ability of the person to think through the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 103 of 263

 1     consequences of their behavior.  I gave
 2     Mr. Comstock a two.  This is a person who has had
 3     a serious life-long problem that's affected every
 4     arena of his life in a negative way.  He did not
 5     manage that over 30 years.  He twice engaged in
 6     therapy once for one day, another time for a very
 7     brief period of time after he incurred a stroke.
 8     Mostly about the trauma of experiencing the
 9     stroke.  He never determined or worked on a way to
10     stop himself from harming children over 30 years.
11              He went into treatment but was found in
12     the Kansas Department of Corrections -- he's
13     bright; having understood what he was taught in
14     treatment over 18 months -- but they believed he
15     would not use it because he had entrenched
16     attitudes that accepted and promoted sexual
17     activity with children so poor treatment at BOP.
18     He's not chosen to engage in treatment for the
19     serious life-long problem.
20              In fact, he's gone on to reinforce his
21     sexual deviance even in the most confined setting
22     by developing child images that he can use for
23     deviant sexual arousal as recently as a few years
24     ago.
25              I gave him a two for dysfunctional

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 104 of 263

1    coping which equates to -- divided by two it

2    equates to a one under the domain score and we

3    have a total domain score of 3.99 which is quite

4    high.  It indicates a strong presence of dynamic

5    or changeable risk factors.

6         Q     Do you use that score -- that 3.99 --

7    in any relation to the actuarials?

8         A     Yes.

9         Q     How?

10        A     This is one way that guides us what the

11   probability is of sexual reoffense or what we call

12   the base rate of sexual reoffense for the cutoff

13   scores on those instruments.

14             There are different norms or sets of

15   probabilities for each of those instruments --

16   four different sets of probabilities -- routine

17   probabilities which are the lowest probabilities.

18             Preselected for treatment -- if an

19   individual has been preselected institutionally to

20   participate in treatment there's a set of norms

21   that can be used for those individuals.

22             What we call non-routine -- a

23   combination of preselected for treatment and high

24   risk norms.

25             The fourth group is the highest

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 105 of 263

1    probabilities -- the sexual reoffense -- and those
2    would be called the high risk norms and those were
3    the ones that I selected to use in this case.
4    They are associated with very high scores on the
5    SRA-FV.  It guides which set of norms to choose.
6         Q       Why did you choose the one with the
7    highest probabilities?
8         A       There are cutoff scores for the SRA-FV
9    so as the score goes higher then you're advised to
10   use higher probabilities of sexual reoffense.
11            Because his score was in the high range
12   I would be advised then to select the high risk
13   norms that have higher risk probabilities.  Those
14   would be the most accurate for Mr. Comstock.
15        Q       Did you look at the criteria for each
16   of the norms to figure out which category to put
17   him in?
18        A       I did, because these norms were
19   developed by criteria of what we call
20   preselection.
21            For example, routine offenders have not
22   been preselected for any special intervention in
23   prison.  They just parole and go out and they
24   haven't had any type of preselection.
25            Some offenders, however, in most

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 106 of 263

1    jurisdictions or most departments of corrections

2    are preselected for sex offender treatment if you

3    have a sex offense.

4           However, in most departments of

5    corrections they don't have the funds to treat

6    every single sex offender.  Generally the highest

7    risk sex offenders are selected out for treatment.

8           There's a set of probabilities for

9    reoffense that apply to those preselected for

10    treatment because they're higher risk than those

11    who were not preselected for treatment.  Those

12    offenders were generally lower risk.  When they go

13    out you would expect those preselected for

14    treatment to have higher recidivism or reoffense

15    rate.

16           Mr. Comstock was preselected for

17    treatment in the Department of Corrections in

18    Kansas and so I had an option of looking at

19    factors having to do with preselection to say

20    maybe I should use those probabilities because he

21    was preselected for treatment.

22           What we know is that the extent of

23    dynamic risk factors is going to be more important

24    than just factors of preselection.  Because his

25    score was so high on SRA-FV -- a measure of

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 107 of 263

1    dynamic risk -- I would be more accurate if I

2    choose the base rates associated with the high

3    risk group rather than preselected for treatment.

4         Q      You talked about this a little bit --

5    he's had sex offender treatment.

6         A      Yes.  He completed an 18-month program.

7         Q      How does his completion of that

8    18-month program factor into your evaluation of

9    his risk?

10        A      The program that he participated in was

11   a time limited program, it wasn't a success

12   limited program.

13              Ideally you would have a program where

14   the offender completed treatment when they had

15   sufficient treatment gains to reduce their risk.

16   Oftentimes in the Department of Corrections as in

17   this case the program ends after 18 months and

18   therefore you have to be careful to look at

19   treatment gains in a program like that because

20   some offenders will have essentially skated along,

21   they would not have worked very hard and yet they

22   didn't get kicked out of the program or terminated

23   so they end the program with few treatment gains;

24   whereas others may do very well and internalize

25   what they learn in treatment and be lower risk as

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 108 of 263

1      a result.

2              It was important to review the

3      treatment discharge report from the Kansas

4      Department of Corrections which described poor

5      treatment progress.

6              I believe that Mr. Comstock while he

7      learned what he could do to lower his risk that

8      they believed he would not use that to lower his

9      risk and there were concerns that he still held

10     some of those very entrenched attitudes that gave

11     him permission to go on to reoffend; that it

12     didn't harm children to do that.  I did not

13     believe that his treatment participation lowers

14     his risk.

15     Q      Flip over to Exhibit 14 in the notebook

16     that's at the witness table.  Is that the

17     discharge summary that you were referring to a few

18     moments ago?

19     A      Yes, it is.

20             That reports that although he has

21     learned how he offends, it is unlikely that he

22     will stop offending.

23     Q      Where is that?

24     A      On page three at the bottom.

25     Q      Just for the record that's Bates

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 109 of 263

```
 1    stamped at the bottom BOP COMS 1362.

 2              Dr. Phenix, did you do any other

 3    testing of Mr. Comstock other than what you have

 4    already talked about?

 5        A      Yes.

 6              I tested him on what's called the Hare

 7    Psychopathy Checklist Revised.

 8        Q      Why did you do that?

 9        A      I did that because that is a

10    psychological test which can indicate with high

11    scores that a person is more likely to commit

12    non-sexual violence or sexual violence.  I look at

13    it essentially as a risk factor if it had high

14    scores.

15        Q      What was his score on that?

16        A      His score on the PCLR was a total score

17    of 12.

18        Q      Is that high?

19        A      No, that's low.

20        Q      How does that factor into your

21    assessment of his risk?

22        A      It was not a risk factor that I

23    considered increases his risk.  It's also not

24    protective of his risk, but it does not increase

25    his risk.  It's fairly common in individuals who
```

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 110 of 263

1    commit child molest to have low scores on the PCLR

2    because they don't generally have a propensity to

3    non-sexual violence or violence offending as much

4    as individuals, for example, who commit rape.

5        Q      You talked about protective risk

6    factors and that, I believe, was kind of the third

7    part of your assessment of his risk -- kind of

8    other factors, is that right?

9        A      Yes.

10       Q      What are the protective risk factors

11   that you considered?

12       A      Risk factors that can reduce risk would

13   first of all be time free in the community after

14   offending.

15              We know that sex offenders who were

16   released into the community in five to ten years

17   and they have no new offenses have about half the

18   risk of what the actuarial indicates when they're

19   released to the community.  That can be

20   protective.  That's not present for Mr. Comstock

21   because he hasn't been released after he's

22   offended.

23              The second has to do with having less

24   time when you look at longevity due to age or due

25   to illness.  That may well be the case for

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 111 of 263

1   Mr. Comstock who does have a number of chronic

2   diseases.  They're currently controlled with

3   medication.  It's difficult for me to estimate

4   longevity for Mr. Comstock, but he may have

5   certainly less than ten years on his life.  I just

6   don't know that.

7         The third factor would be very advanced

8   age.  Generally we think of very advanced age as

9   being over 70 when perhaps the actuarial

10   instruments don't fully account for age.

11     Q    Let's talk about his medical condition

12   or his longevity.  What's your understanding of

13   his current medical condition?

14     A    He had a stroke as a very young man at

15   34.  That was due to high blood pressure which he

16   still has.  It's my understanding it is being

17   controlled medically.  He had a mini-stroke since

18   he's been incarcerated.  He had a myocardial

19   infarction or heart attack while he was

20   incarcerated in 2006 with cardiovascular bypass

21   surgery.  He has diabetes.  He most recently had

22   prostate cancer with radiation.

23     Q    Clearly he has a lot going on.

24     A    Yes.  He has a number of chronic

25   medical conditions.

**Reported By: Joseph C. Spontarelli, CCR**   **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 112 of 263

1        Q      How specifically does that factor into

2   your assessment of his risk?  Would you

3   characterize that as a poor medical condition?

4        A      I would just say that it's a number of

5   medical conditions that could potentially affect

6   his libido, his energy, his sexual interest, his

7   sexual arousal.  It can cause erectile

8   dysfunction.  Everyone is different in terms of

9   how these disorders affect a person.

10       Q      For his age is that a protected factor

11  for him?  You said generally you think of it as 70

12  and over.  He's 69 years old, right?

13       A      Yes.  His age is clearly a protective

14  factor.  It's factored in with a large reduction

15  in risk on Static-99R and Static-2002R.

16              I consider that he is lower risk today

17  at this age than he was when he was a younger man.

18  On the other hand with full knowledge of the

19  reduction and recidivism with age I still find him

20  to be a high risk offender.

21       Q      You indicated earlier you've done about

22  350 evaluations.  How many of those evaluations

23  have been of a person over the age of 65?

24       A      A few of those evaluations.  Maybe 20,

25  30, less.  I don't know.

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 113 of 263

1    Q    Have you determined that all of them

2    met the criteria for commitment?

3    A    No, generally they do not meet the

4    criteria for commitment.

5    Q    When you interviewed Mr. Comstock did

6    you ask him why he was not sexually dangerous or

7    wouldn't reoffend?

8    A    Yes, I did ask him why.

9    Q    What did he tell you?

10   A    First of all he reported to me that he

11   now had lower libido and essentially no sexual

12   interest in children.  That was the first one.

13        He told me that he was deterred by

14   prison.  This was the first time he had been in

15   prison and he didn't like prison and he didn't

16   want to go back to prison.

17        He said that he now understands that

18   sexual activity between an adult and a child is

19   harmful to the child.

20        He also expressed that he has had

21   volitional controls in the past and he can

22   exercise them again in the future.

23   Q    How did those four things factor into

24   your evaluation or assessment of his risk?

25   A    In terms of his libido and his age

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 114 of 263

1    generally that's a very strong consideration for

2    me given the current research.  It's highly

3    unusual for someone at age 58 to be continuing to

4    design their life around seeking out and molesting

5    children.

6              As I said, there is a significant drop

7    to about three or four percent in groups of sex

8    offenders who are 60 and over in terms of

9    reoffending over five years.  That's the age where

10   Mr. Comstock offended.

11             Furthermore, while incarcerated only a

12   few years ago in 2008 he was found to have put

13   considerable effort into collecting child stimuli.

14   It's evident to me that not only does he have

15   libido in 2008 but it's strong enough that he is

16   continuing to likely masturbate and reinforce his

17   deviant sexual arousal with his collection of

18   child images.

19             He's different than other aging

20   offenders whose libido truly is reduced in time so

21   that's how I considered his self-report that age

22   and libido is reduced.

23             In terms of his adversity to being in

24   prison I think that he may well want to stop

25   offending against children because he doesn't want

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 115 of 263

1    to go to prison.  That's legitimate if I believe

2    that.  The problem is I don't think he can stop

3    himself even though prison is looming over his

4    head.  I think his drive emotionally to be with

5    children, physically to be with children remains

6    very strong for him.  Despite the consequences

7    that he will seek out children.

8              He reports that he thinks now that sex

9    is harmful to children and that would help him to

10   stop from offending.  I don't believe that.  I

11   think that he has learned what to say.  He knows

12   what's socially acceptable to say.  He's a bright

13   man, he's manipulative and he's clever.  He's been

14   through treatment where he learns to talk the

15   talk, but I think fundamentally his attitudes are

16   that it's not harmful to children and it can be a

17   loving relationship and that he will flip back to

18   those attitudes which are permission givers to

19   sexually offending.

20             Finally he reported he had behavioral

21   controls because he did not offend in the

22   Netherlands.  If we look at the timeline I made

23   you will see that there are seven victims in the

24   Netherlands and that throughout his life there's

25   no significant period of time where he exhibited

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 116 of 263

1   volitional controls and even institutionally in
2   2008 he could not exhibit volitional controls.
3       Q       Dr. Phenix, does he have a volitional
4   impairment that results from his pedophilia?
5       A       Yes, he does.
6       Q       Why do you say that?
7       A       For a number of reasons, some of those
8   which I discussed.
9               Volitional impairment can be measured
10  by the frequency and duration of his offending.
11  He's offended ever since he was age 15 to age 58
12  and after that collected deviant stimuli.  He has
13  a huge number of victims over that period of time.
14  No indication after any of them that he wanted to
15  stop from offending.
16              He was terminated from two of his jobs.
17  One time for molesting and another time for being
18  involved in child pornography.  Those incidents
19  did not stop him from going on to molest children.
20              He has engaged in a significant risky
21  behavior and the risk hasn't stopped him from
22  child molesting.
23              He reported the number of times that he
24  had child pornography collections and he destroyed
25  them because it was too risky to have them.  He

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 117 of 263

1    went on to continue to collect I think he said a

2    trunk full of child pornography after that even

3    though he had been investigated and in trouble for

4    child pornography.

5              He puts up with a good deal of risk to

6    engage in child molestation which is one of the

7    criteria in the Federal Code of Regulations.

8              He's an individual who has demonstrated

9    attitudes tolerant of child molest and I believe

10   he still has those; that it doesn't harm the

11   child; that you could have a loving, nurturing

12   relationship sexually with a child; that law

13   enforcement causes more trauma to children than

14   having sex with them; that he was a loving parent

15   to an 11-year-old boy that he brought into his

16   home and engaged in sex with.

17             These attitudes are permission givers.

18   They are part and parcel of having serious

19   difficulty with your volition.

20             We have evidence of very current

21   deviant sexual interest.  That would be 2008 --

22   the child images that I discussed a number of

23   times.

24             Furthermore, he wrote a treatise of

25   some type to the staff at Butner which outlined

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 118 of 263

1    the ideal program for a sexually dangerous person

2    and one component of that ideal program -- while

3    he was said to have some good ideas that would

4    help administratively -- he suggested that they

5    house the juvenile sex offenders in the adult

6    sexually dangerous person facility so he continues

7    obviously to struggle with his volition.

8         Q    Dr. Phenix, of all the factors that

9    we've talked about today does the research show

10   that there's one particular factor that is more

11   associated with risk of reoffense than others?

12        A    Yes.

13        Q    What is that factor?

14        A    Sexual deviance is the strongest

15   predictor of sexual reoffense.

16        Q    How does the consideration of sexual

17   deviance affect your evaluation in this case?

18        A    I think that Mr. Comstock has had

19   throughout his life and still has extreme sexual

20   deviance.  He has a very compulsive pedophilia.

21   He has few skills to intervene in that, and he has

22   attitudes and emotional identification with

23   children that is strongly going to further that

24   behavior if released.

25        Q    Dr. Phenix, despite his actuarial

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 119 of 263

1    scores, despite his medical conditions, despite

2    his age you still find that he is a sexually

3    dangerous person.

4        A     Yes, I do; at high risk to reoffend

5    sexually.

6        Q     Aren't you just ignoring the research

7    and substituting your clinical judgment?

8        A     No.  I think I'm paying attention to

9    the research.  Actuarial instruments are limited

10   in what they can tell us.  Sometimes they can give

11   us a pretty good assessment of overall risk and

12   sometimes they cannot.

13            What I'm paying attention to because I

14   think the actuarials cannot inform us accurately

15   in this case is the strongest predictor of sexual

16   reoffense and that is sexual deviance and the

17   research would back me in terms of that risk

18   factor being important in understanding his

19   overall risk.

20            MR. ROYSTER:  Thank you, Dr. Phenix.

21   We don't have any other questions at this time,

22   Judge.  Thank you.

23            THE COURT:  You may cross examine.

24            MS. GRAVES:  Thank you, Your Honor.

25                 RECROSS EXAMINATION

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 120 of 263

1

2    BY MS. GRAVES:

3       Q       Dr. Phenix, if sexual deviance is the

4    most important predictor of sexual reoffense then

5    why isn't that used as the only indicator for all

6    of these actuarials?

7       A       It's not the only risk factor for

8    sexual reoffense; so therefore the actuarials have

9    tried to capture other risk factors that

10   collectively in certain cases can be associated

11   with sexual reoffense such as combining the

12   criminality cluster with sexual deviance as well.

13      Q       The fact is that the actuarials do take

14   into account sexual deviance, don't they?

15      A       To a certain extent.  Not to the extent

16   of Mr. Comstock.

17      Q       What you're doing is you're assuming

18   that Mr. Comstock is completely unlike the group

19   that has been used for the compilation of the

20   Static-99R and the 2002R, is that your position?

21      A       Yes.

22      Q       But you don't have any data to support

23   that, do you?  You don't know the characteristics

24   of the folks within the sample to that extent, do

25   you?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 121 of 263

1        A        There was a small group of individuals
2    that committed child molest and rape.  It's very
3    unusual to have an offender who has had so many
4    victims so there would be few offenders in those
5    samples with that many victims.
6        Q        Dr. Phenix, isn't it your opinion that
7    people who have been convicted of sex offenses
8    have actually offended against many more people
9    than they've actually been caught for?
10       A        Sometimes they have offended against
11   many more.  For example, the Able study would
12   indicate individuals who were convicted of one
13   male child victim and when given constitutional
14   immunity would actually disclose an average of
15   four male victims rather than one.  There are few
16   offenders that have a more extraordinary number of
17   victims as Mr. Comstock.
18       Q        That could be, but it also could be
19   that those people are under-reporting.  Isn't it
20   quite possible that's the case?
21       A        There are studies that examine
22   under-reporting.  We have studies like the Able
23   study that I just quoted that indicate few
24   offenders who have these extraordinary number of
25   victims.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 122 of 263

 1      Q       But it is quite possible that the
 2   people in the sample group are simply
 3   under-reporting their victims, isn't it?
 4      A       It's possible.
 5      Q       You're not relying on the actuarials as
 6   to Mr. Comstock because they simply do not support
 7   your conclusion that he is at high risk.
 8      A       That's not true.
 9      Q       It is true that they don't support your
10   conclusion that he's at high risk, isn't it?
11      A       Yes.
12      Q       Do you often ignore the actuarials?
13      A       Very rarely.
14      Q       How many times in the 24 Adam Walsh
15   cases that you've done have you actually ignored
16   the actuarials?
17      A       None of them.
18      Q       This would be the only one.
19      A       That's correct.
20      Q       If you don't give the actuarials the
21   same weigh in Mr. Comstock's case then your
22   opinion as to Mr. Comstock could hardly be
23   standardized.  It's not really comparable to the
24   opinions that you've given in other cases, is it?
25      A       Every opinion I give is different.  In

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 123 of 263

1    every opinion I give I consider all case factors.

