UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

WESTERN DIVISION

_____

UNITED STATES OF AMERICA,

        Petitioner,

     v.                 No. 5:06-HC-02195-BR

GRAYDON EARL COMSTOCK, JR.,

        Respondent.

_____

Bench Trial - Vol. II
HON. BERNARD A. FRIEDMAN, Judge
November 29, 2011
8:30 a.m. - 7:15 p.m.
Raleigh, North Carolina

REPORTED BY:  Joseph C. Spontarelli, CCR

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 1 of 190

```
 1    APPEARANCES:
 2
 3         UNITED STATES DEPARTMENT OF JUSTICE
           UNITED STATES ATTORNEY'S OFFICE
 4         By:  Joshua B. Royster, Esquire
           and  Edward D. Gray, Esquire
 5         Assistant U.S. Attorneys
           310 New Bern Avenue
 6         Suite 800
           Raleigh, North Carolina 27601
 7         (919)856-4859
           edward.gray@usdoj.gov
 8         On behalf of the United States of America
 9
10
           OFFICE OF THE FEDERAL PUBLIC DEFENDER
11         By:  Debra Graves, Esquire
           and  Kat Shea, Esquire
12         Assistant Federal Public Defenders
           150 Fayetteville Street
13         Suite 450
           Raleigh, North Carolina 27601
14         (919)856-4236
           kat_shea@fd.org
15         On behalf of the Respondent
16
17
18
19
20
21
22
23
24
25
```

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 2 of 190

```
 1              INDEX TO WITNESSES

 2

 3   Witness:          Direct  Cross  Redirect  Recross

 4
     Lela Demby, Ph.D.   --     --      --        --
 5   (Via Video)

 6

 7   George P.          276    307     317
     Corvin, M.D.
 8

 9
     Terence W.         321    376     394
10   Campbell, Ph.D.

11

12   Mary A. Comstock   396    406

13

14   Amy Phenix, Ph.D   --     --      420

15

16

17

18

19

20

21

22

23

24

25
```

**Reported By: Joseph C. Spontarelli, CCR**  **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 3 of 190

```
 1               P R O C E E D I N G S
 2                    8:45 a.m.
 3
 4          MR. ROYSTER:  Our first witness will be
 5    Dr. Lela Demby by way of video deposition.
 6          THE COURT:  Any objection that the
 7    court reporter won't take down the deposition but
 8    that the deposition will be introduced as evidence
 9    in this matter and the record will reflect the
10    contents thereof?
11          MR. ROYSTER:  No objection from the
12    government, Your Honor.
13          MS. SHEA:  No objection.
14
15          (Whereupon, the deposition of Dr. Lela
16    Demby by way of video was commenced.)
17
18          (Video stopped.)
19
20          THE COURT:  To save a little time
21    there's no objection to her qualifications, is
22    there?
23          MS. SHEA:  No, Your Honor.
24          THE COURT:  Maybe we can fast forward
25    it since there are no objections to her
```

**Reported By: Joseph C. Spontarelli, CCR**          www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 4 of 190

1    qualifications.  I have her CV in front of me.  We

2    can fast forward it to the start of her testimony.

3                Any objection by either side?

4                MR. GRAY:  No objection, Your Honor.

5                MS. SHEA:  No objection, Your Honor.

6

7                (Video continued.)

8

9                (Video stopped.)

10

11               THE COURT:  I would suggest I'm hearing

12   it and listening to it.  If there is anything that

13   I will sustain the objection for I will let you

14   know.  If you don't hear from me that means that

15   the objections are overruled for both sides.

16               As to the exhibits in the deposition

17   I'll rule on those all at one time.

18               I think I reversed what I said before.

19   They will be overruled unless I sustain the

20   objection.  I said it the other way.

21               As to the exhibits, I'll rule on those

22   all at one time.  This particular objection I

23   would overrule.

24

25               (Video continued.)

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 5 of 190

 1              (Video stopped.)

 2

 3              THE COURT:  Let's take a break.  We'll

 4      take 20 minutes give or take.

 5

 6              (Recess.)

 7

 8              (Video continued.)

 9

10              THE COURT:  Let the record reflect the

11      Court has had an opportunity to review the total

12      deposition.  The Court has no additional

13      questions.

14              I indicated I may reserve the

15      opportunity to question the doctor when she

16      returns from vacation but after listening to the

17      deposition I have no questions.  I think they have

18      all been sufficiently covered for me.

19              It's my understanding the government

20      has no further witnesses, is that correct?

21              MR. ROYSTER:  That's correct, Your

22      Honor.

23              THE COURT:  Maybe right now is a good

24      time to talk about the exhibits.  Have you had an

25      opportunity to discuss them with each other?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 6 of 190

1          MR. ROYSTER:  We talked about some.

2          THE COURT:  Is it fair to say that the

3    list that's contained in the pretrial statement is

4    that which the government wishes to introduce at

5    this time?

6          MR. ROYSTER:  Your Honor, we would like

7    to strike a couple of the exhibits we put in our

8    pretrial.

9          THE COURT:  The witnesses are no

10   problem since you rested your case.

11         MR. ROYSTER:  I misspoke.

12         THE COURT:  I have page three of ten

13   which are the petitioner's exhibits.  Let's go

14   through them since we have them and we'll go from

15   there.

16         For 1, 2, 3, 4, 5, 6, 7, 8 there's no

17   objections.  Any of those that you wish to strike?

18         MR. ROYSTER:  No, Your Honor.

19         THE COURT:  Nine is objections as to

20   the hearsay, double hearsay, violates Sixth

21   Amendment.  Counsel?

22         MS. SHEA:  Your Honor, on this one we

23   object because Mr. Comstock has the right to

24   confront witnesses against him.  We thought that

25   this was hearsay.  It was testimonial because it

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 7 of 190

1    was made after Mr. Comstock had been certified.

2              We also wanted to point out

3    specifically the whole purpose of this report is

4    really the first sentence of the second paragraph

5    and this is hearsay within hearsay.  This is

6    double hearsay.  I was informed by another staff

7    member that it is suspected that inmate Comstock

8    may have propositioned another inmate.  That's

9    hearsay within hearsay.  There's no exception we

10   believe they can cite to to get that in so we wish

11   to have that excluded.

12             THE COURT:  Counsel, any argument as to

13   that?

14             MR. ROYSTER:  Your Honor, I certainly

15   understand they have a point with respect to it

16   being hearsay within hearsay.  I'm not aware of a

17   point of an exception that would apply

18   specifically to the double hearsay.

19             I believe the experts did rely on it.

20   There is some information about this particular

21   incident, I believe, in Dr. Demby's report and we

22   do believe it's relevant.

23             THE COURT:  There was nothing in her

24   testimony to that effect.

25             MR. ROYSTER:  That's true.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 8 of 190

1          THE COURT:  I'm going to not strike the

2     total document but I'm certainly going to strike

3     that for two reasons.  Number one, I think it is

4     double hearsay.  As I said at the beginning when

5     we talked about prejudicial -- everything is

6     prejudicial but I think this is extremely

7     prejudicial.  There is nothing to back it up.

8     Neither of the experts for the government

9     testified as to any reliance upon that.  I will

10    strike that.

11         MR. ROYSTER:  Judge, just for

12    convenience we can strike the entire exhibit.

13         THE COURT:  Perfect.

14         MS. SHEA:  Thank you, Your Honor.

15         We withdraw our objection to Exhibit

16    10.

17         THE COURT:  Okay.  11?

18         MS. SHEA:  11 we object to.  Hearsay

19    within hearsay again.  We believe that the purpose

20    of this exhibit is for what Mr. Comstock's sister

21    told Mr. Comstock and in turn Mr. Comstock told

22    back to his physician.  That's also hearsay within

23    hearsay.  They're welcome to cross Mary Comstock

24    on whatever they like, but we don't see how that

25    falls within any exception either.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 9 of 190

 1          THE COURT:  I remember reading this

 2   exhibit.  I thought it was for a different

 3   paragraph about the treatment.

 4          MR. ROYSTER:  That's right.

 5          THE COURT:  I didn't even see the thing

 6   about the sister.

 7          I'll strike the thing about the sister.

 8   Again, there was some vague testimony somewhere

 9   down the line.  I have it circled not even close

10   to that portion.

11          MS. SHEA:  It's the last sentence of

12   the second paragraph.

13          THE COURT:  Thank you.

14          I can strike that whole paragraph.

15   Your purpose was for the third paragraph.

16          MR. ROYSTER:  That's right.

17          THE COURT:  We'll strike the second

18   paragraph.

19          MS. SHEA:  We maintain our objection to

20   Exhibit 12.  This has already been cited in the

21   Motions in Limine.  We've lodged our objection.

22          THE COURT:  Objection noted.

23          MR. ROYSTER:  Just for the record is 12

24   admitted, Judge?

25          THE COURT:  12 is admitted.

Reported By: Joseph C. Spontarelli, CCR   www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 10 of 190

```
 1              MS. SHEA:  13 is a report done by Dr.
 2      Hernandez.  We objected to this on hearsay
 3      grounds.  They could have called Dr. Hernandez to
 4      get this report in.  As it stands right now we
 5      believe that it's hearsay and doesn't fall within
 6      the exception.
 7              THE COURT:  Counsel?
 8              MR. ROYSTER:  Judge, first of all we
 9      would contend that it is a business record of BOP,
10      but we would have it for purposes of the
11      statements that Mr. Comstock made to Dr. Hernandez
12      as admissions of a party involved.
13              THE COURT:  I'll admit it.  There is
14      hearsay and so forth.  Since it's a bench trial
15      the Court will give it the weight for which it's
16      due.
17              If I'm not mistaken it was at least
18      referred to as one of the documents that were
19      reviewed by the experts.
20              MS. SHEA:  14 and 15 we believe those
21      are settled through the Motions in Limine.  We
22      withdraw our objections for 16 and 17.
23              THE COURT:  For the record 14, 15, 16
24      and 17 will be admitted.
25              MS. SHEA:  Exhibit 18 is an incident
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 11 of 190

```
 1    report.  We believe this is completely irrelevant
 2    to all three prongs of the Adam Walsh Act.  This
 3    has no bearing on whether Mr. Comstock will have
 4    serious difficulty in refraining from molesting
 5    children.
 6                MR. ROYSTER:  We'll strike that
 7    exhibit.
 8                THE COURT:  Very well.  18 will not be
 9    received.
10                MS. SHEA:  For 19 and 20 we withdraw
11    our objections.
12                THE COURT:  19 and 20 will be received.
13                MS. SHEA:  21 already is received.
14                22 and 23 are the Motions in Limine.
15                THE COURT:  Received.  24 and 25 --
16                MR. ROYSTER:  We're striking both of
17    those, Judge, just to save you the time.
18                THE COURT:  26?
19                MS. SHEA:  26 and 27 were also resolved
20    through pretrial motions.
21                THE COURT:  28 there is no objection.
22    So ordered as to that.
23                Government having rested respondent may
24    proceed.
25                MS. SHEA:  At this time the respondent
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 12 of 190

Page 276

```
 1    calls Dr. George Corvin.

 2

 3              GEORGE P. CORVIN, M.D.,

 4    was sworn or affirmed and testified as follows:

 5

 6              THE COURT:  Doctor, would you be kind

 7    enough to give us your full name and spell your

 8    name, please.

 9              THE WITNESS:  My name is George Patrick

10    Corvin, M.D.  My last name is spelled C-O-R-V-I-N.

11    I'm a forensic general psychiatrist in Raleigh,

12    North Carolina.

13              THE COURT:  Counsel you may proceed

14    with your examination of the witness.

15

16                   DIRECT EXAMINATION

17

18    BY MS. SHEA:

19        Q     Good morning, Dr. Corvin.

20        A     Good morning.

21        Q     You've been called as an expert to give

22    opinion about whether Mr. Comstock's medical

23    condition would have any notable effect on his

24    sexual functioning.

25        A     I have.
```

**Reported By: Joseph C. Spontarelli, CCR**       **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 13 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**     **November 29, 2011**

Page 277

1    Q    Why are you qualified to give that
2    opinion?
3    A    Well, I'm a medical doctor and I carry
4    an unrestricted license to practice medicine in
5    the State of North Carolina.  I've practiced
6    medicine in Alabama and South Carolina and Georgia
7    in one way, shape, form or fashion over the years
8    and as a general and forensic psychiatrist first
9    and foremost I attended medical school and
10   continue to practice that medical specialty.
11   Q    I would like to turn your attention to
12   Exhibit 1 in the respondent's binder of exhibits.
13   A    What is Exhibit 1?
14   Q    It should be a copy of your CV.
15   A    I'm with you now.
16   Q    Do you recognize this to be your CV?
17   A    I do.
18   Q    In particular can you tell us about
19   your board certifications?
20   A    I have a board certification in general
21   psychiatry with added qualifications in the field
22   of forensic psychiatry.
23        I initially became board certified in
24   general psychiatry through the American Board of
25   Psychiatry and Neurology in 1997 and recertified

**Reported By: Joseph C. Spontarelli, CCR**     **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 14 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                  **November 29, 2011**

Page 278

```
 1    in 2007.  I became board certified with added

 2    qualifications as a forensic psychiatrist in 1998

 3    and recertified again in 2008.

 4         Q      Can you tell the Court about what the

 5    certification process entailed?

 6         A      There are multiple steps to obtaining

 7    board certification in any area of medical

 8    specialty.  To become eligible one has to have

 9    completed an approved and appropriate educational

10    program.  In my case I attended medical school at

11    the University of Alabama School of Medicine and

12    graduated from there after four years with my

13    medical degree.

14              I then chose to pursue a residency in

15    psychiatry.  That was another four years of

16    training at the Medical College of Georgia.

17              I stayed in Georgia my last year there

18    as chief resident for the program and had some

19    administrative and research responsibilities and

20    duties at the Medical College of Georgia.

21              I finished there and then decided to

22    delay going out into the workforce for an

23    additional year and pursued what's called a

24    fellowship which is a period beyond residency

25    where physicians can subspecialize.  For example,
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 15 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                      **November 29, 2011**

Page 279

 1     cardiologists can do a fellowship in

 2     interventional cardiology.  I chose to pursue a

 3     fellowship in forensic psychiatry which is what

 4     brought me to North Carolina and to the Bureau of

 5     Prisons.

 6              During my fellowship I was housed and

 7     worked primarily at the federal correctional

 8     complex in Butner, North Carolina and am very

 9     familiar with their hospital and treatment setting

10     there.  In fact my office at one time was in the

11     Maryland Unit where the respondent has been housed

12     most recently.

13              Subsequent to completing those years of

14     education you become eligible to sit for

15     examinations through the American Board of Medical

16     Specialties -- in this case the American Board of

17     Psychiatry and Neurology.  That entails a written

18     examination, a series of oral board examinations

19     where individuals who have been certified for a

20     while will scrutinize your work with patients and

21     actually watch and observe you interact with

22     patients.  That applies both for the general

23     psychiatric boarding and also for forensic

24     psychiatry.  There's two sets of examinations.  At

25     periods in my career it seems like all I do is go

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 16 of 190

```
 1    take exams all over the country.

 2              After successfully finishing those

 3    series of written and oral board examinations then

 4    you become board certified.

 5       Q     You have five letters after the M.D. on

 6    your CV, DFAPA.

 7       A     Right.

 8       Q     Can you tell us what that means?

 9       A     That stands for Distinguished Fellow of

10    the American Psychiatric Association.

11              In my career I've had the opportunity

12    to work as a sort of consultant for the North

13    Carolina Legislature.  I have done some -- I don't

14    know if I'd call it advocacy as much as

15    educational efforts in terms of mental healthcare

16    reform in the State of North Carolina.  Commitment

17    statutes, capital litigation processes -- some of

18    that has to do with financial aspects of the

19    delivery of psychiatric care and services in North

20    Carolina.

21              As a result of some of that activity

22    and some talks that I've given to groups of

23    legislators the North Carolina Psychiatric

24    Association called me about a year ago and asked

25    if they could nominate me for this and I said will
```

**Reported By: Joseph C. Spontarelli, CCR**     **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 17 of 190

1    it cost me anything and they said no.  Basically

2    they put me through this process and they called a

3    bunch of people I work with and interviewed them

4    and got letters and I became a distinguished

5    fellow.  I'm not sure what it means beyond that.

6                THE COURT:  You're a distinguished

7    fellow of the national association?

8                THE WITNESS:  Of the national

9    association.

10               THE COURT:  I've never seen that

11   before.  Congratulations.

12               MR. ROYSTER:  Our understanding is he's

13   going to be testifying on the narrow issue of the

14   medical history and how it may affect

15   Mr. Comstock.  He's not opining on sexual

16   dangerousness.  We don't have any objection to his

17   being qualified to render an opinion on that.

18               THE COURT:  You stipulate to his

19   qualifications?

20               MR. ROYSTER:  Yes, sir.

21               THE COURT:  I would imagine so after

22   seeing his CV.

23               MR. ROYSTER:  Sure.

24               THE COURT:  I'm glad you explained

25   those letters to me.  I saw them when I went

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 18 of 190

1     through this in preparation and I looked and I

2     looked and I looked and I couldn't figure out what

3     it was.

4              THE WITNESS:  I labored about putting

5     them there.

6              THE COURT:  I've been in this business

7     a long time.  It's the first time I've seen this.

8     I'm sure it's something that's very important to

9     your career.  Congratulations.

10             THE WITNESS:  I appreciate that.

11             MS. SHEA:  Thank you, Your Honor.

12             At this point we'll tender Dr. Corvin

13    as an expert in general and forensic psychiatry

14    and we'll enter Exhibit 1 into evidence.

15             THE COURT:  One will be received.  You

16    will be qualified to so testify.  You may proceed.

17    BY MS. SHEA:

18        Q     So what did you review in preparing

19    your opinion in this case?

20        A     It came in stages, if you will.  The

21    Court may have in evidence already or will a

22    report or a letter summarizing my work in this

23    matter and that's dated August 2, 2011.

24             I had been contacted by either yourself

25    or agents of the federal defender's office here in

**Reported By: Joseph C. Spontarelli, CCR**          www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 19 of 190

1   Raleigh not long before this -- maybe a couple
2   weeks before this -- at which time -- to be
3   completely honest with you at which time I
4   initially said I don't think I should be involved
5   in this because I don't do these sorts of
6   evaluations.  I don't consider myself to have the
7   expertise, training and expertise to rate risk
8   factors in accord with the Adam Walsh Act.
9           After not hanging up too quickly I
10  understood that that was not the analysis that was
11  required.  As the Court has heard already it is
12  not my intention or desire to offer an opinion in
13  terms of that ultimate issue.
14          To get back to your question in
15  reference to the opinions that I have offered in
16  this matter as outlined in my August 2nd letter
17  prior to completing that document I reviewed a
18  report that was entitled regarding the civil
19  commitment of Graydon Comstock as a sexually
20  dangerous person that was prepared by Terence
21  Campbell, Ph.D.
22          I also reviewed a CD or electronic
23  record containing Mr. Comstock's very extensive
24  medical and mental health records during the
25  period of time that he's been incarcerated within

Reported By: Joseph C. Spontarelli, CCR  www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 20 of 190

1     the Federal Bureau of Prisons.  Not included in
2     those records for sake of clarification are any
3     records either generated within the Bureau of
4     Prisons or obtained by the Bureau of Prisons from
5     Kansas any of his specific psychiatric records
6     pertaining to his prior sex offender treatment
7     programs nor have I reviewed those to this date.
8               I also reviewed prior to that in
9     preparation of that letter the presentence
10    investigation report dated December 7, 2000.
11              With those records I reviewed and
12    focusing primarily on his medical and mental
13    health records I was in a position to be able to
14    formulate and offer the opinions that are
15    summarized in that August 2nd letter.
16              Subsequent to preparation of the letter
17    I have reviewed additional documents.
18       Q     What additional documents?
19       A     If I recall correctly I also then was
20    provided a report that has been testified to in
21    some detail by Amy Phenix, Ph.D as well as an
22    addendum or an updated report.
23              I also reviewed the report of Lela
24    Demby that we just saw in court -- her videotaped
25    deposition.  I reviewed her report.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 21 of 190

```
 1              I have reviewed a transcript of the
 2   deposition of Graydon Comstock the respondent.  Of
 3   course I've been here in court witnessing
 4   testimony since this proceeding began yesterday.
 5       Q     Just to be clear, you're on Exhibit 2.
 6   That's the letter that you're referring to?
 7       A     Yes, ma'am.
 8       Q     What did your research show generally
 9   about age effect on sexual functioning?
10       A     In the global perspective this aspect
11   of my assessment is probably one of the easier
12   forensic evaluations I've done.
13              I did go to the research pool on the
14   subject and pull some review articles on the
15   expected course of sexual functioning over the
16   lifespan of an otherwise healthy male.  It comes
17   as no great shock to me that as one ages -- I'm
18   focusing primarily on males -- there are some
19   gender difference -- as an individual ages their
20   functioning both in terms of libido and
21   physiologic sexual functioning tends to abate.
22              Absent any other medical complications
23   age alone is independently in research associated
24   with a decline in what one review article actually
25   termed a sexual prowess.  I'm not sure how you
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 22 of 190

1    would define that clinically.  There are some

2    statistics that attach to that.  One study -- this

3    is by the way a review article that was done in

4    May of this year from a group of researchers

5    that -- excuse me -- physicians that has a

6    subscription service called Up-To-Date.  It

7    actually is a very good way to see what is

8    currently understood in various fields of medical

9    care and treatment.

10            They had done a review article on this

11   subject and found that as early as age 40

12   40 percent of otherwise healthy males acknowledge

13   some level of impaired sexual functioning and that

14   as men age another ten percent will generally

15   recognize or report some decline.  Not necessarily

16   severe sexual dysfunction or impotence but some

17   decline in their sexual interest and overall

18   sexual health as they age.  40 percent at age 40,

19   another ten percent with each succeeding decade.

20   Overall five percent of men report some impairment

21   in libido absent other confounding factors.

22            To answer your question directly, aging

23   absent other indicators is not generally seen as

24   helpful for a man's sexual functioning.

25       Q      When reviewing Mr. Comstock's medical

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 23 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                    **November 29, 2011**

Page 287

1    records what medical conditions did you conclude

2    he suffers from?

3        A       He has had a lot; some of which are

4    more directly related to my analysis than others.

5             We know that he had a hypertensive

6    related hemorrhagic stroke in 1980 at a relatively

7    early age.  He was 39.  He has subsequently had

8    evidence of embolic infarcts which is a different

9    kind of stroke probably related to other medical

10   conditions and I probably should clarify what I

11   mean there.

12            In 1980 he had a bleed in his brain

13   that caused a stroke.  Since he has been

14   incarcerated he has had another cerebrovascular

15   incident which has been termed as a TIA or a

16   transient ischemic attack which is associated with

17   many of the other medical conditions.

18            An MRI which has been obtained since he

19   has been in custody showed some microvascular

20   ischemic changes that are consistent with a

21   condition that used to be called multi-infarct

22   dementia.  It is now called vascular dementia.

23            He has neuroimaging and findings in the

24   medical history suggestive of cognitive decline

25   with age as a result of multiple small otherwise

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 24 of 190

1    clinically unrecognized infarcts in his brain.

2              His memory during the years he has been

3    within the Bureau of Prisons has also been noted

4    to decline.  I'm not sure if anybody else noticed,

5    but when he was on the stand yesterday his

6    cognitive efficiency is not what one would expect

7    of an individual younger and healthier.