2    Every person is different.

3         Q      So your opinion regarding Mr. Comstock

4    is based largely on your clinical judgment, is

5    that correct?

6         A      It's based largely on the risk factor

7    sexual deviance and his inability to control that.

8         Q      Is that a result of your clinical

9    judgment?

10        A      Certainly as a clinician I identify

11   with that as the case for him.

12        Q      Actuarials have been found to have

13   moderate predictive values, is that correct?

14        A      Moderate predictive accuracy, yes.

15        Q      Clinical judgment has poor predictive

16   accuracy, isn't that correct?

17        A      Yes.  I would say .50 would equate to

18   flipping a coin when using only your judgment,

19   hunches about an individual that's why it's

20   important to consider research derived risk

21   factors such as sexual deviance in any case.

22        Q      There's really no way for the Court to

23   know how accurate your clinical judgment has been,

24   is there?  In other words, there's no measure for

25   the number of times that you've been right in

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 124 of 263

1    determining that someone is sexually dangerous

2    versus the number of times you've been wrong.

3        A    That's correct.

4        Q    In fact, if you determine that someone

5    is sexually dangerous and that person is locked up

6    and it turns out that you were wrong there's

7    absolutely no way to know what you've done is made

8    a false positive prediction, is there?

9        A    Correct.

10        Q    Do you believe that pedophiles as a

11    group have a higher sex drive than non-pedophiles?

12        A    Yes, I believe the research would

13    demonstrate that.

14        Q    So there's research that demonstrates

15    that pedophiles have a higher sex drive than

16    non-pedophiles.

17        A    Right.  That's not to say that every

18    one does; it's just more prevalent in those

19    samples.

20        Q    You have also expressed the view in

21    another setting that you believe Mr. Comstock will

22    remain at high risk until the day he dies.

23        A    I do unless he suffers from some

24    medical condition that causes him to have reduced

25    libido.

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 125 of 263

1      Q      You are not a doctor, is that

2    correct -- a medical doctor?

3      A      No, I'm not.

4      Q      So you would defer to a medical doctor

5    on the question of how his medical condition has

6    affected him sexually.

7      A      I would certainly defer to a doctor to

8    offer an opinion about that.

9      Q      I believe you indicated in your report

10    that the reduction for age regarding Mr. Comstock

11    on the Static-99R was inappropriate.  Is that

12    still your opinion that it was inappropriate?

13      A      Yes.  I don't think it accurately

14    reflects his risk according to his age.

15      Q      You're not quibbling with the way the

16    instrument operates, are you?

17      A      No, or I would have scored it

18    differently.  I scored it the way it should be

19    scored.

20      Q      According to the instrument he is given

21    credit for age and the cutoff that you referred to

22    as being so troublesome to you -- age 60 -- is

23    actually the cutoff that has been established by

24    the people who created the instrument, is that

25    right?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 126 of 263

 1       A       That's right.

 2       Q       They have done research that

 3     establishes that age 60 is a legitimate cutoff for

 4     stratification of age reduction, is that correct?

 5       A       Yes, for groups of sex offenders.

 6     Group data.

 7       Q       The very purpose of the instrument is

 8     so that when people are compared they're being

 9     compared to apples-to-apples rather than

10     apples-to-oranges, correct?

11       A       Correct.  That's why I didn't compare

12     Mr. Comstock to that example because that would be

13     apples-to-oranges in my opinion.

14       Q       You didn't compare him to what sample?

15       A       The Static-99R sample.  I don't think

16     he's well represented in that sample.

17       Q       You really don't know all of the

18     characteristics of the people in that sample, do

19     you?

20       A       No, I don't know all of the

21     characteristics.

22       Q       You don't know how many of them were 58

23     at the time of their last offense, do you?

24       A       No, I don't.

25       Q       On page 26 of your report you list the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 127 of 263

1    protective factors regarding Mr. Comstock.  You

2    indicated that he suffered a stroke, myocardial

3    infarction and a number of medical conditions

4    prior to his last offense but that's not accurate,

5    is it?

6         A     No.  He suffered the myocardial

7    infarction after his offense.

8         Q     And he also suffered, as you noted in

9    your direct examination, a number of other medical

10   conditions after his last offense, isn't that

11   correct?

12        A     I believe he had a number of existing

13   conditions and that and the prostate cancer were

14   the two conditions that occurred after he was

15   incarcerated.

16        Q     And he also had another stroke after he

17   was incarcerated, isn't that right?

18        A     Yes.  I think in testimony I reported

19   he had a TIA after he was incarcerated.

20        Q     Do you know what treatment he received

21   for his prostate cancer?

22        A     I believe radiation.

23        Q     You're not of the opinion, are you,

24   that sexual function played no role in

25   Mr. Comstock's child molesting are you?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 128 of 263

1       A       (No audible response.)

2       Q       In other words, in order for

3  Mr. Comstock to molest children he would have some

4  degree of sexual function necessary.

5       A       I'm not clear what you mean by sexual

6  function.  If you mean erectile function no, he

7  does not.  As a matter of fact, his preference

8  sexually in terms of sexual fantasy and sexual

9  behavior with his victims was massaging and

10  fellating them and then masturbating.  He had very

11  few incidents of anal intercourse and he does not

12  report that as being a preferable activity.

13      Q       But at the same time you're not saying

14  that his goal is not sexual gratification, are

15  you?

16      A       I believe his goal is both sexual and

17  emotional gratification.

18      Q       So you're not suggesting that only if

19  he achieves an erection and an organism is

20  Mr. Comstock interested in molesting children.

21      A       I believe he'll be interested in

22  molesting children irrelevant of any erectile

23  functioning.

24      Q       But by the same token his interest in

25  molesting children is for sexual gratification,

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 129 of 263

1    isn't it?

2         A       Yes, and emotional gratification.

3         Q       I want to direct your attention to the

4    Kansas Sex Offender Treatment Discharge Summary.

5    It's Exhibit 14.

6                 In your testimony I think you

7    highlighted one portion of that.  You said his

8    prognosis was poor and you noted that it was a

9    timed program; in other words, in order to

10   successfully complete the program one simply had

11   to remain in the program for a specific amount of

12   time or didn't have to meet certain program goals,

13   is that right?

14        A       He may have had to meet certain program

15   goals.  I'm not clear on what those might be.

16        Q       It does indicate on page one of that

17   discharge summary looking at history of treatment,

18   the second full paragraph that Mr. Comstock

19   entered the sexual offender treatment program on

20   July 18, 2002 and met the criteria for successful

21   completion of the 18-month program, is that right?

22        A       That's right.

23        Q       Further down on that page looking at

24   program participation and observations the third

25   paragraph under that section --

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 130 of 263

 1       A      Yes.

 2       Q      It also notes that Mr. Comstock

 3  presented as asexual; that is he denied any

 4  interest in sexual behaviors, is that right?

 5       A      Yes, on the Multiphasic Sex Inventory.

 6       Q      And Mr. Comstock appeared highly

 7  motivated for treatment.  Is that accurate?

 8       A      Yes.  That would have been on the

 9  psychological test.

10       Q      But the result is that he appeared

11  highly motivated for treatment, is that correct?

12       A      That's correct.

13       Q      Further down going to the next

14  paragraph, second sentence -- as his treatment

15  progressed he increased his level of

16  responsibility.  Is that accurate?

17       A      Could you direct me to that paragraph?

18       Q      I'm talking about the last line of the

19  first page.  Are you with me?

20       A      Yes.

21       Q      He increased his level of

22  responsibility.

23       A      Yes.

24       Q      Is that correct?

25       A      Yes.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 131 of 263

1      Q     This is a treatment program that was

2   put on by the Kansas Department of Corrections,

3   correct?

4      A     Correct.

5      Q     Turning your attention to page three of

6   this discharge summary, looking at the fourth full

7   paragraph where it begins Mr. Comstock completed a

8   PMPC that was thorough and insightful.  Do you

9   know what PMPC is?

10     A     I'm sorry, are we on page three, third

11  paragraph?

12     Q     Actually it's the fourth full

13  paragraph.  It begins with Mr. Comstock completed

14  a PMPC that was thorough.

15     A     Yes.  I don't know what that is.

16     Q     It goes on to say he formulated

17  interventions for each element of his deviate

18  sexual pattern, is that correct?

19     A     Yes.

20     Q     He developed positive, appropriate

21  activities that will occupy his time and energy.

22  Is that correct?

23     A     Yes.

24     Q     Towards the end of that paragraph,

25  fourth line from the bottom it says Mr. Comstock

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 132 of 263

 1    appears to have developed a fair amount of insight
 2    into his own behavior.  Is that accurate?
 3         A     Yes.
 4         Q     Would you agree that someone who goes
 5    through sex offender treatment would continue to
 6    develop their attitudes and the hope would be that
 7    they would continue to grow and progress as time
 8    moves along?
 9         A     Yes, you would hope that.
10         Q     Even after treatment one would hope
11    that they would continue to internalize the things
12    that they've learned in treatment and apply those
13    things as they move along.
14         A     Yes.
15         Q     In fact, when someone is in a treatment
16    setting in a prison when it's all said and done --
17    the final analysis -- all you have to go by is
18    what they say, isn't it; what they tell you as far
19    as the change in their attitudes and beliefs?
20         A     You have that, you have written
21    homework, you have how they participated, you have
22    if they engaged in high risk behaviors during
23    treatment.  There's a lot of thoughts, attitudes,
24    behaviors that collectively inform you about their
25    progress.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 133 of 263

1      Q      In the final analysis when it's all
2   said and done and a person is about to be released
3   from prison what you really have is their
4   statements, their words about what they have
5   developed and what they believe, isn't it?
6      A      Yes.
7      Q      What you've done is you've chosen not
8   to believe Mr. Comstock.
9      A      I'm not sure in what regard.
10     Q      In regard to his statements regarding
11  how he has internalized the fact that having sex
12  with children is harmful to him.
13     A      No, I don't believe he has internalized
14  those.
15     Q      I want to refer you to the notes that
16  you took during the interview with Mr. Comstock.
17     A      Yes.
18     Q      Do you have a copy of those with you?
19     A      Not up here on the stand I don't.
20     Q      I just got a copy this morning.
21            THE COURT:  For purposes of the record
22  why don't you mark it.  I assume you're not going
23  to offer it.
24            MS. GRAVES:  No, I'm not.
25

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 134 of 263

1              (Respondent's Illustrative Exhibit No.

2      1 Marked for Identification.)

3

4      BY MS. GRAVES:

5          Q      Dr. Phenix, I'm going to hand you what

6      I marked as Respondent's Illustrative Exhibit No.

7      1.  I believe those are the notes that you took

8      during your interview with Mr. Comstock.

9          A      Yes.

10         Q      Unfortunately the pages are not

11     numbered but hopefully we can move through it.

12             First of all I think you testified on

13     direct that you interviewed Mr. Comstock for three

14     to four hours.  You noted on the front page the

15     interview was two and a half hours.

16         A      Yes, that would be correct.

17         Q      So that's the actual amount of time.

18         A      Yes, approximately.

19         Q      I want to direct your attention to page

20     16 -- Your Honor, it might work better if I can

21     stand next to the witness.

22             THE COURT:  I have no objection if the

23     witness has no objection.  It will probably save a

24     lot of time.

25     BY MS. GRAVES:

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 135 of 263

```
 1        Q       I want to direct your attention to page
 2   16 of your notes.  It's just after the
 3   psychosexual history portion.
 4               First of all these are notes that you
 5   took during the interview of Mr. Comstock,
 6   correct?
 7        A       That's right.
 8        Q       You were writing down your impressions
 9   of what he was telling you or were you actually
10   quoting him from time to time?  Which is it?
11        A       I try to quote when I can.  Sometimes
12   it's just an observation or a statement of me
13   rewording it.
14        Q       Here towards the end of this page where
15   it says techniques not to recidivate are these
16   things that you discussed with Mr. Comstock that
17   he gleaned from the sex offender treatment program
18   that he had?
19        A       Yes.
20        Q       Mr. Comstock indicated that the program
21   was not a waste of time but that it was damaging
22   to him legally.
23        A       Right.
24        Q       Would you agree that it was damaging to
25   him legally?
```

**Reported By: Joseph C. Spontarelli, CCR**            www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 136 of 263

1      A     I think his disclosures showed

2    increased sexual deviance and that could

3    ultimately be damaging.

4      Q     Further down on the last couple lines

5    about Mr. Comstock regarding the NAMBLA

6    experience -- I think you mentioned NAMBLA earlier

7    is one of those organizations that actually

8    encourages pedophilia.

9      A     Yes.

10      Q     Mr. Comstock indicated that he joined

11   NAMBLA after the Netherlands one time and did not

12   rejoin, is that correct?

13      A     Right.  He was found with their

14   materials but apparently he was not a member of

15   the organization in 2000.

16      Q     Moving to page 11.

17      A     Yes.

18      Q     The handwritten notes that you put in

19   the margin to the right -- that's Mr. Comstock's

20   current belief -- he says sex with kids by adults

21   is harmful now.  That's his current belief.

22   That's what he told you.

23      A     That's correct.

24      Q     Look at page 15 of your interview.

25      A     Yes.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 137 of 263

```
 1        Q       This is the point at which he is
 2   describing to you the heart attack that he had.
 3        A       Right.
 4        Q       He had triple bypass surgery.
 5        A       Yes.
 6        Q       While he was incarcerated in 2006.
 7        A       Correct.
 8        Q       Turning to page 16 I think you've added
 9   some notes after that page.
10        A       Yes.  I wrote on the back of the page.
11        Q       Looking at the top of the notes that
12   you prepared under number one you've indicated --
13   I believe this is Mr. Comstock telling you -- he
14   has had no erection in at least a year.  Is that
15   correct?
16        A       Correct.
17        Q       Number two, he indicates if he
18   reoffends he would spent the rest of his life in
19   prison.
20        A       Yes.
21        Q       He does not like prison, right?
22        A       Yes.
23        Q       Number three -- he accepts that child
24   sex is hurtful to kids, is that right?
25        A       Yes.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 138 of 263

     1        Q        Number four -- he indicates that there

     2     are periods when he did have volitional control.

     3        A        Yes.

     4        Q        Then you had an opportunity to discuss

     5     with him a release plan, is that accurate?

     6        A        Yes.

     7        Q        What do you mean by release plan?

     8        A        What he's going to do when he is

     9     released.  Where he's going to live, what kind of

    10     job he'll have, how he'll support himself, what

    11     kind of hobbies and interests he'll have when he

    12     gets out, how he's going to formulate friendships

    13     and a social circle.

    14        Q        Why does a release plan matter?

    15        A        It matters because a stable release

    16     plan that reduces high risk situations will help

    17     prevent an offender from reoffending.

    18        Q        Mr. Comstock listed a number of

    19     interests that he would take up that actually have

    20     nothing to do with children, isn't that right?

    21        A        Yes.

    22        Q        He indicated also he would avoid

    23     children, is that right?

    24        A        Yes.

    25        Q        He indicated that he has a low libido.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 139 of 263

```
 1        A      Yes.
 2        Q      Finally I want to turn your attention
 3     to page 29.
 4        A      Yes.
 5        Q      This is when you're asking him about
 6     his current fantasies, right?
 7        A      Yes.
 8        Q      He indicates in section number nine
 9     that his last sexual fantasies were a long time
10     ago -- a couple of years.
11        A      Yes.
12        Q      I think you must have asked him what he
13     would do if he found himself in a high risk
14     situation, is that right?
15        A      Yes.
16        Q      For example, if an attractive boy sat
17     next to him on a bus what would he do?
18        A      He would move.
19        Q      Isn't that what you would want him to
20     do?
21        A      Yes.
22        Q      It appears from that that Mr. Comstock
23     is saying all of the right things, correct?
24        A      Yes.  I believe that's reflected in the
25     discharge summary from his treatment program as
```

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 140 of 263

1    well.

2    Q    Going back to the material that was

3    found in Mr. Comstock's cell in 2008 -- I guess

4    2008 would pretty much coincide with the time he

5    last said he had sexual fantasies, wouldn't it?

6    He said that at least two years ago, right?

7    A    Right.

8    Q    But that material even in and of itself

9    was not child pornography, was it?

10    A    No.  There was a full frontal view of a

11    prepubescent boy.

12    Q    Was that from like a National

13    Geographic Magazine?

14    A    I didn't see it.

15    Q    As far as you know there was no child

16    pornography among that material.

17    A    As far as I know.

18    Q    I want to talk to you a little bit more

19    about pedophilia.  Mr. Comstock has never denied

20    to a treatment provider as far as you know from

21    all the voluminous materials that you've seen --

22    he has never denied to a treatment provider that

23    he suffers from pedophilia, has he?

24    A    No.

25    Q    In your view pedophilia is a sexual

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 141 of 263

```
 1    orientation or like a sexual orientation; is that

 2    your testimony?

 3         A    Yes.

 4         Q    It's something that Mr. Comstock cannot

 5    change.

 6         A    Correct.

 7         Q    When Mr. Comstock puts in his writings

 8    that he is a pedophile, he is neither happy about

 9    it nor sad about it, it's neither good nor bad

10    that does not suggest that he is more likely to

11    reoffend, does it?  That's just a reality, isn't

12    it?

13         A    His statement that he is a pedophile is

14    a reality that he has pedophilia.  It does not

15    mean that he will or will not reoffend

16    necessarily.

17         Q    So there are plenty of people who have

18    pedophilia who do not offend against children at

19    all, is that correct?

20         A    There are individuals who do not offend

21    against children with pedophilia.

22         Q    And then there are individuals with

23    pedophilia who stop offending against children.