8              His medical records have suggested some

9    concern he may have dementia.  I'm not so sure I

10   have evidence to support or refute such a

11   diagnosis.  His medical history seemed to support

12   that.  The observations of him having impaired

13   memory seemed to be consistent with that.  Some of

14   the subtle findings that he exhibited while he was

15   testifying show some decline in cognitive

16   deficiency.

17             You may have noticed some difficulty

18   capturing what he was trying to communicate.  He

19   was successful in doing so, but not as fluent or

20   perhaps hyper-verbal as I am in talking to the

21   Court.

22             He has a substantial history of both

23   peripheral vascular disease and coronary artery

24   disease.  He had a posterior myocardial infarction

25   that was pretty serious since he was incarcerated.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 25 of 190

 1    He underwent three vessel coronary artery bypass

 2    grafting as a result of that.

 3           He continues to exhibit physical

 4    evidence of impaired peripheral perfusion.  If you

 5    look at him now his pallor is somewhat of a pale

 6    appearance.  That in and of itself is not

 7    diagnostic.  What is more telling is that there

 8    are reflections or descriptions of him in his

 9    medical record with exertion his lips turning blue

10    which is consistent with an impairment in

11    peripheral perfusion also interrelated to the

12    other medical conditions that I will finally get

13    to.

14           In addition to his general

15    cardiovascular disease he carries a diagnosis of

16    Type 2 or adult onset diabetes mellitus.  He

17    continues to suffer from but is being treated

18    largely successfully for high blood pressure.

19           He has a history of prostate cancer

20    diagnosed in the mid '96/'97 timeframe.  He

21    underwent radiation therapy for that.  The status

22    of his prostate cancer at this stage I'm not

23    entirely aware of; although it's been described as

24    being in remission.

25           He is being treated for these

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 26 of 190

 1    conditions with a number of different medications,
 2    and in fact has previously been prescribed
 3    nitroglycerin sublingually for symptomatic angina.
 4           He has a number of very significant
 5    medical problems.  Others perhaps not as
 6    contributory but worth noting is that he is on
 7    medications for gastroesophageal reflux disease.
 8    He suffers from what the BOP terms chronic
 9    functional diarrhea.  He has a history of
10    diverticulosis.  His general overall state of
11    health on his records is not good and on his
12    appearance is not good.
13    Q     The prostate cancer in particular that
14    you mentioned, he was diagnosed while
15    incarceration with that?
16    A     While he was in custody within the
17    Bureau of Prisons and treated as well.
18    Q     I just wanted to clarify that.
19    A     Sure.
20    Q     What, if any, is the relationship
21    between those medical conditions that you just
22    outlined and sexual functioning?
23    A     Just about anything that can affect
24    one's overall general health can have an adverse
25    effect on both the physiology and the emotional

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 27 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     5:06-HC-02195-BR
**Bench Trial - Vol. II**                                      **November 29, 2011**

Page 291

1    component of sexual functioning.

2              You probably don't need a psychiatrist

3    to sit up here and tell you that if you feel bad

4    or you are sick or you view yourself as ill that

5    your interest -- I'm not speaking about

6    individuals with pedophilia but just in general

7    terms -- sick individuals are not as focused on or

8    as interested in all matters sexual as compared to

9    those who are in good health or at least view

10   themselves as being healthy.  It's one of the

11   first things that goes when you get sick.

12              It is certainly the case that

13   individuals with these conditions that I've

14   mentioned have substantial physiologic impairment

15   or at risk of having substantial physiologic

16   impairment.

17              For example, individuals with diabetes,

18   high blood pressure, history of prostate cancer,

19   peripheral vascular disease, history of heart

20   attack, history of stroke, history of depression

21   which I didn't note all independent of each other

22   are associated with an impairment both in the

23   emotional aspect self-report of interest in sex

24   and separately but also relatedly.  The

25   physiologic aspects of sexual functioning like

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 28 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**     **November 29, 2011**

Page 292

1     erectile dysfunction for example.  Erectile

2     dysfunction can result from physical impediment

3     such as inability to perfuse one's penis

4     appropriately, but it has a very strong

5     psychological component as well which can have an

6     adverse effect or an enhancing effect.

7         Q      What, if any, medications is

8     Mr. Comstock currently taking?

9         A      As of the date most recently reflected

10   in his medical records from the Bureau of Prisons

11   he is taking an antipsychotic medication called

12   Abilify which is being used to treat a mood

13   disorder and that's not unusual.  He's taking

14   Atenolol for blood pressure.  He's taking

15   Gemfibrozil which is for cholesterol.  Lisinopril

16   also for blood pressure.  Loperamide which is to

17   treat chronic diarrhea.  Metformin which is an

18   oral medication used in treating diabetes.  Niacin

19   which is sometimes used in managing lipid

20   disorders.  Prilosec for gastroesophageal reflux

21   disease.  Simvastatin also used in treating

22   hypercholesterolemia.  Terazosin which is actually

23   used for treating prostatic hypertrophy but has

24   some effects on blood pressure as well.  He is

25   taking an older antidepressant called Trazodone

**Reported By: Joseph C. Spontarelli, CCR**     **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 29 of 190

1      and a newer antidepressant called Effexor.  He is

2      likely taking Trazodone primarily as a sleep aid;

3      whereas Effexor is more potent in terms of

4      actually treating the underlying mood disorder.

5              The Court has heard much about him

6      being diagnosed with depressive disorder not

7      otherwise specified.  Dr. Demby has described him

8      as meeting criteria historically for major

9      depression.

10             Dr. Owens who is a psychiatrist I know

11     and has at least previously been working with the

12     respondent has diagnosed him as actually meeting

13     criteria for atypical bipolar disorder.  I respect

14     Dr. Owens.  I don't know where that diagnosis came

15     from.  I personally concluded that he had

16     depressive disorder not otherwise specified

17     because there's some uncertainty exactly what form

18     his mood disorder is.  It's clear he has suffered

19     from depressive symptoms which can accurately be

20     described as chronic in nature.

21             At any rate back on the subject of

22     medications, several of these that I've listed for

23     the Court have well-recognized effects adversely

24     on sexual functioning.  Included would be Abilify,

25     Atenolol on occasion, Gemfibrozil which I didn't

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 30 of 190

1    know until I did a literature search on the
2    subject, Lisinopril and Terazosin infrequently,
3    Trazodone frequently and Effexor pretty frequently
4    all have an affect on the physiologic aspects of
5    sexual functioning; i.e., anyone taking these
6    medications alone or in combination runs the risk
7    of experiencing an adverse effect of sexual
8    dysfunction.
9        Q     In your opinion why is sexual
10   functioning an important factor to consider in
11   determining whether Mr. Comstock is sexually
12   dangerous?
13       A     Again, let me preface this by saying I
14   offer no such opinion yea or nay on the subject of
15   dangerousness.
16            Having some passing familiarity as a
17   clinician in terms of normal and abnormal sexual
18   functioning the Court has already heard a great
19   deal about the fact that sexual behavior is
20   comprised of an emotional component which can be
21   very healthy or very unhealthy and a physiologic
22   component which can also be very healthy or very
23   illegal.
24            That said, if one looks at the
25   processes, the steps -- again I'm referring to a

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 31 of 190

1    normal physical being -- the steps involved
2    leading up to and encompassing any sexual conduct
3    or behavior that there are multiple
4    compartmentalized components of that behavior.
5    Interruption in any of those can result in a
6    substantial reduction in libido and sexual
7    behaviors.
8              A perfect example is that if an
9    individual is just sick they may love their spouse
10   very much.  They may still have that emotional
11   connectedness, but the manifestation of that
12   relationship and emotional connectedness through
13   sexual behavior may fall completely off the scope.
14   That does not mean they are not having their
15   emotional needs met through their partner, but
16   rather -- not that this is not a problem -- that
17   the manifestation and expression of that emotional
18   connectedness may cease to occur through the
19   expression of sexual behavior.
20             That some individuals would say -- they
21   would be incorrect -- is also a part of normal
22   aging and it is not.  If you look at the research
23   on the subject some -- if you look at individuals
24   not that much older than the respondent -- less
25   than half -- say 75, 85 -- I may have the ages

Reported By: Joseph C. Spontarelli, CCR     www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 32 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                      **November 29, 2011**

Page 296

 1     wrong here -- it seems like if I'm recalling
 2     correctly it was only 39 percent or so that
 3     reported still having a very active and fulfilling
 4     sexual -- in the 75 to 85 year old age group
 5     39 percent of men versus 17 percent of women
 6     reported being sexually active.  It does not mean
 7     that they are not having their emotional needs
 8     met; it means that something else is interfering
 9     with the physical sexual expression of that
10     relationship.
11          Q     Notwithstanding your limited purview
12     what did you conclude with respect to
13     Mr. Comstock?
14          A     He has a number of factors both
15     chronically -- these medical conditions I've been
16     talking about they are known -- it's not like you
17     get diabetes and you have a sexual impact of that.
18     It's more like you get diabetes and the longer you
19     have diabetes the risk of adverse sexual impact
20     compounds over time.  That can be influenced by
21     successful management and treatment for the
22     condition, but of those conditions cardiovascular
23     disease, diabetes, the prostate cancer -- any of
24     those conditions the longer they are present the
25     greater the risk and the greater the impact will

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 33 of 190

1    be physically on sexual functioning.
2            He has a number of risk factors that if
3    you look at each one independently you say this is
4    a risk factor, this is a risk factor -- taken as a
5    whole they have an additive effect.  I'm not
6    saying one plus one equals two, but medically as a
7    physician I can tell you the greater the number of
8    risk factors you have the greater the overall risk
9    is for adverse functioning.
10           While I have not personally examined
11   Mr. Comstock other than seeing him here in court
12   his risk factor just simply based on advanced age
13   and on the combined and chronic influence of the
14   numerous medical conditions he has and on the
15   combined influence of the medications he needs to
16   take all place him at considerable risk of having
17   a greatly reduced libido interest.  His libidinal
18   urges compared to Mr. Comstock 30 years ago would
19   be expected to be less.
20           There is evidence to suggest at least
21   by risk analysis that his physiologic ability to
22   function normally in various physiologic realms of
23   sexual functioning would be impaired as well, and
24   to the extent that is seemingly confirmed by his
25   own report I read in testimony that he has not had

**Reported By: Joseph C. Spontarelli, CCR**        www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 34 of 190

Page 298

```
 1    any erections spontaneous or otherwise within the
 2    last year which is not a normal finding.
 3        Q    You noted just now that you have not
 4    met Mr. Comstock before seeing him in court.  You
 5    have mentioned a few of your observations of him
 6    in the courtroom.  Have you observed anything else
 7    about Mr. Comstock?
 8        A    Dr. Owens in the Bureau of Prison's
 9    records describes him as rather frail.  He is not
10    a spry individual.
11            Do any of those observations make it
12    impossible for him to engage in the type of
13    illegal conduct that the Court is here to
14    consider?  Nope, they do not.  Nor is it my
15    opinion that he would be physically incapable of
16    offending and damaging a child as a result of his
17    libidinal urges.
18            He is certainly an individual who both
19    on paper and by observation can be, I think,
20    reasonably described as rather frail and showing
21    his age to be exactly that.  He is an old, sick,
22    frail individual with numerous chronic medical
23    complaints who, by the way, has had excellent care
24    in the Bureau of Prisons.  I've been impressed how
25    well they have managed him.
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 35 of 190

 1      Q      Is there any evidence that you found in
 2   the medical records that you reviewed that shows
 3   that Mr. Comstock's sexual urges are stronger than
 4   those of the average person?
 5      A      I'm not aware of that.  I'm not an
 6   expert in this area.  It begs the question how do
 7   you quantify -- what kind of lab test do you get
 8   to quantify sexual urges.
 9             I am independently not aware of any
10   evidence or research demonstrating that.  If there
11   is evidence to suggest that I would love to know
12   how they did that.
13      Q      Is there any scientific data that
14   you're aware of that shows that pedophiles in
15   general have stronger sex drives than people who
16   are attracted to adults?
17      A      I heard people say that in this
18   courtroom, I think.  I don't understand how that
19   question could ever be answered scientifically to
20   be honest with you.
21             I'm a psychiatrist and we specialize in
22   the realm of the unobservable.  I don't see how
23   you can define that.
24      Q      If Mr. Comstock is self-reporting that
25   he is having decreased libido is that consistent

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 36 of 190

 1     with what you have reviewed?

 2         A      Yes.

 3         Q      If Mr. Comstock came to your office

 4     wanting to get treatment for sexual functioning

 5     would you treat him?

 6         A      Do you mean physiologic functioning?

 7         Q      Yes.

 8         A      No, and I don't think any doctor

 9     should.  There's a reason that drugs like Viagra

10     are some of the most commonly prescribed

11     medications in the United States.

12              Medical care has enabled us to live

13     long, healthy lives -- much older than we did

14     decades ago.  As a result the longer men live the

15     higher the incidents of erectile dysfunction.  By

16     the way, when a man begins to experience erectile

17     dysfunction it has an independent adverse effect

18     on libido.

19              These medications are used very

20     effectively in treating ED and have very

21     substantial side effects.  Mr. Comstock suffers

22     from medical conditions that would serve, in my

23     view, as an absolute contraindication but

24     certainly a relative contraindication they can

25     hurt him or kill him.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 37 of 190

1      Q      You heard Dr. Phenix and Dr. Demby
2  testify that Mr. Comstock is sexually dangerous
3  despite his age and medical condition.  Do you
4  disagree?
5              MR. ROYSTER:  Objection.  It's clearly
6  outside the scope of his expertise and what he's
7  testifying about.
8              THE COURT:  I'm not sure he even would
9  answer that question.
10             THE WITNESS:  I wouldn't.
11             THE COURT:  He started off by saying he
12 wouldn't.  I don't think we have to even discuss
13 that.  His whole premise that he started off with
14 was that wasn't the ultimate question he could
15 answer.
16             THE WITNESS:  That is correct.
17 BY MS. SHEA:
18     Q      As a physician do you use, review and
19 study research?
20     A      I do.
21     Q      In fact, have you received any awards
22 for your research?
23     A      Yes, I have.
24     Q      Can you tell the Court about that?
25     A      During my training the Medical College

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 38 of 190

1    of Georgia has a research competition for their

2    trainees where we basically develop a research

3    topic, develop a protocol and hopefully bring that

4    protocol to completion if we're able to do so.

5              I entered that competition two years.

6    It's called the Hurley-Gleckly competition.  That

7    was in Augusta where I trained.  At any rate, in

8    1995 and 1996 I entered that competition and won

9    that competition for the research that was done.

10   Q     As a medical professional do you

11   analyze research methodology?

12   A     I do.  In fact, in medical school one

13   of the courses we have in the first two years of

14   medical school focuses on aspects of medical

15   research and use of medical research and clinical

16   practice and medical statistics as well.

17   Q     Did you review the methodology employed

18   by the other experts in this case?

19             MR. ROYSTER:  Objection.

20             THE COURT:  He can testify whether he

21   reviewed it or not.

22             THE WITNESS:  I did.

23   BY MS. SHEA:

24   Q     Can you tell the Court your

25   observations?

**Reported By: Joseph C. Spontarelli, CCR**       **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 39 of 190

```
 1              MR. ROYSTER:  I'll object.
 2              THE COURT:  Observations in relation to
 3    what?
 4              MS. SHEA:  Observations strictly
 5    related to the methodology.
 6              THE COURT:  Methodology as it relates
 7    to the medical condition and the prescriptions and
 8    so forth?
 9              MS. SHEA:  We would like him to discuss
10    the strength of methodology generally.
11              THE COURT:  Tell me one more time.
12              MS. SHEA:  Methodology of the research
13    that the other experts used in the case.
14              THE COURT:  The underlying research
15    that they used in order to come up with their
16    opinion.  The question is is he familiar with that
17    research?
18              MS. SHEA:  Has he reviewed it.
19              THE COURT:  That's fair.
20              THE WITNESS:  Yes, I have.
21              THE COURT:  Your next question is?
22              MS. SHEA:  What were your observations?
23              THE COURT:  In relation to?
24              MS. SHEA:  The methodology.
25              THE COURT:  He may testify as to that.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 40 of 190

**United States of America v. Graydon Earl Comstock, Jr.**    **5:06-HC-02195-BR**
**Bench Trial - Vol. II**        **November 29, 2011**

Page 304

1          THE WITNESS:  In the scope of my

2    practice as a person who treats patients and in

3    terms of other aspects of my forensic practice

4    where I'm much more involved the use of medical

5    research both in terms of actuarial analysis and

6    other forms of statistical analysis those areas of

7    research -- I'm not even talking about the

8    research the Court has heard about -- those areas

9    of research are very useful in clinical practice

10   in many ways.

11          Actuarial analysis comparing patients

12   against known factors in medicine can be very

13   helpful in a lot of ways.  It helps us understand

14   what causes illness.  It also helps us devise

15   treatment plans for individual patients by

16   recognizing those risk factors for illness that

17   are either protective or aggravating factors so

18   that by analyzing and understanding what those

19   risk factors are we can design a treatment plan to

20   jump on it.

21          For example, for ten years I ran an

22   inpatient unit that treated individuals with dual

23   diagnosis.  Part of my job as medical director for

24   that program was to devise the treatment program

25   and in doing so we did literature research through

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 41 of 190

1    organizations to look at what works best.  The way
2    they define that to some extent is by looking at
3    the population of those similarly ill individuals
4    in the world so that can be very useful.
5         Now, crossing that barrier in the
6    fields of forensic analysis of an individual with
7    this same research can be very dangerous and let
8    me explain what I mean by that.  I'm going to use
9    another area of forensic medicine.
10         In psychiatric medicine one of the
11    things that I am called to do is to testify in
12    civil commitment hearings.  I'm called in civil
13    actions to assess fitness for duty in terms of
14    looking at dangerousness.
15         One of the things that I as a forensic
16    psychiatrist and other psychiatrists I know in the
17    field -- you've probably heard this --
18    psychiatrists are not good at predicting
19    dangerousness.  This research is a prime example
20    of the limitations that we experience in doing so.
21         What you will see if you look very
22    closely -- the Court has actually heard this --
23    while we can identify the groups of people that
24    are at risk of -- let's say mentally ill substance
25    abusers as a whole might be at an elevated risk of

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 42 of 190

**United States of America v. Graydon Earl Comstock, Jr.**   5:06-HC-02195-BR
**Bench Trial - Vol. II**                                    **November 29, 2011**

Page 306

1    engaging in criminal conduct as compared to those
2    that aren't substance abusers that are mentally
3    ill -- that's true actually.  Yet if you try to
4    assign that risk and utilize that risk assessment
5    on an individual case what happens is that you run
6    the risk -- I think the Court has heard it in this
7    case -- you run the risk of having a very high
8    number of what we term false positives.
9              MR. ROYSTER:  Objection.  I don't think
10   he's qualified to get into this testimony.
11   Secondly, it's outside the scope of his report.
12             Our position would be this is the kind
13   of testimony that is surprising enough that we're
14   not able to deal with it and it should be
15   stricken.
16             THE COURT:  It's very interesting and I
17   think he's qualified to testify but it's outside
18   the scope of what you have asked him to testify
19   about.  You filed your documents and have limited
20   his testimony.
21             I would love to hear it maybe one day,
22   but it's beyond that which you have called him for
23   today.
24             MS. SHEA:  During Dr. Corvin's
25   deposition these are areas that Mr. Royster did

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 43 of 190

1   explore with him in his deposition so we didn't

2   really think that we were catching him fully off

3   guard.

4            THE COURT:  I have not read his

5   deposition.  I have read his report and I've also

6   read the pretrial statement here.  I can't say

7   what happened at the deposition.

8            MS. SHEA:  We respect your ruling.  If

9   you want to ask him any further questions --

10           THE COURT:  Not right now because I

11  would be opening a Pandora's box.  I'll be

12  handling these cases for quite a few months.

13           Anything else?

14           MS. SHEA:  No further questions.

15           THE COURT:  Counsel?

16           MR. ROYSTER:  Thank you, Judge.

17

18                CROSS EXAMINATION

19

20  BY MR. ROYSTER:

21      Q    Good afternoon Doctor.  Thank you for

22  your patience as you sat through the last couple

23  days with us.