24         A    Yes.

25         Q    Just because an individual has
```

**Reported By: Joseph C. Spontarelli, CCR**　　**www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG　Document 146　Filed 12/15/11　Page 142 of 263

1    pedophilia does not mean that the individual lacks

2    volitional control, does it?

3         A     No.

4         Q     When you testified on direct that

5    there's a correlation between pedophilia and an

6    increased likelihood of offending you're not

7    referring to a lack of volitional control.

8         A     I think I am.  I think when a person

9    experiences intensive recurrent sexually arousing

10   fantasies and urges to have sex with children

11   they're more likely to go on to reoffend than

12   someone who does not experience that.

13        Q     You are saying that a pedophile is more

14   likely to offend than a non-pedophile, is that

15   what you're saying?

16        A     Yes.

17        Q     But you're not saying that simply by

18   virtue of the fact that someone has pedophilia

19   they lack volitional control.

20        A     That is correct.

21        Q     So you would agree that Mr. Comstock

22   should not be committed merely because he has

23   pedophilia.

24        A     Correct.

25        Q     I want to direct your attention to

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 143 of 263

1    Exhibit 16 of the government's exhibits.

2        A       Yes.

3        Q       That would be the Kansas state judgment

4    in Mr. Comstock's case for molesting the boys in

5    Kansas.

6        A       Yes.

7        Q       I want you to turn to page three of

8    that judgment.

9        A       Yes.

10       Q       There are reasons cited as the basis

11   for departure in that case, is that right?  Do you

12   see that at the top?

13       A       Yes.

14       Q       One of the reasons cited is that the

15   defendant accepts responsibility and shows extreme

16   remorse.  Do you see that?

17       A       Yes.

18       Q       That's referring to Mr. Comstock,

19   right?

20       A       Yes.

21       Q       I want to talk a little bit about your

22   chart and the timeline that you prepared.

23       A       Yes.

24       Q       The source of the vast majority of this

25   information was Mr. Comstock himself, is that

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 144 of 263

1    right?

2        A       Yes.

3        Q       What we just don't really know is what

4    Mr. Comstock's definition of a victim was in all

5    of these instances, is that true?

6        A       We know for those instances what sexual

7    behavior occurred because he described that.

8        Q       It would not be fair to say that every

9    one of these is a victim of a hands-on sexual

10   offense, would it?

11       A       I would have to reference back to see

12   what the actual activity was.  Many of them were.

13       Q       I'm not disputing that.  Far too many.

14               What I'm suggesting is that this also

15   included such things as voyeurism and even child

16   pornography.

17       A       That's right.

18       Q       I think you testified that there was no

19   significant period when Mr. Comstock was able to

20   manage not to offend such that that even supported

21   your conclusion that he has poor volitional

22   control.  Is that a fair summary of what you

23   testified to?

24       A       It is.

25       Q       But there was a period according to

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 145 of 263

1   Mr. Comstock, whose reports you have relied on --
2   there is a two-year period where Mr. Comstock
3   indicated there were no victims, isn't that right?
4       A       Yes.
5       Q       Do you not consider two years to be a
6   significant period?
7       A       No, I don't.
8       Q       You also testified on direct that the
9   fact that someone commits an act shows a lack of
10  volitional control.  Is that accurate?  Did I
11  write that down correctly?  Is that what you
12  intended to say?
13      A       Yes.  If a person molests a child that
14  would show poor volitional control.
15      Q       The very fact that someone commits
16  molestation in your view demonstrates a lack of
17  volitional control.
18      A       At that time, yes.
19      Q       You make no distinction between the
20  criminal who chooses to break the law versus the
21  criminal who feels a compulsion to break the law.
22      A       No, I did not make a distinction.
23              MS. GRAVES:  Your Honor, that's all I
24  have.  Thank you.
25              THE COURT:  I have just a couple

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 146 of 263

1    questions.

2              It appears from listening to your

3    testimony and reading what I've read that the

4    victims of Mr. Comstock were victims where he set

5    himself up in a position starting from when he

6    went to college -- from listening to your

7    testimony -- where he would be in a position to

8    gain access number one, and trust number two.  I

9    think other than those that he paid for that was

10   pretty much his MO for victims.  Would that be a

11   fair statement?

12                    THE WITNESS:  Yes.

13                    THE COURT:  I think I heard you also

14   say that there's no indication that he selected

15   victims by violence, or there's nothing that would

16   indicate he touched somebody's leg on a bus or

17   something of that nature where he would take such

18   a risk.

19                    THE WITNESS:  Not that I know of.

20                    THE COURT:  It appears he throughout

21   all of his victims selected victims where he had

22   access, could gain some control or something and

23   that the risk was not the same as it would be for

24   other situations; for instance he went to

25   countries that had laws that were different than

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 147 of 263

1      ours so that his risk factors he apparently took

2      into consideration to some extent going to some of

3      the places he did.

4              My question is how does that factor

5      into his risk factor today since he will not have

6      access like he used to have?  Does that factor

7      into the risk factor that you've given here?

8              THE WITNESS:  Yes, it does.

9              THE COURT:  How does that factor in?

10             THE WITNESS:  First of all MOs change

11     and evolve over time because the offender wants to

12     be successful so they devise a way that they can

13     do that.

14             He had been successful all his life by

15     going to these countries that are tolerant of this

16     behavior; where there are available victims, by

17     having jobs where he could access the victims.  As

18     you say, that's not a likely scenario for him.

19             He also was very skilled at initiating

20     friendships with children's parents and getting

21     them to trust him.  He's been a coach, he's been a

22     teacher.

23             THE COURT:  But they're always in a

24     situation where he was teaching or where he was

25     counseling; it wasn't just going into the general

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 148 of 263

1    community and making friends.

2           THE WITNESS:  Your Honor, he also

3    worked at youth centers in the community besides

4    being a teacher and a hired coach.  He would work

5    at a youth center where he would meet children and

6    parents and he would develop relationships.

7           THE COURT:  He worked at a youth center

8    as a result of his expertise in education.  He was

9    in Phys Ed, he coached basketball, things where he

10   would have some expertise and have an entrance, so

11   to speak, to the parents.

12          THE WITNESS:  He would.  Now he has a

13   skill set where he could be a volunteer.

14          There are children everywhere and there

15   are all kinds of places where he can access

16   children through churches, through clubs, through

17   the next-door neighbor.

18          What I do know is that Mr. Comstock is

19   creative and well organized and has been focused

20   on accessing children in a variety of ways and

21   it's my belief if he's in the community again that

22   he will find a way to do that.

23          THE COURT:  We heard about the incident

24   in prison in 2008 where he accessed images that

25   were certainly inappropriate in prison but

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 149 of 263

1    probably would be legal if he were out in the
2    community.  If he were to get legal images as were
3    depicted in prison and use those for his sexual
4    gratification do you think that would eliminate
5    the risk to children or highlight it?
6                    THE WITNESS:  No.
7                    THE COURT:  We know he'll have access
8    to that kind of stuff for sure.
9                    THE WITNESS:  I don't think that
10   decreases his risk, I think it increases it.  It
11   reinforces his deviant sexual arousal and for a
12   period of time -- offenders can generally go for a
13   period of time using that material instead of
14   accessing a victim or having fantasies of old
15   victims for a period of time.
16                    Generally in time that's not enough.
17   That's not going to meet his needs.  He'll be in
18   the proximity of children.  He actually said in
19   his relapse prevention plan he thought he would be
20   okay to be around children.  They will be there.
21                    I believe at some point as in the past
22   30, 40 years that it would lead to reoffending
23   rather than prevent him from reoffending.
24                    THE COURT:  You answered both of my
25   questions.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 150 of 263

     1              Government, any further questions?

     2              MR. ROYSTER:  Just a few follow-up.

     3              THE COURT:  Sure.  Go ahead.

     4              MR. ROYSTER:  Thank you, Judge.

     5

     6                    REDIRECT EXAMINATION

     7

     8    BY MR. ROYSTER:

     9         Q     Dr. Phenix, in your review of the

    10    records and everything that you've considered in

    11    this case are there any reasons that he offended

    12    other than just sexual gratification?

    13         A     Yes, there's another primary reason.

    14         Q     What is that?

    15         A     Emotional identification with children.

    16    His emotional needs 100 percent are met by

    17    friendships and relationships with children

    18    whether they're sexual or not.  He's lonely

    19    without that and it leads him to children to meet

    20    those needs.

    21         Q     Even if he's got no libido and he can't

    22    get an erection is he still sexually dangerous?

    23         A     Yes.

    24         Q     That is because of the emotional

    25    identification to children?

**Reported By: Joseph C. Spontarelli, CCR        www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 151 of 263

1       A       Yes.

2       Q       On cross examination you were asked

3   about his plans for release.  Do you believe that

4   he has a solid release prevention plan?

5       A       No.

6       Q       Is what you described and talked about

7   on cross examination is that a solid release

8   prevention plan?

9       A       He has a release plan.  I don't think

10  it's sufficient for him.

11      Q       From everything that you've reviewed in

12  this case are you aware of any relapse prevention

13  plan for Mr. Comstock?

14      A       No, I have not seen one.

15          THE COURT:  Could you come up with one,

16  or do you think it just wouldn't be possible

17  because of the emotional attachment?

18          THE WITNESS:  He would need to come up

19  with a relapse prevention plan which is specific

20  to his arousal pattern, his victim type and his

21  environment.

22          THE COURT:  In your estimation he's not

23  come up with such a plan.

24          THE WITNESS:  Correct.

25          THE COURT:  Even if he came up with

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 152 of 263

```
1    such a plan what do you think the possibilities
2    are of it being really fulfilled?
3              THE WITNESS:  It depends upon his
4    decision to follow it.
5              THE COURT:  Thank you.
6              MR. ROYSTER:  I don't have any other
7    questions, Judge.  Thank you.
8              THE COURT:  Counsel have any questions?
9              MS. GRAVES:  No, Your Honor.
10             THE COURT:  Doctor, thank you very
11   much.  May we excuse the doctor?
12             MR. ROYSTER:  Yes, Your Honor.
13             THE COURT:  Any objection?
14             MS. GRAVES:  No objection.
15             THE COURT:  You may be excused.
16             It's 1:00.  Let's break for lunch.
17   We'll see you all back around 2:00.
18
19             (Luncheon Recess.)
20
21             MR. ROYSTER:  Judge, before we call our
22   next witness we would like to move into evidence
23   some of the exhibits.
24             THE COURT:  I thought they had been
25   stipulated to.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 153 of 263

1          MR. ROYSTER:  There are some objections

2     and I think we can deal with those relatively

3     quickly.

4          For the first eight exhibits there are

5     not any objections so we move those into evidence

6     at this time.

7          THE COURT:  There being no objection

8     they will be received.

9          MR. ROYSTER:  Also Exhibits 21, 24 and

10    28 there are no objections so we would move those

11    into evidence as well.

12         THE COURT:  Give me those numbers one

13    more time.

14         MR. ROYSTER:  Numbers 21, 24 and 28.

15         THE COURT:  Okay.

16         MR. ROYSTER:  On the ones that there

17    are objections it's our understanding with respect

18    to whether they're business records or not we've

19    stipulated to that so it's not necessary for us to

20    call a custodian, but there are remaining

21    objections such as the double hearsay and the

22    Sixth Amendment and the privilege.  We think that

23    the privilege issue has been dealt with.

24         The Sixth Amendment issue we believe

25    relates to confrontation.  It's our position that

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 154 of 263

1    the Sixth Amendment does not apply in these civil

2    cases.  We think the rest of these should be

3    admitted.  I'm not entirely certain what the basis

4    of the objections are.

5              THE COURT:  Let's start at the

6    beginning.

7              The Sixth Amendment is Exhibit No. 9.

8    Counsel?

9              MS. SHEA:  Your Honor, we objected on

10   the Sixth Amendment grounds because the following

11   records are after Mr. Comstock was certified and

12   so we said that they were in preparation for

13   litigation.

14             THE COURT:  By the government?

15             MS. SHEA:  Yes.

16             THE COURT:  Let's do something.  Do we

17   need these right now?  I'd have to sit here and

18   read these documents.

19             MR. ROYSTER:  No we don't, Judge.

20             THE COURT:  I have your list here from

21   your pre-trial statement.  It's basically 9, 10,

22   11, 12, 17 and 25.  Let's wait until we get to

23   those.  Then I'll have a chance to read them or

24   see what the witness says or how they relate and

25   all those things and we'll go from there.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 155 of 263

 1          MR. ROYSTER:  Just for Your Honor's

 2    purposes -- this is going to happen throughout the

 3    two weeks that you're here -- there are going to

 4    be exhibits that the government is seeking

 5    admission of that we may not necessarily spend

 6    much time, if any time, on in the course of the

 7    presentation to the Court.

 8          THE COURT:  Do you want to use it for

 9    argument?

10          MR. ROYSTER:  Use it for argument, use

11    it for your findings of fact and conclusions of

12    law.  It may be that they're not always

13    referenced.  I just want you to know that just

14    because you get a big notebook doesn't mean we'll

15    be going through it.

16          THE COURT:  Before you close we'll go

17    through the exhibits you want admitted.  Since the

18    authenticity has been agreed to at that time I can

19    take a look at them.

20          MR. ROYSTER:  We're ready to go with

21    the next witness.

22          THE COURT:  Very well.

23          MS. SHEA:  Thank you, Your Honor.

24          MR. GRAY:  Your Honor, at this time the

25    United States would call the respondent Mr.

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 156 of 263

1    Graydon Comstock.

2              MS. GRAVES:  Your Honor, we would like

3    to note our objection to forcing Mr. Comstock to

4    testify in this matter.

5              THE COURT:  Tell me about that.

6              MS. GRAVES:  Essentially he's being

7    forced to testify against himself.  I understand

8    that the matter is considered civil in nature.

9    It's our view that because of the consequences of

10   these type proceedings he should not be forced to

11   do so.

12             There are certain aspects of his

13   testimony that we might need to assert the Fifth

14   Amendment if they question him regarding a charge

15   of misconduct.

16             THE COURT:  If there is any time you

17   think you have to assert the Fifth Amendment I'll

18   be more than happy to talk about that.  It is

19   civil in nature.  If I'm not mistaken you have

20   listed him as a witness in your case, too.

21             MS. GRAVES:  I thought we changed our

22   mind.

23             THE COURT:  It's civil in nature.  I

24   think they have a right to call him.  Very frankly

25   I think the Court was kind of looking forward to

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 157 of 263

 1     hearing from him and asking him questions, also.

 2     You may proceed.

 3

 4                 GRAYDON EARL COMSTOCK, JR.,

 5     was sworn or affirmed and testified as follows:

 6

 7                 DIRECT EXAMINATION

 8

 9     BY MR. GRAY:

10         Q     Mr. Comstock, would you please state

11     your name?

12         A     Graydon Comstock.

13         Q     You're the respondent in this case,

14     correct?

15         A     Yes, I am.

16         Q     Mr. Comstock, there has been a lot of

17     discussion by one of the previous witnesses about

18     this issue and I'll just go ahead and ask you --

19     are you a pedophile?

20         A     Yes, I am.

21         Q     By being a pedophile it means you like

22     little kids.

23         A     I prefer children before they have

24     pubic hair.

25         Q     By children are we talking about boys

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 158 of 263

1      in particular?

2          A      Yes.

3          Q      Boys between the ages of six to 14?

4          A      No.  Maybe ten and 14.

5          Q      Have you had any involvement with any

6      kids under the age of ten?

7          A      I do not believe so.

8          Q      Now, when I use the word like what I'm

9      referring to is a sexual attraction.  Are you

10     sexually attracted to young boys between the ages

11     of ten and 14?

12         A      Yes, I am.

13         Q      That's how you feel currently, right?

14         A      Actually right now I somewhat feel I'm

15     asexual.  I don't think I have much libido in any

16     direction.

17         Q      You're attracted to little boys still

18     or that's who you like, that's your sexual

19     preference.

20         A      I'm attracted to boys.

21         Q      But you would testify that you can

22     control your urges with regard to acting on your

23     attraction to little boys.

24         A      Will you repeat that, please?

25         Q      You would testify that you can control

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 159 of 263

1   your urges with regard to your attraction to
2   little boys.
3       A      I don't have the desire for little
4   boys.
5       Q      I'm sorry.  To boys between the ages of
6   ten and 14.
7       A      Yes.
8       Q      Mr. Comstock, how long have you had
9   this attraction to boys between the ages of ten to
10  14?
11      A      I was first aware I was interested in
12  another boy when I was nine years old.  In junior
13  high I think I somewhat fixated on about the age
14  range of ten to 14.  We had an unusual PE program
15  where we all swam naked and I felt like from that
16  point on I was attracted to boys ten to 14.
17      Q      Mr. Comstock, perhaps you could help
18  explain this not only to me but also to the
19  Court -- do you feel this attraction to
20  prepubescent boys -- boys between the ages of ten
21  and 14 -- is natural?
22      A      No, I do not.
23      Q      Do you feel as if it's just the way you
24  are?
25      A      I don't know how I got that way.  I do

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 160 of 263

1      think it's much like an orientation.  I certainly

2      didn't choose it nor want it.  It just kind of is.

3           Q       You said it's something like an

4      orientation.  Are you a referring to pedophilia is

5      similar to homosexuality?

6           A       Homosexuality used to be against the

7      law just like pedophilia is now.

8           Q       Are there any similarities between

9      homosexuality and pedophilia in your mind?

10          A       The male is the object of attraction.

11          Q       With regard to pedophilia do you have

12     any thoughts or feelings in regard to whether or

13     not it should be legal or lawful?

14          A       It should not be legal or lawful.

15          Q       With regard to some of the places that

16     you've had a chance to visit such as the

17     Philippines is engaging in sex with boys between

18     the ages of ten and 14 unlawful?

19          A       No, sir.

20          Q       You say engaging in sex with children

21     now or boys between the ages of ten and 14

22     shouldn't be lawful.

23          A       It should not be.

24          Q       Why do you feel that way now?

25          A       Because I think it does harm kids.  It

**Reported By: Joseph C. Spontarelli, CCR**            www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 161 of 263

1    has a psychological and emotional impact

2    primarily.

3         Q       But in the past you have thought it

4    should be lawful, correct?

5         A       I don't remember ever saying that.

6    I've seen the writing.  Maybe I said that in the

7    past but I don't recall it.

8         Q       Do you remember writing a letter to the

9    personnel out at Butner back in October of 2008

10   where you shared your views on pedophilia?

11        A       I don't remember that particular

12   instance; no, sir.

13        Q       Do you remember telling the staff at

14   Butner -- if you look at your binder in front of

15   you -- look at that binder in front of you --

16   there's a tab that says number 12.  Let me know

17   when you have a chance to get to that.  I'm sorry.