24           You testified about peripheral

25  perfusion.  That is something that can impair

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 44 of 190

 1    sexual functioning and libido, right?
 2        A      It can.
 3        Q      You testified on direct that you didn't
 4    personally examine Mr. Comstock, right?
 5        A      I have not.
 6        Q      That is one of the areas that a
 7    personal examination would have assisted you is in
 8    determining the extent to which his peripheral
 9    perfusion would have affected his impairment and
10    libido.
11        A      True.
12               A review of his medical records helps,
13    but in a perfect world I might have taken him and
14    in fact not only personally examined him but had a
15    physician in internal medicine look at him as
16    well.
17        Q      You can't testify to the extent which
18    his peripheral perfusion has impaired his
19    functioning or libido, can you?
20        A      That's right.
21               Just like with these other areas, while
22    it runs the risk I'm remise in assigning that
23    damage directly to him individually because I
24    don't know that.
25        Q      His chronic mood disorder, that can

Reported By: Joseph C. Spontarelli, CCR              www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 45 of 190

```
 1    affect his libido; right?
 2        A     It can.
 3        Q     A personal examination would have
 4    assisted you in determining the extent to which a
 5    chronic mood disorder would affect his libido,
 6    right?
 7        A     I agree, yes.
 8        Q     You agree that some people engage in
 9    sexual conduct for reasons that are not sexual at
10    all, right?
11        A     While it involves physiologic sexual
12    functioning all sexual conduct is not predicated
13    on the same urges.
14        Q     The motivation is not sexual
15    gratification.
16        A     It is an accepted theory, if you will,
17    that for example many sex offenders are motivated
18    not by what you and I -- I'm not trying to be
19    difficult here -- it's mincing words in a sense.
20    It's how you define sexual gratification.  There's
21    the physiologic gratification of experiencing an
22    orgasm versus the gratification of a hate,
23    anger-driven rapist hurting a woman by raping her
24    which obviously has nothing to do with
25    Mr. Comstock.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 46 of 190

 1      Q      You heard Mr. Comstock testify
 2    yesterday and he's not either one of those.  He
 3    testified, didn't he, that he was not motivated by
 4    sexual gratification for dozens of his victims,
 5    right?
 6      A      I heard him testify to that effect.
 7    The emotional connectedness was an important
 8    component for that.
 9      Q      He doesn't have any of the elements of
10    the hate and the anger and inflicting harm on his
11    victims.
12      A      In terms of psychopathy there's really
13    no history behaviorally or otherwise to suggest
14    that he's that type of a predatorial harming and
15    hating individual if you will.
16      Q      You agree don't you, Dr. Corvin, if
17    something else is driving his interest in these
18    children other than sexual gratification it may
19    not matter whether his libido is decreasing, isn't
20    that true?
21      A      I think that's true.  It's an important
22    point you make.
23      Q      That's what you testified to at your
24    deposition, right?
25      A      That's true.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 47 of 190

1        If he is having his emotional needs met

2    through the expression of physical sexual

3    connectedness that component still requires other

4    components but I think what you say is a valid

5    point; that to the extent his physical health

6    impairs his ability to act sexually that if the

7    emotional needs -- the need for nurturing -- the

8    emotional connectedness is an important step in

9    setting the first step, if you will, in the

10    sequence of events that ends in a sexual offense

11    then the illus in and of itself does not negate

12    the need for that connectedness.

13        I would add that while I agree very

14    much with what you said it takes all of those

15    measures to line up a sexual offense.

16        That being said, let me play the

17    psychiatrist on both sides of the fence.  I also

18    agree with what your experts have said which is

19    that despite his medical conditions that doesn't

20    mean that he could not be motivated to and

21    actually engage in a sexual offense.  I don't have

22    an opinion one way or the other on that.

23        Simply stated it's my view that his

24    overall general medically debilitated condition

25    makes it less likely that psychologically he would

**Reported By: Joseph C. Spontarelli, CCR**    www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 48 of 190

**United States of America v. Graydon Earl Comstock, Jr.**       **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                         **November 29, 2011**

Page 312

 1    engage in those acts.
 2        Q      It's not your opinion that he can't
 3    have sexual urges for children.
 4        A      No.
 5        Q      It's not your opinion that he could not
 6    have sexual urges period.
 7        A      No.
 8        Q      You cannot say whether he is at risk to
 9    reoffend.  That's not what you're here to do,
10    right?
11        A      I have no opinion on that.
12        Q      What you're saying is it's not that
13    he's at no risk it's just that it's possibly
14    reduced because of everything he has going on with
15    him.
16        A      We seldom speak in absolutes.  Whenever
17    a psychiatrist does you can be guaranteed they're
18    wrong.  You're right, I'm not saying no risk.
19        Q      You heard his testimony and you heard
20    the testimony of the experts about the kinds of
21    activities he was engaging in which primarily
22    involved fondling young boys, right?
23        A      Correct.
24        Q      Clearly while he has these medical
25    conditions he's still able to use his arms and

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 49 of 190

1     move around such that he could fondle boys if he

2     had the opportunity.

3          A     Yes, if he were so motivated to do so

4     and the opportunity were to present itself and he

5     chose to do that -- chose is a loaded word as

6     well -- physically he could engage in that sort of

7     conduct.

8          Q     You mentioned on direct that as one

9     ages their functioning libido and their

10    physiological functioning decreases.

11         A     Tends to.

12         Q     The research that you cited was that

13    approximately 40 percent of men over 40 have or

14    report impaired sexual functioning.

15         A     The term was some level of impaired

16    sexual functioning, yes.  It seems high to me, but

17    that's what it says.

18         Q     Mr. Comstock was 58 years old when he

19    was still fondling little boys.

20         A     You're absolutely correct.

21         Q     He may still have had decreased libido

22    but it didn't stop him in offending, right?

23         A     That's a good point.  If you put the

24    two together it's possible.  At 58 he would have

25    fallen in that 40 or 50 percent and had some

**Reported By: Joseph C. Spontarelli, CCR**          www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 50 of 190

 1    impaired interest or functioning and yet

 2    reoffended.  That is possible, yes.

 3         Q      In fact, he had already had a stroke by

 4    the time he was continuing to offend, right?

 5         A      That's correct.

 6         Q      Based on his testimony and what you

 7    have also heard there were a number of offenses

 8    even after he suffered that stroke, right?

 9         A      I'll have to tell you I'm unclear where

10    my mind is on what the number of the offenses

11    were.  With that uncertainty yes, I agree with

12    that statement.

13         Q      While he's been in prison he's had a

14    heart attack.

15         A      Yes.

16         Q      That was in 2006.

17         A      I think it was 2006.

18         Q      The prostate cancer that was in 2007

19    roughly, right?

20         A      It was 2007.

21         Q      The radiation was in 2007, right?

22         A      December I think.

23         Q      Even after a stroke -- the diabetes has

24    been there for quite some time, the hypertension

25    has been there for some time.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 51 of 190

```
 1       A      Right.
 2       Q      He's been on these medications for some
 3   time.
 4       A      Right.
 5       Q      All prior to 2008, right?
 6       A      Yes.
 7       Q      With all these things going on
 8   including the prostate cancer and the radiation he
 9   still in June of 2008 is stockpiling pictures of
10   little boys, isn't that true?
11              MS. SHEA:  Objection, Your Honor.  He
12   testified he didn't review those records.
13              THE COURT:  If he knows.
14   BY MR. ROYSTER:
15       Q      You sat through the testimony all day
16   yesterday, didn't you?
17       A      I did.
18       Q      Did you hear the testimony about all
19   the photographs that were found in prison in his
20   cell?
21       A      I did.  I didn't see the photographs
22   but I'm aware of them.
23       Q      You're aware of them from being here
24   yesterday and today.
25       A      Correct.
```

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 52 of 190

**United States of America v. Graydon Earl Comstock, Jr.**   5:06-HC-02195-BR
**Bench Trial - Vol. II**   **November 29, 2011**

**Page 316**

```
 1      Q      That event happened after all these
 2   other health conditions and even all the
 3   medications that you talked about, right?
 4      A      Yes, but let's not make the
 5   assumption --
 6      Q      I understand you haven't seen the
 7   pictures.
 8             The point I'm only making, Dr. Corvin,
 9   is that event happened after he had suffered all
10   these conditions and even after his prostate
11   treatment and his prostate cancer, correct?
12      A      Correct.
13             I think it's worth saying in response
14   to that -- I think the Court has heard
15   testimony -- I as a physician draw a big
16   difference between a man finding an individual --
17   whether that be a boy or a woman -- sexually
18   attractive different than saying -- let me give
19   you an example since my wife is not here.
20             If I am driving down the road and I see
21   a billboard and there may be some attractive
22   models on it I may note that is an attractive
23   woman.  That does not necessarily put me at risk
24   as an individual given my own psychological
25   make-up of pursuing that woman or another woman or
```

**Reported By: Joseph C. Spontarelli, CCR**   **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 53 of 190

 1    going and committing a rape or doing anything.

 2              I don't mean to imply that it's my

 3    opinion that he can have no appreciation of the

 4    fact that he throughout his entire adult life has

 5    found these ten to 14 year old prepubescent boys

 6    as attractive.  I think that was the word he used.

 7              I haven't seen the pictures.  I think

 8    it's safe to assume that they weren't viewed as in

 9    and of themselves pornographic or other charges

10    would have been forthcoming related to that.

11      Q      That's clearly speculation on your

12    part.

13      A      It absolutely is.  I worked and lived

14    for a lot of my career in the building where he is

15    now.  It is speculative on my part.

16              MR. ROYSTER:  Thank you, Judge.  We

17    don't have any other questions.

18              THE COURT:  Defense, any further

19    questions?

20              MS. SHEA:  Yes, Your Honor.

21

22                    REDIRECT EXAMINATION

23

24    BY MS. SHEA:

25      Q      Dr. Corvin, in your cross examination

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 54 of 190

1      you mentioned a distinction between finding
2      someone attractive and pursuing that person
3      sexually.  Can you elaborate on that distinction?
4          A      Sure.
5              Most human beings may note other human
6      beings as attractive, sexually interesting, pique
7      their curiosity if you will.  In the vast majority
8      of those instances no overt behavioral anomalies
9      result -- in the very vast majority of those
10     instances.
11             I'm not talking about in the case of
12     Mr. Comstock or in the case of pedophilia in
13     general, but simply finding otherwise legal images
14     of young boys attractive or even sexually
15     attractive while certainly consistent with
16     pedophilia -- I don't mean to defend that in any
17     way, shape, form or fashion -- but that in and of
18     itself does not equate in my view with a
19     pronounced risk of then engaging in overtly
20     violent or dangerous sexual conduct.
21         Q      Mr. Royster also mentioned to you that
22     Mr. Comstock had a stroke at age 39.
23         A      Right.
24         Q      Do people tend to recover more quickly
25     when they're younger versus when they're older?

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 55 of 190

```
 1        A       Yes.   From that and other medical
 2    conditions as well, yes.
 3        Q       Since Mr. Comstock has been
 4    incarcerated at the age of 58 what medical
 5    conditions has he suffered from?
 6        A       The treatment that at least was
 7    initiated while he's been in custody or continued
 8    was for the high blood pressure, Type 2 diabetes,
 9    prostate cancer with radiation therapy --
10    presumably in remission -- although he has
11    suggested perhaps not -- he had a posterior wall
12    myocardial infarction with evidence of a
13    peripheral perfusion problem resulting from that.
14    He's had a lot.  He's 69 and less healthy than
15    many 69 year olds.
16               MS. SHEA:  No other questions, Your
17    Honor.
18               THE COURT:  Anything further?
19               MR. ROYSTER:  No, Judge.
20               THE COURT:  Thank you very much,
21    Doctor.  We appreciate it.
22               We'll adjourn until 2:00 because I know
23    an hour will not be enough time for everybody to
24    get lunch.
25
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 56 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                              **November 29, 2011**

Page 320

1              (Luncheon recess.)

2

3              THE COURT:  Can we please have the next

4      witness?

5              MS. GRAVES:  We would ask if Dr. Corvin

6      could be released.

7              THE COURT:  Absolutely.  Any objection?

8              MR. ROYSTER:  No objection.

9              THE COURT:  He could have been released

10     before lunch.  I suspect we'll see each other

11     again.  We have a lot of these cases.

12             MS. GRAVES:  We call Dr. Terence

13     Campbell.

14

15             TERENCE W. CAMPBELL, Ph.D.,

16     was sworn or affirmed and testified as follows:

17

18             THE COURT:  If you could give us your

19     full name and spell your last name I would

20     appreciate it.

21             THE WITNESS:  Terence Campbell.

22     T-e-r-e-n-c-e  C-a-m-p-b-e-l-l.

23             THE COURT:  Thank you Doctor.

24             I see you're from Michigan.  Hopefully

25     while we're all down here we'll get some nice

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 57 of 190

1    weather.

2             Counsel, you may proceed.

3           MS. GRAVES:  Thank you, Your Honor.

4           DIRECT EXAMINATION

5

6    BY MS. GRAVES:

7        Q      Dr. Campbell, can you hear me okay?

8        A      Yes.  You're coming through loud and

9    clear.  Thank you for asking.

10       Q      Would you please tell the Court some

11   things about your professional background?

12      A     I completed my Bachelor's Degree Cum

13   Laude in 1965 at Western Michigan University

14   majoring in psychology and sociology.

15        THE COURT:  When I was a state Judge I

16   had a court officer -- we have a Western graduate

17   here, too -- I had a court officer who went to

18   Michigan State but he spent a little time at

19   Western -- whenever anybody said they went to

20   Western or Michigan State I would say oh, must

21   have been a good drinker.  Jennifer went to

22   Western.

23        THE WITNESS:  I completed my doctoral

24   degree in human development and clinical

25   psychology at the University of Maryland in 1970.

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 58 of 190

Page 322

```
 1            I have done additional post-doctoral
 2    training in family psychology and family therapy
 3    during the academic year 1984/1985 at the
 4    University of Rochester Medical School located in
 5    Rochester, New York.
 6    BY MS. GRAVES:
 7        Q     Do you have any board certifications?
 8        A     Yes.
 9            I am board certified in forensic
10    psychology by the American Board of Professional
11    Psychology.  There's only about 250 of us
12    nationwide who are so certified in that specialty.
13        Q     What does it take to become board
14    certified in forensic psychology?
15        A     First of all you have to apply with
16    your application.  You have to satisfy
17    requirements for education, training and
18    experience.  If you have sufficient education,
19    training and experience you move on to the next
20    step.  Only about 50 percent of candidates survive
21    that first step the first time they apply.
22            The next step is a written examination.
23    Only about 50 percent of the remaining candidates
24    passed the written examination the first time
25    around.  If you pass the written examination then
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 59 of 190

1    you undergo an oral examination where you are

2    examined by three other diplomates who share your

3    specialties within forensic psychology.  For the

4    remaining candidates only about 50 percent of

5    those remaining candidates pass the oral

6    examination the first time around.  Fortunately I

7    passed everything the first time around.

8         Q     I see that you've done a lot of

9    post-doctoral training.  Is there any of it that

10   you would like to highlight for the Court that is

11   particularly relevant to this case?

12             THE COURT:  You're looking at Exhibit

13   3?

14             MS. GRAVES:  Yes.

15             THE COURT:  No problem.  I have it

16   here.  I'm following along with you.

17   BY MS. GRAVES:

18        Q     I'm referring to your Curriculum Vitae.

19        A     I already mentioned the post-doctoral

20   training at the University of Rochester.

21   Additionally I did training in structural and

22   strategic family therapy.  I've done specific

23   training in the use of the Psychopathy Checklist

24   Revised.

25             I probably should have kept better

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 60 of 190

1   track of my training.  I'm embarrassed to say the

2   Michigan Board of Psychology has no continuing

3   education requirements for psychologists.

4         THE COURT:  I'm well aware of that.

5         THE WITNESS:  As a result I don't

6   always keep as good a track as I should keep

7   track, but as a member of the American

8   Psychological Association and the American

9   Psychological Society and the American Psychology

10   Law Society I have continually attended and

11   involved myself in training opportunities related

12   to actuarial assessment, risk assessment in

13   general, diagnostic endeavors and I have also been

14   in a position where I have been teaching workshops

15   in these areas.

16   BY MS. GRAVES:

17     Q    I noticed beginning at page three you

18   published a number of books and articles.

19     A    Yes.

20     Q    Are any of them of particular note

21   regarding this case?

22     A    Yes.

23         The first book that's applicable to

24   this matter is the book originally published in

25   December 2001 with my colleague Demosthenes

Reported By: Joseph C. Spontarelli, CCR   www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 61 of 190

**United States of America v. Graydon Earl Comstock, Jr.**    **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                      **November 29, 2011**

Page 325

 1    Lorandos titled Cross Examining Experts in the
 2    Behavioral Sciences.  That came out in 2001.
 3    Beginning in 2003 and every year after that we do
 4    an annual update of Cross Examining.
 5            What Cross Examining does is it teaches
 6    attorneys the necessity for psychologists relying
 7    on psychological science when they testify in
 8    legal proceedings, and the necessity of relying on
 9    psychological science when testifying in a
10    proceeding such as this one is clear and evident.
11            Also, in 2004 I wrote Assessing Sex
12    Offenders-Problems and Pitfalls.  That was the
13    first edition.  Then in 2007 I wrote Assessing Sex
14    Offenders-Problems and Pitfalls, Second Edition.
15    Q      Then there are a number of professional
16    articles that you've authored.
17    A      Yes.
18    Q      Are any of those of particular
19    relevance in this case?
20    A      Yes, many of them are relevant.
21    Probably the single most relevant article is not
22    there because it was published in June of 2011.
23    If we're counting it's article number 50.  That
24    article is titled The Predictive Accuracy of the
25    Static-99R and Static-2002R.

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 62 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                              **November 29, 2011**

Page 326

```
 1              Other articles that are directly
 2    relevant and applicable to this proceeding is the
 3    Campbell and DeClue 2010 article titled Maximizing
 4    Predictive Accuracy in Sexually Violent Predator
 5    Evaluations.  Article number 46, Campbell and
 6    DeClue, 2010, Flying Blind with Naked Factors:
 7    Problems and Pitfalls in Adjusted-Actuarial Sex
 8    Offender Risk Assessment.
 9              There are still other articles that are
10    relevant, but the three that I have just
11    identified are the most recent and most directly
12    relevant articles at this time.
13        Q     What sort of practice do you have?
14        A     I am self-employed specializing in
15    forensic psychology.
16        Q     As part of that practice do you also
17    conduct forensic evaluations?
18        A     Yes, I do.
19        Q     Have you conducted any evaluations
20    regarding the Adam Walsh Act?
21        A     Yes, I have.
22              In terms of evaluations pursuant to the
23    Adam Walsh Act this would be my fourth evaluation.
24        Q     Have you also conducted forensic
25    evaluations regarding civil commitment for
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 63 of 190

1    sexually dangerous persons in state proceedings?

2        A     Yes, I have.  I've done those

3    evaluations in the States of Washington,

4    California, Wisconsin, Iowa, Missouri and Florida.

5        Q     Over what period of time?

6        A     Over a 13-year period of time.  I think

7    the first one I did was in 1998.

8        Q     About how many do you think you've

9    done?

10       A     I would say approximately a hundred all

11   totaled.

12       Q     Have you testified as an expert in

13   those various states?

14       A     Yes.

15       Q     Have you testified as an expert in

16   federal court regarding the Adam Walsh Act?

17       A     Yes.

18             MS. GRAVES:  Your Honor, at this time

19   we would tender Dr. Campbell as an expert in the

20   field of forensic psychology.

21             THE COURT:  Any voir dire or any

22   objection?

23             MR. ROYSTER:  No objection and no voir

24   dire, Your Honor.  Thank you.

25             THE COURT:  You may proceed and you may

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 64 of 190

1     testify as an expert.

2              MS. GRAVES:  Thank you, Your Honor.

3     BY MS. GRAVES:

4        Q     Dr. Campbell, how did you become

5     involved in the case we have here of Mr. Graydon

6     Comstock?

7        A     As I recall it, Ms. Graves, you

8     contacted me over the phone.  You verbally

9     outlined the case.  I indicated to you that I

10    would like to review more information.  You sent

11    me the October 2006 report of Dr. Hernandez, the

12    February 17, 2011 report of Dr. Demby and the

13    April 2011 report of Dr. Phenix.

14       Q     Did you receive some other documents

15    after that?

16       A     Yes, Bates numbered documents that

17    would add up to approximately 2000 pages; plus an

18    additional report from Dr. Phenix corresponding to

19    her in-person interview of Mr. Comstock.

20       Q     What were you asked to do?

21       A     I was asked to assess Mr. Comstock and

22    view the Adam Walsh criteria.  Specifically I was

23    to determine whether or not Mr. Comstock is

24    sexually dangerous to others in that he suffers

25    from a mental illness, abnormality or disorder.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 65 of 190

1          I was also asked to determine as a

2    result of the presumed serious mental illness,

3    abnormality or disorder would Mr. Comstock have

4    serious difficulty in refraining from sexually

5    violent conduct or child molestation if released.

6       Q    As part of that evaluation did you

7    interview Mr. Comstock?

8       A    Yes, I did.

9       Q    Did you write a report?

10       A    Yes, I did.

11       Q    At tab four of the respondent's

12    notebook is that the report that you compiled?

13       A    Yes.

14          To be precise, if you go back to tab

15    one that's like a Table of Contents for my report.

16          THE COURT:  Do you mean page one of

17    your report?

18          THE WITNESS:  Yes.

19          Page one is the beginning of what I

20    call an outline summary or like a Table of

21    Contents.

22          THE COURT:  The top right-hand corner

23    has an exhibit label four so we're on the same

24    page.

25          THE WITNESS:  I don't have the exhibit.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 66 of 190

1              THE COURT:  You don't have the exhibit
2       in front of you.  That's fine.
3       BY MS. GRAVES:
4           Q      Do you have the book?
5           A      All I have to do is look down.
6              THE COURT:  If you would rather work
7       off of your own copy that's perfectly fine as long
8       as we're all working off the same copy.
9              You can take a look at tab four, or you
10      can use your report as long as it's the same
11      thing.
12             THE WITNESS:  I'm to go to tab four?
13             THE COURT:  Yes, and then you'll see
14      your name up there.  It's the other book.  There's
15      two books.  They're identical except on the front
16      of the government's it has a seal.
17             MS. GRAVES:  May I help him?
18             THE COURT:  Yes, please.
19             THE WITNESS:  Now we're literally and
20      figuratively on the same page.
21             THE COURT:  If you prefer to use your
22      copy you're welcome to as long as it's the
23      identical thing that's in the book.
24             THE WITNESS:  I will rely on my copy to
25      some extent, but always referring to the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 67 of 190

1      pagination from Exhibit 4 in the exhibit book.

2              THE COURT:  Thank you.

3      BY MS. GRAVES:

4          Q      Is the exhibit at tab four the report

5      that you prepared in connection with this case?

6          A      Yes, it is.

7          Q      Could you look at tab five and tell me

8      if you can identify that as the Relapse Prevention

9      Interview that you conducted in this case?

10         A      Yes.  That's exactly what it is.

11         Q      And then at tab six would that be the

12     notes that you took in this case in conducting the

13     structured clinical interview of Mr. Comstock?

14         A      Correct.

15         Q      Now let's turn to the evaluation

16     itself.  You said you were asked to answer three

17     questions, is that right?

18         A      Correct.

19         Q      The first of those questions is whether

20     Mr. Comstock had committed acts of child

21     molestation or sexually violent conduct, is that

22     right?

23         A      Correct.

24         Q      What was your answer to that question?

25         A      Yes.

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 68 of 190

1       Q       What did you find?

2       A       Going back in time --

3               THE COURT:  You may direct your

4       attention to that if you want.  I don't think

5       there is any dispute on either side as to that.  I

6       think the first two there's no dispute.

7               MS. GRAVES:  Yes, sir.

8               THE COURT:  You can ask him just to

9       make sure that he's on the same page.

10              MS. GRAVES:  Exactly.

11              THE COURT:  I don't think you have to

12      go into it too much.

13      BY MS. GRAVES:

14      Q       As to the second question whether

15      Mr. Comstock suffers from a serious mental

16      disorder can you answer that question?

17      A       My answer would be yes.

18      Q       What was that disorder?

19      A       Pedophilia.

20              THE COURT:  For the record as well as

21      the government nobody disputes that.  There's no

22      dispute by either side.

23              MS. GRAVES:  Thank you, Your Honor.

24

25      BY MS. GRAVES:

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 69 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**     **November 29, 2011**

Page 333

1     Q    Let's turn our attention to the third

2    question.  What's the third question you were

3    going to answer?

4     A    As a result of a serious mental

5    illness, abnormality or disorder would

6    Mr. Comstock have serious difficulty in refraining

7    from sexually violent conduct or child molestation

8    if released.

9     Q    What was your answer to that question?

10     A    No.

11     Q    How did you go about addressing that

12    question?

13     A    I went about addressing that question

14    first of all in terms of assessing the issue of

15    serious difficulty in controlling his behavior.

16    Psychologists would recognize

17    impulsivity as amounting to serious difficulty in

18    controlling one's behavior.  As a result I

19    administered the Barratt Impulsiveness Scale to

20    Mr. Comstock to obtain objective data indicating

21    whether or not he can be considered impulsive.

22    The objective data that I obtained via

23    the Barratt clearly indicate no; Mr. Comstock is

24    not an impulsive person.  He is not the kind of

25    person who rapidly acts without thinking first.

**Reported By: Joseph C. Spontarelli, CCR**     **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 70 of 190

 1       Q       Do you consider impulsiveness to be the
 2   only measure of whether someone has volitional
 3   control?
 4       A       No.
 5               I think in terms of necessary and
 6   sufficient distinctions.  For example, oxygen is
 7   necessary to sustain human life but in and of
 8   itself it's not sufficient.  We need warmth, we
 9   need food, we need shelter to sustain human life.
10               Correspondingly impulsiveness is a
11   necessary condition of volitional impairment but
12   in and of itself is not sufficient.  Volitional
13   impairment also, for example, necessitates
14   well-defined stimuli that will provoke impulsive
15   behavior.
16               The bottom line being because
17   impulsiveness is a necessary condition for
18   volitional impairment if there is no impulsiveness
19   there is no volitional impairment.
20       Q       Tell us more about the Barratt
21   Impulsiveness Scale.
22       A       Let me turn to the appropriate area of
23   my report.
24       Q       Will you refer us to what page you're
25   going to?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 71 of 190

1      A      I am on page ten and flipping over to
2   page 11.
3             The Barratt Impulsiveness Scale is
4   arguably the most commonly administered
5   self-report measure specifically designed for the
6   assessment of impulsiveness.  The Barratt scale
7   has different norm groups.
8             THE COURT:  You're on page --
9             THE WITNESS:  I'm now over on page 11.
10            THE COURT:  I got it.
11            THE WITNESS:  I am sorry.
12            THE COURT:  You're talking about at the
13  top.
14            THE WITNESS:  Yes.
15  BY MS. GRAVES:
16     Q      Use the page you're comfortable with.
17     A      If I can use the pages with which I'm
18  comfortable I'll be referring to the pagination in
19  my own report.
20            THE COURT:  The record will reflect
21  that is part of Exhibit 4, but it's on the top as
22  opposed to the bottom.  We'll all work off the
23  same one.
24            THE WITNESS:  The Barratt Impulsiveness
25  Scale has undergone peer review.  It provides

Reported By: Joseph C. Spontarelli, CCR            www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 72 of 190

1   different norm groups for comparison purposes.