18   I meant tab number 11.

19        A       I have it.

20        Q       Is the document in front of you a

21   document that says Federal Bureau of Prisons

22   Psychology Data System?

23        A       Yes.

24        Q       Would you mind just taking a moment to

25   read through that form; in particular the third

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 162 of 263

1    full paragraph that begins with during our

2    meeting?

3          A      To myself?

4          Q      Yes.  Feel free to read it to yourself.

5    Let me know when you have had an opportunity to

6    finish reading it.

7          A      I don't remember writing it, but it

8    does appear that I did.

9          Q      Do you remember telling the

10   psychological staff out at Butner --

11         A      Dr. Bourke, yes.

12         Q      That you considered that pedophilia was

13   similar to an orientation or lifestyle choice?

14         A      I think it's an orientation.  I don't

15   think it's necessarily a legitimate one or one

16   that's legal.  I think it's an orientation just

17   like the others.

18         Q      You say being a pedophile is who you

19   are.  Do you remember saying that to Dr. Bourke?

20         A      Again, I didn't choose my orientation.

21   It is who I am.  I think at this point in time I'm

22   not going to change it.  I have to make the best

23   of what I am and go on from there.

24         Q      With regard to treating who you are and

25   going on from there, back when you were talking to

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 163 of 263

1    Dr. Bourke you indicated that you didn't want to
2    participate in treatment; that you weren't a
3    treatment candidate in any way.
4        A    I don't think so.  I think that's
5    correct.  I had treatment in Kansas and with
6    coercion and a lot of things it turned out to be
7    very negative.  That's basically why I'm in this
8    courtroom today.
9        Q    We'll talk a little bit about the
10   coercion.  Do you think the Kansas program worked?
11       A    I think so.  I learned things in there
12   that I have used and when I get out will continue
13   to try to use.
14       Q    What sort of things did you learn?
15       A    I learned that things go in a cycle and
16   we get lonely and from there on to different
17   things and it ends up in a violation.  That there
18   are things you can do to help veer away from that.
19       Q    Did your learn anything else in the
20   Kansas program?
21       A    Yes.
22       Q    What else?
23       A    It was an 18-month long program.
24       Q    Did they teach you strategies for how
25   to deal with your urges?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 164 of 263

1        A       Yes.

2        Q       Did they teach you a strategy in terms

3    of if you feel the urge to be around children that

4    you should do something?

5        A       If you feel an urge to be around

6    children the main thing they would stress is the

7    need for a support network to call somebody that

8    would help you get back on track.

9        Q       Did it teach you any strategies with

10   how to deal with things such as child pornography?

11       A       Yes.  I don't remember it being

12   discussed too much.  Pornography is an insighter.

13   It tends to stimulate you to do things that you

14   shouldn't do and you should avoid it.

15       Q       Is that one of your triggers?

16       A       I'm not sure.

17       Q       You're not sure?

18       A       I'm not sure it's a trigger.  I've had

19   pornography.  I don't remember a direct tie-in

20   between pornography and victimizing someone.

21       Q       Just so I'm clear, we're talking about

22   child pornography.

23       A       Yes.

24       Q       Do you think you could possess child

25   pornography and that would be okay?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 165 of 263

1     A    I think that would not be all right.

2  It can be a trigger and it's against the law.

3     Q    You just said it might be a trigger.

4  What sort of things might it trigger you to do?

5     A    To try to makes contact with young

6  people to look for opportunities to associate with

7  possible victims.

8     Q    You said earlier that you took the

9  Kansas sexual offender treatment program and that

10  you got some good things out of it.

11     A    Yes, I did.

12     Q    You had received psychological

13  treatment prior to the Kansas treatment with

14  regard to pedophilia, right?

15     A    Very minimal.

16     Q    You did this because you were having

17  urges and touching kids, right?

18     A    I did it because I was confused and

19  wondered if I could get any help and do something

20  to help alter my orientation.

21     I started it when I was 22 years old.

22  I went to a psychiatrist in Cleveland and

23  primarily because of the cost I did not continue

24  that.

25     After my stroke in the Netherlands I

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 166 of 263

1     had counseling which was not only in regard to my
2     pedophilia which we did discuss but it was also to
3     help me adjust to a career change due to my
4     stroke.
5          Q     You had counseling before you went
6     overseas to teach at these schools in the
7     Netherlands and in India, correct?
8          A     Yes.  One session.
9          Q     That one session was focused on dealing
10    and addressing the issues of your orientation as
11    you described.
12         A     Primarily it had to do with my
13    relationship with my mother.  It didn't seem to be
14    directly related.
15         Q     You just testified you also were trying
16    to address your orientation.  Did that treatment
17    take place before you went over to India?
18         A     Yes.
19         Q     While you were in India you engaged in
20    going on camping trips with students, right?
21         A     I did.  There were no victims
22    associated with that.
23         Q     Mr. Comstock, what do you consider a
24    victim?
25         A     Having some type of sexual relationship

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 167 of 263

1    whether it be just touching or fondling.  The

2    camping trips in India were high school kids.

3         Q    Mr. Comstock, would a victim include a

4    person you were staring at -- voyeurism?

5         A    Technically.

6         Q    Would a victim include the children

7    that were in the child pornographic images you

8    were looking at?

9         A    I guess so.  The pornography that was

10   found in my cell most recently was all from

11   commercial sources.  I had actually offered to

12   show them what I had.  If they found it I thought

13   they would think nothing of it.  I offered to show

14   it to them.

15        Q    These were images that you cut out?

16        A    They were images cut out of things.

17   They also included images of food and a car I

18   liked and a few things like that.  They were

19   things that appealed to me.

20        Q    It included photos of young boys

21   between the ages of ten and 14 -- prepubescent

22   boys.

23        A    Yes.

24        Q    Mr. Comstock, when were these things

25   found in your room at Butner?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 168 of 263

1      A      It was about a year ago. I don't know

2    the exact date.

3      Q      Did you collect this all in one period

4    or did you collect it over a period of time?

5      A      If I saw something I liked I would cut

6    it out or tear out the page or whatever and put it

7    in an envelope. I offered to show the envelope to

8    Dr. Bourke.

9      Q      Why would you collect these items?

10      A      Because they were attractive to me.

11      Q      What do you mean by attractive to you?

12      A      My sexual orientation is to the ten to

13    14 year olds. I find ten to 14 year olds

14    attractive whether they're clothed or not clothed.

15      Q      Those items that you cut out, were they

16    arousing to you? Did they pique your sexual

17    interest?

18      A      I don't think I ever got them to

19    masturbate by or anything like that. They were

20    just attractive. I don't recall ever using them

21    for fantasy fulfillment.

22      Q      Why did you go through the trouble of

23    cutting out pictures of ten to 14 year old boys

24    over an extensive period of time and keep them in

25    your room?