2   For Mr. Comstock I selected a norm group of prison

3   inmates and compared to a norm group of other

4   prison inmates Mr. Comstock scored far below the

5   cutoff for high impulsiveness.  The cutoff for

6   high impulsiveness is a score of 74 and

7   Mr. Comstock scored 52.  That would put him in

8   about the fifth percentile.  That is to say,

9   95 percent of incarcerated inmates taking this

10  test would score higher on the Barratt than

11  Mr. Comstock did.

12  BY MS. GRAVES:

13      Q       In your view Mr. Comstock is not an

14  impulsive person.

15      A       Correct.

16      Q       Does that cause you to conclude that he

17  does not suffer from the impairment of his

18  volitional control?

19      A       It leads me to conclude that it is

20  unlikely that he suffers from impairment of

21  volitional control; but then in addition to that I

22  also wanted to do the structured clinical

23  interview to see if there was any evidence of

24  another personality disorder applicable to

25  Mr. Comstock.  In addition I also wanted to do the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 73 of 190

1  Relapse Prevention Interview to assess

2  Mr. Comstock's volitional controls.

3      Q      Why is volitional control important to

4  this question of whether he would have serious

5  difficulty in refraining from child molestation?

6      A      Serious difficulty equates to a

7  breakdown in volitional control where there are

8  some sex offenders that in the presence of

9  particular stimuli they cannot control their

10  behavior and instead they act out impulsively.

11          The objective data say that

12  Mr. Comstock does not fall into that class of

13  offenders that I just described.

14      Q      I believe there was testimony earlier

15  that if someone commits the act itself of child

16  molestation committing the act demonstrates a lack

17  of volitional control.  Do you agree with that?

18      A      No, not at all.

19          We can have people who sexually abuse

20  children and go about it in a very planned,

21  careful, deliberate manner and at any step along

22  the way they could stop if they wanted to but they

23  choose not to.

24      Q      In your estimation the question whether

25  someone has serious difficulty refraining goes to

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 74 of 190

Page 338

```
 1    the person who -- not the person who chooses to
 2    not stop but the person who cannot stop.
 3         A      Correct.
 4         Q      Does that mean that the person
 5    absolutely cannot stop?  How do you see serious
 6    difficulty along that scale?
 7         A      First of all your question identifies
 8    the answer -- how do you identify difficulty along
 9    this scale -- you're right, it's a continuum.
10              Then we can have a situation where for
11    the offender whose behavior controls break down
12    because of volitional impairment the closer he
13    gets to his goal of abusing the child the more
14    intense his impulses are and the more difficult it
15    becomes for him to stop.  If he's many steps away
16    perhaps he could stop, but if he's getting closer
17    and closer and closer with the breakdown of
18    volitional control he can't stop.
19              On the other hand, if we have an
20    offender whose volitional controls are intact at
21    any point along the continuum of the step-wise
22    progression and proceeding to sexually abusing a
23    child that offender whose volitional controls are
24    intact can stop himself.  If he anticipates being
25    apprehended he can stop himself.
```

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 75 of 190

1        Q       Do you see serious difficulty in

2    refraining as a psychological term of art or does

3    it have some other meaning?

4        A       I think it is a legal term which myself

5    and other psychologists have interpreted

6    psychologically.

7        Q       So you're comfortable offering an

8    opinion on it.

9        A       Yes, I'm comfortable offering an

10   opinion on that issue expressing it in terms of

11   impulsivity, relying on the objective data that I

12   obtained from the Barratt Impulsiveness Scale

13   therefore reducing to about zero my reliance on

14   clinical judgment.

15       Q       Have you used the Barratt Impulsiveness

16   Scale in other Adam Walsh cases?

17       A       In all of them.

18       Q       Did you also use it in some of your

19   state cases or all of your state cases?

20       A       Yes.  I've used it continually for

21   about the past four to five years.

22       Q       Do you know whether other forensic

23   psychologists use the scale?

24       A       Yes, there are other forensic

25   psychologists who also use the Barratt.

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 76 of 190

 1      Q      What other methods or factors did you
 2   consider in your assessment of Mr. Comstock?
 3      A      I used the structured clinical
 4   interview for personality disorders to assess does
 5   Mr. Comstock satisfy diagnostic criteria for
 6   personality disorder.  A personality disorder is
 7   defined as a long-term maladaptive enduring
 8   personality style.
 9            In terms of the structured clinical
10   interview for personality disorders it became
11   clearly evident no, Mr. Comstock does not satisfy
12   diagnostic criteria for any personality disorder.
13      Q      Why would it matter whether he suffered
14   from personality disorder?
15      A      Because the relevant statute clearly
16   asks as a result of the serious mental illness --
17   excuse me -- does this individual suffer from a
18   serious mental illness, abnormality or disorder
19   and a personality disorder is a serious mental
20   illness.
21      Q      After you ruled out personality
22   disorders what else did you do?
23      A      Then I assessed Mr. Comstock's risk of
24   sexual reoffending using the actuarial instrument
25   we've been talking about -- the Static-99R.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 77 of 190

1     Q     How does the actuarial assessment tie

2   into the question that's before the Court?

3     A     The question of serious difficulty in

4   refraining from sexually violent conduct or child

5   molestation if released -- quite simply as a

6   psychologist that question asks me what is the

7   risk of this offender reoffending sexually.

8     Q     Is it possible for a psychologist to

9   say with certainty whether Mr. Comstock will or

10   with not reoffend?

11     A     No.   The best we can do is express his

12   risk of reoffending in percentage terms and say

13   compared to a group of previously convicted sex

14   offenders this is the risk expressed in percentage

15   terms of Mr. Comstock reoffending over a five-year

16   period of time.

17     Q     I think you said you used the

18   Static-99R, is that right?

19     A     Correct.

20     Q     Why did you chose that particular

21   instrument?

22     A     Because there is peer reviewed data

23   authored by me and my colleague Dr. DeClue

24   allowing me to specify with considerable precision

25   what is the risk for any offender of sexual

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 78 of 190

1   reoffending given a particular Static-99R score.

2   Given a score I could say his risk of reoffending

3   over a five-year period of time, for example, is X

4   percentage.

5        Q     Explain first what peer review is.

6        A     Peer review is a process of quality

7   control in the publication of scientific material.

8              The most recent articles I published

9   when they underwent peer review the editor in

10  chief of those articles sent the articles to three

11  members of the journal's editorial board who are

12  familiar with the topic that I'm writing on and

13  then independent of each other each of the three

14  editorial consultants reviewed the manuscript,

15  expressed observations, made recommendations for

16  changes or changes to be considered and then made

17  recommendations such as excellent article, publish

18  as is; very good article but it needs some

19  revision; could be a good article but it needs

20  considerable revision or no, this article should

21  not see the light of a publication day because it

22  amounts to junk science.

23       Q     Tell the Court how Static-99R works.

24       A     Static-99R is the latest iteration of

25  the original Static-99.  The original Static-99

**Reported By: Joseph C. Spontarelli, CCR**          www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 79 of 190

**United States of America v. Graydon Earl Comstock, Jr.**          5:06-HC-02195-BR
**Bench Trial - Vol. II**                                                   **November 29, 2011**

Page 343

1    became available in February 2000.  They missed

2    1999 by a couple of months.

3             The original Static-99 was developed by

4    Carl Hanson and David Thornton.  The original

5    Static-99 had a sample of 1086 previously

6    convicted sex offenders.  About half of those

7    offenders were from Canada and the other half were

8    from the United Kingdom.  Those offenders were

9    followed over a 15-year period of time and

10   52 percent of those offenders were known to

11   sexually reoffend.  Specifically -- excuse me.  I

12   misspoke.

13            For the whole sample approximately

14   25 percent of those offenders reoffended.

15   Approximately 252 of the total sample of 1086.

16            The original Static-99 was scored from

17   one through six and then all scores six, seven,

18   eight were treated the same.  They were all

19   treated as six and above.

20            For offenders who scored six and above

21   129 of them sexually -- again I misspoke.

22            129 offenders scored six and above.  67

23   of them reoffended, 62 of them did not reoffend.

24            Over the years as the Static-99 was

25   used with increasing frequency it became evident

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 80 of 190

Page 344

1     that there was a major problem with it. It was

2     over-predicted recidivism. In 2008 we saw a

3     new --

4         Q    You said in 2008 there was a change?

5         A    Yes.

6           There was a change in 2008 with a new

7     development with the Static-99 using two different

8     norm groups. You could compare an offender to a

9     high risk group or compare an offender to a

10    routine group.

11          This change came about trying to

12    correct for the problem of over-prediction or an

13    excessive number of false positive

14    classifications. Unfortunately it didn't work out

15    as well as intended and one year later we see a

16    whole revision in Static-99 and the development of

17    the Static-99R.

18          A graduate student in Canada working on

19    her Master's thesis -- her name is Leslie

20    Helmus -- developed a sample of more than 9000 sex

21    offenders and said you need to look at the risk of

22    sexual reoffending in terms of is this a routine

23    offender, is this a non-routine offender, is this

24    an offender who is in need of treatment or is this

25    an offender who by virtue of his history is a high

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 81 of 190

1    risk offender.  We started out with one set of

2    norms for the Static-99 in the year 2000.  We now

3    have four sets of norms for the Static-99R in the

4    year 2011.

5         Q     Is all of this an attempt to improve on

6    just looking at the linear progression?

7         A     Yes.  Exactly.

8         Q     When we talk about linear progression

9    we're talking about the correlation between

10   increased recidivism as the score on the

11   instrument increases.

12        A     Yes.

13              The term psychologists typically use is

14   the Static-99 and the Static-99R are linear

15   additive models; that is to say the higher the

16   score obtained on the instrument the greater is

17   the risk of sexual reoffending.

18        Q     Upon finding that it didn't work out as

19   well is that what caused them to come up with

20   these different groups for comparison?

21        A     Yes.

22              In her Master's thesis Ms. Leslie

23   Helmus pointed out that the original Static-99 was

24   over-predicting recidivism and that we needed to

25   revise the Static-99 norms to avoid stumbling into

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 82 of 190

1    an unacceptable frequency of false positive

2    classifications.

3       Q    How did they determine the norm groups

4    or the sample groups?

5       A    I'm not entirely sure. This is one of

6    the greatest problems with the Static-99R. We

7    have four different norm groups, and we have no

8    well-defined guidance as to which norm group

9    should be applied to which offender.

10         Specifically do we have well-defined

11    guidance available to us for making decisions

12    about which norm group to apply to Mr. Comstock?

13    No, we do not. If we had would decision making

14    rules about what norm group do you use then we

15    would have adequate inter-rater reliability data.

16         Inter-rater reliability data would ask

17    for this particular offender or for these

18    particular offenders we have 20 psychologists

19    making decisions about which norm group. Those 20

20    psychologists are making their decisions

21    independent of each other. To what extent do

22    those psychologists agree what is the appropriate

23    norm group for a given offender.

24         We express that kind of agreement in

25    terms of a correlation coefficient. Real quickly

**Reported By: Joseph C. Spontarelli, CCR**   **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 83 of 190

Page 347

1      correlation coefficients can range from 0.00 with

2      no relationship between two variables

3      whatsoever and up to 1.00 where we have a perfect

4      relationship between two variables.

5              In a classic paper published in Law and

6      Human Behavior in the early '90s they recommended

7      an acceptable level of inter-rater reliability for

8      any instrument to be used in a forensic setting is

9      .80.  That's the level of inter-rater reliability

10     we would want to see for the question of which

11     norm group do you select when you're using the

12     Static-99R.  No such data are available.

13        Q     Because there's no data indicating

14     which norm group to apply what do you suggest?

15        A     What I do when I report Static-99R

16     outcomes I explain, one, there are no well-defined

17     decision making rules that I can use to support my

18     selection of one norm group over another therefore

19     I'm going to use all four.  Using all four then I

20     will report a range of risk for this offender.

21        Q     Mr. Comstock scored a two on the

22     Static-99R, is that right?

23        A     Correct.

24        Q     Can you tell the Court what that score

25     means?

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 84 of 190

1        A       I'm trying to find the appropriate page

2    in my report.

3                The best way to do it is to understand

4    that when we're using and actuarial instrument to

5    assess recidivism risk there are four --

6                THE COURT:  One second.

7                The two is based upon the average of

8    the four?

9                THE WITNESS:  No.  Same score.

10   Everybody agrees.  In other words, Dr. Phenix --

11               THE COURT:  Everybody agrees it's a

12   two.

13               THE WITNESS:  Two.  The issue is which

14   comparison group do you use.

15               THE COURT:  It's the next step that you

16   average them.

17               THE WITNESS:  Then the question is

18   okay, how do we interpret this score; how do we

19   understand it.  Using my pagination I recommend we

20   go to page 25 of my report.

21               In Category F I talk about computing

22   predictive accuracy.  How are we going to identify

23   the predictive accuracy of the Static-99R for a

24   score of two.

25               We have to understand there's four

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 85 of 190

1  possible outcomes.  You can have a true positive
2  outcome.  The evaluator says as a result of this
3  score I'm predicting that this individual is going
4  to reoffend and in fact he does reoffend.
5           We can have a false positive outcome.
6  The evaluator says as a result of this
7  individual's score I'm predicting that he will
8  reoffend but in fact the offender does not
9  reoffend.
10          Thirdly we can have a true negative
11 outcome.  The evaluator says as a result of this
12 individual's score I'm predicting that he will not
13 reoffend and in fact he does not reoffend.
14          Finally there's a false negative
15 outcome that should include a missing S and false
16 negative outcome corresponds to a situation where
17 the evaluator says this offender will not reoffend
18 but in fact he does reoffend.
19          As a result of my 2011 article
20 published in Open Access Journal of Forensic
21 Psychology we can identify the frequency of true
22 positive/false positive, true negative/false
23 negative outcomes for any Static-99R score using
24 any one of the four comparison groups.
25 BY MS. GRAVES:

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 86 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                     **November 29, 2011**

**Page 350**

 1      Q       Let me try to clarify something first.

 2              There are people who score two in every

 3      comparison group or every norm group, is that

 4      right?

 5      A       (No audible response.)

 6      Q       You said there were four groups for

 7      comparison.

 8      A       Right.

 9      Q       But there are people who have scored a

10      two in each of those four groups.

11      A       Correct.

12      Q       What you're trying to do then is

13      determine what's the risk for a person who scores

14      a two or what's the rate of recidivism for a

15      person who scores a two in each of those groups.

16      A       Again correct.

17      Q       The question then is which group do you

18      compare Mr. Comstock to and your conclusion is you

19      should compare him to each of those groups.

20      A       That's right, and report a range of

21      risk.

22      Q       What is it that you're getting at with

23      the false positives/false negatives and true

24      positives/true negatives?

25      A       Let's go to page 26 and we'll start

**Reported By: Joseph C. Spontarelli, CCR**           **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 87 of 190

1     with a routine sample.  This is not in the report
2     but I just computed it.  In the routine sample
3     there's a total of 2406 offenders in the routine
4     sample alone.
5          Q     This is from the group that was
6     analyzed under the Static-99R.
7          A     Correct.
8                For a score of two we can interpret it
9     in either of two ways.  We can say my position is
10    going to be for any offender scoring two and above
11    on the Static-99R I will rule in recidivism risk.
12               The other way is I can say my position
13    is for a score of two and below on the Static-99R
14    I will rule out recidivism risk.
15               Let's look at Category G on page 26
16    where it says true positive 120.
17               For a score of two using the routine
18    sample if I say I'm going to predict all offenders
19    scoring two and above on the 99R will reoffend I
20    will have 120 true positives.  I will also obtain
21    1277 false positives.  At this point I can compute
22    what's known as the positive predictive value.  It
23    corresponds where it says PPV.
24               Remember I have 120 true positives, I
25    have a total of 1397 rule-in decisions.  That's

Reported By: Joseph C. Spontarelli, CCR               www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 88 of 190

1    120 plus 1277.  120 divided by 1397 is .09.  The
2    positive predictive value tells us that if you
3    rule in recidivism risk for an individual scoring
4    two and higher on the Static-99R you will be
5    correct nine percent of the time.  You will be
6    mistaken 91 percent of the time.
7              Then we can look at the other decision
8    making alternatives available to us and say for
9    anyone scoring two or below on the 99R I'm going
10   to rule out recidivism risk.  Now we want to look
11   at the true negative and false negative outcomes
12   because we're ruling out recidivism risk.
13             If you say for any score of two and
14   below on the Static-99R I'm ruling out recidivism
15   risk you will have 1320 true negative
16   classifications, and you will have 29 false
17   negative classifications.  1320 plus 29 is 1349.
18   That's the total number of negative
19   classifications.  The total number of decisions
20   where you say this guy is not going to do it.
21   You're correct 1320 times so the negative
22   predictive value is .97.  You're going to be
23   correct 97 percent of the time when ruling out
24   recidivism risk.  You're going to be wrong
25   three percent of the time when ruling out

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 89 of 190

1  recidivism risk for a Static-99R score of two

2  comparing that offender to the routine sample over

3  a five-year follow-up.

4      Q      The bottom line is the instrument is

5  better at ruling out recidivism than ruling it in.

6      A      Exactly.

7             Look at page 26 and look under the

8  column of NPV.  We can see the negative predictive

9  values are .97 for the routine sample, .95 for the

10  preselected for treatment sample, .93 for the

11  non-routine sample, .90 for the high risk sample.

12             For Mr. Comstock ruling out recidivism

13  risk will be accurate for offenders such as

14  himself somewhere between 90 to 97 percent of the

15  time depending upon which norm group you want to

16  look at.

17             Conversely we can look at the positive

18  predictive values.  Positive predictive values are

19  .09, .12, .19, .23.  If we rule in recidivism risk

20  for offenders such as Mr. Comstock we will be

21  correct somewhere between nine percent and

22  23 percent of the time.  We will be mistaken when

23  ruling in somewhere between 77 percent and

24  91 percent of the time.

25      Q      Is there a place where one can go to

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 90 of 190

1    see what the recidivism rate is for these various

2    groups?

3         A     I can tell you.  There is a place you

4    can go -- Campbell 2011 -- the Predictive Accuracy

5    of the Static-99R and Static 2002-R.  I also put

6    that information in my report for five-year

7    follow-ups the recidivism base rate for the

8    routine sample is six percent.

9         Q     Six percent?

10        A     Right.

11              For the preselected for treatment

12   sample the recidivism base rate is 9.1 percent.

13   That is to say 9.1 percent of that sample

14   reoffended over a five-year follow-up.

15        Q     That's for people with a score of two?

16        A     No.  I'm talking now about the entire

17   sample.

18        Q     I gotcha.

19        A     For the non-routine sample the

20   recidivism base rate for that entire sample is

21   14.8 percent.

22              THE COURT:  What page are you on,

23   Doctor?

24              THE WITNESS:  Page 23.

25              I have to tell you on page 23 the base

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 91 of 190

1  rate data for the routine sample was omitted but I
2  know it's six percent.
3            THE COURT:  Thank you.
4            THE WITNESS:  To complete it, the base
5  rate for the non-routine sample over a five-year
6  follow-up is 14.8 percent.  Finally the base rate
7  of recidivism over a five-year follow-up for the
8  high risk group is 21 percent.
9  BY MS. GRAVES:
10     Q     Is there any way of knowing how similar
11  or dissimilar Mr. Comstock is to the folks in the
12  sample groups?
13     A     No, because the sample groups are not
14  well enough defined that we can identify which
15  sample group applies to Mr. Comstock and make that
16  identification in a consistent manner.  Making
17  identification in a consistent manner would
18  necessitate an acceptable level of inter-rater
19  reliability for that decision and there's no
20  inter-rater reliability data available.
21     Q     Would you say that the actuarial
22  instrument is limited?
23     A     Yes.
24            Specifically it is limited in the sense
25  that it is much more accurate for ruling out

Reported By: Joseph C. Spontarelli, CCR              www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 92 of 190

**United States of America v. Graydon Earl Comstock, Jr.**   5:06-HC-02195-BR
**Bench Trial - Vol. II**   **November 29, 2011**

Page 356

1   recidivism risk than it is for ruling in

2   recidivism risk.

3        Q       Is it also limited in that it doesn't

4   address Mr. Comstock in particular?

5        A       Correct.

6            It does not take into consideration,

7   for example, Mr. Comstock's health status.  We ask

8   ourselves given what has been described by a

9   physician as a physically frail individual of 68

10  years of age can we even apply these Static-99R

11  data to him.

12       Q       Nevertheless, is the Static-99R still

13  considered the best risk assessment tool in the

14  area right now?

15       A       If we're talking about risk assessment

16  tools for assessing the risk of sex offender

17  recidivism, yes.  If we're talking about actuarial

18  instruments in general no.

19           I just came upon the most impressive

20  instrument in the past week and it will be used by

21  federal probation officers after they have

22  undergone appropriate training for identifying the

23  post-conviction risk of recidivism for any federal

24  defendant.

25           That actuarial instrument is premised

**Reported By: Joseph C. Spontarelli, CCR**   **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 93 of 190

1    on more than 100,000 individuals and that again
2    should give you the impression Static-99R is not
3    doing that hot with 8- to 9000 in its sample when
4    we have an impressive sample of over a hundred
5    thousand offenders which federal probation
6    officers will be using regularly in the near
7    future.
8        Q     You've got the Static-99R which
9    predicts risk but doesn't tailor it to a specific
10   individual.
11       A     Given idiosyncratic characteristics of
12   that individual, no.
13       Q     But it can give you a general
14   assessment based on the score he had on that
15   instrument and comparing him to the people who
16   have the same score.
17       A     Yes.
18       Q     Even with its limitations is it still
19   better at risk assessment than clinical judgment?
20       A     Absolutely.  Clinical judgment when
21   assessing the risk of recidivism or future
22   dangerousness is an unmitigated disaster.
23             Clinical judgment is especially a
24   disaster because it persistently over-predicts
25   future dangerousness.  Clinical judgment again and

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 94 of 190

 1    again walks evaluators into false positive

 2    classifications.

 3        Q      Even with all that said you made a

 4    judgment in this case.

 5        A      And what judgment did I make?

 6        Q      You made the judgment that he would not

 7    have serious difficulty.

 8        A      I made that judgment based upon

 9    objective data and a structured interview; both of

10    which are inconsistent with clinical judgment.