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 169 of 263

```
 1        A       They were attractive to me.  From time
 2   to time maybe once a month I would look at them.
 3        Q       So you would look at them once a month.
 4        A       Maybe not that much.
 5        Q       They weren't posted on your wall, were
 6   they?
 7        A       No.
 8        Q       You had them in an envelope you said?
 9        A       Yes.
10        Q       Was this envelope in a desk drawer?
11        A       We have a storage box under our beds
12   for legal documents and things like that.
13        Q       Why did you hide these photos?
14        A       They weren't hidden.  That's where I
15   kept all kinds of documents; my letters from home,
16   legal documents.  It was just a storage place.  We
17   don't have much room to store in a prison cell.
18        Q       Mr. Comstock, in that collection of
19   photographs there was a photograph of a young
20   boy's frontal shot.
21        A       I read that.  I don't remember it.  If
22   there was it must have been from National
23   Geographic or something.  I honestly don't
24   remember a frontal nude.  If there was it was not
25   in a pornographic pose or anything like that.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 170 of 263

1      Q      What do you consider a pornographic

2  pose?

3      A      Someone that was openly trying to

4  overtly display their genitalia or possibly had an

5  erection or something like that.  It was nothing

6  like that.  It was like you would see pictures of

7  people from India; women that had breasts showing

8  or kids around a swimming hole.

9      Q      You said that pornography is if there's

10  genitals exposed or an erection.  If there was a

11  photograph of a child that was just partially

12  clothed only wearing underwear would that count as

13  pornography to you?

14      A      If I had pictures like that it was not

15  for pornographic reasons.

16      Q      What would be for pornographic reasons?

17      A      What would have been?

18      Q      Yes.  You said for pornographic

19  reasons.  Could you explain what you mean by that?

20      A      I mean they were not gathered to turn

21  me on.

22      Q      Why were you gathering these photos?

23      A      Because they were attractive.  Again, I

24  had pictures of a car, I had pictures of food, I

25  had pictures of boys.  I guess I feel it's

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 171 of 263

1      something that seemed rather minor because I was

2      open with anybody seeing it.  I wasn't worried

3      about a shakedown.

4          Q      Do you remember where these items were

5      found during that shakedown?

6          A      In an envelope in a box under my bed as

7      I recall.  I didn't notice they were gone for a

8      while.

9          Q      Mr. Comstock, if I could turn your

10     attention to some of your treatment that you had

11     while you were in Kansas.

12         A      All right.

13         Q      You completed that program in Kansas,

14     correct?

15         A      Yes, I did.

16         Q      You heard Ms. Graves reading some of

17     the components of your discharge report which is

18     Government Exhibit No. 14 in that binder in front

19     of you.

20         A      Yes.

21         Q      In that report as Ms. Graves read on

22     the first page of Government Exhibit No. 14 which

23     is Bates stamped at the bottom 1360 there's a

24     mention about you essentially presenting as

25     asexual.  Do you see that in the second to last

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 172 of 263

1    paragraph?  His MSI was similar to his entry MSI.
2    However, on his exit Mr. Comstock presented as
3    asexual; that is he denied any interest in sexual
4    behaviors.
5        A     Yes, I see that.
6        Q     When you left Kansas that first time
7    you said you didn't have any sexual interest in
8    children or boys between the ages of ten to 14.
9        A     I feel then much like I feel now.
10       Q     That next line says you were open about
11   your attraction to children with the folks in
12   Kansas, weren't you?
13       A     Yes.
14       Q     You admitted you were a pedophile then
15   too, didn't you?
16       A     Yes, I did.
17       Q     It says that you took minimal
18   responsibility for your offending in that report.
19   Did you take responsibility for your offending?
20       A     I thought I did.  That's somewhat
21   subjective judgment.
22       Q     On page 1361 Ms. Graves read a
23   component that said you were highly motivated for
24   treatment.  Were you motivated to try to get
25   through the treatment program?

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 173 of 263

1     A     I wanted to get out of prison and I

2    wanted not to offend again and those went

3    hand-in-hand. Yes, I think I was motivated to

4    finish treatment.

5          When I first got into the program I

6    dropped out for a while because they were going to

7    do the part that to me could come back to haunt me

8    in later court proceedings. For about a month I

9    was out of the program and then I got back in

10   because the discipline measures for being a

11   program dropout were very severe and I completed

12   the program at that time.

13         The sexual history thing they do in the

14   program is where you list victims and name names

15   and so forth. I felt it was a Fifth Amendment

16   violation.

17     Q     In spite of your reticence you were

18   still motivated to complete the program, or at

19   least that's what the report says.

20     A    Yes. Once I had decided to go ahead

21   and complete it I did the best I could.

22     Q    On page 1362 of Government Exhibit No.

23   14 Ms. Graves read a portion that said

24   Mr. Comstock completed a PMPC. What is PMPC?

25     A    I don't remember PMPC. You did a

Reported By: Joseph C. Spontarelli, CCR   www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 174 of 263

1    complete review of your triggers and your relapse

2    prevention.  The relapse prevention plan was for

3    you to stay out of trouble.  It was a long thing.

4    It was like 20, 30, 40 pages.  They said I did a

5    pretty good job with it.  Everyone had to complete

6    one.

7         Q      As part of your learning about

8    treatment in Kansas one of the things that you

9    learned was that engaging in fantasies about boys

10   between the ages of ten and 14 was a bad thing,

11   right?

12        A      Yes.

13        Q      Doing that sort of fantasizing could

14   lead you down the path of engaging in bad

15   behavior, right?

16        A      Yes.

17        Q      Would you agree that it's unhealthy for

18   you to engage in those sort of fantasies?

19        A      Yes.

20        Q      At the time it appeared that you were

21   concerned about finding essentially a replacement

22   behavior for your fantasy urges for young boys.

23   Was that correct at the time?

24        A      Where are you finding that?

25        Q      That's also on the same page in that

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 175 of 263

1    same paragraph on Bates stamp 1362.  The paragraph

2    begins with Mr. Comstock.

3         A    I'm not finding it.

4         Q    Mr. Comstock, on the screen in front of

5    you is Bates stamp 1362.

6         A    Yes.

7         Q    It's the third to last line in that

8    paragraph that begins with Mr. Comstock completed

9    a PMPC.

10        A    Is it highlighted?

11        Q    No.  It's right below the highlighted

12   section.  It states he stated he is concerned

13   about finding replacement behaviors that are

14   healthy, appropriate and meet his romantic and

15   sexual needs.  Do you see that line?

16        A    Yes.

17        Q    Mr. Comstock, did you find a

18   replacement for those needs?

19        A    I just tried to work on adult

20   relationships that were not youth oriented.  I

21   turned to reading, I did different things.  In

22   terms of the future I hope to have a dog that will

23   help me with emotional needs and try to stay

24   active.

25        Q    Did the folks at Kansas tell you that

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 176 of 263

1    perhaps cutting out pictures of young boys might

2    be a bad trigger for you?

3        A       I don't remember that specifically.

4    They talked about pornography, not about pictures

5    of kids.  I think probubly always an attractive

6    ten to 14-year-old male whether they're walking

7    down the street or whatever will be attractive to

8    me.  If it's in a magazine it will be attractive.

9    It doesn't mean I want to fantasize about it or

10   have any sexual thoughts.

11       Q       Mr. Comstock, do you see any problem

12   with you having those cutout photos of ten to

13   14-year-old boys that were taken in the shakedown?

14       A       No.

15       Q       You don't think that's a big deal.

16       A       No.

17       Q       Mr. Comstock, with regard to the reason

18   why you were in the Kansas prison you pled guilty

19   to two state charges, correct?

20       A       Correct.

21       Q       What were those charges?

22       A       Indecent liberties with a minor times

23   two.

24       Q       With regard to the indecent liberties

25   with a minor what did you do?

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 177 of 263

1      A      There were two brothers.  One was nine,

2   one was ten.  With the ten year old he was in my

3   car in the passenger's seat.  We were coming back

4   from a ball game.  It was a ball game I had not

5   coached.  I asked him how he had done.  He said we

6   won.  I scored a couple of baskets.  I put my hand

7   on his thigh -- he was wearing shorts -- and I

8   said good job.  That's all that happened.

9           With the younger brother while he was

10  at my home we were waiting for the older brother's

11  phone call.  It was the same day.  I was sitting

12  on the floor in front of my couch.  We were

13  watching TV.  He was sitting between my legs and I

14  put my hand around him and I unzipped his pants

15  and I fondled him for about 20 seconds.  I don't

16  mean to be minimizing.  I know that sounds like

17  it.

18     Q      Mr. Comstock, you said the older one

19  was in the car with you and the younger one was at

20  your home.

21     A      Yes.

22     Q      What did you plead guilty to again?

23     A      Inappropriate touching.

24     Q      With the older one -- meaning the one

25  in the car -- the touching on the thigh -- you

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 178 of 263

1     pled guilty to inappropriate touching.

2          A      Yes, I did.

3          Q      Did you think that touching him on the

4     thigh was inappropriate?

5          A      Not really.  The two cases were tied

6     together and I wanted the situation to play out

7     for everybody involved.  I wanted it to be over

8     with.

9          Q      Mr. Comstock, what do you mean by play

10    out for everybody involved?

11         A      I didn't want the kids to suffer any

12    more from prosecutors and police and things such

13    as that.  I wanted them to be able to call it

14    quits.

15         Q      Do you think that they were suffering

16    as a result of the actions of the police and

17    prosecutors?

18         A      I think they were suffering.  The

19    reason for the suffering was primarily because of

20    me and what was deemed by their mother to be

21    inappropriate and sexual.  It was very emotionally

22    damaging to them whether it was meant to be or

23    not.

24         Q      Mr. Comstock, the older child testified

25    and said to the police that you had touched his

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 179 of 263

1      genitals under his shorts.  Is it your testimony

2      that that didn't happen?

3          A      Yes, it is.

4          Q      Mr. Comstock, if you didn't think

5      touching him on the thigh was really an unlawful

6      act why did you plead guilty to it?

7          A      The two cases were tied together.  If I

8      pled to them both they were going to run them both

9      concurrently.  I knew I was guilty of the younger

10     brother so it didn't seem like worth making an

11     issue over it.

12         Q      Just so I'm clear, you didn't think it

13     seemed like a big deal that you were pleading

14     guilty to touching a kid in a sexual manner and

15     you didn't?

16         A      I had the younger brother and to me

17     they were related in the sense that someone

18     thought it and it didn't do much good in my own

19     mind to separate the two.

20         Q      How did you know these two brothers?

21         A      They were students at the school.  They

22     also played on the basketball team I helped

23     coach -- one of them did.

24         Q      What do you mean by at the school?  Is

25     this a school you were teaching at?

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 180 of 263

1      A      I was a counselor at Lakin Elementary

2   School.

3      Q      As a counselor what were some of your

4   duties?

5      A      The primary deal was preventative

6   guidance where you go into every classroom once

7   every two weeks and you have a program on caring,

8   on how to get along with others, on what to do

9   about bullying and various things like that.  You

10  do that about 26 times a year with each grade.

11         You help them with individual problems

12  like if somebody has a death in the family or for

13  kids a death of a pet can be traumatic.  You deal

14  with issues.

15         The principal always wanted to get

16  involved when there were discipline problems and

17  wanted you to work out programs with kids that

18  were always in trouble to try to get them to be

19  more thoughtful and not to create the kind of

20  problem.

21      Q      Were you good at being a counselor?

22      A      In my own opinion I was an outstanding

23  physical education teacher, health teacher and

24  administrator.  I was a good counselor.

25      Q      Why do you make the distinction --

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 181 of 263

1      A    I didn't have the level of educational

2    background.  I had a certification in counseling.

3    I did not have licensure or a Master's Degree.

4      Q    As a result of being a counselor did

5    you encounter these two brothers often in the

6    school?

7      A    Once every two weeks.  They were not

8    problem makers.  They were gone a lot --

9      Q    Could you repeat that again?

10      A    They were absent a lot.  I had to

11    contact the mother about that.  They both had a

12    lice problem.  We would get one cleared up and

13    then the other would come in.

14      In elementary school with lice when one

15    of the siblings is out you send both of them home.

16    They were missing loads of school time.

17      Q    Did you ever help them out with their

18    lice problem?

19      A    No.  I offered that but that was

20    pretext.

21      Q    Could you explain what you mean by

22    that?

23      A    I offered.

24      Q    You offered to help who?

25      A    I thought if they couldn't afford it

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 182 of 263

1      that I would out of my pocket provide the

2      solutions that they needed for shampoos.  I

3      offered if they wanted to come to the home to put

4      it on to shampoo them.  Those were primarily

5      behaviors to try to get them into my home.  My

6      offer to help them with the lice was not.  I was

7      very concerned about them getting back into

8      school.

9          Q      What was the pretext?

10         A      All I'm saying is that this was a way

11     to get them into my home.  I could have offered to

12     come to their house.  I offered to buy it for them

13     and just drop it off, but that didn't work.

14         Q      You said you tried this as a pretext to

15     get them into your home.  How did you get to take

16     the older brother in your car?  How did that

17     relationship get started?

18         A      When they signed up for basketball they

19     both wanted to play and then they said we don't

20     have a car.  I said I would try to make sure they

21     found a way to get to the games.

22                With the older one I would call or make

23     arrangements with one of his teammates.  I did not

24     coach his team.  He would come to the rec center

25     and would be picked up by the parent of one of the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 183 of 263

1    other kids and taken to the game and brought back

2    to the rec center.  Is that clear?

3         Q     That helps.

4               Why did you feel the need for you to

5    take him in your car?  There were other parents,

6    right?

7         A     Yes.  Almost all the time that worked

8    out.  One time it didn't.

9         Q     Was that the one time that --

10        A     Yes, it was.

11        Q     It was the one time he was in the car

12   with you that you touched him on the thigh and

13   said good job?

14        A     Yes.  He may have been in the car other

15   times doing different things but that was the one

16   time, yes.

17        Q     How is it that the younger brother was

18   at your house?

19        A     He played on my team so I was taking

20   him to the game.  His older brother had an away

21   game.  He stayed with me while his brother was

22   gone and we played our game and came back.

23        Q     After he played in the basketball game

24   you brought him back to your house.

25        A     Yes.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 184 of 263

 1       Q       Why didn't you take him home?

 2       A       He had nobody at home.  I was waiting

 3   for his older brother and I took them both home.

 4       Q       How did you end up sitting with the

 5   younger brother in your lap?

 6       A       I asked him if he wanted something to

 7   eat for breakfast and he said yes.  I brought him

 8   some cereal in a bowl.

 9               Between the couch and the TV was a

10   coffee table, and when I was watching TV I would

11   usually sit in front of the couch and lean back on

12   the legs of the couch and put my food on the

13   dining table and that's what I did for him.  What

14   I did was I just slid it behind him.

15       Q       You said this was breakfast.  Did he

16   stay overnight?

17       A       No.

18       Q       The game was in the morning?

19       A       He was there in the morning.  We were

20   going to the game a little later.

21       Q       While you guys were eating breakfast

22   you slid in behind him.

23       A       Yes.

24       Q       Why did you do that?

25       A       I wanted the affection, I guess.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 185 of 263

 1      Q      Can you explain a little bit what you
 2  mean by the affection?
 3      A      I enjoy the touch.
 4      Q      Was it you touching him, him touching
 5  you?
 6      A      I was touching him.  Actually both.
 7      Q      How did it make you feel?
 8      A      I felt comfortable until I had molested
 9  him and then I felt awful.  I quit after a very
10  short period of time.
11      Q      You were behind him.
12      A      Yes.
13      Q      And then you fondled him.  How did you
14  fondle him?
15      A      I put my hands around his arms and his
16  waist and undid the top -- I think he had
17  buttons -- one or two buttons on his jeans -- I
18  put my right hand inside of his pants and his
19  underpants and touched his penis for a very short
20  while.  Again, I didn't mean to minimize it.  I
21  felt guilty very quickly.
22      Q      Was it your intention to have sex with
23  him?
24      A      No.
25      Q      Was it your intention for him to touch

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 186 of 263

1    you?

2         A         No.

3         Q         Why did you do this?

4         A         I'm a pedophile.  It felt good.  I was

5    attracted to boys that age.  I shouldn't have done

6    it.  I was sorry for doing it, but I did it.

7         Q         Was it just spur of the moment?

8         A         Yes.

9         Q         Did it happen very quickly, or was this

10   something that he was sitting in your lap for a

11   while and then you just kind of reached around

12   him?

13        A         Somewhat spur of the moment.  Somewhat

14   like you described.

15        Q         Did you unbutton his pants very quickly

16   and then just kind of jam your hands in there and

17   gab his penis?

18        A         I slid it in fully.

19        Q         You were acting in a slow fashion in

20   order to get your hand on his penis.

21        A         As I recall, yes.

22        Q         Do you recall how long you touched his

23   penis?

24        A         I think about 20 seconds.  That's my

25   guess now.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 187 of 263

1     Q     When you say you fondled him, were you

2     just placing your hand on his penis; were you

3     moving your hands; were you stroking his penis?

4     A     I stroked it for a short period of

5     time.

6     Q     After you did this did you tell him not

7     to say anything about it?

8     A     I read that and I don't believe I did;

9     no, sir.

10    Q     Was that a concern of yours?

11    A     Certainly I hoped he didn't say

12    anything about it.  I don't believe I warned him.

13    Q     Did you get the impression that he was

14    compliant; he was kind of hoping you would do it?

15    A     No, sir.

16    Q     So the fondling was all your idea.

17    A     Yes, sir.

18    Q     He didn't do anything to lead you on.

19    A     No.

20    Q     By the time this had taken place how

21    long had you known him?

22    A     Half a year.

23    Q     Was he in the car with you and his

24    older brother when you had him in the car?

25    A     They were together at times.  When I

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 188 of 263

1    touched his older brother on his knee he was not

2    in the car, no.

3          Q      Just for clarification, did you touch

4    him on his knee?

5          A      On his thigh.

6          Q      Where about on his thigh?

7          A      About two inches above his knee.

8          Q      Was that the inner thigh, on top of the

9    thigh?

10         A      On top of the thigh.

11         Q      Why did you do that?

12         A      Because it just felt good.  It also

13   seemed to be natural.  He won a ball game and I

14   said how did you do and I went good job.

15         Q      You just made a motion where you had

16   your hand in a fist.  Was your hand in a fist when

17   you did it?

18         A      No.  I didn't want to shake the

19   counter.

20         Q      I understand.

21                Your hand was open.

22         A      Yes.

23         Q      How old was the older brother when this

24   happened?

25         A      11 and ten I believe they were.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 189 of 263

1        Q        Mr. Comstock, after this came to light

2    to the mother didn't you try to talk to the mother

3    about this whole thing?

4        A        Only about the lice shampoo, not about

5    the incident that took place.

6        Q        When did you talk to her about the lice

7    shampoo?  Was this after you had touched the

8    younger brother?

9        A        It was before.

10        Q        The lice shampoo conversation took

11    place before you touched the two boys?

12        A        That's correct.

13        Q        Did you use lice shampoo as a pretext

14    to try to touch other boys in school?

15        A        No, I did not.

16        Q        Mr. Comstock, as a result of your plea

17    of guilty in Kansas to the two charges involving

18    the older and younger brother were other charges

19    dropped?

20        A        They said they would not pursue other

21    charges.  I don't think they were dropped.  I was

22    never informed there were other charges.  They

23    said if I pled to the two there would be no

24    further investigations.

25        Q        Were you aware of any other

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 190 of 263

 1    investigations that were taking place?

 2         A      I know at one point the investigator

 3    had been to every student in the school and asked

 4    them if there had been inappropriate touching.  I

 5    think they found no one.  I'm told now that there

 6    were two boys who did say something had happened.

 7         Q      What do you know about those two boys?

 8         A      Their aunt rented below me and they had

 9    access -- I was in an upstairs apartment -- they

10    had a door that opened up to that so they were in

11    a way neighbors.  They were not brothers.  They

12    looked like twins, but I think they were cousins.

13         Q      How old were they?

14         A      Maybe second grade.

15         Q      Did you touch these two boys?

16         A      No.

17         Q      Do you know why these two boys would

18    say that you did?

19         A      No.  Knowing elementary kids they like

20    the attention.  It's the nature of elementary

21    kids.

22         Q      Could you kind of walk me through that?

23    What do you mean by they like the attention?

24         A      If you walked up and said did

25    Mr. Comstock like you, did he ever touch you, do

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 191 of 263

1    you think it's inappropriate an elementary kid
2    might well say yes to all those.  He was getting
3    individual attention from the examiner.
4              When the kids walked in the building I
5    held my hand for them to give me a high five.  It
6    could have been perceived that way.
7       Q     Do you think you were the victim of
8    wrong perceptions of touching a lot?
9       A     Not a lot, no.
10      Q     Have you ever known that someone said
11   he touched me and it was just perceived wrong?
12      A     The only thing I can think of is when I
13   was in Alaska I touched a boy on the head and the
14   father thought it was racist because he was a
15   black boy.  It wasn't racist.  I was just trying
16   to get his attention.  Nothing ever came of that.
17      Q     Mr. Comstock, in addition to the state
18   charges that you were charged with as a result of
19   the search there were federal charges.
20      A     That's correct.
21      Q     What were those federal charges?
22      A     I'm going to have trouble remembering
23   the exact language -- use of a computer to
24   download images of children below certain ages and
25   explicit sexual conduct -- something to that

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 192 of 263

     1   effect.
     2       Q       Mr. Comstock, there has been testimony
     3   by Dr. Amy Phenix.
     4       A       Yes.
     5       Q       You were here during that testimony.
     6       A       Yes, I was.
     7       Q       She testified about a number of items
     8   that were found in your house as a result of a
     9   search.
    10       A       That's correct.
    11       Q       One of the things found was a magazine
    12   from NAMBLA.
    13       A       Yes.
    14       Q       Was that actually found in your house?
    15       A       Yes, it was.
    16               The magazines from NAMBLA are not
    17   pornographic.  They don't have pictures in them.
    18   They tend to be the status of the law at present,
    19   what's happening around the world.  There are no
    20   pictures.  If there are picture they're totally
    21   clothed.
    22       Q       At the deposition you testified that
    23   one of the reasons you didn't continue subscribing
    24   or receiving that literature is because it didn't
    25   have a lot of pictures, isn't that right?

Reported By: Joseph C. Spontarelli, CCR   www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 193 of 263

 1        A      I don't believe I said that.  I believe
 2   I said it wasn't something I felt inclined --
 3   there was nothing in it of interest to me.
 4        Q      Is it your testimony that the lack of
 5   photos was one of the reasons why you stopped
 6   receiving that magazine?
 7        A      I suppose I would have liked the
 8   magazine better if it had photos, but not
 9   necessarily pornographic -- just of kids.
10        Q      Let me know if this sounds familiar --
11   counsel I'm reading from page 19 of his deposition
12   testimony starting at line 17 -- but it was not
13   pornographic.  I didn't read -- the one I had I
14   guess I kept for a while.  I don't know because I
15   didn't resubscribe because I saw no reason to.
16   Question:  Why did you see no reason to?  Well, I
17   just didn't.  It wasn't the type of thing I
18   expected.
19        A      That's correct.
20        Q      It cost money and I would get it and
21   look through it and the articles didn't interest
22   me.
23        A      That's correct.
24        Q      I didn't care what was happening in
25   Michigan or Ohio.  What were you expecting?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 194 of 263

1    Answer:  Don't know.  Question:  Were you
2    expecting it to be pornographic?  Answer:
3    Expecting it to be more pictures in there;
4    although not necessarily hard pornography but just
5    pictures of boys maybe at the park or at the beach
6    or what have you.
7         A     That's probably true.
8         Q     Mr. Comstock, you didn't necessarily
9    expect it to have hard pornography.  Were you
10   expecting it to have at least some nude photos?
11        A     No.  I think when I subscribed I knew
12   it did not.
13        Q     Mr. Comstock, in addition to that
14   magazine from NAMBLA there were also kids' video
15   games in your possession, correct?
16        A     Yes.
17        Q     And permission slips for kids to come
18   to your house and use your computer, correct?
19        A     I had games.  They were not for kids so
20   much as I enjoyed them.  They were things like
21   Centipede or Phoenix.  If you're familiar with
22   games those are adult games, too.
23              I wanted the parents to know where
24   their kids were.  If they were at my house I
25   wanted them to know that they were there.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 195 of 263

1        Q       Why would you want kids at your house?

2        A       I wanted to be comfortable in my house.

3        Q       I guess what I'm asking is why would

4    you want kids to come to your house?

5        A       (No audible response.)

6        Q       You didn't have kids, right?

7        A       No, I did not.

8        Q       There weren't any kids coming over to

9    play with your kids.

10       A       No.

11       Q       You were a counselor at the school.

12       A       Yes.

13       Q       Were you doing after-school tutoring?

14       A       No.

15       Q       Why would you want kids to come over to

16   your house?

17       A       As Dr. Phenix said I enjoy emotional

18   contact with children.  To some extent it was

19   mutual.

20       Q       What do you mean by mutual?

21       A       I think they enjoyed being there.

22       Q       Do you think the kids enjoyed being

23   around you?

24       A       Yes.

25       Q       Do you feel like they got benefit out

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 196 of 263

 1    of being there?

 2        A      For the most part it didn't hurt them.

 3    I'm not sure they benefited from playing video

 4    games anymore than they would in your home.

 5        Q      Mr. Comstock, why would you want to

 6    have these young boys between the ages of ten and

 7    14 in your home when you knew you were a

 8    pedophile?

 9        A      That was not a wise decision.

10        Q      That may be the case, but why would you

11    do that?

12        A      They'd come over and I enjoyed the

13    emotional warmth they provided.

14        Q      By emotional warmth did you feel like

15    it made you feel good to have these kids around?

16        A      Yes.  They would enjoy themselves.

17    They were having a good time.  I enjoyed that.

18        Q      Did you feel like you related to them?

19        A      Yes.

20        Q      Would you feel more comfortable being

21    around kids than you would adults?

22        A      I would say it was the same.  I've had

23    excellent adult friends and still do.  I had adult

24    friends every place I've been including girl

25    friends.  Kids have enjoyed being around me, too.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 197 of 263

```
 1        Q        Would you have considered those kids
 2    friends?
 3        A        Many of them, yes.
 4        Q        As friends would you try to spent as
 5    much time as you could with them?
 6        A        I don't recall that, no.
 7        Q        Mr. Comstock, you claimed in your
 8    writings to various doctors at the Bureau of
 9    Prisons that you've only had one hands-on victim.
10    Do you remember that?
11        A        I don't recall it.  Of the two victims
12    in Kansas to me one was a hands-on.
13        Q        The older brother was not a hands-on
14    victim.
15        A        Technically he was.  I put my hand on
16    his thigh.
17        Q        You told Dr. Phenix and Dr. Demby that
18    you've had some victims.
19        A        Yes.
20        Q        Who are these some victims?
21                 MS. GRAVES:  Objection.
22                 MR. GRAY:  Your Honor, it's part of the
23    testimony that's being given; especially in light
24    of what we've heard is this is there to satisfy
25    the issue of not only acts of child molestation
```

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 198 of 263

1    but attempted acts of child molestation.

2                THE COURT:  Do you mean specifically by

3    name?

4                MR. GRAY:  Not specifically by name.

5                THE COURT:  What are you looking for?

6                MR. GRAY:  What I'm looking for, Your

7    Honor, is more specifically were these children

8    that were with him --

9                THE COURT:  Ask him a specific

10   question.

11   BY MR. GRAY:

12       Q      Mr. Comstock, where did these some

13   victims -- where did you assault these some

14   victims in terms of location?

15               MS. GRAVES:  Objection.

16               THE COURT:  Overruled.

17               THE WITNESS:  One was my brother when I

18   was --

19               MS. GRAVES:  Objection.  Move to

20   strike.

21               THE COURT:  Overruled.  It's in the

22   records anyhow already.

23               THE WITNESS:  Sir, repeat the question.

24               THE COURT:  I heard the number seven

25   before and I've heard some testimony about it.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 199 of 263