11        Q      Let's look at some of the other

12    instruments that have been referred to and perhaps

13    even used by yourself.  Did your use the

14    Static-2002R?

15        A      Did I use it?  No.  I know that Dr.

16    Phenix used it.  If you go to page 27 of my report

17    I report outcome data for the Static-2002R.

18             I make typographical errors, also.  I

19    think Dr. Phenix made a small typographical error

20    where at one point in her report she typed six for

21    the Static-2002R and I think she meant five.

22             If you look on page 27 you have to

23    understand for the Static-2002R there's only three

24    comparison groups; routine sample, non-routine

25    sample and high risk sample.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 95 of 190

1          If you look on page 27 referring to my

2    pagination you see the outcomes for the

3    frequencies of true positive/false positive, true

4    negative/false negative for a Static-2002R score

5    of five over a five-year follow-up.  There the

6    positive predictive values range from .10 to .27.

7    That means if ruling in recidivism risk relying on

8    a Static-2002R score of five the evaluator will be

9    correct somewhere between 73 percent and -- excuse

10   me -- the evaluator will be incorrect somewhere

11   between 73 percent and 90 percent of the time.

12          If ruling out recidivism risk saying

13   no, this offender will not reoffend again relying

14   on a Static-2002R score of five over a five-year

15   follow-up ruling out recidivism risk an evaluator

16   would be correct somewhere between 85 percent and

17   97 percent of the time.  Therefore, the margin of

18   error is much, much greater when ruling in

19   recidivism risk vis-a-vis the Static-2002R

20   compared to ruling out recidivism risk.

21      Q     There was also a mention of an SVR-20

22   instrument.  Are you familiar with that?

23      A     Yes, I'm quite familiar with the Sexual

24   Violence Risk-20.

25      Q     I think Dr. Demby used that instrument.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 96 of 190

```
 1       A      Yes.

 2       Q      What do you know about that instrument?

 3       A      That it is a proxy for clinical

 4   judgment.  It is not an actuarial instrument.

 5   There is no way to compute positive predictive

 6   values and negative predictive values or is there

 7   any way to identify the frequencies of true

 8   positive/false positive, true negative/false

 9   negative outcomes when relying on the SVR-20.

10              Moreover the SVR-20 invokes

11   consideration of supposed risk factors that are

12   known not to be correlated with recidivism.

13   Specifically I'm going to page 46 of my report --

14   excuse me -- I'm going over to page 47 and 48.

15              For example, the SVR-20 suggests that

16   an offender's extreme minimization and/or denial

17   increases the risk of sex offender recidivism, but

18   at the same time SVR manual acknowledges there is

19   no clear evidence supporting this factor's ability

20   to predict future sexual violence although it

21   predicts general criminality in sexual offenders.

22              The manual goes on to say according to

23   professional reviews it -- extreme minimization

24   and denial -- it is an important factor to

25   consider in clinical evaluations of risk.  That is
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 97 of 190

1    entirely and completely irresponsible.  What the

2    manual is suggesting is set aside any

3    considerations of empirical accuracy and

4    passionately embrace your clinical judgment again.

5         Q     How about the PCLR?

6         A     What about the PCLR?  It's a very, very

7    complex instrument.

8              The PCLR is a 20-item instrument

9    designed for assessing psychopathy.  As Robert

10   Hare -- the originator of the PCLR -- outlined

11   psychopathy involves two different factors.

12   Factor one corresponds to an impulsive individual

13   who demands immediate gratification and acts first

14   without thinking.  Factor two corresponds to the

15   kind of individual who in a cold and calculated

16   remorseless fashion will manipulate and use other

17   people.

18              The whole problem here with the PCLR

19   and this proceeding is Robert Hare himself reports

20   in his manual the PCLR is not a good predictor of

21   sexual recidivism.  For criminal offenders younger

22   than the age of 40 the PCLR can be a pretty good

23   predictor of general criminal recidivism but not

24   specific sexual recidivism.

25              Moreover, Hare points out for offenders

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 98 of 190

1    45 years of age and older the PCLR is virtually

2    worthless; therefore if someone has used the PCLR

3    in this proceeding with Mr. Comstock they've

4    demonstrated that they don't pay close attention

5    to the relevant research and authoritative

6    opinion.

7         Q       Finally I think there's the SRA-FV.

8         A       Yes.

9                 This is the structured risk assessment

10   forensic version that Dr. Phenix testified about.

11   In her deposition Dr. Phenix characterized the

12   items of the structured risk assessment as being

13   complicated and I would agree entirely with her.

14                In her deposition she also

15   characterized the scoring of the structured risk

16   assessment as being complicated, and again I would

17   agree with her entirely.

18                If we agree that we are using a

19   complicated instrument with a complicated scoring

20   procedure the question becomes one of what are the

21   levels of inter-rater reliability obtained when

22   using the structured risk assessment.  To what

23   extent can two or more psychologists evaluating

24   the same offender independent of each other agree

25   in their structured risk assessment findings.

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 99 of 190

1            To appropriately use the structured
2     risk assessment in a forensic setting we must have
3     data to answer the question I just posed.
4     Heilbruen has told us we expect a level of
5     inter-rater reliability found in a correlation
6     coefficient of .80 or greater.  Then we ask do we
7     have that acceptable level of inter-rater
8     reliability for the structured risk assessment and
9     the answer is emphatically no.
10            Moreover, I should explain to the Court
11    we don't have any peer reviewed data regarding the
12    structured risk assessment whatsoever.  We have
13    one article written by David Thornton.  It's a
14    good article.  Thornton's article is a good
15    article.  It's an important article.  In the
16    article what Thornton is talking about is how and
17    why he developed the structured risk assessment
18    and what his hopes and aspirations are for that
19    instrument which is an appropriate thing to write
20    about in the initial stages of developing an
21    instrument; but again there are no peer reviewed
22    data demonstrating an adequate level of
23    inter-rater reliability for the structured risk
24    assessment.
25            THE COURT:  Do you know when he wrote

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 100 of 190

1     that article?

2                THE WITNESS:  Within the last year.

3                THE COURT:  Thank you.

4     BY MS. GRAVES:

5         Q     Not only is there a lack of inter-rater

6     reliability, but is there also a problem with no

7     evidence of incremental validity?

8         A     Correct.

9                When we talk about incremental validity

10    we're saying okay you have a score on an actuarial

11    instrument -- score on the Static-99R.  That score

12    will tell you how accurately you can rule in

13    recidivism risk and that score will tell you how

14    accurately you can rule out recidivism risk.

15               Now with incremental validity the

16    question becomes more of can we use an instrument

17    such as a structured risk assessment to increase

18    the level of predictive accuracy compared to what

19    we would get from the Static-99R alone.

20               Let's go back to page 26 of my report

21    for a moment.  Let's just look for illustrative

22    purposes at the outcome data for the routine

23    sample.

24               If the structured risk assessment

25    provided any incremental validity above and beyond

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 101 of 190

1    the Static-99R then we would have to see an

2    increase in the frequency of true positive

3    outcomes.  The 120 number would have to

4    substantially increase.  To get incremental

5    validity correspondingly we would also expect that

6    the frequency of false positive outcomes --

7    1277 -- that that number would have to decrease so

8    then we ask okay when using the structured risk

9    assessment are there any peer reviewed data

10   demonstrating that that instrument increases the

11   frequency of true positive outcomes and/or

12   decreases the frequency of false positive outcomes

13   when using the Static-99R and the answer is

14   emphatically no.  No such data exists.

15        Q     You pretty much contended that the

16   Static-99R is the best of the actuarial

17   instruments to use until we get this data from

18   U.S. probation.

19        A     Yes.

20        Q     What other factors can you legitimately

21   consider in determining Mr. Comstock's risk of

22   recidivism?

23        A     You can look at how does he respond to

24   a structured interview.  It pains me a little to

25   say this but I think I would have to say that the

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 102 of 190

```
 1    quality and the status of treatment for sex

 2    offenders in the United Kingdom is a little bit

 3    advanced ahead of us -- not a lot but a little.

 4    David Thornton would be responsible for that.

 5                 Dr. Thornton is the director of the

 6    treatment program in Wisconsin, but he also

 7    originated in the UK and he maintains a faculty

 8    appointment in Norway.  Dr. Thornton has gone back

 9    and forth --

10                 MR. ROYSTER:  Objection.

11    Non-responsive.

12                 THE COURT:  Sustained.  It's very

13    interesting, but let's get to the meat of it.

14                 THE WITNESS:  You're right.

15    BY MS. GRAVES:

16       Q    Let's get to the structured clinical

17    interview.

18       A    The structured clinical interview has

19    been developed by Dr. Thornton and two other

20    figures in the United Kingdom.  What it does is to

21    systematically address what situations would put

22    this offender at risk for sexual reoffending, and

23    in those situations that would put him at risk how

24    would he deal with those circumstances.

25                 As I interviewed Mr. Comstock using the
```

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 103 of 190

1    Relapse Prevention Interview it became quite clear
2    and evident that he can identify situations that
3    would put him at risk, and he has well-defined
4    appropriate plans for how he would cope with those
5    risky situations.
6        Q       Is that something that has been
7    validated as a good indicator?
8        A       Validated unfortunately no.  When you
9    ask about validation we're talking about would
10   there be a way to score the instrument indicating,
11   for example, that a high score was associated with
12   a low risk of recidivism and vice versa.  That
13   would be the ideal procedure for validation and
14   unfortunately that has not been done.
15       Q       How do you know that the structured
16   clinical interview is helpful to use?
17       A       How do I know it's helpful to use?
18       Q       Yes.
19       A       Because I can use it without resorting
20   to my clinical judgment.  I can rely on precise
21   well-formulated questions where there is a logical
22   rationale for using those questions and then I
23   respond in a qualitative manner asking myself in
24   this case does Mr. Comstock appear able to respond
25   appropriately in situations and circumstances that

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 104 of 190

**United States of America v. Graydon Earl Comstock, Jr.**      **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                       **November 29, 2011**

Page 368

1    could pose a risk for him and my answer is yes.

2        Q      Is it a concern that the person you're

3    interviewing might be trying to deceive you and

4    just give you the answers that you want to hear?

5        A      Yes.

6        Q      How do you deal with that?

7        A      You ask a number of questions.  You

8    look for consistency of answers.  You look for how

9    closely is this individual trying to read me.

10   Mr. Comstock doesn't do that.  What he does is

11   when he's deep in thought about some issue he

12   looks right over my right shoulder.  He looks like

13   he's scanning the wall behind me.  What he's doing

14   is he's simply gathering his thoughts but he's not

15   relying on me for any cues.

16       Q      In addition to the structured clinical

17   interview are there other data that you look to?

18       A      Yes.

19              The whole issue of using -- related to

20   SVR but a little bit different -- the whole issue

21   of can we use any kind of a risk factor to support

22   a conclusion that Mr. Comstock is at risk for

23   sexual reoffending.

24              For example, can we use a risk factor

25   such as sexual deviance to support a conclusion

**Reported By: Joseph C. Spontarelli, CCR**      **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 105 of 190

1    that because of his supposed level of deviance he

2    is at risk for sexual reoffending and the answer

3    is emphatically no if we look at the relevant peer

4    reviewed data.

5        Q    Are there any risk factors that the

6    relevant peer reviewed data have indicated would

7    be legitimately correlated with increased

8    recidivism?

9        A    No, not at all.  The classic research

10   paper is Hanson --

11           THE COURT:  The answer is no.  It's

12   very interesting and I want to learn as much as I

13   can since this is the first time, but I think we

14   have to move on.

15   BY MS. GRAVES:

16       Q    You say sexual deviancy is one that is

17   not correlated with increased recidivism.

18       A    It appears to be correlated but it's a

19   but issue.  That data was reported by Hanson and

20   Bussiere in 1998.  Their data reported a

21   correlation of about .25 between sexual deviancy

22   and sex offender recidivism for child molesters

23   whose sexual deviancy had been established by

24   penile plethysmographic data sometimes called PPG

25   data where a device that measures erection is put

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 106 of 190

1    around the penis and then the individual looks at

2    pictures of nude and semi-nude children, looks at

3    pictures of nude and semi-nude adults and then you

4    record what does he respond to.

5              If we stop and think that definition of

6    sexual deviance is not applicable to Mr. Comstock.

7    Given his physical condition on a PPG test he

8    would flat line it.  There would be no response.

9    Consequently those data don't fit Mr. Comstock.

10    Q     How about age?  Is age something that

11    should be considered in Mr. Comstock's situation?

12    A     Yes.

13    Q     Are you saying age should be considered

14    apart from the way it is used in the Static-99R?

15    A     I think we can supplement the

16    Static-99R with authored age-related data.

17    Specifically go to page 37 relying on my

18    pagination of my report.

19              In there we see a table reported by

20    Wollert in 2006 in a peer reviewed article and we

21    can look at the age of the offender, the type of

22    offender.  We see for offenders between the ages

23    of 68/69 over an eight and a half year period

24    follow-up four percent of those offenders

25    reoffended.  Then go forward to page 37 now we

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 107 of 190

1    have a sample of only five but none of those

2    offenders reoffended.

3             These data additionally underscore that

4    age in and of itself for an individual

5    Mr. Comstock's age can be almost conclusive.

6             THE COURT:  Let's take a break here.

7    We'll take about 15 minutes.

8

9             (Recess.)

10

11            THE COURT:  You may proceed.

12   BY MS. GRAVES:

13       Q    Dr. Campbell, you heard the testimony

14   of Dr. Demby today.

15       A    Yes.

16       Q    She referred to Mr. Comstock as an

17   outlier in that the actuarial instrument -- the

18   Static-99R -- did not -- should not be applied to

19   him.  Can you explain what an outlier is as

20   briefly as you can?

21       A    An outlier is an atypical member of a

22   population.

23       Q    How does one determine whether someone

24   is an outlier?

25       A    With a great deal of error variance

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 108 of 190

1    undermining your decision because by definition

2    outliers are atypical and unusual.

3              For example, let's talk about age and

4    recidivism.  If we look at Mr. Comstock's age his

5    risk of recidivism over an eight and a half year

6    follow-up is approximately four percent.  That

7    means for a hundred offenders matching

8    Mr. Comstock -- all of them were child

9    molesters -- if I say none of them will reoffend

10   I'll be right 96 percent of the time.  If someone

11   says Dr. Campbell can you identify the other

12   four percent I'm not even going to try because the

13   likelihood of my being correct is only four times

14   out of a hundred.

15       Q    Would the number of victims that

16   Mr. Comstock had prior to his first detection or

17   prior to his first prosecution factor into a

18   determination as to whether he's an outlier?

19       A    Not if we're going to rely on an

20   objective instrument such as the Static-99R.

21   Despite whatever the number of his previous

22   victims are the fact remains that Dr. Demby, Dr.

23   Phenix and I all agree that Mr. Comstock's

24   Static-99R score is a two.

25              I have given you the relevant outcome

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 109 of 190

1    data in terms of the levels of accuracy obtained

2    with ruling in recidivism risk and the levels of

3    accuracy obtained when ruling out recidivism risk

4    for a Static-99R score of two.

5        Q    Mr. Comstock completed the Kansas Sex

6    Offender Treatment Program which was a

7    time-limited program.  Is there any indication

8    that a time-limited program is any less effective

9    than a goal oriented program?

10        A    No.  The--

11        THE COURT:  That's fine.  No.

12    BY MS. GRAVES:

13        Q    No is good.

14        You did a Relapse Prevention Interview

15    of Mr. Comstock.

16        A    Correct.

17        Q    During that interview were you

18    satisfied that Mr. Comstock's relapse prevention

19    plan was a good one?

20        A    Yes.

21        Q    Would Mr. Comstock having pictures of

22    boys in the ten to 14 age group -- fully clothed

23    pictures -- that were not at all sexual -- would

24    that add to his risk of reoffending?

25        A    Not necessarily, no.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 110 of 190

Page 374

```
 1              MS. GRAVES:  That's all I have.  Thank
 2    you.
 3              THE COURT:  Before you have a chance to
 4    cross I just have one question and I'm going to
 5    ask it now so you will have a chance to develop it
 6    if you want.
 7              What would happen should his sister
 8    pass away or become incapacitated?  Tell me what
 9    that would do if you know or if you have an
10    opinion as to the risk factor.
11              THE WITNESS:  I can tell you the first
12    thing that would happen is Mr. Comstock would sink
13    into a pretty serious state of depression --
14              THE COURT:  That I've gathered from
15    everyone.
16              THE WITNESS:  -- such that he would
17    need treatment.
18              THE COURT:  Tell me if you have a risk
19    factor.
20              THE WITNESS:  Let's assume under those
21    circumstances that he obtains competent treatment
22    with appropriately prescribed psychotropic
23    medication.  If he had other sources of support
24    available to him that he had established in the
25    interim between release and his sister's death
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 111 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                        **November 29, 2011**

Page 375

1    then I think he would recover and do quite well.

2              If he had no sources of social support

3    available to him under those hypothetical

4    circumstances that you described even with

5    appropriate treatment I think he would struggle

6    but if we had very, very effective treatment I

7    think he would eventually overcome those

8    circumstances.

9              THE COURT:  Your answer was not

10   unexpected.

11             If at least for a period of time there

12   was another factor and that was a probation

13   officer or something like that do you think that

14   would substantially decrease any risk that we may

15   have?

16             THE WITNESS:  Depending on the

17   relationship between Mr. Comstock and his

18   probation officer.  If it's a sound constructive

19   relationship with a probation officer responding

20   to Mr. Comstock in terms of I have faith in you, I

21   think you can do the right thing but please

22   understand I'm going to watch you like a hawk but

23   I also want you to know I'm available to you for

24   assistance if you need it I think Mr. Comstock

25   would respond quite positively to those kinds of

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 112 of 190

1    circumstances.

2                  THE COURT:  Thank you.  Government.

3                  MR. ROYSTER:  Thank you, Judge.

4                  CROSS EXAMINATION

5

6    BY MR. ROYSTER:

7        Q      Dr. Campbell, have you ever testified

8    in favor of civil commitment for a sexually

9    dangerous person ever?

10       A      No.

11       Q      I noticed from your resume that you are

12   not a member of the Association for Treatment of

13   Sex Abusers, is that true?

14       A      Correct.

15       Q      Isn't that where all the research about

16   all the things that you've talked about is

17   discussed?

18       A      Yes.  May I explain?

19       Q      She can follow-up with you.

20       A      I get the ATSA Journal.

21       Q      But you don't go to the ATSA

22   conferences and hear how the research is

23   presented, is that true?

24       A      Sometimes I do.

25       Q      When was the last time you went?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 113 of 190

1          A      2004.

2          Q      You agree that Mr. Comstock suffers

3     from pedophilia, right?

4          A      Yes.

5          Q      Part of the reason for your diagnosis

6     was the possession of these pictures that he had

7     in 2008, right?

8          A      To a certain degree.  The most

9     important factor was what Mr. Comstock

10    self-discloses himself.

11         Q      It was important enough for you to

12    include that under your diagnosis, right?

13         A      Yes.

14         Q      In fact, that was one of the few things

15    that you reported supported the diagnosis of

16    pedophilia in your report was the pictures from

17    2008.

18         A      I think my report refers to

19    Mr. Comstock characterizing himself as a

20    pedophile.

21         Q      Other than that and the pictures

22    there's not much else about your diagnosis for

23    pedophilia, is there?

24         A      After he says I am a pedophile there's

25    not much of a need for anything else.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 114 of 190

1      Q     The DSM -- you're familiar with that,
2  right?

3      A     Correct.

4      Q     The DSM says that the recidivism rate
5  for individuals with pedophilia involving a
6  preference for males is roughly twice that for
7  those that prefer females, doesn't it?

8      A     That's what it says.  Completely
9  unsubstantiated without any data to support the
10  assertion whatsoever.

11      Q     But that is what it says.

12      A     That's what it says.  Of course we'll
13  be disregarding it sometime within the next 24 to
14  36 months when DSM-V comes on-line.  Who knows
15  what it will say about pedophilia.

16      Q     You would characterize his pedophilia
17  as in control, is that right?

18      A     Correct.

19      Q     Because you believe or it's your
20  opinion that he currently has the ability to
21  control his urges.

22      A     Correct.

23      Q     That's based on your interview with
24  him, right?

25      A     Correct.  Also on the objective data

**Reported By: Joseph C. Spontarelli, CCR   www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 115 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                          **November 29, 2011**

Page 379

1   obtained via the Static-99R and looking at the

2   relevant age-related data.

3       Q      Looking at the Static-99R data you're

4   able to discern that he is presently able to

5   control his sexual urges, is that your testimony?

6       A      No.  My testimony is that it is more

7   likely than not that he is able to control his

8   sexual urges because the likelihood of his sexual

9   reoffending ranges somewhere from nine percent to

10  23 percent.

11      Q      I understood your testimony to be that

12  he currently has the ability to control his urges.

13  Is that your testimony?

14      A      If controlling urges means controlling

15  his overt behavior then yes, that is my testimony.

16      Q      The report that you've written and

17  you've provided to the Court that's a very similar

18  outline to how you do other reports, right?

19      A      Yes.

20      Q      Did you actually read the report before

21  you submitted it to Ms. Graves?

22      A      Yes.

23      Q      Did you notice that you left

24  information in there that pertained to other

25  respondents, other cases that you're dealing with?

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 116 of 190

1      A      Yes, I noticed that.

2      Q      You left it in there anyway.

3      A      Excuse me.  I noticed that after I

4   submitted the report to Ms. Graves.

5      Q      You talked about the Relapse Prevention

6   Interview.  Maybe we can take a look at that for a

7   few moments.

8             I understood your testimony to be that

9   it's the information that he provided in this

10  Relapse Prevention Interview that lead you to

11  opine that he had clearly identified situations

12  that put him at risk, is that accurate?

13     A      Yes.

14     Q      He had well-defined appropriate plans.

15  That's based on this Relapse Prevention Interview.

16     A      Yes.

17     Q      This Relapse Prevention Interview, this

18  assesses a sex offender's familiarity with the

19  goals and procedures of relapse prevention, right?

20     A      Correct.

21     Q      Obviously his familiarity with the

22  goals and procedures of relapse prevention is

23  important otherwise you would not have included

24  it, right?

25     A      Again correct.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 117 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                       **November 29, 2011**

Page 381

1       Q       I believe you testified that this gives
2    you objective data, is that correct?
3       A       It gave me data via a structured
4    interview.  In other words, this data is more
5    reliable than relying on clinical judgment and not
6    as reliable as data that had been validated in the
7    manner that an actuarial instrument can be
8    validated.
9       Q       You're asking him a set of questions
10   and he's just answering your questions, is that
11   right?
12      A       Correct.
13      Q       You're basically having to believe what
14   he tells you in order to discern or opine that he,
15   as you put it, had clearly identified situations
16   that put him at risk and well-defined appropriate
17   plans.  You're relying on his statements to you.
18      A       Yes.
19      Q       Let's take a look at the first question
20   there.  Number one, what feelings or moods would
21   put you at risk for sexually offending again.  I
22   guess you tell him describe at least two different
23   moods.  You tell him that, right?
24      A       Yes.
25      Q       He does identify two, loneliness or

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 118 of 190

1    anxiety.  Those are the things that he mentions

2    that would put him at risk, right?

3         A       Correct.

4         Q       Now the second question -- the 1-B --

5    how well would you cope with such feelings or

6    moods in the future.  Describe at least two ways

7    of coping you could use.  You did say two ways,

8    right?

9         A       Yes.

10        Q       He says that he would turn to his

11   sister who is very supportive and that's the only

12   way that he tells you he will cope.  He can't even

13   identify two ways, can he?