```
 1    These are the same ones you referred to before in
 2    other discussions with other people, would that be
 3    correct?
 4              THE WITNESS:  Yes.
 5              THE COURT:  You may proceed.
 6              I'm not so sure you have to give
 7    exactly the location and dates and instances.  I
 8    think the location isn't really relevant anyhow.
 9              MR. GRAY:  Your Honor, we would argue
10    that it is relevant to an extent.
11              THE COURT:  I think dates are relevant
12    because of the doctor's timeline and her testimony
13    in terms of occurrences and so forth.
14              MR. GRAY:  I'm going to streamline the
15    questioning to make it move along faster.
16    BY MR. GRAY:
17        Q    The seven victims you told Dr. Demby
18    and Dr. Phenix about, was that an accurate number?
19        A    I think so.  In Kansas they pushed and
20    pushed.  They considered victims kids that I
21    supervised in the shower even though it was part
22    of my job.  All the voyeurism images they also
23    included pornography so we put a number to it and
24    added them in.
25        Q    Mr. Comstock, would you please turn in
```

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 200 of 263

1    that binder in front of you to tab number 12 which

2    is Government Exhibit No. 12?  If you would turn

3    to the second page.

4          A      Okay.

5          Q      Do you see that chart?

6          A      Yes.  I've seen this before.

7          Q      What is it?

8          A      When I came here to Butner Dr.

9    Hernandez said how many victims do you have and I

10   said six or seven.  He said Mr. Comstock, I think

11   you've got a lot more than that.  By Monday --

12   this was on a Friday -- I was to have a complete

13   set.

14          At that point what I remembered was

15   what I had given SOTP and I summarized the SOTP

16   records and so I tried to duplicate that form and

17   I couldn't duplicate it.  This has many of the

18   exagerations and inconsistencies that were also

19   in the Kansas form.

20         Q      This is a document that you wrote.

21         A      Yes, it is.

22         Q      All of the locations that are listed

23   there are locations that you've written in.

24         A      Yes.

25         Q      On this chart there's a number of

Reported By: Joseph C. Spontarelli, CCR   www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 201 of 263

1    columns.

2          A      Yes.

3          Q      The column that says victims, you wrote

4    victims?

5          A      Yes.

6          Q      Are the seven victims that you told Dr.

7    Demby and Dr. Phenix about are they listed on that

8    column?

9          A      Yes.

10         Q      The seven victims that you told Dr.

11   Demby and Dr. Phenix about, are those all hands-on

12   victims?

13         A      Yes.

14         Q      Meaning those are victims that you

15   touched?

16         A      I think five were.  I included a couple

17   of family members as victims; one only because it

18   was financial and emotional.

19         Q      When you were talking to Dr. Demby and

20   Dr. Phenix and they asked you about child sex

21   victims you listed one that was a financial

22   victim?

23         A      Yes.

24         Q      That was your sister?

25         A      Yes.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 202 of 263

1      Q      You said that you listed another family

2   member.

3      A      Yes.

4      Q      So there are five non-family member

5   hands-on victims.

6      A      Yes.

7      Q      Were you including the two from Kansas?

8      A      Yes.

9      Q      On your chart at the bottom where it

10  says 58 to 59 Lakin, Kansas -- do you see that?

11     A      Yes.

12     Q      Right across from that it says four.

13     A      Yes.

14     Q      That's within the victims' category.

15     A      Yes.

16     Q      If you go all the way across to the

17  other side there's a four on top of a hash mark.

18     A      On that same line?

19     Q      On that same line.

20     A      I find one underlined.

21     Q      At the top it says a summary sexual

22  history.

23     A      Yes.

24     Q      What do you mean by a summary of your

25  sexual history?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 203 of 263

1       A       My victims over the course of my
2  lifetime.
3       Q       Did you mean just hands-on victims?
4       A       I was trying to include all victims
5  that were included in the SOTP program in Kansas.
6       Q       There's a column to the left of where
7  it says victims that says place.
8       A       Yes.  After age it says place.
9       Q       That's the location of where the
10 assault took place.
11      A       Yes.
12      Q       To the left of that is a column that
13 says age.  Is that your age?
14      A       Yes.
15      Q       To the right of that victims' column
16 there's a column that begins A-N-A-L.  What is
17 that?
18      A       Anal.
19      Q       What does that mean?
20      A       I had two victims that were anal.
21      Q       Are you engaging in anal sex on them,
22 are they engaging on you?  What do you mean by
23 anal?
24      A       It could have been either.
25      Q       Let's go to the next column over.  What

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 204 of 263

1    is that?

2         A       Female.

3         Q       Are we identifying that a victim is a

4    female in that instance?

5         A       Yes.  In two cases the females were the

6    aggressors.

7         Q       I notice where it says female it says

8    two and one or one and two in that female column.

9    Do you see where it says Harrison, Arkansas and is

10   that Fayetteville, Arkansas?

11        A       Yes.

12        Q       But it doesn't say one and two in the

13   victim column.  Why is that?

14        A       Because I didn't think they were

15   victims.

16        Q       Unless they were a victim you wouldn't

17   put them in the victim column.

18        A       That's correct.

19        Q       To the right of that female column

20   there's a column that has R-E-L on it.  What does

21   that mean?

22        A       Relative.

23        Q       By relative do you mean it's a relative

24   of yours or a relative of one of the victims?

25        A       A relative of mine.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 205 of 263

```
 1       Q       To the right of that column is one that
 2    says S-T.  What does that mean?
 3       A       Student.
 4       Q       The column to the right of that, what
 5    is that?
 6       A       Athlete.
 7       Q       Is that A-T-L for athlete?
 8       A       Yes.
 9       Q       To the right of that is C-O.
10       A       Counselee.
11       Q       Meaning somebody that you were a
12    counselor for.
13       A       Yes.
14       Q       To the right of that there's another
15    series of letters.  What does that mean?
16       A       One which I cannot describe and also
17    what I call CSW or male prostitutes.
18       Q       Does CSW stand for child sex worker?
19       A       Yes, it does.
20       Q       As we go through this chart you're
21    saying that this chart was created by you when Dr.
22    Hernandez asked you to do what exactly?
23       A       He asked me to come up with victims.
24    What I tried to do was to duplicate what I had
25    done in Kansas.
```

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 206 of 263

1      Q      Mr. Comstock, would you please turn to

2   tab number 22 in that binder?

3      A      Yes.

4      Q      What is that?

5      A      This was what was done in Kansas.

6      Q      How do you know that?

7      A      It's the only other time I remember

8   doing one like that.  It appears as though it's

9   something I would have done in Kansas as part of

10   the SOTP program.

11      Q      This document which we have marked as

12   Government Exhibit No. 22, did you write these

13   columns out?

14      A      Yes.  Frankly I kind of had forgotten

15   that, but it looks like mine.

16      Q      While you were at the Kansas SATP was

17   this the only chart or written document that you

18   wrote detailing out some of your victims?

19      A      It was, I think, the final chart.  We

20   were doing homework all the time.

21      Q      Mr. Comstock, would you turn to tab

22   number 23 in that binder?

23      A      Yes.

24      Q      What's that?

25      A      It's an autobiography.  It was done as

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 207 of 263

1    part of the SATP program.

2         Q      Did you write that?

3         A      Yes, I did.  It was required.

4         Q      So that's your handwriting?

5         A      Yes, it is.

6         Q      What sort of guidance were you given

7    when you were asked to write it?

8         A      To make it as detailed as possible.  To

9    start with when you were born and your whole life

10   including as much as you could about your sexual

11   history.

12        Q      When you did the autobiography did you

13   do the autobiography at about the same time as you

14   did the chart which is Government Exhibit No. 22?

15        A      No.

16        Q      How far apart in time did you write

17   those?

18        A      I'm guessing two and a half to three

19   years.

20        Q      The chart that you did for Dr.

21   Hernandez which is at tab number 12 -- the first

22   chart we were just speaking about -- how long

23   between the chart you did at Kansas which is

24   Exhibit 22 and that chart -- how much time

25   elapsed?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 208 of 263

 1        A       I thought that's what you just asked.
 2    That's two and a half, three years.
 3        Q       What I was asking about earlier is that
 4    chart at Exhibit No. 22 and the autobiography at
 5    Exhibit No. 23.
 6        A       That was done probably three or four
 7    months apart.
 8        Q       Mr. Comstock, Exhibit No. 12 where it
 9    says Lakin, Kansas and it has four under
10    victims --
11        A       Yes.
12        Q       You wrote four?
13        A       Yes.
14        Q       But it's your testimony today that
15    that's an exaggeration?
16        A       I think it is, yes.
17        Q       Why do you say you think it is?
18        A       I had the reports but I don't think
19    they happened.  The other two I was involved in
20    and was charged with.
21        Q       Mr. Comstock, did you molest more than
22    two boys in Kansas?
23        A       No.
24        Q       Did you only molest one boy in Kansas?
25        A       Yes, but I don't count the boy where I

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 209 of 263

1    put my hand on his thigh.

2        Q      All the way to the far right-hand

3    column on that Exhibit No. 12 where it says four,

4    what does that four mean?

5        A      Still on Lakin?

6        Q      Still on Lakin.

7        A      Four would be other.  I don't recall

8    what it's relating to.

9        Q      In that column that you previously

10   identified as counselee there's a four there as

11   well.

12       A      Yes.

13       Q      What does that four indicate?

14       A      They were my counselees.  The town is a

15   small town.  Everybody I would have come in

16   contact with was a counselee.

17       Q      You have a column that's marked

18   athlete.  You didn't put either of the two

19   brothers that you pled guilty to in the athlete

20   column, did you?

21       A      No.

22       Q      Why not?

23       A      One boy was not an athlete of mine.

24       Q      Which one was that?

25       A      The older.

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 210 of 263

 1              For the other boy I was a coach but I
 2      had a co-coach and he did most of the coaching.
 3      Our relationship was more counselee.
 4          Q      So the five non-related victims that
 5      apparently you told Dr. Phenix and Dr. Demby
 6      about, where are they located on this chart?
 7          A      I'm not recalling right now where I had
 8      them.  I'm not recalling making up a list of seven
 9      or what have you.  It's not ringing a bell.
10          Q      Do you not remember where the other
11      three victims -- where those took place?
12          A      No, I do not.
13          Q      Mr. Comstock, was Michael one of your
14      victims on your chart?
15          A      Yes.
16          Q      Would he be reflected in one of your
17      stays in the Philippines?  Would he be reflected
18      in that line?
19          A      Yes, he would.
20          Q      Michael is a person that you consider
21      to be like a stepson to you.
22          A      Yes.
23                 THE COURT:  Is this a good time to take
24      a break?
25                 MR. GRAY:  Yes, Your Honor.

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 211 of 263

 1            THE COURT:  Let's take our afternoon

 2   break.

 3

 4            (Recess.)

 5

 6            THE COURT:  You may continue.

 7            MR. GRAY:  Thank you, Your Honor.

 8   BY MR. GRAY:

 9       Q     Mr. Comstock, I was asking you about

10   whether or not Michael was on that chart as a

11   victim.

12       A     Yes, he was.

13       Q     When you met him he was a child sex

14   worker.

15       A     Yes, he was.

16       Q     Meaning that you were paying him for

17   sexual services.

18       A     Yes.

19       Q     But eventually that relationship became

20   more than just a John and prostitute relationship.

21       A     Yes.

22       Q     In fact, you look at him now as your

23   stepson.

24       A     Foster son.

25       Q     When did you stop having sex with him?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 212 of 263

1       A       It would have been weeks or maybe a
2    month of him moving into the house.
3       Q       How old was he when that happened?
4       A       I suppose 12.
5       Q       When he moved into the house did you
6    pay his pimp to buy him?
7       A       No.
8       Q       On this chart Michael is reflected in
9    that 15 that you have across from the Philippines.
10      A       Yes.
11      Q       And he would be in that ten where it
12   says child sex workers.
13      A       Yes.
14      Q       That number of 15 victims that you had
15   in the Philippines and those ten child sex
16   workers -- those child sex workers are you
17   considering those victims?
18      A       Yes.
19      Q       There's another line that says vacation
20   in Thailand where you have two victims and across
21   the line it says two child sex workers.
22      A       I'm not finding it, but yes.
23      Q       Right below the Philippines where it
24   says age 37 there is V-A-C Thailand.  That's
25   vacation Thailand, correct?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 213 of 263

1        A       Yes.

2        Q       Number two for victims.

3        A       Yes.

4        Q       All the way across under the other

5   columns there's two underneath the hash mark for

6   two child sex workers.

7        A       That's correct.

8        Q       You had sex with two child sex workers

9   while you were in Thailand.

10       A       Yes.

11       Q       If we go down to Canary Islands there's

12  five victims and then there's five child sex

13  workers that you had sex with there.

14       A       Yes.

15       Q       You had sex with five child sex workers

16  while you were in the Canary Islands.

17       A       Yes.

18       Q       If we go down to where it says Rogers,

19  Arkansas where it says 44 to 45 --

20       A       Yes.

21       Q       If we go across there's one victim in

22  the counselee section, right?

23       A       Yes.

24       Q       You had one victim that was a

25  counselee.

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 214 of 263

1      A      I'm not remembering that right now, but
2    that's what the chart shows.
3      Q      Did you have one victim in Rogers,
4    Arkansas or not?
5      A      I'm just not recalling right now.  I
6    recalled something when I made the sheet up, but
7    I'm not recalling right now.
8      Q      Is that one of your exaggerations or is
9    it not?
10     A      I'm not sure.
11     Q      When we go down to where it says Dubai
12   UAE 47 to 48 there's a hash mark where it says
13   victims and there's a hash mark where it says
14   anal, right?
15     A      Yes.
16     Q      And a hash mark where it says female,
17   right?
18     A      Right.
19     Q      There's a hash mark on all the other
20   columns, right?
21     A      Right.
22     Q      So you had no victims in Dubai.
23     A      Correct.
24     Q      Did you in fact have any victims in
25   Dubai?

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 215 of 263

```
 1        A      No.
 2        Q      So you remember you didn't have any
 3   victims in Dubai.
 4        A      Correct.
 5        Q      You don't remember whether or not you
 6   had any victims in Rogers, Arkansas.
 7        A      That's correct.
 8        Q      The child sex workers that you had --
 9   for instance the five in the Canary Islands -- you
10   remember the five child sex workers you paid for.
11        A      Yes.
12        Q      Those five child sex workers were in
13   fact five prostitutes that you had sex with.
14        A      Yes.
15        Q      That five is not an exaggeration.
16        A      No.
17        Q      When you told Dr. Demby and Dr. Phenix
18   that you had seven and out of those seven two
19   were -- one was a relative and one was a financial
20   victim -- that number was a lie.
21               MS. GRAVES:  Objection.
22               THE COURT:  Overruled.
23               THE WITNESS:  Let me try to explain
24   that.  It was all self-disclosure under
25   intimidation and obviously against my best
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 216 of 263

1    judgment.  If that had not happened I would have

2    had seven victims.

3    BY MR. GRAY:

4        Q       It was your testimony that this number

5    of 78 that you have on this chart under Government

6    Exhibit 12 --

7        A       I still think it includes some that are

8    such things as seeing kids in the showers.  We

9    gave a number to that.  I'm failing to remember

10   what number.  I think that was true -- I know that

11   was true on the 101.  I'm not remember whether it

12   was true in the 78 or not.

13       Q       Mr. Comstock, in the autobiography

14   where you were describing the sexual acts with

15   children were the acts that you describe in your

16   autobiography accurate?

17       A       Yes.

18       Q       In your autobiography where you

19   described the acts that engage in this instant

20   offense -- the Lakin, Kansas events -- where you

21   discussed where you were charged with indecent

22   assault of two minors and then you discuss two

23   additional minors -- you in fact remember those

24   two.

25       A       I don't remember victimizing the two

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 217 of 263

1    other boys.  I'm said to have.

2        Q     Let me ask this question:  Did you or

3    did you not victimize those two boys?

4        A     I did not.

5        Q     Although you pled guilty to touching

6    both of them.

7        A     Only to the two.  I pled guilty to two

8    victims.

9        Q     Mr. Comstock, your attraction to

10   children is not solely based on a sexual drive, is

11   it?

12       A     No.  I love children.

13       Q     In fact you never want to hurt

14   children, right?

15       A     No.

16       Q     In fact you told counselors that you

17   feel a very close connection with children, right?

18       A     That's true.

19       Q     As part of this close connection you

20   feel an emotional attachment to children, right?

21       A     That's true.

22       Q     It would be fair to say that a lot of

23   your conduct has been driven by your emotional

24   need to connect with these children, correct?

25       A     I suppose.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 218 of 263

1    Q    This desire to emotionally connect with

2  children has been present your entire life, hasn't

3  it?

4    A    I think more so at certain times than

5  others.  I've had situations where I had very

6  active social professional lives where the

7  children were not a major influence as they were

8  at other times.

9          I'm a workaholic.  I worked long hours

10  at school, but when I left school I emotionally

11  was around adults most of my life.

12    Q    You have only had anal sex with two

13  boys, correct?

14    A    That's true.

15    Q    So the remaining victims you were

16  either masturbating them or performing fellatio on

17  them or they were touching.

18    A    They were fellating me.  There were

19  several mutual masturbations.

20    Q    Repeat that again.

21    A    There were several mutual

22  masturbations.

23    Q    You engaged in this sort of conduct

24  while you were a member of a group in the

25  Netherlands with other sex offenders, correct?

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 219 of 263

 1        A        It was called NVSH.  It's Dutch for
 2   National Work Group Sexual Understanding.  This
 3   was a government run group.  There were police
 4   that were present, there were psychologists that
 5   were present.  It was not a total pedophile work
 6   group.
 7                I remember what a relief I felt when I
 8   first went to their meeting.  They sat around just
 9   talking.  There were people like to me.  I didn't
10   have to be in the closet.
11        Q        Part of this relationship of being
12   around these people that were like you they would
13   give you child photographic materials, wouldn't
14   they?
15        A        No, they would not.
16        Q        One of the guys in the group never gave
17   you videotapes that had child pornography on
18   there?
19        A        One of them did.
20        Q        In fact, he would give you child
21   pornography that was on a videotape that was
22   preceded by a normal firm so in a sense he would
23   have a regular film like the Secret Garden and the
24   first couple minutes would be a regular movie and
25   then he would splice in child pornography.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 220 of 263

 1      A       That's correct.
 2      Q       You received this from that guy who was
 3  a friend of yours in this group in the
 4  Netherlands.
 5      A       That's the only time that happened.
 6      Q       Is there a group that's similar to that
 7  Netherlands group in the United States?
 8      A       I thought perhaps NAMBLA would be but
 9  it was not.
10      Q       There was a guy in that group who the
11  FBI came asking you about during the course of one
12  of their investigation, isn't that correct?
13      A       That's correct.
14      Q       As a result of the FBI asking a bunch
15  of questions about this guy and his child
16  pornography and his activities you were fired from
17  a job, right?
18      A       I was not re-contracted.
19      Q       When did this non-re-contracting take
20  place?
21      A       I would have to look at the chart.
22  Rogers, Arkansas.
23              THE COURT:  I don't think the chart
24  itself is an exhibit.  If you're speaking about
25  Dr. Phenix's chart it's not in that book.  We can

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 221 of 263

1     give you a copy.

2                 MR. GRAY:  Your Honor, I believe he was

3     referring to the chart under Exhibit No. 12.

4     BY MR. GRAY:

5          Q     Mr. Comstock, was that the chart you

6     were referring to?

7          A     Yes.  It does not give the year.  It

8     was when I was 44/45 years old.

9          Q     After working in Rogers, Arkansas you

10    went to work in Rangely, Colorado then Dubai and

11    you went back to Rangely, Colorado and then went

12    back to the Philippines and worked in the

13    Philippines for a number of years.

14         A     That's right.

15         Q     Then you were fired from the job in the

16    Philippines as a result of your relationship with

17    Michael, isn't that right?

18         A     I was not re-contracted.

19         Q     After you were not re-contracted you

20    came back to the states and started working in

21    Lakin, Kansas, right?

22         A     That's correct.

23         Q     The job you had in the Philippines was

24    as a counselor, correct?

25         A     That's correct.

Reported By: Joseph C. Spontarelli, CCR                    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 222 of 263

1       Q       The job you had in Rogers, Arkansas was

2    that as a counselor as well?

3       A       It was.

4       Q       Mr.  Comstock, does your sister work?

5       A       Yes, she does.

6       Q       She works a normal 8:00 to 5:00 day?

7       A       I think she works longer than that.

8       Q       Mr. Comstock, you have admitted you're

9    pedophile; right?

10      A       That's true.

11      Q       But you feel like you can control your

12   urges.

13      A       Yes, I do.

14      Q       You feel you can control your urges in

15   part because you went through treatment in Kansas,

16   right?

17      A       Partly.

18      Q       You went through treatment in other

19   programs prior to Kansas, correct?