14        A       No, no, no.  He continues on and says,

15   for example, my sister might notice that I was

16   focusing on something I shouldn't be -- he's

17   making a veiled reference to a male child -- in

18   the visiting room and she would switch sides of

19   the table with me.

20        Q       It's your testimony that those are two

21   ways of coping that he could use to reduce his

22   risk.

23        A       Sister might respond supportively;

24   sister might respond in a manner that subtly sends

25   a signal to him I know you're having a problem,

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 119 of 190

1    let me help you with the problem.

2         Q       I just want to make sure I understand

3    that in your mind it's your opinion that those are

4    two ways that he identifies to cope to reduce his

5    risk, is that right?

6         A       Yes.

7         Q       The second question -- we're not going

8    to go through all of these --

9                 THE COURT:  You can take all the time

10   you need.

11   BY MR. ROYSTER:

12        Q       The question is what thoughts including

13   sexual thoughts and fantasies would put you at

14   risk of sexually reoffending?  Describe at least

15   two different thoughts.  He says being alone with

16   a child so that's one I guess.

17        A       Correct.

18        Q       Being with a boy who I thought was a

19   prostitute.  I guess that's a second way.

20        A       Correct.

21        Q       Just the thought of being alone with a

22   child would put him at risk to reoffend; is that

23   what he's saying?

24        A       What he's saying is it could.

25        Q       Just being merely alone with the child?

Reported By: Joseph C. Spontarelli, CCR            www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 120 of 190

Page 384

1          A          I'm hesitating -- your question about
2    being alone with a child is?
3          Q          What I'm saying is is he communicating
4    to you in response to your question that just the
5    mere fact that he is alone with a child is
6    increasing his risk to commit a sex offense?
7          A          It could.
8          Q          Of course the second part in all these
9    kind of have a how would you cope with these
10   things and the second question there is how would
11   you cope with such thoughts in the future.
12   Describe at least two ways.  He says for example,
13   a ten-year-old boy sits down next to me.  I would
14   leave.  I would be diplomatic saying it's time for
15   me to go meet someone and now I'm comfortable with
16   being alone.
17                    Is it your testimony that those are two
18   ways of coping with the thoughts and feelings that
19   he identified above that put him at risk?
20         A          It's a matter of opinion if that's one
21   complex way or two separate ways.
22         Q          It's interesting that he says I'm now
23   comfortable with being alone because didn't before
24   that he just say in the first question that
25   loneliness or anxiety would increase his risk to

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 121 of 190

1    reoffend?  How can he be comfortable being alone

2    but it also increases his risk to reoffend?

3       A    Loneliness or anxiety about something

4    and -- now your question is?

5       Q    He is saying he is now comfortable

6    being alone.  Doesn't being alone put him at risk

7    to reoffend?

8       A    It could.  What he's also saying is I'm

9    more comfortable with being alone now than I have

10    been in the past.

11       Q    But loneliness -- at least he appears

12    to identify that as a trigger, right?

13       A    He's also saying but it's not as much

14    of a trigger as it was in the past.

15       Q    I guess he told you that separate from

16    what you've included in your interview.

17       A    Yes.

18       Q    The third question -- how would you

19    cope -- sorry -- what events might make you more

20    likely to have feelings or thoughts that put you

21    at risk and he says I even have trouble thinking

22    that way, but loneliness, anxiety or feelings.

23       A    You left out feelings of loss.

24       Q    I'm sorry, it does say that.

25       The third part -- how would you cope

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 122 of 190

```
 1   with such events in the future?  Describe at least
 2   two different ways of coping.  He only identifies
 3   one, doesn't he?  Plan ahead to avoid children.
 4   As an example I'd go grocery shopping early in the
 5   morning.
 6        A     Yes.  Later on he talked about wanting
 7   to volunteer at an animal shelter but making sure
 8   his hours at the animal shelter would be during
 9   school hours when children aren't there.
10        Q     I don't see anything about an animal
11   shelter in question three, do you?
12        A     No.  The animal shelter issue came
13   later.
14        Q     Let's skip over to question ten.
15   Indicate on a scale of zero to ten the likelihood
16   of you committing a sex offense in the future.
17   His response is I don't think zero is the answer,
18   but it would be very low.  I don't want to be
19   over-confident.
20             On his relapse prevention plan he can't
21   even tell you that the likelihood of him
22   committing another sex offense is zero, can he?
23        A     No.  What he is saying is I'm not going
24   to become over-confident.  If I'm going to err I'm
25   going to err on the side of excessive caution.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 123 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                       **November 29, 2011**

Page 387

 1      Q      But he can't tell you that his risk to

 2   reoffend is zero, can he?

 3      A      Because he does not want to be

 4   over-confident.

 5      Q      Mr. Comstock is 69 years old.

 6      A      Correct.

 7      Q      You believe that this profoundly lowers

 8   his risk, right?

 9      A      Correct.

10      Q      In fact you believe that it's almost

11   conclusive, right?

12      A      Correct.

13      Q      You referenced the Wollert study in

14   support of this conclusion and that showed that 49

15   offenders between the ages of 60 and 69 were

16   followed and only two of those reoffended.

17      A      Correct.

18      Q      Mr. Comstock was 58 years old when he

19   was molesting boys, right?

20      A      Correct.

21      Q      He's at least pretty close to the

22   individuals that were 60 to 69 that did reoffend,

23   right, or were offending in that Wollert study?

24      A      No.  He's ten years older.

25      Q      I'm saying at the time he committed the

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 124 of 190

1    offenses.

2         A       I didn't understand.

3         Q       When he was 58 years old he was

4    molesting boys.

5         A       Correct.

6         Q       He was still offending when he was

7    almost 60, right?

8         A       Correct.

9         Q       Let's talk for a second about this

10   positive predictive value and negative predictive

11   value.  Did I say it right?

12        A       Yes, you did.

13        Q       Do you believe that what this Court has

14   to do is make a decision about whether

15   Mr. Comstock will reoffend or not?

16        A       I know the question is an altogether

17   legitimate question and I'm going to politely

18   decline to answer it.  It's outside my scope of

19   expertise.  I'm testifying as a psychologist.

20               THE COURT:  That's fair.

21   BY MR. ROYSTER:

22        Q       How long did it take you to calculate

23   those values?

24        A       You have to understand that I

25   calculated all the values for all possible

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 125 of 190

```
 1    Static-99R scores and calculated all of the
 2    possible values for all Static-2002R scores.  The
 3    first time around I had some computational errors
 4    that were pointed out to me in the peer review
 5    process.
 6         Q     You got the scores, right?
 7         A     Yes.
 8               Please understand the values that
 9    you're looking at on page 26 were not prepared for
10    this report per se; they were prepared for my peer
11    reviewed article titled Predictive Accuracy of the
12    Static-99R and Static-2002R.
13         Q     When you were asked to look at this
14    case the first thing you did was calculate the
15    positive predictive value and the negative
16    predictive value, right?
17         A     Correct.
18         Q     Based on the calculation you decided to
19    take this case, right?
20         A     Based on that calculation and based on
21    the Wollert data and based upon my impressions of
22    Mr. Comstock's health status.
23         Q     You reached a preliminary opinion that
24    he was not sexually dangerous based solely on the
25    computations alone, right?
```

**Reported By: Joseph C. Spontarelli, CCR**    www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 126 of 190

```
 1        A      No.
 2        Q      Your deposition testimony where you
 3   said and relying on those computations alone I
 4   made a preliminary conclusion that Mr. Comstock
 5   was not sexually dangerous is that inaccurate?
 6        A      Preliminary conclusion that warranted
 7   additional interview and obtaining additional
 8   information.  Your question made it sound as if I
 9   made a final conclusion and no, I did not.
10        Q      That's why I said preliminary opinion.
11               You made a preliminary opinion that he
12   was not sexually dangerous based on the
13   computations alone, right?
14        A      Correct.
15        Q      Of course the information that you
16   gathered later on just confirmed your preliminary
17   opinion, is that true?
18        A      Relying on objective data.
19        Q      Did I understand you to testify on
20   direct examination that there are no risk factors
21   for sexual reoffense?
22        A      They can be used by themselves.  What
23   you have to do is combine risk factors together
24   ending up with an actuarial instrument when you do
25   the combination.  You never, never rely on one
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 127 of 190

1    factor and one factor alone.  In 1998 Hanson and

2    Bussiere advised us don't do that; the

3    correlations are too small.

4         Q     Was it your testimony that sexual

5    deviancy is not a risk factor that can demonstrate

6    sexual reoffense?

7         A     Ask the question again.  Before I made

8    the mistake of not closely listening.

9         Q     Was it your testimony that sexual

10   deviancy is not a risk factor for sexual

11   reoffense?

12        A     Correct, it is.

13        Q     It is?

14        A     Correct, that is my testimony.

15        Q     A minute ago you referenced that Hanson

16   and Bussiere study.  Doesn't the article actually

17   say the strongest predictors of sexual offense

18   recidivism were measures of sexual deviancy?

19        A     The strongest single predictor.  That

20   study also said don't rely on one predictor and

21   one predictor alone.

22        Q     The research bears out that sexual

23   deviancy is a strong predictor of sexual

24   reoffense.

25        A     When you rely on phallometric data for

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 128 of 190

1    child molesters.  And as I explained, you can't

2    rely on phallometric data for Mr. Comstock.

3        Q    The sexual deviancy that is reported

4    isn't entirely relying on the phallometric data,

5    is it?

6        A    Yes, it is.  Go to the article you're

7    referring to.  Go to page 352.  Look at Table 1 --

8    Predictors of Sexual Recidivism.  Look down to

9    sexual deviancy and the first category is

10    Phallometric Assessment (children).

11        Q    A couple below that it says any deviant

12    sexual preference and doesn't reference

13    phallometric data at all, does it?

14        A    No.  The problem is, how do we reliably

15    define any deviant sexual preference; that is do

16    we have acceptable levels of inter-rater

17    reliability available to us when evaluators are

18    attempting to identify any deviant sexual

19    preference.  No such data exists.

20        Q    The point is that the sexual deviancy

21    that's mentioned in that article doesn't

22    necessarily require a phallometric measure, does

23    it?

24        A    No.  The point is --

25        THE COURT:  Just answer the question.

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 129 of 190

 1              MR. ROYSTER:  No is the answer.
 2      BY MR. ROYSTER:
 3          Q      Dr. Campbell, with respect to
 4      volitional impairment I understood your testimony
 5      to be that impulsiveness is a necessary component
 6      to find a volitional impairment, is that right?
 7          A      Correct.
 8          Q      You used the Barratt Impulsiveness
 9      Scale to measure his impulsiveness.
10          A      Barratt Impulsiveness Scale.  You and I
11      know why we have to be careful about how you
12      pronounce things.
13          Q      This Barratt Impulsiveness Scale, this
14      is another test that you used that requires him to
15      give you the answer; right?
16          A      Yes.
17          Q      You're relying again on his self-report
18      with respect to the questions you were asking him.
19          A      Correct.
20          Q      Based on that score you made a
21      determination he was not highly impulsive, is that
22      right?
23          A      Again correct.
24          Q      Because of that he doesn't have a
25      volitional impairment, is that your conclusion?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 130 of 190

1     A    Yes.

2     Q    So the person that has planned

3 premeditated grooming that person can't be --

4 can't have a volitional impairment, right?

5     A    Correct.

6     Q    Dr. Campbell, when you interviewed him

7 he told you that he could still derive sexual

8 gratification from sexually stimulating a child,

9 didn't he?

10     A    Correct.

11     MR. ROYSTER:  Judge, I don't have any

12 other questions.

13     THE COURT:  Any other questions by the

14 respondent?

15

16             REDIRECT EXAMINATION

17

18 BY MS. GRAVES:

19     Q    Dr. Campbell, what does that mean that

20 Mr. Comstock would still gain sexual gratification

21 from stimulating a child?

22     A    It has to be followed up with

23 understanding that Mr. Comstock now recognizes

24 that that kind of contact is wrong.  It damages

25 children, it harms them psychologically and he

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 131 of 190

1    would avoid it also because of considerations of

2    his own self-interest.

3              When I said to him do you understand if

4    you were released and then are re-arrested for

5    another sexual offense you will die in prison and

6    he said yes.  He completely understands that.

7        Q    What's the definition of a pedophile?

8        A    An individual who has a sexual

9    attraction to children.

10       Q    And that's what Mr. Comstock remains to

11   this day.

12       A    Yes.

13             MS. GRAVES:  That's all I have.

14             THE COURT:  Thank you, Dr. Campbell.

15   You may step down.

16             May he be excused?

17             MS. GRAVES:  He may be excused.

18             MR. ROYSTER:  He can be excused.

19             THE COURT:  Next witness, please.

20             MS. SHEA:  The respondent calls Mary

21   Comstock.

22

23

24             MARY A. COMSTOCK,

25   was sworn or affirmed and testified as follows:

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 132 of 190

1

2              THE COURT:  Give us your full name and

3    spell your last name, please.

4              THE WITNESS:  My name is Mary Alice

5    Comstock C-o-m-s-t-o-c-k.  I am Graydon Comstock's

6    sister.

7              THE COURT:  Thank you.

8

9                   DIRECT EXAMINATION

10

11   BY MS. SHEA:

12      Q      Good afternoon Ms. Comstock.

13             Why are you willing to have your

14   brother live with you despite the fact that he's a

15   pedophile?

16      A      My brother Don has been more than a

17   brother; he has been a father, he has been a

18   friend.  To me he is more than a sexual identity.

19             THE COURT:  Take your time.

20             THE WITNESS:  I have seen him from

21   childhood.  I've known him for 58 years.  I may

22   not remember all of that.  I may remember him for

23   only 55 of those years.  He was the brother who

24   took me tick-or-treating; he was the brother who

25   took me to school.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 133 of 190

```
 1              I have seen him in relationships with
 2     his mother who was in a nursing home for eight and
 3     a half years and every Summer he came to live with
 4     me.  This relationship didn't begin ten years ago
 5     when he was incarcerated; this relationship is 58
 6     years in the making and it is much more.
 7     BY MS. SHEA:
 8          Q    You've been sitting in court throughout
 9     his civil commitment hearing, right?
10          A    Yes.
11          Q    You're aware that the government
12     alleges that he has molested over a hundred
13     children.
14          A    Yes.
15          Q    Does that your change your mind?
16          A    No.
17          Q    Why not?
18          A    Because I believe in second chances.  I
19     teach at a community college in which most of our
20     students are students who have made mistakes.
21     They didn't make good grades coming out of school,
22     but they deserve their second chances and my
23     brother deserves his.
24          Q    Tell the Court about where you live.
25          A    First of all I live in Arkansas.  In
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 134 of 190

1    Arkansas the sexual offender registry is in place.

2    My brother will be a Category 4 sexual offender

3    simply for having admitted that he's a pedophile.

4        The requirements are that we cannot be

5    within 2000 feet of any school, daycare or park.

6    Furthermore, there is notification door-to-door

7    for 2000 feet within the vicinity.

8        My home has already been approved --

9    admittedly on a preliminary basis and for a short

10    term -- but I am also already in the works to get

11    a home that will be more appropriate for my

12    brother.

13        Heber Springs is a town of 6500.  It is

14    a community in which there's a lot of hunting and

15    fishing.  It's an hour and 15 minutes north of

16    Little Rock.  It is approximately 45 minutes north

17    of Conway, 45 minutes east of Searcy.  It is very

18    much in the Bible belt.  It is a small community.

19    There aren't a lot of stores.  We have a grocery

20    store and a small Walmart.  You don't want to

21    dress shop there because there's no dress shop.

22    It's small and everybody knows each other.

23    Q        Do you have any children Mary?

24    A        No.

25    Q        When if ever are children in your

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 135 of 190

```
 1    house?
 2         A        Never.
 3         Q        Are you in good health?
 4         A        Yes, I am.  I'm not planning to kick
 5    the bucket anytime soon.
 6         Q        You mentioned this a little bit -- how
 7    have you prepared for your brother's potential
 8    arrival?
 9         A        In 2006 when we anticipated that my
10    brother would be coming home we had the initial
11    reviews by parole at that time --
12                  THE COURT:  By the federal parole
13    officers?
14                  THE WITNESS:  Uh-huh.
15                  -- in 2 different locations.
16                  At the time I was living in Little Rock
17    and so I made first contact with the parole
18    officer there, and then I had a second parole
19    officer who came to my home there in 2006 and
20    looked at the home.
21                  At that time -- I'll just make the
22    comment -- I was very careful and Don instructed
23    me to be very careful about distances from
24    daycares and parks and so at that time when I was
25    selecting a home in 2006 I was very careful about
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 136 of 190

```
1   making sure that we would be good distances away
2   from different groups.  I also chose an area that
3   was primarily retirees.
4            Secondly I have already gotten rid of
5   my computer.  I did it in 2006 in preparation for
6   his coming home.  I have not replaced it because
7   each year I anticipated that he would be coming
8   home.  Those are the early choices that I made.
9            Then in 2008 I bought a home again with
10  the knowledge that if I owned my own home nobody
11  could kick me out and nobody could kick him out.
12  I have a home that I have purchased and it is in a
13  small residential neighbor but it sits on half an
14  acre.  It has two bedrooms, two baths.  We would
15  have separate living areas.  It's a good
16  situation.
17           Yet at the same time I recognize that I
18  want to find a larger home.  At the time I bought
19  that house I was approved for 125,000.  It doesn't
20  sound like much but it goes a long way in
21  Arkansas.  I bought a house for 85 and I put it on
22  a 15-year payout; so at this point four years
23  later I am prepared now to turn around and sell my
24  property and buy a home that will be in an area
25  where we will have larger lots and where we will
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 137 of 190

1     have more separation.

2              Those are the things that I am actively

3     doing.  As a matter of fact, I have already made

4     contact with a real estate agent.  I have told her

5     exactly what I need.  She is a friend of mine so

6     she knows the circumstances.  I have already been

7     in touch with my banker.  This is what we are

8     currently in the process of doing.

9     BY MS. SHEA:

10     Q      How will you serve as your brother's

11     support system?

12     A      First of all one of the things that

13     you're already hearing me indicate is I want to

14     make sure he is in a situation of security.  I

15     want him to feel as though he can walk outside the

16     door and not have people on top of him.

17              Also, I want to be sure that the

18     neighborhoods are secure.  That people are

19     comfortable with him and that they are aware that

20     he's there.  That's part of the notification

21     system.  Yet that they will not be threatened by

22     that.  I am looking at neighbors that will allow

23     us that opportunity.  Those are some of the things

24     that I am trying to provide in the way of a secure

25     home and a support system.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 138 of 190

**United States of America v. Graydon Earl Comstock, Jr.**    **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                         **November 29, 2011**

Page 402

1        I also know that the emotional support
2   system is a very important piece of this.  He is
3   my brother.  He is not coming to be some sort of a
4   renter from me.  We will share a home.  I think
5   that it's important that he knows that I accept
6   him fully.
7        Q    You mentioned briefly you worked at a
8   community college.  Can you tell the Court a
9   little bit about your job.
10       A    The community college is about 600 in
11  population.  We started in '97 and in 2007 they
12  actually built a college.  I teach there full
13  time.  I'm an instructor of English.  In my
14  teaching I teach 18 hours a week, and on top of
15  that I am committed to the university for an
16  additional ten to 12 hours that are office hours;
17  hours in which I advise students or in which I
18  will be able to see them come and go but that
19  means 30 hours of actual commitment.
20       I also have a lot of flexibility.
21  There are only two full-time English instructors
22  and between the two of us we work very closely to
23  coordinate so that we are able to spend the time
24  that we need with our families.
25       My colleague has a husband who has

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 139 of 190

1    advanced heart disease and so she frequently has

2    to be gone or she has to make arrangements to take

3    him to and from Little Rock and so we work

4    together very actively.

5        Q    How would being away from home during

6    work hours limit the support that you could offer

7    your brother?

8        A    I don't think that it needs to.  In

9    other words, I'm available by telephone.  I have

10   the flexibility to come and go.  If he has a

11   situation that arises where he needs my support I

12   can be there as I am right now.  I'm taking time

13   off from school.

14            Those are the things that I feel I can

15   offer him.  Plus there is a community of friends

16   that I have there; many of whom have already

17   indicated their support of me and my brother in

18   making this transition.

19       Q    What effects have you noticed that

20   incarceration has had on your brother?

21       A    When he was arrested in 2000 he was

22   relatively healthy.  He was able to get around.

23   He still had some limp from the early stroke.

24   What I have seen since then, of course, is first

25   of all the stroke that he had as he was leaving

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 140 of 190

**United States of America v. Graydon Earl Comstock, Jr.**  5:06-HC-02195-BR
**Bench Trial - Vol. II**  **November 29, 2011**

Page 404

```
 1    the Kansas prison system that stroke left him with
 2    a very pronounced tic for a long period of time --
 3    a facial tic -- and even to this day an active leg
 4    syndrome.  If you watch you will notice he movers
 5    his feet a lot.
 6              Aside from the stroke he, of course,
 7    has been diagnosed with diabetes.  He had the
 8    massive heart attack in Seagoville which led to
 9    the open heart surgery in the Spring of 2006.  Of
10    course that has left him with the -- he can't even
11    walk -- based upon his reporting to me he cannot
12    walk across the prison yard without having to
13    rest.  I'm conscious of that being a problem.
14              He's had hearing loss.  He has had at
15    this point, of course, also the prostate cancer.
16    He is on medication for cholesterol for heart
17    disease.  You have heard all of that testimony.
18              I have seen him become -- sorry Don --
19    increasingly frail.  I have watched him get to the
20    point where each visit is an uncertainty as to
21    whether I will see him again.
22         Q    How would you describe your
23    relationship with your brother?
24         A    We have been close my entire life.
25    Throughout my lifetime we have had a special
```

**Reported By: Joseph C. Spontarelli, CCR**  **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 141 of 190

1    connection.  We have been friends, we have shared

2    some of the most traumatic events, of course, of

3    lifetimes.

4              I was the one who had to call him when

5    dad passed away.  He was in Peru at the time.  We

6    only were able to reach him by way of shortwave

7    radio.  We were all together when my mother passed

8    away and we were in the room with her.

9              During the Summers for the eight and a

10   half years my mother was in the nursing home he

11   was with me for two months every Summer and we did

12   everything together.

13        Q    How often do you two communicate?

14        A    At this point we talk twice a week.

15   I'm not able to get out here as frequently as I

16   was able to visit when he was in Kansas or Texas.

17   At that time I was seeing him every six to eight

18   weeks.  Now I'm able to get out here once or twice

19   a year and that's it.  The telephone calls are our

20   way of staying in communication.

21        Q    Was there a time in the past when you

22   believed your brother was molesting children?

23        A    No, but I do know that he told me that

24   he loved children and that he was attracted to

25   boys at one point but I did not realize he was

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 142 of 190

1    active.

2         Q       Did your brother lie to you in the

3    past?

4         A       I believe he has.

5         Q       Why do you believe now that he will not

6    reoffend in the future?

7         A       First because I have seen the effect of

8    prison.  He does not want to come back here.  That

9    is a major reason why I do not believe he will

10   offend but I also know one other thing -- he knows

11   as I do that I'm putting my life on the line, too.

12   He will not betray that.

13              MS. SHEA:  No further questions.

14              THE COURT:  Any cross examination?

15              MR. GRAY:  Yes, Your Honor.

16   BY MR. GRAY:

17        Q       Good afternoon Ms. Comstock.

18        A       Good afternoon.

19        Q       Ms. Comstock, I noticed that you've

20   been sitting in the back of the courtroom for most

21   of the trial, is that correct?

22        A       Yes.

23        Q       It's very clear that your brother is

24   very lucky to have a loving sister like you.  You

25   want to do the best you can to provide a

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 143 of 190