20      A       One was one day and one was once a week

21   for two months.

22      Q       So you did complete other psychological

23   treatment with regard to the issue of pedophilia

24   and your urges toward children prior to the Kansas

25   SATP program, correct?

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 223 of 263

1        A      Minimal, yes.

2        Q      You worked in a school after the FBI

3    came and investigated which led to you not getting

4    a contract in Rogers, Arkansas.

5        A      Correct.

6        Q      You went to work at another school

7    after you lost your job in the Philippines as a

8    result of your relationship with Michael.

9        A      That's correct.

10       Q      You had the cutouts of the boys in your

11   room in Butner after you had successfully

12   completed the Kansas SATP program, isn't that

13   correct?

14       A      True.

15              Again, I will say if anyone here saw

16   those cutouts they would not feel them to be

17   offensive at all.

18       Q      Since you've been at Butner you have

19   not taken or engaged in any sex offender

20   treatment, have you?

21       A      No, I have not.

22       Q      In fact, you refuse to do so because

23   you're concerned about the ramifications.

24       A      That's true.

25       Q      Yet you feel now you are a changed

Reported By: Joseph C. Spontarelli, CCR              www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 224 of 263

 1    person and you will not offend anymore.

 2         A      That's correct.

 3         Q      Why do you feel that?

 4         A      Because of my age.  I just don't have

 5    the desire.  I have been in prison.  I don't want

 6    to come back.  It's the same reasons I've given

 7    earlier.  I think adult sex with a child can be

 8    damaging particularly emotionally and

 9    psychologically.  There have been periods in my

10    life when I had volitional control.

11         Q      You said you had volitional control.

12    When you were engaging in the sexual acts in, say,

13    the Philippines you had volitional control.

14         A      No.

15                When I was in the Netherlands and I was

16    a workaholic and had a very active professional

17    and social life I didn't have any victims in the

18    Haig at that time at all.

19                Amsterdam is a metropolitan city and

20    has a number of child prostitutes.  My life itself

21    did not revolve around that.

22         Q      On the chart on Exhibit 12 you have 35

23    to 41 the Haig, Netherlands seven victims and of

24    them you have two child sex workers.

25         A      That was in Amsterdam.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 225 of 263

1      Q      Where was Amsterdam located?

2      A      About 60 miles north of the Haig.

3      Q      In the Netherlands?

4      A      Yes.

5      Q      While you were working in the Haig you

6    traveled to Amsterdam to engage in acts with child

7    sex workers.

8      A      It was an hour train ride.

9      Q      You feel that's an example of how you

10   had volitional control of being able to refrain

11   from engaging in sexual acts with children?

12     A      I think at the time I was in the Haig I

13   made very few trips to Amsterdam.  There were sex

14   workers there.  I was there seven years.  I think

15   that is something of a sample.

16     Q      The five victims that you had at the

17   Haig who were not child sex workers one was a

18   student and one was an athlete, how is that an

19   example of how you had volitional control?

20     A      I'm not remembering those cases right

21   now.

22     Q      Mr. Comstock, is it your testimony that

23   you can refrain from engaging in sex with kids

24   when you want to?

25     A      Yes, sir, it is.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 226 of 263

```
 1        Q       And all of these instances of when you
 2   had child sex victims -- the 78 times you have
 3   listed here -- the 101 times you have listed in
 4   the SATP Kansas listing -- those are all roughly
 5   around a hundred times that you wanted to have sex
 6   with kids.
 7        A       The opportunity was there and I took
 8   advantage of it.
 9        Q       When the opportunity was there and you
10   wanted to have sex with kids you would have sex
11   with kids.
12        A       Yes, sir.
13        Q       If you're released and the opportunity
14   is there because your sister is at work and
15   there's a child and you have the urge how do we
16   know you're not going to want to give in at that
17   time?
18        A       I guess you have to believe me in that
19   things have changed.  We have different situations
20   now.  I no longer have the libido.  I know it
21   harms children.  I would respect the property of
22   my sister.
23        Q       If there was a child in the park
24   between the ages of ten and 14 years old and you
25   have the urge to touch that child sexually would
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 227 of 263

1    you report yourself?

2         A       If I had a support network I might, but

3    I would certainly leave the situation.  I might

4    leave and then someone in my family or therapy

5    group or whatever I'd say I had a close call today

6    or I might have had a close call -- kind of walk

7    me through it.

8         Q       If your sister has a computer at the

9    house and there's the opportunity to get access to

10   child pornography what steps would you take in

11   order to stop that from happening?

12        A       As I understand it number one she

13   doesn't have one.  Number two, if you have one you

14   can have safeguards put on the computer.  You can

15   also not connect to the Internet and use it for

16   word processing and stuff such as that and not

17   connect to the Internet.

18        Q       Mr. Comstock, what steps would you take

19   if you were to get a Sunday paper and in the

20   circular they have the pictures of the little boys

21   with underwear on because underwear happens to be

22   on sale at Target?

23        A       I don't think that would have an affect

24   on me; I just don't.  I wouldn't cut it out.  The

25   pictures I had in the room were not from catalogs

Reported By: Joseph C. Spontarelli, CCR              www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 228 of 263

1    so to speak.  They may have been from magazines or
2    newspapers.  I've never gone through Sears or J.C.
3    Penney's or anything like that to get pictures.
4    We don't even have catalogs in prisons.
5        Q     Mr. Comstock, the chart that's under
6    tab number 12 that we've been talking about,
7    that's a chart that you wrote out.
8        A     Yes.
9        Q     So you're familiar with that chart and
10   you know that is a chart that you wrote.
11       A     Yes.
12       Q     You're the author of that.
13       A     Yes.
14       Q     Mr. Comstock, if you would go to tab
15   number 19.
16       A     Yes.
17       Q     There is a document there.  Do you know
18   what that document is?
19       A     Yes.
20       Q     What is it?
21       A     I was upset at a lot of things.  I had
22   a friend who was a psychologist.  I just wrote
23   down my triggers.  It was written for him and for
24   me.  I wrote down things that bother me and things
25   that make me mad.

**Reported By: Joseph C. Spontarelli, CCR**         **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 229 of 263

1      Q      On the last page of that document which
2    is Bates number 1557 it says in paragraph 13
3    volitional control-I think so.  I had no brushes
4    with the law until the age of 58 years old.
5    Working with children for 40 plus years.
6    Volitional control-I think so.  Is that your
7    writing?
8        A      Yes, it is.
9        Q      Mr. Comstock, would you turn to tab
10   number 20?
11       A      Okay.
12       Q      Do you know what that document is?
13       A      I remember doing it.  I don't recall
14   the details.
15       Q      Did you type out this document?
16       A      I believe I did.
17       Q      Where it says why I'm not a sexual
18   dangerous person even though I'm a pedophile
19   that's your title?
20       A      Yes.
21       Q      The information that's written within
22   there is that -- are those your thoughts?
23       A      Yes.
24       Q      Mr. Comstock, tab number 22.
25       A      Yes.

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 230 of 263

1       Q       The chart that is there and the
2   information within those charts that's your
3   handwriting?
4       A       Yes, it is.
5       Q       Where it has the tabbing where it says
6   at the top your age, sexual behavior, who and how
7   you know, thoughts, feelings and so on are those
8   your column headings?
9       A       I think they were determined by the
10  SATP program.
11      Q       Did you write those out?
12      A       Yes.
13      Q       What is meant by thoughts?
14      A       What you were thinking at the time.
15      Q       If we were to go down the page to where
16  it says nine MLB in small letters -- do you see
17  where it says that?
18      A       Yes.  That was to help me remember.
19      Q       Help you remember what?
20      A       Places, names, events.  I can't be more
21  specific.
22      Q       What does MLB stand for?
23      A       Somebody's name.
24      Q       Where it says thoughts -- where it says
25  I don't like this, I want to get away -- are those

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 231 of 263

1    your thoughts or is that the thoughts of MLB?

2        A    It's my thoughts.

3        Q    Where it says anxious and confused are

4    those your feelings or are those the feelings --

5        A    My feelings.

6        Q    If you would turn the page to where it

7    says at the bottom 2271 there's a 15 that says TV

8    and then a row that says 15 and RC.  In between

9    there is another row where it says note MFM.  What

10   does that mean?

11       A    Massage, fellatio, masturbate.

12       Q    Is that conduct that you're engaging in

13   or is that conduct that's being engaged in upon

14   you?

15       A    That's my activity.

16       Q    That line right below that where it

17   says 15 -- it looks like RC -- there's FWS.  What

18   does that mean?

19       A    Fondle while sleeping.

20       Q    The next column where it says who and

21   how you know -- you are the junior leader at the

22   YMCA or is that the victim?

23       A    The victim was.

24       Q    Where it says thoughts -- those are

25   your thoughts?

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 232 of 263

 1        A       Yes.

 2        Q       And those are your feelings?

 3        A       Yes.

 4        Q       When it goes across where it says the

 5  column common fantasies and masturbation habits it

 6  says MFM.  Is that you engaging in MFM upon him or

 7  is that you masturbating yourself?

 8        A       It's me on him.

 9        Q       Mr. Comstock, if you would turn the

10  page to where it says page number 2274.

11        A       Okay.

12        Q       There's a row that says New Delhi,

13  India, 1969 to 1971.  Is that a row that denotes

14  the location where you were at?

15        A       Yes.

16        Q       If we see a row like that that means

17  that's where you were located at the time.

18        A       Yes.

19        Q       The row right below that says sexual

20  behavior 27 FL -- it has sexual behavior that's

21  listed in there -- who and how you know, thoughts,

22  feelings.  Under frequency it says once per month.

23  Anal penetration three time only or one time only.

24        A       One time only.

25        Q       Does that identify with your conduct?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 233 of 263

1        A      Yes.

2        Q      Does that mean that you were having

3    some sort of sexual activity with them one time

4    per month regularly?

5        A      One time only.

6        Q      Where it says where that took place at

7    your apartment on campus?

8        A      Yes.

9        Q      And where it says grooming and shaping

10   behavior, arrange for him to work for me, was good

11   to his parents does that mean he was working for

12   you in some capacity?

13       A      Yes.

14       Q      By grooming and shaping behavior is

15   this the activity that you took in order to get

16   the victim closer to you?

17       A      Yes.

18       Q      Mr. Comstock, if you would turn to

19   what's Bates numbered 2285.

20       A      Yes.

21       Q      It says your age and it says 58.

22       A      All right.

23       Q      The first line has BET.  Is that an

24   acronym or is that supposed to be a victim's name?

25       A      It's a victim's name.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 234 of 263

```
 1         Q      Is that Beto?

 2         A      Yes.

 3         Q      Is this one of the acts you pled guilty

 4    to?

 5         A      Yes, it is.

 6         Q      Right below that is another column that

 7    says 58 TR or is that JR?

 8         A      That's JR.

 9         Q      Is this one of the acts that you pled

10    guilty to?

11         A      Yes, it is.

12         Q      Right below that there is a another 58

13    and it has two in superscript above that.

14         A      Yes.

15         Q      What does two mean?

16         A      That's the two boys that accused me.

17    They said they were bothers but they were actually

18    cousins I thought.

19         Q      The feelings where it says excited and

20    happy is that your feelings?

21         A      Yes.

22         Q      Where it says thoughts and it says they

23    don't even seem to care although they did respond

24    that was you writing that down?

25         A      Yes.
```

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 235 of 263

1    Q    Where it says grooming and shaping

2    behavior it says welcome them to the rec center

3    and kept them occupied and happy.

4    A    Yes.

5    Q    This act that you have listed in this

6    row where it says 58, two this in fact happened.

7    A    Yes.  This was added after I realized

8    in talking with attorneys that we were going to

9    have to make it more accurate.  I was not charged

10    with it.  It was not something that would have

11    been known if I had not participated in this SATP

12    program.

13    Q    So it happened.

14    A    Yes.

15    Q    Right below that it says arrested and

16    then it has a child pornography charge.

17    A    Yes.

18    Q    You wrote all these in.

19    A    Yes.

20    Q    If you would turn to tab number page 3.

21    A    All right.

22    Q    It's the autobiography.

23    A    Okay.

24    Q    You wrote this autobiography.

25    A    Yes, I did.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 236 of 263

1     Q      Your own handwriting.

2     A      It appears to be, yes.

3     Q      This was done at the campus SATP.

4     A      Yes.

5            MR. GRAY:  No further questions, Your

6     Honor.

7            THE COURT:  You may examine the

8     witness.

9

10              CROSS EXAMINATION

11

12    BY MS. GRAVES:

13    Q      Mr. Comstock, what name do you go by

14    with your family and friends?

15    A      Don.

16    Q      Do you mind if I call you Don?

17    A      That's all right.

18    Q      Don, how long have you been in prison?

19    A      11 years now.

20    Q      Had you ever been in prison before?

21    A      No, I never had.

22    Q      In fact you had been free to travel the

23    world before you got locked up, weren't you?

24    A      Yes, I had.

25    Q      How has prison affected you?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 237 of 263

```
1         A      Well, it's changed my look on life.
2    Certainly I don't have the same ambitions I once
3    had.  I've changed a lot in terms of my health, my
4    age and the way I look on life.
5         Q      How old are you now?
6         A      I am 69.
7         Q      How would you describe your health now?
8         A      Not good.
9         Q      What sorts of health problems have you
10   had since you've come into prison 11 years ago?
11        A      I've had a minor stroke, I've had a
12   major heart attack and triple bypass open heart
13   surgery.  I continue to have hypertension and high
14   cholesterol.  I am now considered hard-of-hearing.
15   I have prostrate cancer.  It's presently in
16   remission.  I'm not sure how long it's going to
17   last.  I'm having signs that it may be coming out
18   of remission.
19        Q      Do you have any problems with
20   incontinence?
21        A      All the time.
22        Q      How many medications are you currently
23   taking?
24        A      I take 11.
25        Q      How has your decline in health affected
```

**Reported By: Joseph C. Spontarelli, CCR**          www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 238 of 263

```
 1    your sexual interest?
 2        A      I'm assuming that's the main reason I
 3    don't seem to have any sexual interest.  I don't
 4    get erections.  I don't fantasize.  The other day
 5    in our day room there are four TVs side-by-side
 6    and the second from the right there was a Little
 7    League game on.  It was an international game.
 8    Japan playing southern California I think.  On the
 9    end TV was CNN.  I realized and was kind of
10    shocked I was watching CNN.  The Little League
11    game didn't interest me.  I wasn't interested in
12    the Little League game.  I feel like the libido
13    has decreased.
14        Q      On a scale of one to ten and ten being
15    the peak of your sexual interest in children where
16    would you say your interest is now?
17        A      One or two.
18        Q      Do you feel that you have control of
19    your sexual interest in children?
20        A      Yes, I do.
21        Q      Do you feel like you always had
22    control?
23        A      No.
24        Q      You changed in that respect.
25        A      Yes, I have.
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 239 of 263

1    Q    Is this something that you wanted to

2  happen; you wanted to change in that respect?

3    A    Yes, it was.

4    Q    What motivated you to want to change?

5    A    The four things I've kind of mentioned.

6  One is I don't want to come back to prison.  I

7  don't want to die here.  Someone said that's

8  probably what would happen if I came back to

9  prison.  I don't want to hurt children.  If I love

10  them, as I say that I do, I'm aware sex can harm

11  them emotionally and psychologically and I just

12  don't have the libido.

13    Q    When you were in the Kansas sex

14  offender treatment program why did you enter the

15  program to begin with?

16    A    It was required.  I was moved from

17  another institution to the prison there to take

18  the program.  Everyone did.

19    Q    Were you a volunteer for the program or

20  was it ordered as part of your judgment?

21    A    It was ordered as part of my judgment.

22    Q    Once you got there you were compelled

23  to disclose certain things in order to remain in

24  the program, is that correct?

25    A    That's correct.

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 240 of 263

1    Q    When you were making these disclosures

2    did the treatment providers give you feedback as

3    to whether they thought your disclosures were

4    adequate?

5    A    Yes.

6    Q    What would be the consequences if they

7    felt your disclosures were not adequate?

8    A    You would be considered a program

9    refusal which I became at one point.  When I was

10    in the program about halfway through it was time

11    to do the sex history and the PPG and I felt like

12    to do that could be very damaging to me in terms

13    of future charges and so I dropped out of the

14    program.  I told them I would not do those things.

15    I would not do the sex history, I would not do the

16    PPG, I would not do the polygraph.

17    They immediately suspended me from the

18    program.  They called me a program refusal.  When

19    that happened I was moved into maximum custody --

20    the more dangerous part of the prison -- the

21    commissary was dropped from $60 a week down to

22    five.  They collected your TV and your

23    electronics.  You got no good time.  They lowered

24    your visitation.  There were tremendous pressures

25    to get back in the program.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 241 of 263

 1              At one point because of being in a

 2     small one-man cell and being locked down 23 hours

 3     a day I became emotional.  I had crying spells and

 4     I got psychiatric help.  I eventually got back in

 5     the program because I was having trouble coping

 6     with the intimidation and coercion.

 7          Q     You go back into the program and you

 8     successfully completed the program, is that right?

 9          A     Yes, I did.

10          Q     Can you separate in your mind the

11     benefits of the program from the negative

12     consequences that have come from the program?

13          A     I think you do learn things that can be

14     of use in the program.  The reason I have been

15     reluctant to get back involved was because of all

16     the negatives.  One of the negatives is they drag

17     you through the dirt.  It's kind of like being in

18     a civil commitment hearing.  It's that way for 18

19     months and ever day is like that and it's very

20     hard.

21          Q     Every day you're repeatedly reminded of

22     all the things that you have done wrong.

23          A     Yes.  If you say I was a good teacher

24     they say it's compartmentalizing.

25          Q     Essentially the program would not allow

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 242 of 263

1    you to maintain a sense of dignity about your

2    previous life.

3        A      No.

4        Q      When you made the reports disclosing

5    the victims did you distinguish between what types

6    of offenses you had committed against those

7    victims in terms of child porn, voyeurism versus

8    hands-on offenses?

9        A      In the first history there were some

10   that were voyeur, some pornography.  I read a book

11   on 101 something.  I thought if I wrote 101

12   victims they would leave me alone so I added some

13   for seeing kids in the showers even though that

14   was part of my job.

15       Q      Once you completed that list did you

16   feel that the program administrators were

17   satisfied with what you had written?

18       A      As I went through they seemed

19   satisfied.  When I finished they made my prognosis

20   poor which surprised me.

21       Q      With the providing of the list they

22   seemed satisfied with that?