```
 1     supporting environment for him, is that right?
 2          A      Yes.
 3          Q      Because you've been here in the
 4     courtroom did you get an opportunity to hear some
 5     of the testimony about some of his past acts with
 6     children?
 7          A      I did.
 8          Q      Was that some of the first time you
 9     heard some of that information in this courtroom?
10          A      Some of it.
11          Q      Had your brother told you about how he
12     lost his job in the Philippines prior to hearing
13     it in the courtroom?
14          A      Yes.
15          Q      Had your brother talked to you and
16     informed you a little bit about some of the things
17     he had been doing in the Netherlands prior to you
18     hearing about that activity here in the courtroom?
19          A      Since his incarceration, yes.
20                 May I add a comment?
21          Q      Absolutely ma'am, please.
22          A      In the Philippines I knew about
23     Michael.  Don called mother.  I didn't know that
24     they had a relationship, but I knew that he was a
25     foster son.  We talked to Michael -- mother and
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 144 of 190

```
 1      I -- when she was still in the nursing home.
 2              When my brother was incarcerated
 3      Michael contacted me.  Michael and I maintained a
 4      relationship for many years.  I was very much
 5      aware of Michael and I have to say a part of his
 6      life, too.
 7         Q     Did you know about the other portion of
 8      the relationship that your brother had with him?
 9         A     No.
10         Q     Ms. Comstock, you work at the community
11      college.  Is that 8:00 to 5:00?
12         A     No.
13         Q     What are your hours?
14         A     They can vary.  Usually I go in
15      somewhere between seven and 8:00 and I am usually
16      home anywhere from two to three Monday through
17      Thursday.  Friday we don't even teach on our
18      campus.
19         Q     You understand if he were released to
20      stay with you there would be an obligation of
21      going to such things such as sex offender
22      treatment.
23         A     Uh-huh.
24         Q     Would you be willing to go to sex
25      offender treatment with him?
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 145 of 190

 1       A       I have made that commitment.
 2       Q       You heard your brother testify that he
 3  didn't feel like he needed sex offender treatment.
 4  Do you feel like he would need that treatment?
 5       A       I believe that he needs along with his
 6  court appointed attorneys and the agreements in
 7  the legal system to make decisions.  I am not
 8  making his decisions for him, but I will be
 9  supportive of the decisions that are made to
10  support his care.
11       Q       Ms. Comstock, if he were to be ordered
12  to go to sex offender treatment and he didn't go
13  what would you do?
14       A       Considering that now I'm his primary
15  transportation I'd probably hogtie him and put him
16  in the car.
17       Q       If Mr. Comstock had a job walking dogs
18  or around dogs -- we know how little boys like
19  dogs -- how would you react if he were walking a
20  dog and a small ten-year-old boy came up to him?
21       A       Of course that's on the assumption that
22  I'm with him.  I can certainly make sure that a
23  small ten-year-old boy turns around and goes back
24  the other way.  I have a gift for doing that.
25       Q       If you weren't with your brother and

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 146 of 190

1     you were to learn about a ten-year-old boy

2     approaching your brother what would you do?

3          A     I think that that is a question that

4     also requests what exactly was it about.  In other

5     words, did my brother then bring him home.  That's

6     a completely different answer.

7               If a boy approaches him on the street

8     and says I want to sell you baseball tickets and

9     my brother Don says no what am I supposed to do?

10    I think there are some areas that I too will need

11    guidelines.

12              One thing that you should be aware of

13    is that in the State of Arkansas all teachers

14    including community college teachers are mandatory

15    child abuse reporters.

16         Q     Ms. Comstock, if you were to find

17    People Magazine or a magazine that had photos of

18    young boys in the house what steps would you take?

19    What would you do?

20         A     I would certainly eliminate the

21    magazines.  You're talking about People Magazine.

22    Some of these magazines are routine things that we

23    get that come in.

24              Let me ask you the question -- if I

25    receive a paper -- I write a column for the Sun

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 147 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**     **November 29, 2011**

Page 411

1    Times for our area -- if I receive a paper a lot

2    of times our papers may have pictures of children

3    that are swimming in the lake -- obviously we're

4    not going to keep them around; we're going to

5    throw them away and put them on their way.

6          If I see my brother collecting certain

7    types of information I'll talk to him about why

8    and what's going on and find out whether he needs

9    further assistance in dealing with some of the

10    issues.

11    Q    Would you do anything else?

12    A    What would you expect me to do?  I'm

13    really asking straight out.

14          I would talk to him about what the

15    situation is and refer him to others for treatment

16    or for guidance I think is kind of what goes with

17    the territory, isn't it?

18          If he has a parole officer then this

19    might be an instance where the parole officer

20    becomes involved.

21          MR. GRAY:  No further questions, Your

22    Honor.

23          THE COURT:  Assuming that he may or may

24    not have a probation or parole officer -- assuming

25    he did though, would you have any hesitation

**Reported By: Joseph C. Spontarelli, CCR**     **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 148 of 190

1   whatsoever of contacting that person should you

2   have any concerns whatsoever whether they be minor

3   or major?  Would you have any concerns thinking

4   you're getting your brother in trouble or anything

5   of that nature?

6               THE WITNESS:  Maybe I should have

7   actually said this earlier.  At one point I worked

8   for the Department of Community Correction from

9   2005 to 2006.  I was a management analyst.  That

10  does not make me an expert in criminal justice.  I

11  was a management analyst working with statistics.

12  I got to know a lot of the parole and probation

13  officers.  I'm comfortable with their role.  I

14  understand that what they are trying to do is

15  trying to help people incorporate into the

16  community.  I don't think that I would have any

17  problem.

18              THE COURT:  I guess I'm more concerned

19  about your role.  I would have a hard time picking

20  up the phone and calling if it was my sister or my

21  brother.  I see it happen all the time in family

22  situations where it's a son or somebody -- the

23  parent has great intentions as I know you do --

24  but can't make that call.  Do you think you can

25  make that call whether it be probation officer or

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 149 of 190

1    authorities or somebody else?  I know and I see it

2    happening.  It's easy to say and hard to do.  Do

3    you think you can make that call?

4                THE WITNESS:  I can make that call.

5                THE COURT:  You understand the

6    importance of not remaining silent not only to

7    your brother but to society?

8                THE WITNESS:  I do.  I understand the

9    importance to him, to society, to me.

10               THE COURT:  Your standing in the

11   community -- the fact that this is going to have

12   to be reported and so forth -- your neighbors are

13   going to know -- I suspect that you have a

14   close-knit community -- how do you feel about

15   that?

16               THE WITNESS:  It's going to be

17   difficult.

18               THE COURT:  Have you discussed this

19   with your friends or with people that you consider

20   to be part of your social structure?

21               THE WITNESS:  Certainly some of them.

22               THE COURT:  Tell me about your support

23   system.  What kind of support system do you have

24   in your town or your community?

25               THE WITNESS:  As you heard me say I

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 150 of 190

1    write a column for the paper.  A couple of years
2    ago I was voted in as the outstanding faculty
3    member.  We only have 11 but I was voted in as the
4    outstanding full-time faculty member for that
5    year.  I am in a situation where I've got a lot of
6    students that really care about me.  I have a
7    small college that cares about me.
8              I have also been a member of a
9    Presbyterian church there -- in which I am the
10   youngest member -- does that worry you -- I am a
11   member of that Presbyterian church or at least
12   attend and I have started a spiritual discussion
13   group there in which we are a little more
14   unconventional.  We like to talk about things like
15   touch therapy and reincarnation and different
16   forms of meditation.  We have a group of about 16
17   to 20 now that meet on a regular basis.  They are
18   all part of my support network and some of them
19   will become part of Don's.
20             THE COURT:  If you had to make that
21   phone call and you needed some strength and
22   support these are people you would go to?
23             THE WITNESS:  Yes.
24             THE COURT:  You have in the past when
25   your mom passed away and so forth?

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 151 of 190

```
 1              THE WITNESS:  This is a new community.
 2              Mother passed away in 1999 two months
 3     before Don was arrested.  When she passed away I
 4     had a completely different community around me.
 5              I have been here now for five years.
 6     For that five-year period I have made friends
 7     gradually but I have developed genuine
 8     friendships.
 9              THE COURT:  People you think you could
10     go to for support and you have gone to?
11              THE WITNESS:  Yes.  A wide range
12     including an attorney who is looking forward to
13     meeting Don.
14              THE COURT:  Since you have been in this
15     town are you aware of anybody else living in town
16     that would be on the list?
17              THE WITNESS:  Yes.
18              THE COURT:  This wouldn't be the first
19     occasion for this town.
20              THE WITNESS:  No.  It's not a pleasant
21     event for any of them.
22              THE COURT:  I'm just trying to get a
23     feel for what's going to be happening.
24              THE WITNESS:  I actually had a friend
25     that was a sexual offender back from 1990 and
```

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 152 of 190

```
 1    recently it was posted on the web sites and he
 2    lost a job.  I didn't even know until I saw his
 3    picture.
 4              THE COURT:  I know this is probably a
 5    difficult question -- I know you have another
 6    brother.  Do you have a relationship with him?
 7              THE WITNESS:  Yes.
 8              THE COURT:  I know the history there --
 9    we all heard it here in court.  Is there anything
10    in that that would interfere?
11              THE WITNESS:  He will be visiting.
12              THE COURT:  He's reaching out also.
13              THE WITNESS:  He and I have talked
14    every evening since I've been here.  David went
15    with me to visit Don the entire time Don was in
16    Kansas.
17              THE COURT:  He actually visited?
18              THE WITNESS:  Yes.
19              THE COURT:  How far does he live from
20    you?
21              THE WITNESS:  At that time he lived in
22    Kansas.  It was convenient for him.  He visited
23    and once without me there.  On a Christmas Eve he
24    went to visit Don.
25              THE COURT:  Where does he live now?
```

**Reported By: Joseph C. Spontarelli, CCR**          www.huseby.com
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 153 of 190

```
 1              THE WITNESS:  He now lives in Salem
 2    Springs, Arkansas which is about four hours from
 3    me.  He will be visiting.  He has already
 4    confirmed that with me.
 5              THE COURT:  Has he in the past visited
 6    you in Little Rock or in this new town?
 7              THE WITNESS:  Yes.
 8              THE COURT:  Do you visit him?
 9              THE WITNESS:  Yes.  As a matter of fact
10    I just missed Thanksgiving with him.
11              THE COURT:  Does either side have any
12    further questions?
13              MS. SHEA:  No further questions.
14              THE COURT:  Any further questions?
15              MR. GRAY:  No, Your Honor.
16              THE COURT:  You may step down.  Thank
17    you.
18              Any additional witnesses that have
19    popped up?
20              MS. GRAVES:  No, Your Honor.  We would
21    like to move into evidence --
22              THE COURT:  Let me get my list.  Let's
23    work off the list that's contained on page five.
24              MS. GRAVES:  One through eight there is
25    no objection.
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 154 of 190

 1          THE COURT:  They will be received.

 2          MS. GRAVES:  Number nine is an article

 3   that Dr. Campbell referred to and relied on in his

 4   assessment.  We would offer that under 803-19 as a

 5   learned treatise.

 6          THE COURT:  What's the petitioner's

 7   position?

 8          MR. ROYSTER:  I think it's actually 18.

 9          THE COURT:  It's 18.

10          MR. ROYSTER:  It's our objection that

11   these are hearsay.

12          THE COURT:  It indicates here they were

13   not produced.  Do you have them now?

14          MR. ROYSTER:  We do have them now.

15          THE COURT:  I'll admit it.  I don't

16   know how much weight I'll give them or if I'll

17   even read them.  I'll put them into the record

18   since he testified to them.  In fact I'm not going

19   to read them and I'm tell you that right now.

20          Somewhere down the line since they have

21   now all been produced and both sides have a copy

22   there's no reason not to have them in.  That would

23   apply all the way through the end.

24          MS. GRAVES:  Yes, sir.

25          THE COURT:  I'm allowing them only

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 155 of 190

**United States of America v. Graydon Earl Comstock, Jr.**     **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                        **November 29, 2011**

Page 419

```
 1     because of the fact that number one they've been
 2     produced, and number two they've been referred to.
 3     Certainly the weight they are going to deserve is
 4     based upon the testimony and not based upon the
 5     articles because I have no intention nor the time
 6     to read all those articles.
 7                 The respondent rests?
 8                 MS. GRAVES:  Yes, Your Honor, we rest.
 9                 THE COURT:  Anything by the petitioner?
10                 MR. ROYSTER:  Judge, we would like to
11     call Dr. Phenix for brief rebuttal.
12                 THE COURT:  You may do so.
13
14                 AMY PHENIX, Ph.D.,
15            recalled to the witness stand:
16
17                 THE COURT:  Dr. Phenix, you may take
18     the stand.  You're still under oath.  Just give us
19     your name again for the record so the court
20     reporter has it.
21                 THE WITNESS:  Amy Phenix.
22
23
24                 REDIRECT EXAMINATION
25
```

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 156 of 190

1      BY MR. ROYSTER:

2          Q      Dr. Phenix, were you in the courtroom

3      to observe Mr. Comstock testify?

4          A      Yes, I was.

5          Q      Did you make any clinical observations

6      about his testimony?

7          A      Yes, I did.

8          Q      What clinical observations did you make

9      about Mr. Comstock's testimony?

10         A      In many ways he still seems to me and

11     appears and presents to me as an untreated sex

12     offender.  He still expresses some troubling

13     cognitive distortions about his offending, about

14     his behaviors.

15                For example, I think first and foremost

16     he believed that collecting pictures of boys that

17     were in his victim age range -- a boy that was

18     nude and obviously would be an erotic stimuli for

19     him -- collecting them -- putting a lot of effort

20     into collecting them -- having close to a hundred

21     of those as recently as 2008 -- he doesn't see any

22     problem with that.  He kind of dismissed that as

23     what's the big deal; even noting that the Court

24     would not really think that was a problem if they

25     looked at them.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 157 of 190

1    Q    What is the big deal?  You heard the

2    testimony from one of the witnesses -- I think it

3    was Dr. Corvin who mentioned it wasn't that big a

4    deal I think.  Why is it a big deal?

5    A    Anyone that is familiar with sex

6    offender treatment and precursors to offending

7    knows that this would be absolutely forbidden

8    behavior.  He should be avoiding any type of child

9    stimuli that would cause him to engage in any type

10    of sexual fantasy.

11    The reason on the treatment wards for

12    sexually dangerous persons that you cannot have

13    this kind of material and that it's screened so

14    carefully in the mail is because it's a high-risk

15    behavior and that is one of the first things that

16    a person would learn in sex offender treatment is

17    to avoid anything that would be a trigger for

18    sexual fantasies or sexual behavior.

19    It's troubling that to this day walking

20    out into the community that he would believe that

21    it would be okay to collect pictures of naked boys

22    between ten and 14.  That's just one of the

23    observations that I had.

24    He's a person who says I'm safe now in

25    the community because I have low libido.  He even

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 158 of 190

1    told me in my interview I think it's really okay

2    now to be around children because I have low

3    libido.  It's never okay for Mr. Comstock to be in

4    the presence of children.  Perhaps if there is

5    very strict supervision, but ideally never in the

6    presence of children because he has such a very,

7    very strong attraction to them and such a strong

8    emotional identification to them that to break

9    that pattern he must not be in the presence of

10   children.

11          To begin to say I'm okay enough for any

12   reason to be in the presence of children for

13   Mr. Comstock is a cognitive distortion and a

14   high-risk situation.

15          He's a person that sat up here and

16   after being a treatment failure has said I don't

17   need treatment.  This is a person that all of his

18   life he has struggled with these deviant sexual

19   fantasies and urges.  He's had 100 victims at

20   least.  He sits here after being a treatment

21   failure and says I don't need treatment.  I'm okay

22   now.  That can't help me in any way.  That leaves

23   him with nothing to help him to remain sex offense

24   free, to help him with these strong urges that he

25   gets to be in the presence of children, to touch

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 159 of 190

1    children, to feel the love of children.

2              In sex offender treatment offenders

3    will develop offense cycles.  It starts with the

4    very beginning of offending.  What's the first

5    behavior thought that occurs that carries them on

6    and on and on to the point where they actually

7    offend.

8              He would have in treatment examined his

9    offense cycle and all of those precursors to

10   offending, and he would have learned strategies to

11   stop himself along the way.

12             He talked about up here on the stand

13   when he molested Bento.  Bento was a nine-year-old

14   male who he hugged and fondled his genitals in his

15   apartment.  He was asked was that a spur of the

16   moment act and he said yes, it was spur of the

17   moment.

18             I didn't provide treatment to

19   Mr. Comstock, but just looking at his offense

20   cycle and what he's admitted to -- he admitted to

21   meeting parents in order to ingratiate himself to

22   children and that's exactly what he did with

23   Bento's mother to be able to get permission to

24   drive both of the boys places, to get permission

25   from mom to have Bento over at his apartment.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 160 of 190

```
 1              He said he knew Bento for six months
 2     prior to this molestation.  He was caring for him,
 3     he was feeding him in his own home and so the
 4     stage was set for six months.  It's just
 5     impossible for me to believe that in a moment with
 6     no sexual fantasies, urges and planning that he
 7     suddenly molested this boy because it was exactly
 8     like all of the times that he planned those
 9     molests.
10              I think that he is not in touch with
11     those aspects that have caused him such problems
12     and difficulty with his volition in the past; and
13     I think his cognitive distortions have not been
14     sufficiently addressed in treatment so he will
15     have those volitional controls when he gets out.
16        Q     Did you read the Relapse Prevention
17     Interview that Dr. Campbell put together?
18        A     Yes.
19        Q     Did you hear Dr. Campbell testify about
20     it?
21        A     Yes.
22        Q     Do you think that that is a sufficient
23     relapse prevention plan?
24        A     It's superficial, it's completely
25     insufficient.  It mentions a few of the thoughts,
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 161 of 190

1    feelings and behaviors that have been problematic.

2    It's in no way a structured relapse prevention

3    plan that provides for interventions for these

4    types of behaviors for his reoffense cycle; the

5    strategies and techniques that he'll use in the

6    community in order to prevent relapse.  No, it's

7    completely and wholly inadequate.

8        Q    What about the fact that his sister is

9    so willing to have him come in her home and stay

10   with her?

11       A    It's a double-edge sword.  He's

12   incredibly lucky and it's a gift to him that he

13   has such a loving sister who is so invested.  We

14   know that love is not enough.  I wish that it was.

15            It's going to be an incredibly

16   difficult adjustment to the community particularly

17   in a small town where everyone knows everyone and

18   where the community -- particularly today and in

19   the last years -- finds sex offenders so

20   reprehensible and really make their lives utterly

21   miserable when they're released to the community

22   particularly with Level 4 notification.

23            In my experience having recommended

24   offenders be released from sexually violent

25   predator programs in the state I had one who his

Reported By: Joseph C. Spontarelli, CCR            www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 162 of 190

1    car was shot at.  Just unbelievable kinds of

2    behavior and reaction to the community.

3               I think it takes a very strong support

4    system from probation officers, from treatment

5    therapists and incredibly strong-willed people to

6    be able to live through that and survive that.

7        Q      Did you hear the testimony of Dr.

8    Campbell relating to the SRA-FV?

9        A      Yes, I did.

10       Q      Why did you even use that?

11       A      The SRA-FV is one of three newer

12   instruments that is a collection of the validated,

13   dynamic or changeable risk factors.  In fact,

14   contrary to what Dr. Campbell said the reason that

15   we examine dynamic risk factors -- and today

16   frankly are really excited to have identified the

17   dynamic risk factors -- is because they add a

18   significant amount of incremental validity to the

19   static risk factors.

20              There is a statistical measure of

21   incremental validity.  What that means is that you

22   would only consider additional risk factors if

23   they add new information and improve the

24   prediction.

25              The SRA at the current time has the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 163 of 190

```
 1   greatest incremental validity when added to
 2   Static-99, and as a result that's the instrument
 3   that I chose to use because it helps to improve
 4   prediction over my actuarial instrument.
 5        Q    Does Mr. Comstock appreciate his level
 6   of risk?
 7        A    I don't think he appreciates his level
 8   of risk.
 9        Q    Why do you say that?
10        A    Because realistically on a scale of one
11   to ten he's not a one risk.  A normal human trait
12   is to minimize something bad about yourself or
13   something wrong with yourself.  We all do that.
14   It's just human.  Only through treatment can we
15   really confront what that risk is and then accept
16   the interventions that are important to keep the
17   person safe and the community safe.
18             He says to me I think that I can be
19   around kids.  He's not appreciating his risk.  I
20   don't need treatment.  He's not appreciating his
21   risk.  I'm a one on a scale to ten -- a person
22   with a hundred victims; a person looking at child
23   pictures in 2008.
24             I think he grossly underestimates his
25   risk and I think he grossly overestimates his
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 164 of 190

1    ability to refrain from seeking out children.

2              MR. ROYSTER:  I don't have any other

3    questions.

4              THE COURT:  Any questions counsel?

5              MS. GRAVES:  I don't have any

6    questions.

7              THE COURT:  You may step down Doctor.

8    Thank you very much.

9              Petitioner rests at this point?

10             MR. ROYSTER:  Yes, Your Honor.

11             THE COURT:  Now that both sides have

12   rested let me tell you what I have in mind and if

13   it interferes with anybody's life please let me

14   know.

15             I would like to hear very short, maybe

16   ten-minute closing arguments.  The reason I say

17   short is that each of you have submitted to me

18   proposed Findings of Facts and Conclusions of Law.

19   Then I would like to take a recess for about a

20   half hour.

21             As to two very important issues there's

22   no dispute.  The third which is extremely

23   important is the issue that we have all focused in

24   on in this trial and it's an issue that the Court

25   has to decide.  I have been listening very

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 165 of 190

 1    carefully.  It's my intention to render a bench
 2    decision for lots of reasons which I will explain
 3    more later.
 4              This is a very old case.  I could spend
 5    a lot of time writing on it.  Probably I will have
 6    to write on some of these because I think I'm
 7    going to have to make some impressions and so
 8    forth.  The age of this case, the development of
 9    the case and the way it's been developed I think
10    it deserves a rapid resolution.
11              With that said petitioner anything you
12    have to say in the next five or ten minutes I'll
13    be more than happy to listen to it.
14              MR. GRAY:  Your Honor, as the Court has
15    recognized this entire case comes down to the
16    third issue of whether or not Mr. Comstock is
17    going to have serious difficulty refraining from
18    engaging in acts of child molestation.
19              I think things can be best summed up by
20    the testimony of Dr. Phenix and Dr. Demby which is
21    he does not recognize the risk.  We're talking
22    about somebody who as recently as 2008 basically
23    talked about his 40 years of working with boys on
24    an almost daily basis and claiming that he wasn't
25    caught until the age of 58.  That's from the first

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 166 of 190

1     paragraph of Government Exhibit No. 20.  This was
2     written after they had found photos of children
3     within his cell room.  He explained to the Court
4     well, what's the big deal.  The one little comment
5     about what's the big deal really does kind of sum
6     up the level of cognitive distortion that we have
7     here.
8                The fact he doesn't recognize why it's
9     a problem for a 58-year-old man and now a
10    68-year-old man to possess pictures that he took
11    time to cut out, store of the very type of person
12    he's sexually attracted to -- we're talking ten to
13    14-year-old prepubescent males -- and keep them
14    after going through at least three rounds of
15    treatment; going through the Kansas SOTP -- Sexual
16    Offender Treatment Program -- yet still thinking
17    it's okay for him to possess this sort of material
18    without recognizing the triggers that it's
19    causing, the risk that it's raising, the things
20    that he's dealing with.
21                One thing that we have learned is that
22    his risk is not simply risk driven by libido.  His
23    risk as he testified to is driven by an emotional
24    attachment; the fact that he loves these kids,
25    that he cares for these kids and he creates a

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 167 of 190

1    relationships with these kids.