23       A      Yes.  I took a polygraph twice.

24       Q      You passed the polygraph?

25       A      Yes.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 243 of 263

1      Q      When you took the polygraph you were

2   relying on your own definition of what a victim

3   was or what they had told you.

4      A      I was relying on theirs.

5      Q      When you provided that information to

6   the sex offender treatment program did you feel

7   that the information was privileged?

8      A      No.  I think that's why I had so much

9   trouble with it.  That's why I was out of the

10  program for a while.  Even though I had hoped it

11  was privileged I was afraid it would come back to

12  haunt me which it has done.

13     Q      Did anyone tell you that it wasn't

14  privileged?

15     A      I was told the best way to not be

16  civilly committed was to complete the program.

17  That's not true.

18     Q      Are you talking about back when you

19  were in Kansas they were already talking about

20  civil commitment?

21     A      Yes.

22     Q      For the state civil commitment program.

23     A      Yes.

24     Q      You were told you could avoid civil

25  commitment in the State of Kansas if you completed

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 244 of 263

1    the program.

2        A       Not a hundred percent.  They said the

3    best way to avoid it.  They didn't say if you

4    complete it you will avoid it.

5        Q       Were you told that Kansas would provide

6    that information to Butner or to the federal

7    government?

8        A       We were given the opinion that the

9    information would not be used against us in any

10   court proceeding.

11       Q       When you arrived at Butner and you were

12   approached by Dr. Hernandez I believe you

13   indicated you thought he already had the Kansas

14   material.

15       A       Yes.  He said some things that

16   indicated to me he knew about the 101 so that's

17   what he wanted repeated.  That's when I made the

18   chart out and I couldn't get to 101.

19       Q       Why couldn't you get to 101?

20       A       I couldn't remember that many.  I just

21   didn't get there.

22       Q       Do you recall when you obtained counsel

23   regarding this whole process?

24       A       It was after I talked to Dr. Demby and

25   after I talked to Dr. Hernandez.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 245 of 263

1    Q    Was that in 2007?

2    A    Probably so.  I was brought here in

3    2006.  It was while I had my original counsel Ms.

4    Jane Pierce who is now in Washington.

5    Q    After you had spoken with Dr. Hernandez

6    and provided him with that extensive list and

7    after you had spoken with Dr. Demby who was doing

8    a forensic evaluation of you that's when you

9    consulted counsel after you had spoken to them.

10    A    After that, yes, to the best of my

11    recollection.

12    Q    In your conversations with counsel have

13    counsel warned you to not adopt the disclosures

14    that were made in treatment?

15    A    They told me not to confer with anybody

16    from the government.

17    Q    In your later conversations with

18    evaluators you did not admit to -- you did not

19    adopt the disclosures that you had given in the

20    Kansas program or the summary you had provided to

21    Dr. Hernandez, is that correct?

22    A    That's correct.

23    Q    That's because of your understanding of

24    what your lawyers were telling you.

25    A    That's correct.

**Reported By: Joseph C. Spontarelli, CCR**    www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 246 of 263

1        Q        You were asked about this group that
2    you were involved with in the Netherlands; the
3    group that you described as not pedophile.  Was
4    this sort of a workshop that was designed to
5    discourage acts of pedophilia?  Would you agree
6    with that statement?
7        A        I'm not sure I would.  They had a group
8    for gay teens, they had a group for lesbians, they
9    had a group for pedophiles.  This was a chance to
10   get together and discuss.
11       Q        Was the purpose of this network so that
12   you could facilitate the transfer of child porn to
13   one another?
14       A        No.
15       Q        Was it so you could facilitate the
16   abuse of children among one another?
17       A        No, it was not.
18       Q        When this one individual provided you
19   with some child porn he was operating outside the
20   purposes of that program.
21       A        Yes, he was.
22       Q        When you were molesting young boys was
23   the purpose of that molestation to obtain sexual
24   gratification?
25       A        It was never important to me.  It would

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 247 of 263

1      have been nice if they did to the extent they

2      could at that age.  It never was important for me

3      to obtain sexual gratification.

4          Q      When you touched them and you became

5      excited was that sexual?

6          A      It was sexual, but I could count on one

7      hand the number of times I might have orgasmed.

8          Q      Nevertheless what you're saying is that

9      when you were touching them it was for sex -- that

10     was your sexual outlet.

11         A      It was also an emotional outlet.

12         Q      I'm asking was it a sexual outlet.

13         A      Yes.

14         Q      You can admit that.

15         A      There were dozens I touched that were

16     not sexual.

17         Q      The molestation that was sexual?

18         A      Yes.

19         Q      As far as your plan to live with your

20     sister Mary when you're released from prison,

21     could you explain to the Court your relationship

22     with your sister?

23         A      We've always been very close.  I'm the

24     oldest in the family, she's the youngest.  When I

25     had emotional ups and downs she was there.  I

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 248 of 263

1     think the reverse is kind of true.  We supported

2     each other and we've always been close.

3          Q     Have you ever lived with her before?

4          A     Off and on.  When I came home from

5     overseas for the summers or Christmas holidays I

6     would stay at her place.

7          Q     Are you aware of her standing in the

8     community where she lives?

9          A     Yes.

10         Q     What is that?

11         A     She's an outstanding member of society.

12    She's been a teacher and a graduate student.  She

13    worked on her Ph.D for a while when I was staying

14    with her.

15         Q     Would you ever want to do anything that

16    would embarrass or threaten her standing in the

17    community?

18         A     No.

19         Q     How do you feel about her willingness

20    to allow you to live with her?

21         A     Most grateful.  It's something she

22    doesn't have to do.  It means a tremendous amount

23    to me.

24         Q     I think you indicated on direct that

25    you had derived emotional support from adult

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 249 of 263

```
 1    relationships.
 2         A       Yes.
 3         Q       Can you expound on that a little?
 4         A       My best friend for 35 or 40 years is
 5    still my best friend.  Every place I've been I had
 6    adult friends including usually a lady friend.  I
 7    had a social life.  I have people I still
 8    correspond with.  I write to one of them once
 9    every week or two.  I miss a lot of them.
10         Q       You've always maintained employment, is
11    that right?
12         A       That's correct.
13         Q       Would you intend to seek employment if
14    released?
15         A       Probably not.  I have Social Security,
16    I have a little bit of retirement from a previous
17    retirement fund.  If I don't have to pay rent then
18    I'm good to go.
19         Q       So you think you're well enough to
20    work.
21         A       Probably not.
22         Q       One of the things you offered to do
23    while you were at Butner was you offered to
24    undergo castration in order to demonstrate that
25    you would not be sexually dangerous.
```

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 250 of 263

**United States of America v. Graydon Earl Comstock, Jr.**  **5:06-HC-02195-BR**
**Bench Trial**  **November 28, 2011**

Page 251

1  A  That's correct.

2  Q  How far did you go along those lines?

3 Did you investigate that?

4  A  I did.  It got to where the medical

5 people kind of turned me down.  They said they

6 couldn't do it voluntarily only if it was a

7 byproduct of my prostrate cancer.  Sometimes

8 castration is done for that.

9  Q  There's this exhibit that Mr. Gray

10 pointed you to -- Exhibit No. 20 -- where I

11 believe you indicated that you prepared this and

12 said why I am not a sexually dangerous person.

13  A  Yes.

14  Q  In number one you said you do have

15 volitional control with an exclamation point.  You

16 still feel that way.

17  A  Yes, I do.

18  Q  In number seven you indicated that love

19 and lust are not the same.  Take away lust and

20 what do you have left.  Yes, I admit to that.

21    Are you saying you now no longer would

22 seek sexual gratification from children?

23  A  Yes.

24  Q  And that your feelings for children now

25 are purely love without the sexual gratification.

**Reported By: Joseph C. Spontarelli, CCR**  **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 251 of 263

 1          A       That's true.

 2          Q       Do you recognize that you have probably

 3    forfeited any right or any trust anyone might have

 4    in you in terms of having you around children?

 5          A       Yes, I do.

 6          Q       You can live with that.

 7          A       Yes.

 8          Q       Number 19 is the list of my triggers.

 9          A       Tab number 19?

10          Q       Tab 19.

11                  I think the subheading you have here is

12    areas of conflict and tension, is that right?

13          A       Yes.

14          Q       These are things that upset you, are

15    they not?

16          A       Yes.

17          Q       This is not some list of things that

18    excite you in any way or get you interested.

19          A       I write about lots of things including

20    politics.

21          Q       Can you describe for the Court the

22    conditions under which you've been held at Butner?

23                  MR. GRAY:  Objection.  Relevance, Your

24    Honor.

25                  THE COURT:  I'll give her some

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 252 of 263

1      latitude.

2                  MS. GRAVES:  Thank you.

3                  THE COURT:  You may proceed.

4                  THE WITNESS:  Pretty much as any other

5      prisoner.  We are separated --

6                  THE COURT:  Just for the record, I

7      intend to take a tour of Butner sometime while I'm

8      here in the next couple months.

9                  THE WITNESS:  Butner has one unit --

10     the Maryland Unit -- specifically for child

11     molesters or people with sex crimes.  Then there's

12     the rest of the prison and we're kept separated.

13     They go to great efforts to keep us apart.

14                 Basically there's no difference in the

15     treatment.  We eat in the same dining hall, wear

16     the same uniform, we go to the same clinic, we're

17     double bunked.  I'm not at the moment but many

18     are.  It's more or less a prison.

19     BY MS. GRAVES:

20          Q      Are there any limitations in your

21     recreation time or any limitations on when you can

22     go to the dining hall and whatnot?

23          A      Yes.

24                 They're different than what they are

25     for the lower compound.  I'm not sure they're

Reported By: Joseph C. Spontarelli, CCR            www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 253 of 263

1    less.  We have a much smaller recreation area.
2    The food is the same.
3        Q     Out at Butner does each unit go with
4    its own group to the dining hall?  Is that how
5    it's organized?
6        A     We're very carefully divided.  We go as
7    a unit.
8        Q     During your time at Butner have you
9    been disciplined for anything?
10       A     Yes.
11             One time I had pictures on my wall.  I
12   went through a period where I was a little bit
13   belligerent.  That was after November 8, 2006
14   which was my out date.  That's when everything
15   being the same I would have gotten out.  It's now
16   been over five years ago.  There was a while after
17   that happened I kind of had trouble accepting the
18   authority of the BOP.
19             One time I swatted a kid in the head --
20   kind of a big brother swat -- nonetheless I spent
21   time in the hole.  I think those are the only two
22   times.
23       Q     Have you worked while you were at
24   Butner?
25       A     Initially I worked in the kitchen.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 254 of 263

1    Q    How long did you work in the kitchen?

2    A    About two months.  I was having some

3    medical problems and so I retired.  They said I

4    couldn't do that but I did.

5    Q    What sort of medical problems were you

6    having?

7    A    When I was standing I was getting

8    dizzy.  I had blue lips.  I was unsteady on my

9    feet.

10         Since I have been in the federal

11   correctional system I have been unassigned for

12   medical reasons.  When I came to Butner all of a

13   sudden after the year I had a heart attack they

14   decided I should work in the kitchen.

15   Q    You were willing to go along with it

16   but the folks at the kitchen thought that you

17   shouldn't be there, is that right?

18   A    I felt I shouldn't be there.

19   Q    Who asked you not to come back?  Did

20   they ask you not to come back or did you ask not

21   to go back?

22   A    I gave them a letter saying that I

23   resigned and they said you can't do that and we're

24   going to take you to the lieutenant which they did

25   and he made a phone call up to the Maryland Unit

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 255 of 263

1    and that's when a decision was made that those in

2    the Maryland Unit don't have to work.  I and

3    everybody else after that if they work it's as a

4    volunteer.

5          Q      I'm going to turn your attention to

6    Respondent's Exhibit No. 7.

7          A      That's my letter of resignation.

8          Q      That's your letter of resignation from

9    the kitchen.

10         A      Yes.

11                MS. GRAVES:  That's all I have.  Thank

12    you.

13                THE COURT:  You talked about if you

14    were released the need for some support.  Tell me

15    what you have in mind.  What kind of support would

16    you get if you were to go back in the community?

17                THE WITNESS:  For support I have my

18    sister.  I have a brother who is fairly

19    supportive.  His immediately family is not but he

20    is.  He's also in Arkansas.

21                I would hope to come up with other

22    people that were just friends.  I don't know how

23    that would come about.

24                THE COURT:  How big a town does your

25    sister live in?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 256 of 263

 1                THE WITNESS:  I think it's about 2500.

 2                THE COURT:  You've lived there before.

 3                THE WITNESS:  No.  I've never been

 4      there.

 5                THE COURT:  I don't know anything about

 6      the geography.

 7                THE WITNESS:  I think it's about 60

 8      miles north of Little Rock.

 9                THE COURT:  What does your sister do

10      there in town?

11                THE WITNESS:  She is an instructor at

12      the Arkansas State University at the local campus.

13                THE COURT:  Which is how far?

14                THE WITNESS:  The campus is in the same

15      town.

16                THE COURT:  How big a school is it, if

17      you know?

18                THE WITNESS:  It's not a big school.

19                THE COURT:  I would imagine you would

20      have to register with the police department as a

21      sex offender.

22                THE WITNESS:  Yes, I would.

23                THE COURT:  You have discussed that

24      with your sister.

25                THE WITNESS:  Yes.  Her home was

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 257 of 263

 1    approved at one point.

 2              THE COURT:  You said you were friends

 3    with somebody for 35 or so years.  This person is

 4    the a male/female?

 5              THE WITNESS:  It's a she.

 6              THE COURT:  How far away does she live?

 7              THE WITNESS:  She lives in Florida.

 8    She's not real close.

 9              THE COURT:  Is there anybody physically

10    close that you have an acquaintance with or

11    friends?

12              THE WITNESS:  I've never lived there.

13    I've never had much trouble making friends.  It's

14    just a matter of getting there and finding

15    appropriate social contacts where I can make

16    friends.

17              THE COURT:  You say it's not your

18    intention to go to work.  Is it your intention to

19    volunteer or do anything else?

20              THE WITNESS:  I was thinking about

21    that.  I thought maybe in terms of emotional

22    attachment not only would it be nice to have a dog

23    but there is a kennel nearby and that perhaps I

24    could volunteer at the kennel.

25              THE COURT:  It wouldn't have to do with

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 258 of 263

```
 1    coaching or schools or anything like that.
 2                THE WITNESS:  No.
 3                THE COURT:  You indicated you've taken
 4    up reading.  What do you read?  What kind of books
 5    do you read?
 6                THE WITNESS:  I've been reading the
 7    Larson series and I love John Grisham books.
 8                THE COURT:  Did you read the latest
 9    one?
10                THE WITNESS:  I haven't read that one
11    yet.
12                THE COURT:  I am in the middle of it.
13    I can't put it down.
14                You read other books?
15                THE WITNESS:  Yes.
16                THE COURT:  Have you read Innocent?
17                THE WITNESS:  Yes, I have read that.
18    It takes place in a town in Oklahoma as I recall.
19                THE COURT:  Right.
20                I know you can't say because you're not
21    there -- how would you keep busy every day?  Do
22    you watch TV?  Do you like TV?
23                THE WITNESS:  I could even watch the TV
24    of my choice.
25                THE COURT:  Do you like TV?
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 146  Filed 12/15/11  Page 259 of 263

```
 1                    THE WITNESS:  I love TV.
 2                    THE COURT:  Tell me what kind of
 3      programs you watch.
 4                    THE WITNESS:  My channel I watch mostly
 5      is CNN.  I kind of enjoy politics.  I watch
 6      sports.
 7                    THE COURT:  Any of the series, any of
 8      the pawn shops or storage wars?
 9                    THE WITNESS:  I like Two and a Half
10      Men.
11                    THE COURT:  Have you seen the new ones?
12                    THE WITNESS:  No.
13                    THE COURT:  You indicated you have some
14      income.  Do you collect Social Security?
15                    THE WITNESS:  I'm eligible.
16                    THE COURT:  How much, do you know?
17                    THE WITNESS:  I don't know.
18                    THE COURT:  When you were working
19      overseas did you pay into Social Security?
20                    THE WITNESS:  It depends on the school.
21      Most of them we did.
22                    THE COURT:  You said you had a small
23      retirement.  From where?
24                    THE WITNESS:  From the Netherlands.
25      They had a program --
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 260 of 263

```
 1              THE COURT:  For the Americans that
 2    worked over there?
 3              THE WITNESS:  Yes.
 4              THE COURT:  Do you know whether you're
 5    eligible for Medicare?
 6              THE WITNESS:  I think everyone 65 is,
 7    aren't they?
 8              THE COURT:  I don't know.
 9              You said your sister is your younger
10    sister.  How many years younger?
11              THE WITNESS:  11.
12              THE COURT:  Any other questions?
13              MR. GRAY:  Just one, Your Honor.
14
15              REDIRECT EXAMINATION
16
17    BY MR. GRAY:
18         Q    Mr. Comstock, if you were released
19    would you participate in a sex offender treatment
20    program?
21         A    For the reasons I've outlined I would
22    prefer not to.  I would not mind mental health
23    treatment.  I don't want to get drug through the
24    dirt again.  I don't think an additional program
25    would help me.  I feel like I would be better off
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 261 of 263

1   and healthier if I'm not involved in that type of

2   program.  If it was a different type of mental

3   health program I would be glad to participate.

4               MR. GRAY:  No further questions.

5               THE COURT:  Anything further?

6               MS. GRAVES:  No, sir.

7               MR. ROYSTER:  Your Honor, our next

8   witness is going to be Dr. Demby and that will be

9   by video.  If you want to play a little bit of

10   that today we can.

11               THE COURT:  We'll break.  It's 5:00.

12   We'll start it tomorrow.  Do you have the

13   equipment here?

14               MR. ROYSTER:  Yes.

15               If you want to get started a little

16   earlier in the morning we'll certainly be here and

17   ready to go at 8:30.

18               THE COURT:  I have no problems with

19   that at all.  8:30 is perfect with us.

20

21               (Court adjourned for the day at 5:30

22   p.m.)

23

24

25

Reported By: Joseph C. Spontarelli, CCR   www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 262 of 263

1

2

3

4                   REPORTER'S CERTIFICATE

5

6        I, Joseph C. Spontarelli, court reporter,

7   do hereby certify that the pages contained herein

8   accurately reflect the notes taken by me, to the

9   best of my ability, in the above-styled action.

10

11

12

13                    _Joseph Spontarelli_
                      Joseph C. Spontarelli,

14                    Court Reporter

15

16

17

18

19

20

21

22

23

24

25

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 146   Filed 12/15/11   Page 263 of 263