2            Despite the fact that he had a stroke,

3    triple bypass, radiation treatment and all the

4    medication that he's been on still in 2008 he

5    couldn't fight the urge to take time to collect a

6    bunch of photos from various sources just so he

7    could keep them in his room under his bed in a

8    box.

9            When we take a look at what we have

10   here he summed it up best when he said he is

11   emotionally driven to being with these kids.  He

12   says that he's been emotionally connected to

13   kids -- he explained this when he said that he has

14   had emotional connections to dozens of kids that

15   he's molested.

16           The one consistent thing that all of

17   the experts have said is that this emotional

18   attachment is a very strong thing for

19   Mr. Comstock.  This idea that his age, his medical

20   condition, all the other factors that would

21   normally prevent him from being a higher risk the

22   fact that all those don't play a role in reducing

23   his risk only emphasizes that he will have serious

24   difficulty refraining from engaging in child

25   molestation in the future.

Reported By: Joseph C. Spontarelli, CCR    www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 168 of 190

1          Even Dr. Corvin who testified about the
2     numerous medical maladies that were present in
3     Mr. Comstock -- when asked would these prevent him
4     from engaging in child molestation -- Your Honor
5     I'm paraphrasing the question -- his answer was
6     nope.  That's a very telling thing.
7          It's quite a recognition of the level
8     of risk we see within a person like Mr. Comstock.
9     Mr. Comstock doesn't recognize the risk.  He told
10    us that he feels like he doesn't need any
11    treatment.  He told us that he thinks he won't
12    offend again because he's afraid of going back to
13    jail.
14          These self-serving statements were
15    relied upon quite heavily by Dr. Campbell.  We
16    need to take his statements for what they are.
17    They are self-serving statements.  These
18    self-serving statements apparently seemed to have
19    developed in the last two years.
20          What we know is that he will continue
21    to have serious difficulty refraining from child
22    molestation unless he receives and engages in
23    positive treatment within a sex offender program.
24    This is the opinions of Dr. Phenix and Dr. Demby
25    who said his needs are emotionally driven because

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 169 of 190

1    he has trouble controlling himself.  His urges

2    aren't driven simply by sexual desires, but

3    they're driven by that emotional need to connect

4    with his victims.  This is the type of person who

5    needs sex offender treatment in order to reduce

6    his overall level of risk.

7            He has proposed a relapse plan and this

8    relapse plan is not a realistic relapse plan and

9    that's from the testimony of both Dr. Demby who

10    called it sketchy and Dr. Phenix who said it was

11    superficial.

12            When we take a look at what was

13    presented over the last two days, Your Honor, and

14    we take a look at the person who Mr. Comstock is

15    we see a person with a history of over a hundred

16    victims who just doesn't understand his level of

17    risk.  Unfortunately in the community the risk is

18    out there.

19            Mr. Comstock may be an appropriate

20    candidate in the future after receiving treatment

21    within the certified treatment program and after

22    being certified he may be a candidate for

23    conditional release where the Court can impose

24    additional conditions based upon his completion or

25    progress within a certified commitment program.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 170 of 190

1    However, he is not there yet.  He's clearly in a
2    position where he needs the additional treatment
3    regardless of his thoughts whether he needs it or
4    not and that's simply because when we look at the
5    level of risk he doesn't recognize the risk.
6    Unfortunately the risk is out there on newspaper
7    shelves, newspaper stands, on the television with
8    the Little League World Series -- the risk is out
9    there.
10           The question we have to ask ourselves
11   is is he going to have serious difficulty
12   refraining from engaging -- serious difficulty
13   refraining from engaging in child molestation.
14   The evidence that the government has put forth
15   over the last two days has shown by clear and
16   convincing standards that he will have serious
17   difficulty refraining from engaging in child
18   molestation if he is released.  Thank you.
19           THE COURT:  Thank you.
20           MS. GRAVES:  Your Honor, we don't
21   civilly commit people in this country for looking
22   at pictures of fully clothed young boys.
23           Dr. Campbell and Dr. Corvin have
24   testified that looking at pictures of those types
25   do not correlate with increased recidivism not

Reported By: Joseph C. Spontarelli, CCR         www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 171 of 190

**United States of America v. Graydon Earl Comstock, Jr.**          **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                          **November 29, 2011**

Page 435

1     even for Mr. Comstock.

2               When you look at Mr. Comstock today the

3     government wants you to focus on everything he's

4     done in the past.  He has done a lot of harm in

5     the past.  He acknowledges the harm he's done in

6     the past.  His past is his past.  He is trying to

7     move forward and he has done and said everything

8     that he can do to indicate his intention of moving

9     forward without molesting another child.

10              He successfully completed the sex

11    offender treatment program in Kansas.  Contrary to

12    what Dr. Phenix testified to he's successfully

13    completed the program.  He has said the right

14    things.

15              Dr. Phenix testified on cross

16    examination that she simply chooses not to believe

17    him.  What more can he do?  He will never be able

18    to convince her that he is suitable for release

19    because she simply will not believe him, Your

20    Honor.

21              That's what this Court has to decide is

22    has he done everything that he can do?  Has he

23    done what's been asked of him?

24              This man has been locked up five years

25    now past his release date.  He submitted to the

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 172 of 190

1    program, he completed the program and his

2    participation was used against him.  Even to this

3    day every effort he makes to participate in the

4    program is being used against him yet the

5    government wants you to continue to lock him up

6    and have him participate in yet another program.

7            Mr. Comstock's age and medical

8    conditions undoubtedly reduce his risk of sexual

9    recidivism.  You heard the testimony of Dr.

10   Campbell and Dr. Corvin on this point.  Mr.

11   Comstock suffers from some significant medical

12   conditions.

13           Just think about Mr. Comstock's pattern

14   of sexual offending.  It starts with teaching and

15   coaching.  It is consistent throughout his

16   offending history.  He grooms children, he grooms

17   young boys and he offends.  Mr. Comstock is not

18   the guy who is walking down the street and molests

19   the first child that he sees or grabs the first

20   boy that he encounters.  That's not at all his

21   pattern.

22           When you're talking about serious

23   difficulty in refraining you've got to look at the

24   man in the context of who he is and what's he's

25   done in the past and look at him now.  What's the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 173 of 190

1    opportunity?  He's no longer a teacher.  He will
2    not be out in the community teaching.  He will not
3    be bringing boys home to tutor.
4              His sister is agreeing to take him in.
5    The statute says if released.  We're looking at
6    right now.  Would Mr. Comstock have serious
7    difficulty in refraining if released.  We have to
8    look at the conditions right now that he would be
9    released to and we have to look at the man as he
10   is right now.
11             He has said everything that he can say
12   to indicate that he doesn't want to offend anymore
13   and that he has control of himself and the
14   government simply chooses not to believe him.
15   It's really that simple.  How can he say more?
16             A telling point is when Dr. Campbell
17   was on the witness stand and he was cross examined
18   by Mr. Royster about the fact that Mr. Comstock
19   could not say that his risk was zero.  Then
20   Mr. Gray stands up and argues that he won't
21   acknowledge how high his risk is.  He's damned if
22   he does and he's damned if he doesn't.  There is
23   nothing he could say to satisfy them.
24             He has gone through this entire
25   process.  He's been as candid with the Court as he

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 174 of 190

1    possibly can.  He's making every effort.  His

2    sister has been just above and beyond whatever

3    anyone could envision for a placement opportunity

4    for someone who is being released from prison let

5    alone someone who is a convicted sex offender.

6    There is no better situation.

7            So many of these folks will leave

8    prison homeless.  They will have to sleep under a

9    bridge.  Mr. Comstock has this wonderful situation

10   and this tremendous support system.

11           Dr. Phenix would sit here and say that

12   love is not enough, family is not enough.  What

13   more is there?

14           He's willing to follow whatever rules

15   the Court would impose.  He's subject to three

16   years of supervised release.  The Court will

17   retain jurisdiction over him during that period.

18   The Court could impose any set of conditions.  The

19   Court could require him to take sex offender

20   treatment.

21           This man has never been a recidivist.

22   This is the first time he has encountered the

23   criminal justice system.  Everything you look at,

24   every actuarial that has been validated everything

25   looks at whether someone continues to offend after

Reported By: Joseph C. Spontarelli, CCR        www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 175 of 190

1   they have been through the criminal justice system

2   and after they have been punished have they

3   learned their lesson.

4             This really is his first second chance.

5   He's never been punished before.  Here he is 69

6   years old, in poor health -- he's not sexually

7   dangerous Your Honor.

8             The government has failed utterly in

9   their burden and the Court should so find.

10            THE COURT:  Thank you.

11            We'll stand in recess.

12

13            (Recess.)

14

15            THE COURT:  Let me apologize for

16  keeping everybody waiting.  It's been a long time

17  since I've written out and done a bench opinion

18  quite like this but I thought it was important as

19  I told you before.  I'm so used to dictating and

20  my secretary doing it and with my shorthand and my

21  law clerks know what I'm talking about and getting

22  it back on my desk a short time later.  It took me

23  a little bit longer.  I apologize up front.

24  Hopefully it is thorough and complete and will

25  answer all questions that need to be answered and

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 176 of 190

1   will cover all the issues that are important to be
2   covered.
3           I think it's important in this
4   particular case to get an opinion out ASAP.  The
5   case has been going on a long time for everybody.
6           When I first got this assignment I knew
7   it would be a difficult assignment.  I had never
8   heard of the statute.  I didn't even think one of
9   these kind of statutes could even be in existence
10  very frankly until I started reading the law and
11  seeing what's going on and then I kind of
12  questioned whether or not at this stage of my
13  career I should be involved in these kind of cases
14  where the decisions are rough and the stakes are
15  high but that's what I get paid for and I'm glad
16  to do it and it's my intention to do it and to do
17  it as best I possibly can.
18          With that said I'll be handling these
19  cases on a fairly regular basis.  I know the bar
20  is limited on both sides because of the nature of
21  the cases, the experts are limited because of the
22  nature of the cases.  Each case as I see it I'm
23  going to call it.  What I might decide in one case
24  may not overlap other than the law will be the
25  same.  In another case I don't want anybody to

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 177 of 190

1    think that I'm telegraphing or saying anything
2    that would affect any other case -- it absolutely
3    won't.  The issues of expert reports, the issues
4    of credibility -- all of those things I think each
5    case has to be treated separately.
6            I understand that the bar is limited in
7    terms of respondents, it's limited in terms of
8    petitioners, it's limited in terms of experts.  I
9    will absolutely consider each one individually and
10   I don't want anybody to think that I may comment
11   on a credibility issue or anything.  Each case I
12   am going to look at as an individual case because
13   I think it has to be done so with the realization,
14   however, that I'm going to probably hear
15   cumulative testimony but each one will be
16   different.
17           Also I think that it's important to say
18   that in deciding this case that I'm deciding it on
19   this case only; the law of this case, the facts of
20   this case as I heard them here in the four corners
21   of this transcript.  I heard lots of other things
22   and I'm certainly aware of lots of things that
23   happened.
24           I find the conduct of Mr. Comstock
25   deplorable.  I think we all do.  That's not going

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 178 of 190

1    to influence what's going to happen here.  Very

2    frankly, if I was the sentencing Judge and knew

3    what I knew here -- I don't think the sentencing

4    Judge knew all of these things -- I'm just being

5    up front -- we wouldn't be here.  He would still

6    be in prison.  We wouldn't be discussing this as

7    an issue.  That's my philosophy of sentencing and

8    so forth.  However, that's not why we're here and

9    I don't intend to let that interfere with my

10   decision in any way whatsoever.

11            I have respect for what I do, I have

12   respect for the parties and I have respect for the

13   law and I have become very familiar now with

14   4248 -- four numerals I had never known before.

15   Every time I talk to somebody, a lawyer, a

16   colleague, the U.S. Attorney in Michigan who is my

17   former law clerk and anyone else about it there

18   are very few people that know about 4248 but we're

19   getting to know it very well.

20            With all of that said I'm going to try

21   to take my time.  Sometimes I have a difficult

22   time reading my own writing, but I certainly know

23   what's in my head so I'll try to get it out as

24   best I can.

25            I think starting off there is no

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 179 of 190

**United States of America v. Graydon Earl Comstock, Jr.**          **5:06-HC-02195-BR**
**Bench Trial - Vol. II**          **November 29, 2011**

Page 443

```
 1    dispute as to two requirements of the act.  Number
 2    one, that Mr. Comstock does not contest that he
 3    has engaged in child molestation in the past and
 4    that the government has established by clear and
 5    convincing evidence this element.  I don't think
 6    there is any dispute as to that.
 7              Number two, there is no disagreement
 8    that Mr. Comstock suffers from pedophilia and that
 9    this is a serious mental illness, abnormality or
10    disorder and that the government has established
11    this by clear and convincing evidence.
12              The issue I have before me is would
13    respondent have serious difficulty in refraining
14    from sexually violent conduct or child molestation
15    if released.  Serious conduct is serious behavior
16    that would be difficult for the defendant to
17    control.
18              The Court finds that the past
19    activities of respondent were designed and
20    executed to fulfill his needs both emotionally and
21    physically.  That respondent has changed his
22    opinion of his actions and their effects on the
23    victim recently and society's views and so forth.
24              That the respondent is not going to
25    seek additional counseling or treatment
```

**Reported By: Joseph C. Spontarelli, CCR          www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 180 of 190

1    voluntarily.  I think he's made that pretty clear

2    from the record.  That he's going to rely upon his

3    own motivations and perceptions of his ability to

4    control and other things within his environment at

5    the time.

6            The Court finds that the respondent

7    also suffers from many kinds of things.  He

8    suffers from major depression disorder which

9    appears to be in remission at this time; as well

10   as the fact he had a stroke at age 39 the results

11   of which both affected him physically as well as

12   mentally.  His heart condition, heart attack,

13   triple bypass, diabetes, prostate cancer, high

14   blood pressure, memory declining -- I think there

15   is no dispute as to the medical condition of the

16   respondent in this matter.

17           The Court has been impressed with the

18   credibility of the witnesses in this particular

19   matter and the testimony as it relates to this

20   particular case and finds that the psychologists

21   have one common thread in that they all agree that

22   Mr. Comstock had a score on the Static-99R for

23   self-offender of a two.  I'm not sure from that

24   point on other than the two petitioner's experts

25   they agree on a whole lot.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 181 of 190

1          The Court heard a lot of testimony from

2     the expert testimony from both sides why the two

3     may not be the appropriate key in this case.

4          We heard from petitioner's witnesses

5     that the age reduction in this case is not

6     appropriate because of several reasons; the

7     primary of which were the age of 58 when his

8     offense occurred and the health issues according

9     to petitioner's experts were not a major

10    mitigating factor.

11         The Court heard testimony of Dr.

12    Campbell and he opined on several issues.  The one

13    that the Court believes is somewhat relevant and

14    important in this particular matter is that it has

15    been established -- there's been no

16    counter-evidence to it -- on page 37 of Dr.

17    Campbell's report where he is laying out the

18    evidence and the statistics and so forth -- he

19    opines and shows at his table that after age 70

20    there is zero chance of recidivism.  I think

21    that's an important consideration in the findings

22    of facts and conclusions in this particular

23    matter.

24         I also think it's important to discuss

25    in some detail the testimony of Dr. Corvin.  Dr.

**Reported By: Joseph C. Spontarelli, CCR**    **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 182 of 190

1   Corvin's orientation was somewhat different than

2   the other experts that testified in this case.

3   They were psychologists who are very highly

4   trained and well qualified.  Dr. Corvin's

5   orientation was more of a medical orientation, and

6   also he was presented as an expert in that area as

7   opposed to other areas.  The Court believes that

8   his conclusions that due to the respondent's age,

9   medications, medical conditions that this has

10  decreased his sexual stimulation.  He has sexual

11  dysfunctions, he has lower libido.  Dr. Corvin

12  opined that the likelihood of engaging in child

13  molestation or similar kinds of conduct would be

14  substantially decreased.

15          The Court finds that is certainly

16  consistent with the literature that he cited and

17  with his own evaluations and so forth and that is

18  another aspect that I think is a very important

19  aspect in this particular matter.

20          The Court believes from the limited

21  amount that I've heard here today and yesterday

22  that this isn't a textbook case.  If it was a

23  textbook case it would certainly be perhaps much

24  more level but it isn't a textbook case.  All the

25  psychologists agree statistically in terms of the

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 183 of 190

1    two and so forth that there's reasons to have

2    other considerations other than just the

3    statistical analysis.  That the 2002-R in this

4    particular case has facets that should also be

5    considered.

6              I think it's important and I listened

7    very carefully to Dr. Demby.  She said the

8    respondent would have to turn around 180 degrees

9    to get his needs met in a different way and

10   manner.  I think that was very telling, but I also

11   think from listening to the testimony and find in

12   this particular matter that because of Dr.

13   Corvin's testimony in terms of his conditions and

14   likelihood of him even having that need in any

15   kind of compulsive inappropriate way would be very

16   greatly deminished.

17             His former MO was to cultivate

18   relationships and friendships through his work and

19   gain confidence both of the kids as well as their

20   parents.  The Court believes this position or his

21   MO is no longer viable; that he does not have the

22   ability to do so, does not the have the

23   wherewithal to do so.

24             The Court finds that respondent no

25   longer has not only the ability or the resources

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 184 of 190

1    to do so but the Court finds that a major

2    deterrent is in place in this case and that is the

3    realization of substantial and great punishment.

4    I think taking that into consideration along with

5    the other testimony is a very important

6    consideration.

7              The Court is not impressed at all with

8    the relapse prevention plan contained in

9    Respondent's Exhibit 5, but I am impressed with

10   some other things that I think are very good

11   relapse prevention plans.  Number one is I'm

12   impressed with the relapse prevention plan of the

13   respondent's sister.  I think she is going to keep

14   a watchful eye upon him.  Respondent is going to

15   have a supportive living arrangement upon which he

16   can rely.  I think his sister has made it very

17   clear that she is going to keep a close eye on

18   him.  I think she has also made it very clear that

19   she realizes what her responsibilities are and

20   that her responsibilities even go further than

21   just as a loving relative but go to her own

22   profession and her own sense of right and wrong.

23   The Court believes that she does have the

24   financial ability to do that which she has

25   indicated that she would do.

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 185 of 190

```
 1                    The Court also believes a very good
 2          relapse prevention plan is the 6500 sets of eyes
 3          in the town.  Dr. Phenix I think hit the nail on
 4          the head from what I understand her testimony was
 5          and that was it is very difficult especially for
 6          what she characterizes as Class 4 -- which I'm not
 7          familiar with either way -- to exist in a
 8          community where the community knows of this and
 9          she even gave us some examples.  I think that is
10          part of the plan in this particular matter.  6500
11          eyes in a town as described to me I think is a
12          very important consideration.
13                    I think part of that plan also is the
14          three-year supervised release that the respondent
15          will be subjected to should he be released.
16                    The Court has had an opportunity to
17          review the conditions.  They are part of an
18          exhibit in this particular matter Bates stamped
19          000006.  The conditions are not only the standard
20          conditions of supervised release as we all know
21          them, but also some very specific conditions
22          including to abide by all the laws, that he shall
23          not have a computer, that he will not have contact
24          with minors.  I know that those are all
25          theoretically good and I think it's part of this
```

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 186 of 190

1  whole prevention program.

2          I think the other part of it is his
3  medical condition as Dr. Corvin testified to and I
4  think as has been testified to here on several
5  occasions.  I think another one is his failing
6  health.  All of these the Court believes are all
7  part of the plan that should be implemented.

8          Taking all of these into consideration
9  and taking all of the testimony that the Court has
10 heard and the law as I have just indicated the
11 Court finds that the government has failed to
12 establish by clear and convincing evidence -- when
13 I say clear and convincing evidence I have used
14 several standards in trying to formulate this.
15 The case law talked about firm belief using that
16 as a standard.  The courts have spoken about
17 highly probable.  I've used that as a standard.
18 Of course the more traditional definition is more
19 than preponderance but less than beyond a
20 reasonable doubt.

21         Taking all of those things and looking
22 at it and taking the testimony and the evidence
23 and determining credibility, determining the kinds
24 of things that are necessary by clear and
25 convincing evidence the Court finds that the

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 187 of 190

**United States of America v. Graydon Earl Comstock, Jr.**          **5:06-HC-02195-BR**
**Bench Trial - Vol. II**                                           **November 29, 2011**

Page 451

1    government has not established by clear and

2    convincing evidence that respondent would have

3    serious difficulty in refraining from sexually

4    violent conduct or child molestation if released

5    and so for those reasons the Court will enter an

6    order that the defendant be released from custody

7    on this case.  I'm not sure what's happening on

8    his other case or anything of that nature.

9              Starting with the petitioner is there

10   anything that you think that I have not included

11   that should be included?

12             MR. ROYSTER:  No, Your Honor.

13             THE COURT:  Defense?

14             MS. GRAVES:  No, Your Honor.

15             THE COURT:  I want to thank both sides.

16   I have not had an opportunity to appear before

17   this bar before.  I think both of you have done a

18   phenomenal job for your clients.

19             The preparation of this case was some

20   of the finest preparation that I have seen.  I

21   told Judge Gates the same thing.  I said I have

22   been traveling for 23 years to courts outside of

23   ours.  This year we've probably been in three or

24   four different courts including our own.  The

25   quality of preparation and the quality of

**Reported By: Joseph C. Spontarelli, CCR**          **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 188 of 190

1    documents that have been filed are outstanding

2    under any standard around the country that I have

3    seen.  That includes the preparation of witnesses,

4    the reports that have been submitted by experts.

5              It's an all around pleasure to come in

6    and to be able to just have the luxury of trying a

7    case that is so prepared and we had an opportunity

8    to see such great pleadings.  With that said we'll

9    stand in recess.  Thank you very much.

10

11             (Court adjourned for the day at 7:15

12   p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

**Reported By: Joseph C. Spontarelli, CCR**        **www.huseby.com**
**HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082**
Case 5:06-hc-02195-BR-JG   Document 147   Filed 12/21/11   Page 189 of 190

1
2
3
4                    REPORTER'S CERTIFICATE
5
6          I, Joseph C. Spontarelli, court reporter,
7    do hereby certify that the pages contained herein
8    accurately reflect the notes taken by me, to the
9    best of my ability, in the above-styled action.
10
11
12
13          _____
                Joseph C. Spontarelli,
14              Court Reporter
15
16
17
18
19
20
21
22
23
24
25

Reported By: Joseph C. Spontarelli, CCR          www.huseby.com
HUSEBY, INC. - 1230 W. Morehead Street, #408, Charlotte, North Carolina 28208 (800) 333-2082
Case 5:06-hc-02195-BR-JG  Document 147  Filed 12/21/11  Page 190 of 190